2021-2304

IN THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

SECRETARY OF DEFENSE,

Appellant,

v.

RAYTHEON COMPANY, RAYTHEON MISSILE SYSTEMS,

Appellees.

Appeal from the Armed Services Board of Contract Appeals
in Nos. 59435, 59436, 59437, 59438, 60056, 60057, 60058, 60059, 60060, and 60061, Administrative Judge Cheryl L. Scott, Administrative Judge Richard Shackleford, and Administrative Judge David D'Alessandris

**BRIEF OF APPELLANT, THE SECRETARY OF DEFENSE**

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

DANIEL B. VOLK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 353-7955

Attorneys for Appellant

OF COUNSEL:

ALEXANDER M. HEALY
Senior Trial Attorney
Contract Disputes Resolution Center
Defense Contract Management Agency
Hanscom Air Force Base, MA 01731

January 25, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... v

ABBREVIATIONS IN THIS BRIEF .......... vii

STATEMENT OF RELATED CASES .......... viii

JURISDICTIONAL STATEMENT .......... 1

STATEMENT OF THE ISSUES .......... 1

STATEMENT OF THE CASE .......... 3

I. Nature Of The Case .......... 3

II. Unallowable Costs In Government Contracting .......... 5

III. Raytheon's Lobbying Costs .......... 8

A. Raytheon's Government Relations Department .......... 8

B. Lobbying Outside Of Regular Business Hours Is A Regular And Expected Part Of The Lobbyists' Job .......... 9

C. Raytheon's Policies And Procedures For Its Lobbying Cost Withdrawal Calculation .......... 11

1. Default To Allowable .......... 11

2. Keep No Records Of Allowable Activities .......... 13

3. Instruct The Lobbyists Not To Report Lobbying Activities Outside Of Regular Business Hours .......... 14

4. Unaccounted-For Time = Allowable Time .......... 15

D. Examples Of Raytheon's Policies In Practice .......... 16

E. Board Proceedings .......... 17

IV. Raytheon's Acquisition And Divestiture Costs .................................19

A. Raytheon's Corporate Development Department.....................19

B. Raytheon's Corporate Policies Regarding Allowability Of A&D ............................................................21

C. Examples Of Raytheon's A&D Policies In Practice ................26

D. Resulting Charges To The Government Held Allowable By The Board ........................................................28

SUMMARY OF ARGUMENT ............................................................................29

ARGUMENT .......................................................................................................31

I. Standard Of Review .........................................................................31

II. None Of Raytheon's Lobbying Salary Costs Were Allowable .........31

A. Applicable Law ..........................................................................32

1. Salary Costs For Lobbying Are Expressly Unallowable ..............................................................32

2. Directly Associated Costs Are Also Unallowable .........35

3. Costs Are Never Allowable Without Adequate Records—Especially In The Lobbying Context ............36

B. The Records Raytheon Chose To Keep Do Not Establish The Allowability Of Any Of Its Lobbying Salary Costs.................................................................................38

C. By Design, Raytheon Disregarded Many Lobbying Hours In Its Lobbying Withdrawal Calculation ......................39

1. Raytheon's Lobbyists Did Not Work For Free ..............41

2. The Board Misinterpreted FAR 31.201-6(e)(2) ............44

3. There Is No Justification For Raytheon's Failure To Account For All Of The Lobbyists' Hours Of Work ............45

D. The Government Met Its Burden ............46

III. None Of Raytheon's A&D Salary Costs Were Allowable ............47

A. Applicable Law ............47

B. Raytheon's Bright-Line Rules Fail To Comply With The Bright Line Rule That Is Already In The FAR............48

C. Raytheon Charged Unallowable A&D Costs To The Government ............50

D. The Board Erred In Failing To Uphold DCMA's Disallowance ............52

CONCLUSION ............55

ADDENDA

Addendum A ASBCA Opinion, Feb. 1, 2021

Addendum B ASBCA Opinion Denying Reconsideration, May 11, 2021

Addendum C FAR 31.205-22, Lobbying and political activity costs

Addendum D FAR 31.205-27, Organization costs

# TABLE OF AUTHORITIES

## CASES

*Boeing N. Am., Inc. v. Roche*,
298 F.3d 1274 (Fed. Cir. 2002) ........................................................................6

*Crowley v. United States*,
398 F.3d 1329 (Fed. Cir. 2005) ......................................................................31

*General Dynamics Corp.*,
02-2 B.C.A. ¶ 31,888 (June 10, 2002)...............................................................7

*Geren v. Tecom, Inc.*,
566 F.3d 1037 (Fed. Cir. 2009) ........................................................................6

*Parsons Glob. Servs., Inc. ex rel. Odell Int'l, Inc. v. McHugh*,
677 F.3d 1166 (Fed. Cir. 2012) ......................................................................31

*Raytheon Co. v. Sec'y of, Def.*, 940 F.3d 1310 (Fed. Cir. 2019) ......................................................... passim

*Sharp Elecs. Corp. v. McHugh*,
707 F.3d 1367 (Fed. Cir. 2013) ......................................................................31

## STATUTES AND REGULATIONS

2 U.S.C. § 1601 .................................................................................................8

10 U.S.C. § 2324 ...................................................................................... 4, 7, 32

28 U.S.C. § 1295(a)(10)......................................................................................1

31 U.S.C. § 1352(a)(1)......................................................................................32

41 U.S.C. § 4303 ........................................................................................ 7, 32

41 U.S.C. §§ 7101-7109 ..................................................................... 1, 4, 31

48 C.F.R. § 9904.401 .......................................................................................43

48 C.F.R. § 9904.405 .......... passim

FAR 2.101 .......... 3

FAR 16.101 .......... 3

FAR 31.001 .......... 6

FAR 31.110 .......... 4

FAR 31.201-1 .......... 5

FAR 31.201-2 .......... passim

FAR 31.201-5 .......... 54

FAR 31.201-6 .......... 7, 35, 44, 45

FAR 31.203 .......... 3

FAR 31.205 .......... 4, 6, 7

FAR 31.205-12 .......... 21, 49

FAR 31.205-22 .......... passim

FAR 31.205-27 .......... passim

FAR 31.205-51 .......... 6

FAR 42.709-4 .......... 7

FAR 52.242-3 .......... 7

## ABBREVIATIONS IN THIS BRIEF

| | |
|---|---|
| A&D | Acquisition and Divestiture |
| ASBCA | Armed Services Board of Contract Appeals |
| CAS | Cost Accounting Standards |
| DCAA | Defense Contract Audit Agency |
| DCMA | Defense Contract Management Agency |
| FAR | Federal Acquisition Regulation |
| NBIO | Non-Binding Indicative Offer |
| Raytheon | Raytheon Company and Raytheon Missile Systems |

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, appellant's counsel states that he is not aware of any other appeal in or from this action that previously was before this Court or any other appellate court under the same or similar title. Appellant's counsel is unaware of any case pending in this Court that may directly affect or be affected by this Court's decision in this appeal.

In 2019, this Court decided a dispute between the same parties involving similar subject matter. *Raytheon Co. v. Sec'y of Def.*, 940 F.3d 1310 (Fed. Cir. 2019). That case was an appeal from a different Armed Services Board of Contract Appeals (ASBCA or board) case, involving an incurred cost submission from a different year.

Although we are not aware of any cases pending in this Court that will be affected by the Court's decision, the Court's decision in this appeal will likely control the outcome of nearly-identical issues in several other appeals by Raytheon Company that are now pending before, and have been stayed by, the ASBCA (ASBCA Nos. 60694, 60695, 60697, 60698, 61444, 61445, 61446, 61587, 61588, 61912, 61913, 62261, 62262, 62788, 62789, 62790, and 62791).

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1295(a)(10). The ASBCA had jurisdiction under 41 U.S.C. § 7105(e)(1)(A).

Raytheon Company and its business segment, Raytheon Missile Systems, (collectively Raytheon) timely appealed to the ASBCA from contracting officer's final decisions issued by the Defense Contract Management Agency (DCMA), an agency of the Department of Defense.[1] *See* Appx3-5, Appx1350, Appx2365. On May 12, 2021, DCMA received the board's May 11, 2021 final decision, denying reconsideration. Appx116-118 (Addendum B). We timely filed our notice of appeal with this Court on September 7, 2021, within the 120 days allowed by 41 U.S.C. § 7107(a)(1)(B).

## STATEMENT OF THE ISSUES

**1. Lobbying Costs.** Absent narrow exceptions, Federal contractors are not allowed to charge the Government for lobbying activities. Federal Acquisition Regulation (FAR) 31.205-22 (reproduced at Addendum C).[2] Raytheon includes a portion of its in-house lobbyists' salaries in the indirect rates it charges to the Government, claiming that the lobbyists do not work exclusively on lobbying

[1] In 2020, Raytheon Company merged with, and became a wholly-owned subsidiary of, United Technologies Corporation, which changed its name to Raytheon Technologies Corporation. *See* Appx1 n.1.

[2] The FAR is codified at Title 48 of the Code of Federal Regulations.

activities. Raytheon does not keep records to show that the lobbyists actually worked on activities other than lobbying. Rather, it instructs the lobbyists simply to report how many hours they spent lobbying. Any hours not affirmatively accounted for as lobbying are treated as allowable. Moreover, Raytheon instructs the lobbyists not to report any hours worked before 8:00 A.M., after 5:00 P.M., or on weekends or holidays. Even though the lobbyists admit that attendance at night and weekend lobbying events is a regular and expected part of their job duties, Raytheon maintains that there is no cost for that work because the lobbyists' salaries compensate them only for work done during regular business hours. Are these policies compliant with the FAR? Are the lobbying department costs that Raytheon charged to the Government under these policies allowable?

**2. Acquisition and Divestiture Costs.** The FAR also prohibits contractors from charging the Government for expenditures made in connection with corporate reorganizations, such as mergers and acquisitions. FAR 31.205-27 (reproduced at Addendum D). Although FAR 31.205-27 makes no allowance for early-stage acquisition and divestiture (A&D) expenditures, Raytheon adopted a corporate policy whereby it *stops* charging the Government for acquisition work only after making a "non-binding indicative offer" (NBIO or indicative offer) to an acquisition target. For divestitures, Raytheon's policy is to stop charging the Government only after it has made the decision to "go to market" with its offering

materials. Are these policies compliant with the FAR? Are the costs Raytheon charged to the Government under these policies allowable?

## STATEMENT OF THE CASE

### I. Nature Of The Case

This appeal is about whether Raytheon's corporate policies regarding lobbying and A&D costs comply with the FAR.

After the end of each year, Raytheon submits to the Government a final indirect cost proposal. *See* Appx2. These proposals, sometimes called incurred cost submissions, report the indirect costs Raytheon incurred over the course of the year.[3] They are used to establish the indirect rates Raytheon charges to the Government, particularly under its cost-reimbursable Government contracts.[4]

[3] A direct cost is "any cost that is identified specifically with a particular final cost objective." FAR 2.101. For example, "[c]osts identified specifically with a contract are direct costs of that contract." *Id.* An indirect cost is "any cost not directly identified with a single final cost objective, but identified with two or more final cost objectives or with at least one intermediate cost objective." *Id.*; FAR 31.203(b). For example, general and administrative, or G&A, expenses necessary to operate a company, but not associated with any individual contract, are indirect costs.

[4] The Government awards both fixed-price and cost-reimbursement contracts. *See* FAR 16.101(b). A large majority of Raytheon's revenue comes from Government contracts, many of which are cost-reimbursement contracts. *E.g.*, Appx393. Our references in this brief to Raytheon charging costs to the Government does not mean that Raytheon recovers 100 percent of the costs underlying its indirect rates from the Government. Some of Raytheon's revenue comes from other sources. However, through one type of contract or another, Raytheon recovers the majority of these costs from the Government.

Not all of the costs that contractors choose to incur may be passed on to the Government; some costs are unallowable by law. *E.g.*, 10 U.S.C. § 2324(e); *see* FAR 31.205. Raytheon must certify that its incurred cost submissions do not contain any unallowable costs. *See* 10 U.S.C. § 2324(h); FAR 31.110. This case concerns Raytheon's 2007 and 2008 incurred cost submissions.[5]

In 2007 and 2008, Raytheon charged the Government for approximately half of the salary costs of the Raytheon departments responsible for lobbying and for mergers, acquisitions, and divestitures.[6] *See* Appx22, Appx44. Following audits by the Defense Contract Audit Agency (DCAA), DCMA determined that Raytheon's 2007 and 2008 submissions included expressly unallowable lobbying and A&D costs, along with other types of unallowable or expressly unallowable costs. DCMA issued contracting officer's final decisions demanding reimbursement for the unallowable costs and, for expressly unallowable costs, payment of penalties. *See* Appx3-5. Raytheon appealed to the ASBCA under the Contract Disputes Act of 1978, codified as amended at 41 U.S.C. § 7101-7109.

[5] Although this case is limited to Raytheon's 2007 and 2008 incurred cost submissions, Raytheon continues to rely upon the same corporate policies that we challenge in this appeal.

[6] In this brief, "salary" refers to both salary and fringe benefits. The Government also disputes, on the same basis as the salary costs, the bonus and incentive compensation costs paid to employees in Raytheon's lobbying and A&D departments.

The board held a hearing in May of 2017. Appx19673. On February 1, 2021, it issued an opinion in Raytheon's favor. Appx1-115 (*Raytheon Co.*, ASBCA No. 59435, 21-1 B.C.A. ¶ 37,796 (Feb. 1, 2021). With minor exceptions not relevant to this appeal, the board concluded that all of Raytheon's claimed costs were allowable and appropriately charged to the Government. *Id.* The board found that the corporate policies on which Raytheon had relied in calculating the costs it claimed for its lobbying department and the department responsible for mergers and acquisitions were acceptable. Appx20, Appx36-37, Appx51. DCMA moved for reconsideration, which the board denied. Appx116-118 (*Raytheon Co.*, ASBCA No. 59435, 21 B.C.A. ¶ 37,860, 2021 WL 2254766 (May 11, 2021)).

## II. <u>Unallowable Costs In Government Contracting</u>

Federal contractors may elect to incur a variety of costs in the course of operating their businesses and performing contracts for the Government. However, the mere fact that a contractor incurs a cost does not create any presumption that it may recover the expenditure from the Government, even in cost-reimbursement contracts. *See, e.g.*, FAR 31.201-1(b).

Rather, a cost is allowable—*i.e.*, recoverable from the Government—only if it complies with the requirements enumerated in FAR 31.201-2(a): (1) reasonableness; (2) allocability; (3) standards promulgated by the Cost Accounting Standards (CAS) Board, if applicable, otherwise, generally accepted

accounting principles and practices appropriate to the circumstances; (4) terms of the contract; and (5) any limitations set forth in FAR subpart 31.2. FAR 31.201-2(a); *see Geren v. Tecom, Inc.*, 566 F.3d 1037, 1040 (Fed. Cir. 2009); *Boeing N. Am., Inc. v. Roche*, 298 F.3d 1274, 1280 (Fed. Cir. 2002) ("The concept of cost allowability concerns whether a particular cost can be recovered from the government in whole or in part.").

The subsections of FAR 31.205-1 through -52 address, "in detail, the allowability of particular selected costs." *Boeing N. America, Inc.*, 298 F.3d at 1285. Some of the cost principles in FAR 31.205 make certain costs expressly unallowable, declaring that costs of that type or category will never be allowable, even if the cost otherwise meets the general allowability criteria of FAR 31.201-2(a). *E.g.*, FAR 31.205-51 (costs of alcoholic beverages). As relevant to this appeal, FAR 31.205-22, "Lobbying and political activity costs," makes lobbying costs expressly unallowable, and FAR 31.205-27, "Organization costs," makes merger and acquisition costs expressly unallowable.

An expressly unallowable cost is "a particular item or type of cost which, under the express provisions of an applicable law, regulation, or contract, is specifically named and stated to be unallowable." FAR 31.001; *see also Raytheon Co. v. Sec'y of Def.*, 940 F.3d 1310, 1314 (Fed. Cir. 2019) (salaries of in-house lobbyists are expressly unallowable). If a contractor's indirect rate proposal

contains an expressly unallowable cost, in addition to the cost being disallowed and refunded to the Government, a penalty must be assessed, absent a waiver. 10 U.S.C. § 2324(b); 41 U.S.C. § 4303(b); FAR 42.709-4; FAR 52.242-3; *see also General Dynamics Corp.*, 02-2 B.C.A. ¶ 31,888 at 157,569 (June 10, 2002) (discussing Congress's desire to end a "'cat-and-mouse game' . . . in which the cost of an item is submitted regardless of whether it's allowable, and the burden is placed on the Government auditors to identify and disallow the item"), *rev'd in part*, *Rumsfeld v. Gen. Dynamics Corp.*, 365 F.3d 1380 (Fed. Cir. 2004).

Finally, in addition to costs that are (1) *expressly unallowable*, such as under a subsection of FAR 31.205, or simply (2) *unallowable*, on the basis of some other aspect of the five general allowability limitations enumerated in FAR 31.201-2(a), a cost may be unallowable on the basis that it is (3) *directly associated* with some other unallowable or expressly unallowable cost. FAR 31.201-6(a). "A directly associated cost is any cost that is generated solely as a result of incurring another cost, and that would not have been incurred had the other cost not been incurred." *Id.* "When an unallowable cost is incurred, its directly associated costs are also unallowable." *Id.*

## III. Raytheon's Lobbying Costs

### A. Raytheon's Government Relations Department

Within its headquarters, Raytheon maintains an office of Government Relations. Appx14.[7] The role of the office is to attempt to influence legislation—*i.e.*, to lobby—on Raytheon's behalf. *See, e.g.*, Appx3494; *see also* Appx22887 (Raytheon lobbyist testifying: "Lobbying is the attempt to influence legislation through communications with Congress, members of Congress, the staffs.").

In 2007 and 2008, Raytheon employed about 20 to 22 in-house lobbyists and support staff in its Government Relations office. Appx14. That total included about a dozen Federal lobbyists registered under the Lobbying Disclosure Act of 1995, 2 U.S.C. § 1601 *et seq.*; two lobbyists responsible for state and local government relations, as well as managing and raising funds for Raytheon's state political action committees (PACs); two employees dedicated to Raytheon's Federal PAC, known as RAYPAC; and support staff. Appx14, Appx3756-3758, Appx21169.

Thus, Government Relations is Raytheon's lobbying department. Appx19884-19885, Appx21880. In 2007 and 2008, the department had a list of 10 shared "organizational goals." Appx3494. None of those goals suggests that the

---

[7] Raytheon's Government Relations office has been known by various other names. Appx14. In Raytheon's accounting records, it is identifiable as cost center number 90206. *Id.*

office was tasked with undertaking any allowable activity—or any activity at all other than lobbying and lobbying-related tasks. *See id.*[8] The lobbyists' position descriptions indicate that they were hired to perform lobbying. Appx3262-3264 (Federal lobbyist), Appx3569-3570 (state lobbyist); *see also* Appx3580-3582 (PAC Administrator). The "Goals & Accomplishments" documents that the lobbyists prepared in connection with their annual performance reviews confirm that they were doing the job they were hired to do. Appx3494-3566, Appx3781-3862.

### B. Lobbying Outside Of Regular Business Hours Is A Regular And Expected Part Of The Lobbyists' Job

As the board found, "Raytheon's lobbyists worked early mornings, late nights, and weekends from time to time on what all of the testifying witnesses considered to be a regular part of their work duties." Appx36; *see* Appx23 ("She considered the functions she attended outside her normal work hours to be part of her regular work duties."); Appx24 ("He considered the functions he attended

[8] The list of goals is: "Develop a world-class legislative strategy to support company growth"; "Achieve 95% of the President's budget request for RTN [Raytheon] programs in Congressional appropriations"; "Obtain funding for 35% of the business plus up requests"; "Increase key leader visits with Congressional customers by 50%"; "Obtain two-way feedback from top government (Congressional) customers"; "Tailor company legislative priorities with contact plans"; "Assign a senior lobbyist for each business"; "Meet office budget objectives"; "Maintain the highest standards of ethics and obey all laws and regulations"; "Grow the Raytheon Political Action Committee resource base." Appx3494.

before 8 AM and after 5 PM to be part of his regular work duties."); Appx25 ("This was an expected part of the job in Government Relations and part of his regular work duties."); Appx21206-21211, Appx21857-21858, Appx22898-22900, Appx22936-22946.

After-hours work is ordinarily a core part of working as a lobbyist, given the importance of attending and hosting fundraising events, the majority of which are not held during the regular business day. *See* Appx25 ("The fundraisers were typically outside regular hours and were sometimes on weekends."); Appx3539 (lobbyist accomplishments: "The . . . Team hosted 24 events and attended 654 fundraisers."); Appx3788 (lobbyist goal: "Attend no fewer than 100 fundraisers, and 3 major conferences."); Appx3790 (goal: "Host fundraisers for key Members."); Appx3811 (goal: "Host/co-host at least two fundraisers for Members of Congress by personally coordinating or supporting the coordination of each event. Fundraiser invitations will list Raytheon or my name as the host/co-host."); Appx3812 (accomplishment: "Attended out-of-town fundraisers to show Raytheon support on local/state turf.").

At the board hearing in this case, one of Raytheon's former senior lobbyists explained that if Raytheon was going to make a political contribution from one of its PACs, there needed to be "a Raytheon face show[ing] up at the event:"

> You can put a PAC check in the mail . . . . But . . . as Government Relations managers, our participation in

> PAC events was that if we were supporting a member of Congress, it was useful from a relationship standpoint that they see a Raytheon face show up at the event that you're supporting.
>
> . . . .
>
> Because everybody else is there too. I don't know of any organization, association, or company that would write a PAC check for an event and not show up.

Appx22937; *see* Appx22936-22939.

### C. Raytheon's Policies And Procedures For Its Lobbying Cost Withdrawal Calculation

#### 1. Default To Allowable

Each year, to determine how much of its lobbying department costs to pass on to the Government, Raytheon performs what it calls a "lobbying withdrawal calculation." Appx21. Without a "withdrawal," all of the lobbyists' salaries would be included in the indirect rates Raytheon charges to the Government. In other words, Raytheon's approach to ensuring that it does not charge the Government for unallowable lobbying activities unfolds in two basic steps: First, Raytheon starts by putting all of its lobbying department's costs into a bucket. Then, Raytheon purports to take its lobbying costs out of the bucket. What remains in the bucket gets charged to the Government. In 2007 and 2008, only about half of what went into the bucket came back out. The other half got charged to the Government.

Specifically, in 2007, Raytheon spent over $4.62 million[9] on its Government Relations department. Appx3654. It withdrew 53.3 percent of those costs as unallowable, and included the remaining $2,161,215—$1,870,428 of which was for salaries—in the indirect rates it charged to the Government. *Id.*; Appx22, App883. In 2008, Raytheon spent over $5.11 million[10] on its Government Relations department. Appx3900. It withdrew exactly 50 percent of those costs as unallowable, and included the remaining $2,558,450—at least $981,822 of which was for salaries[11]—in the indirect rates it charged to the Government. *Id.*; Appx22; Appx2343.

At one point, a DCAA auditor asked Raytheon's Charles Vilandre, a Senior Manager in the Raytheon department responsible for calculating Raytheon's disallowance factor, if it would not "make more sense" to approach this calculation in the opposite manner—*i.e.*, set the default for these employees[12] as unallowable,

---

[9] Raytheon's gross costs for its Government Relations cost center were greater. The $4.62 million is what remained after certain costs of that cost center, such as travel costs, were excluded and treated separately as allowable or unallowable under rules other than the lobbying cost principle at FAR 31.205-22. Appx3654.

[10] As discussed in the prior footnote, Raytheon's gross costs were greater.

[11] *See, e.g.*, Appx21046-21047 (due to a miscommunication, DCAA's 2008 audit figures apparently did not capture fringe benefits).

[12] In that message, the auditor was referring both to the lobbyists and the A&D employees discussed next.

and only add costs to the bucket of costs charged to the Government if the lobbyists affirmatively reported having worked on allowable activities. Appx3893 ("if, as it appears, these employees spend over half of their time working on unallowable work[,] wouldn't it make more sense to have their default be to an unallowable order and then have the 'exception' be the allowable charge numbers?"); *see also* Appx3892 (Mr. Vilandre responding, "I'm not clear on what you are expecting in the way of a response from me. . . .").

Raytheon did not change its approach. The default for the lobbyists' time remains allowable, with costs withdrawn as unallowable only to the extent that the lobbyists affirmatively report having engaged in lobbying activities.

### 2. <u>Keep No Records Of Allowable Activities</u>

There are no records of Raytheon's lobbyists having worked on any particular allowable activity for any identified period of time. As the board observed, the lobbyists "do not report the nature of any alleged non-lobbying activities." Appx20. Rather, the purpose of the lobbyists' monthly time reports "is to report time spent on unallowable activities only." *Id.*

"For the most part," "Raytheon's paper time sheets are not detailed." *Id.*[13] "Normally, they identify the hours spent on lobbying for a given day, not the specific activities." *Id.*; *see, e.g.*, Appx3369-3380. In other words, the records on

[13] Raytheon's state lobbyists did not keep paper time sheets at all. Appx22.

which Raytheon relies—to support charging the Government for about half the costs of its lobbyists' salaries—amount to lists of numbers of hours that the lobbyists estimated having spent engaged in the activities for which the Government *cannot* be charged.

### 3. Instruct The Lobbyists Not To Report Lobbying Activities Outside Of Regular Business Hours

As the board found, "[d]uring 2007 and all relevant times, Raytheon instructed its Government Relations personnel to exclude from their monthly time-sheet reports any time spent on unallowable lobbying activities on a weekend, holiday, or before 8 AM or after 5 PM." Appx20. Raytheon put that policy in writing. Appx3221 ("NOTE: Time spent on lobby activity after the scheduled working day is not reported."); Appx17 (board opinion quoting policy).

In preparing its lobbying withdrawal calculation, Raytheon's accounting department would meticulously investigate any suggestion that a lobbyist had reported night or weekend work on his or her paper timesheet, and remove any such hours from its withdrawal calculation. Appx3630-3633, Appx3632 ("Need to confirm that employee worked on both days [Saturday and Sunday]. If so, will not include hours in my report."); *id.* ("Action: Confirm if employee worked on Sunday, if so, will not include hours in my report."); Appx21671-21673.

When Raytheon developed an online lobbying compliance tool, which the lobbyists began using in April 2008 to submit monthly reports of the number of

hours they spent lobbying, Raytheon designed the tool so that the lobbyists could not report hours spent lobbying on weekends, holidays, before 8:00 A.M., or after 5:00 P.M. *See* Appx21.

### 4. <u>Unaccounted-For Time = Allowable Time</u>

Using the unallowable hours reported by the lobbyists, Raytheon calculates a "lobbying disallowance factor," which it applies to what it considers to be the "recoverable"[14] costs of its lobbying department, withdrawing the product of that calculation. *See* Appx21. The board explained the mechanics of the calculation:

> The ratio's numerator was the total number of unallowable hours reported by the lobbyists. The denominator was the total number of work hours available during a given year to the employees who reported unallowable hours, based upon a 40-hour work week less vacation and holidays. Dividing the numerator by the denominator yielded a percentage—the lobbying disallowance factor. Raytheon applied this factor to what it deemed to be Government Relations' recoverable expenses (including the salary and fringe benefits paid to its lobbyists and their administrative staff) to determine the costs associated with unallowable lobbying activities under FAR 31.205-22.

Appx21.

The result of that calculation is withdrawn, and the remainder of Raytheon's lobbying department costs are charged to the Government through Raytheon's indirect rates. Thus, Raytheon treats all lobbyist time not affirmatively accounted

---

[14] The $4.62 million (2007) and $5.11 million (2008) discussed above.

for as being allowable—not on the basis of any record that allowable activities were actually undertaken in that time, but rather on the basis of an *absence* of a report that the lobbyist had engaged in lobbying (or any other activity) during those hours.

### D. Examples Of Raytheon's Policies In Practice

In 2007 and 2008, William "Woody" J. Lee II was a Senior Manager of Government Relations for Raytheon. Appx3498, Appx3788, Appx22884, Appx22923. Mr. Lee was a registered lobbyist. Appx22923. At the board hearing, he explained that registration was "a legal requirement . . . if you spend more than 20 percent of your time dealing with [Federal] 'lobbying.'" Appx22923-22924. When asked if, in 2007 and 2008, it was a "close call" as to whether he met that 20 percent threshold and needed to register, Mr. Lee responded, "No." Appx22924.

Indeed, at least in some respects, 2007 was a "record" year for Mr. Lee. Appx3499. In his annual employee "Goals and Accomplishments" document, Mr. Lee reported that in 2007 he "[a]ttended a personal record total of 119 political fundraisers and 44 local non-fundraising events, resulting in 55 evenings during the year with commitments. In addition, [he] spent a total of 25 nights away from home on travel." Appx3499.

However, Mr. Lee's reports of lobbying hours for purposes of Raytheon's withdrawal calculation tell a different story. For the entirety of 2007, Mr. Lee reported a total of 239 hours of lobbying activities. Appx3650. Dividing by 1832 hours—Raytheon's 2007 total of available working hours based on a 40-hour workweek, less vacation days and other paid time off—Raytheon treated 13 percent of Mr. Lee's salary as unallowable and the remaining 87 percent as an allowable charge to the Government. Appx3650-3654.

In his 2008 accomplishments, Mr. Lee presented the following report: "Attended 103 political fundraisers during the year, the most of anybody on the staff. Also attended 34 non-fundraising official events. These activities consumed 60 evenings, which otherwise would have been free for personal activities. Also, overnight travel consumed an additional 31 nights during the year." Appx3789.

For purposes of Raytheon's lobbying cost withdrawal, however, Mr. Lee reported a total of 442.5 lobbying hours in 2008. Appx3898. Dividing by 1840, Raytheon's total available work hours for 2008, Raytheon treated 24 percent of Mr. Lee's 2008 salary as unallowable and the remaining 76 percent as an allowable charge to the Government. *Id.*

### E. <u>Board Proceedings</u>

At the board hearing, a DCAA auditor was asked to explain DCAA's "main areas of concern." Appx21038. He responded:

> Well, I guess the main concern was . . . with the unallowable withdrawal percentage, which I think was 53.3 percent in 2007. You know based on the interviews that we performed and the evidence that we reviewed, we believe that that was drastically too low. And as our conclusions stated, we believed that all of the effort and costs in that department were related to lobbying or lobbying-related effort.
>
> Additionally, at various times during this audit, there were requests made to Raytheon to provide documentation that would support allowable activities performed, perhaps those that would perhaps, for example, those that would show some of the exceptions in FAR 31.205-22 that would make certain efforts, congressionally-facing efforts allowable, in addition to anything else that the contractor had to provide. And we did not receive any evidence pointing to this allowable activity.

Appx21038.[15]

Ultimately, the board did not share those concerns. Appx37-38. DCMA explained why Raytheon's policies did not comply with the FAR. *E.g.*, Appx23398. It explained why Raytheon's records were inadequate. *E.g.*, Appx23443, Appx23453-23454. Even in the implementation of those unreasonable policies, DCMA catalogued a litany of errors. *E.g.*, Appx23419-23423.

The board was unconvinced. Appx34-38. It found no deficiency with Raytheon's corporate policies, practices, or calculations. *Id.* The board ruled that

[15] The allowable exceptions are at FAR 31.205-22(b).

the Government had not proven that any of the lobbying costs Raytheon had charged to the Government—not one penny—was unallowable, let alone expressly unallowable and subject to penalty. Appx38. Accordingly, the board overturned DCMA's administrative decision and sustained Raytheon's appeal as to the allowability of its lobbying costs in full. *Id.*

## IV. <u>Raytheon's Acquisition And Divestiture Costs</u>

### A. <u>Raytheon's Corporate Development Department</u>

Within its corporate headquarters, Raytheon also maintains a department known as Corporate Development.[16] The role of Corporate Development is to work on mergers, acquisitions, and divestitures.[17] *E.g.*, Appx21935 ("Everything that we do is focusing around acquisition and acquisitions and divestitures . . . ."); *see also* Appx21939-21940 ("all . . . activities have an eye towards the A&D end").

In 2007 and 2008, Raytheon's Corporate Development office "had seven or eight employees, six of whom were focused upon strategic business transactions and acquisition and divestiture (A&D) or merger activities, and one or two of

---

[16] Raytheon uses cost center 90043 to track the costs of this department, which has also been known by names other than Corporate Development. *See* Appx40.

[17] In some documents, "MA&D" is used to refer to mergers, acquisitions, and divestitures. Mergers were not a significant part of Corporate Development's work in 2007 and 2008, so the costs at issue in this case have often simply been described as A&D costs. *See, e.g.*, Appx40.

whom were administrative assistants." Appx40; *see also* Appx4834-4836 (position descriptions).

Dr. Charles Mueller, who in 2007 and 2008 was the most senior of the individuals that Corporate Development employed in the position of Director,[18] Appx20513-20515, explained:

> I mean, corporate development is, you know, they do A&D work. And the A&D work is, it's a full spectrum of the A&D activities. Which are the very beginning of evaluating opportunities that are prospects for changing a position in a market or a technology to the conclusion of a final balance sheet. Which is the step that ends the interactions between buyer and seller typically.

Appx20522-20523.

Raytheon's corporate policies require that "[a]ll activities concerning mergers and acquisitions by any Business, including opportunities presented by a third party, must be coordinated with Corporate Development." Appx4807; *see also id.* ("all communication by a Business with an acquisition candidate concerning its interest in a transaction must be coordinated with Corporate Development. Communications with third parties, such as investment bankers, venture capitalists or other financing sources, related to an acquisition opportunity or transaction must also be coordinated in advance with Corporate Development.").

---

[18] In 2007 and 2008, Dr. Mueller held the position Director III. Appx4851, Appx4872.

"Corporate Development made proposals for acquisitions or divestitures to [Raytheon's] Acquisition Council which, in 2007 and 2008, consisted of senior Raytheon leaders, including the Chief Executive Officer, Chief Financial Officer, General Counsel, and Vice President of Corporate Development." Appx41.

### B. Raytheon's Corporate Policies Regarding Allowability Of A&D

In its corporate policies, Raytheon recognizes that organizational costs associated with mergers and acquisitions are unallowable. *See* Appx42-43. However, Raytheon maintains that its Corporate Development employees perform not only A&D work, the costs of which are unallowable under FAR 31.205-27, but also work for which Raytheon may charge its costs to the Government, such as economic planning covered by FAR 31.205-12. *But see* FAR 31.205-12 ("Economic planning costs do not include organization or reorganization costs covered by 31.205-27.").

Like its treatment of lobbying costs, the starting point for Raytheon's A&D cost withdrawal is that all of the costs of its Corporate Development office are included, and then Raytheon removes a portion of those costs through its A&D withdrawal calculation. *See* Appx43-44. In its A&D withdrawal calculation, Raytheon multiplies the number of hours reported by its Corporate Development employees as having crossed Raytheon's bright-line thresholds by each employee's labor rate, and withdraws the product of that calculation from the Corporate

Development cost center's costs. *See* Appx4922-4933, Appx5022, Appx5242.[19]

Dr. Mueller explained the process that Raytheon used to keep track of the unallowable hours: "once a [year[20]], [our executive administrative assistant] would ask members of the corporate development department to provide the days spent on projects, after bright line moments." Appx20529; *see also* Appx20530 ("Well, . . . I used my recollections, my memory, to identify days that I spent on these projects.").

The "bright line moments" to which Dr. Mueller referred are based on a written policy Raytheon adopted. Under that policy, Raytheon instructs its Corporate Development employees *not* to report all of their hours of work related to an acquisition or a divestiture for purposes of Raytheon's withdrawal calculation. Specifically, Raytheon's policy provides, in part:

[19] Unlike its lobbying withdrawal, Raytheon does not create a disallowance factor to be applied against the entire Corporate Development cost center. *See* Appx21736-21737; *see also* Appx4915, Appx5022 (withdrawal calculations).

[20] In the testimony, Dr. Mueller described this procedure as quarterly rather than annually. However, as of 2008, it was still being done only annually. Appx4941-4942. As the board explained, at some point in time, Corporate Development switched from reporting once a year to once a quarter. Appx43. One way that we know that the transition to quarterly reporting had not yet occurred in 2008 is that all of the employees who left Corporate Development before the end of the year did not submit any reports of time to be withdrawn at all. *See, e.g.*, Appx23475 (¶¶ 226-227). Because, unlike its lobbying withdrawal procedure, Raytheon did not apply a disallowance factor to all of its Corporate Development costs, instead removing hours on an individual basis only, all of the salaries of employees who left during the course of a year were charged to the Government in full. *See id.*

> Unallowable acquisition costs commence with the submission of an indicative offer. Unallowable divestiture costs commence when the decision to "go to market" with the offering materials is made.

Appx41 (quoting Appx3107).

Raytheon uses these thresholds, which it calls its bright-line rules, to decide when to stop charging A&D costs to the Government. As the board explained, "At the point, on the acquisition side, when Raytheon submitted a non-binding indicative offer (NBIO), or on the divestiture side, when it made the decision to go to market, the company switched from recording costs as allowable to recording them as unallowable." Appx43.

Of course, Raytheon does not take any affirmative step to "record[] costs as allowable." *Id.* Rather, what the board meant by "the company switched . . . to recording [costs] as unallowable," *id.*, is that when the administrative assistant queried the Corporate Development office as to how much time they recalled spending on unallowable work during the prior year, the numbers they responded with were only for time spent after Raytheon's bright-line thresholds had been crossed. *See* Appx20529.

There is no question that the Corporate Development office did a great deal of A&D work before crossing Raytheon's bright-line thresholds. For instance, Raytheon's Dr. Mueller was asked, "do you believe you performed any acquisition planning before you submitted NBIO?" Appx20547. His response: "Yes, I do."

*Id.* Another former Director in the Corporate Development office, Thomas O'Rourke,[21] Appx20883-20884, testified:

> Q. [W]ould it be fair to say that a lot of research and analysis is performed by Corporate Development before an indicative offer is submitted?
>
> A. It is fair to say that there is a lot of work up front before an NBIO is submitted, yes.

Appx20918; *see also* Appx20918-20919 (part of "Corporate Development's job is to . . . do research and analyze particular candidates to make sure they're appropriate for NBIO").

On the divestiture side, Mr. O'Rourke similarly agreed that a "tremendous" amount of the work involved in a divestiture is done "up front." Appx20925-20926. He testified:

> Q. And you would agree that . . . there's a lot that goes into the planning of divestitures before there is a decision made to move forward on a divestiture candidate?
>
> A. I believe that there's a lot of work that goes into getting ready for a potential divestiture, yes. And that includes a lot of analysis around everything I just went through.
>
> . . . .
>
> A. The planning is all of the analysis that goes into a divestiture.

[21] In 2007 and 2008, Mr. O'Rourke held the position Director I. Appx4853, Appx4876.

Q. And you would agree that there's a tremendous amount up front – a lot of work up front with divestitures before the decision is made to move forward.

A. There's a tremendous amount of work, yes.

Appx20925-20926.

A Raytheon slide presentation titled "Participants Guide to Acquisitions, Divestitures, and Equity Transactions: Volume 1 – Divestitures," Appx4580, corroborates Mr. O'Rourke's testimony. As illustrated in Raytheon's "Overview Of The Divestitures Process" slide, reproduced below, much of Raytheon's divestiture work is indeed done long before any "go to market" decision is made:



Appx4593.

### C. Examples Of Raytheon's A&D Policies In Practice

During the board hearing, the Government provided examples of how Raytheon's bright-line rules resulted in it charging the Government for unallowable A&D costs. For example, the Government introduced a document prepared by the second-most senior Director in Raytheon's Corporate Development department at the time, Paul Bailey,[22] listing his 2007 employee "Goals & Accomplishments." Appx4847-4850.

In that document, Mr. Bailey reported that his 2007 accomplishments included efforts he made to have Raytheon acquire three companies, which Raytheon code-named "Ball," "Swales," and "Argon." Appx4849 ("Worked with SAS to approach two businesses: Ball and Swales. . . . Worked with NCS to present Argon to Acquisition Council."). Raytheon never made an indicative offer to any of those three companies. *Id.* ("Ball not interested in being acquired. Swales acquired by ATK. . . . Argon not interested in being acquired."). Because Raytheon never made an indicative offer to any of these acquisition targets, Mr. Bailey's work on those projects never crossed Raytheon's bright-line thresholds. Thus, as Mr. Bailey confirmed at the board hearing, all of the time he

[22] In 2007 and 2008, Mr. Bailey held the position of Director II, Appx4847, Appx4866, making him the second-most senior Director, after Dr. Mueller.

spent pursuing those acquisition targets was included in Raytheon's charges to the Government. Appx22349.

Moreover, "Ball," "Swales," and "Argon" were just three of the 23 acquisition "opportunities" that Mr. Bailey reported as having been presented to Raytheon's Acquisition Council in 2007. According to Mr. Bailey's report of his accomplishments, "[i]n 2007, 23 opportunities . . . were brought forward to [Raytheon's] Acquisition Council," which "[r]esulted in 8 NBIO's submitted, 3 final offers and 2 acquisitions." Appx4849.

In other words, for 15 of the 23 acquisition candidates that Mr. Bailey presented to Raytheon's Acquisition Council, Raytheon never made any indicative offer. Mr. Bailey's work on those 15 acquisition targets therefore never crossed Raytheon's bright-line thresholds, so all of his time pursuing those 15 acquisition targets was charged to the Government. Appx22350 ("Q. . . . So obviously the only time after those eight NBIOs, that's the only time recorded that's unallowable? A. Yes. We worked on many candidates . . . . So it would, the only time that we would have submitted for, the only time we submitted [to be withdrawn from Raytheon's incurred cost submissions to the Government] was after NBIO.").

Even for the eight acquisition candidates that Raytheon's Acquisition Council decided to tender an indicative offer, Mr. Bailey did not report any

unallowable time relating to six of those eight acquisitions or potential acquisitions. Appx22351-22352. Thus, for 21 of the 23 acquisition candidates described as having been presented to Raytheon's Acquisition Council in 2007 according to Mr. Bailey's own list of accomplishments, Raytheon did not withdraw any of Mr. Bailey's time as unallowable merger and acquisition work under FAR 31.205-27.

### D. Resulting Charges To The Government Held Allowable By The Board

In 2007 and 2008, Raytheon charged about half of the salaries of its A&D professionals to the Government. Specifically, in 2007, Raytheon spent about $2.86 million in gross expenses for its Corporate Development department. Appx5171. It withdrew 53.4 percent of those costs as unallowable, and included the remaining $1,333,804—of which $903,817 was for salaries—in the indirect rates it charged the Government. *Id.*; Appx44; Appx895. In 2008, Raytheon spent about $2.37 million in gross expenses for its Corporate Development department. Appx5171. It withdrew 48.8 percent of those costs—less than half—as unallowable, and included the remaining $1,213,586—of which $831,797 was for salaries—in the indirect rates it charged the Government. *Id.*; Appx44, Appx2032.

Following audits of Raytheon's incurred cost submissions, DCAA concluded that all of the salary costs Raytheon included in those submissions from its Corporate Development cost center were expressly unallowable under FAR

31.205-27, as well as non-compliant with CAS 405. 48 C.F.R. § 9904.405-40(a). Appx893-898, Appx1035, Appx2031-2037, Appx2170; *see* Appx45, Appx48. Concurring with DCAA, DCMA issued contracting officer's final decisions disallowing Raytheon's Corporate Development costs and assessing penalties. Appx1275-1287, Appx1288-1301.

Raytheon appealed to the board. The board agreed with Raytheon, endorsing Raytheon's bright-line rules as a "reasonable reading" of the FAR. Appx51 ("In sum, Raytheon's 'bright-line' policy represents a reasonable reading of the FAR provisions . . . ."). DCMA moved for reconsideration, with a request that the board refer the motion to its Senior Deciding Group. Appx24013-24017, Appx24246-24248. In a May 11, 2021 opinion, the board denied the motion, without substantive discussion of the issues, and declined to refer it to the board's Senior Deciding Group. Appx116-118. Our appeal followed.

## SUMMARY OF ARGUMENT

Raytheon did not comply with the FAR. In calculating that about half of the salaries of its in-house lobbyists and A&D team were recoverable from the Government, Raytheon relied on corporate policies that do not conform to the plain language of the controlling regulations. Unaccounted-for time does not equal allowable time. A cost unsupported by adequate documentation is never an allowable cost. FAR 31.201-2(d).

The inadequacy of Raytheon's records pervades this entire case. Through its indirect rates, Raytheon charged the Government millions of dollars for salaries of individuals hired to undertake activities that are expressly unallowable under the FAR, without a single record establishing that any of those individuals engaged in any allowable activity for any identifiable period of time. Raytheon's overall approach—whereby it asks a lobbyist how many hours the lobbyist spent lobbying, and then treats the remainder as allowable non-lobbying activity—is unacceptable. Nor is that approach acceptable with respect to Raytheon's mergers and acquisitions department.

Equally unacceptable are the specific corporate policies under which Raytheon instructed the lobbyists and A&D team to not even report the entirety of the time they spent engaged in the unallowable activities that they were hired to perform. FAR 31.205-22 makes no exception for night and weekend lobbying. FAR 31.205-27 makes no exception for early-stage acquisition and divestiture work.

Raytheon attempts to use its corporate policies to make its own bright-line rules, but the bright-line rules that must be followed are already in the FAR. The entirety of Raytheon's Government Relations and Corporate Development salary costs were unallowable, and the board erred in holding otherwise. This Court should reverse.

# ARGUMENT

## I. Standard of Review

Under 41 U.S.C. § 7107(b), this Court reviews the board's decisions as to questions of law without deference. *Sharp Elecs. Corp. v. McHugh*, 707 F.3d 1367, 1371 (Fed. Cir. 2013); 41 U.S.C. § 7107(b) ("decision of the agency board on a question of law is not final or conclusive; but . . . on a question of fact . . . may not be set aside unless the decision is (A) fraudulent, arbitrary, or capricious; (B) so grossly erroneous as to necessarily imply bad faith; or (C) not supported by substantial evidence.").

Interpretation of the FAR, and application of its provisions to the facts of the case, are questions of law to which the Court owes the board no deference. *See Parsons Glob. Servs., Inc. ex rel. Odell Int'l, Inc. v. McHugh*, 677 F.3d 1166, 1170 (Fed. Cir. 2012); *Crowley v. United States*, 398 F.3d 1329, 1333 (Fed. Cir. 2005).

## II. None Of Raytheon's Lobbying Salary Costs Were Allowable

To comply with FAR 31.205-22, Raytheon needed to accomplish two things: (1) not charge the Government for any costs of the expressly unallowable lobbying activities enumerated in FAR 31.205-22(a), and (2) maintain adequate records to demonstrate that it was not charging the Government for those unallowable activities. FAR 31.205-22(d); FAR 31.201-2(d); 48 C.F.R. § 9904.405-50(a) & (b)(1). Raytheon adopted policies and procedures that

prevented it from accomplishing either of those requirements.

## A. Applicable Law

### 1. Salary Costs For Lobbying Are Expressly Unallowable

Congress has decided that appropriated funds earned on Federal contracts will not be used to lobby for more contracts. 31 U.S.C. § 1352(a)(1) ("None of the funds appropriated by any Act may be expended by the recipient of a Federal contract . . . to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with . . . . awarding of any Federal contract. . . . [or] extension, continuation, renewal, amendment, or modification of any Federal contract . . . .").

Federal statutes prohibit contractors from recovering lobbying costs from the Government under Federal contracts. Specifically, by statute, contractors are not allowed to recover any "[c]osts incurred to influence (directly or indirectly) legislative action on any matter pending before Congress, a State legislature, or a legislative body of a political subdivision of a State." 10 U.S.C. § 2324(e)(1)(B) (defense agency contracts); 41 U.S.C. § 4304(a)(2) (parallel rule for civilian agency contracts).

Under FAR 31.205-22, which implements the statutory prohibition against recovery of lobbying costs, all costs associated with the following broad list of

activities are expressly unallowable:

> (1) Attempts to influence the outcomes of any Federal, State, or local election, referendum, initiative, or similar procedure, through in kind or cash contributions, endorsements, publicity, or similar activities;
>
> (2) Establishing, administering, contributing to, or paying the expenses of a political party, campaign, political action committee, or other organization established for the purpose of influencing the outcomes of elections;
>
> (3) Any attempt to influence (i) the introduction of Federal, state, or local legislation, or (ii) the enactment or modification of any pending Federal, state, or local legislation through communication with any member or employee of the Congress or state legislature (including efforts to influence state or local officials to engage in similar lobbying activity), or with any government official or employee in connection with a decision to sign or veto enrolled legislation;
>
> (4) Any attempt to influence (i) the introduction of Federal, state, or local legislation, or (ii) the enactment or modification of any pending Federal, state, or local legislation by preparing, distributing or using publicity or propaganda, or by urging members of the general public or any segment thereof to contribute to or participate in any mass demonstration, march, rally, fund raising drive, lobbying campaign or letter writing or telephone campaign;
>
> (5) Legislative liaison activities, including attendance at legislative sessions or committee hearings, gathering information regarding legislation, and analyzing the effect of legislation, when such activities are carried on in support of or in knowing preparation for an effort to engage in unallowable activities; or
>
> (6) Costs incurred in attempting to improperly influence (see

> 3.401), either directly or indirectly, an employee or officer of the Executive branch of the Federal Government to give consideration to or act regarding a regulatory or contract matter.

FAR 31.205-22(a).[23]

In a prior appeal by Raytheon, this Court recognized that "salary costs for lobbying activities are expressly unallowable under FAR § 31.205-22." *Raytheon Co. v. Sec'y of Def.*, 940 F.3d 1310, 1314 (Fed. Cir. 2019). That case involved lobbying salary costs included by Raytheon in its 2004 incurred cost proposal as a result of several "errors" and "omissions" it made in its lobbying withdrawal calculation. *Raytheon Co.*, 940 F.3d at 1311; *id.* at 1312 n.2. The ASBCA upheld DCMA's assessment of penalties. *Id.* at 1311.

Raytheon appealed, arguing that its lobbyists' salary costs were not expressly unallowable and therefore not subject to penalties. Raytheon maintained that because FAR 31.205-22(a) does not use the word "salary," the "generic language of 'costs associated with [lobbying activities]'" does not encompass lobbying salaries as expressly unallowable costs. *Id.* at 1312. This Court found

[23] FAR 31.205-22(b) provides three narrowly-defined exceptions: "(1) Providing a technical and factual presentation of information on a topic directly related to the performance of a contract . . . in response to a documented [Congressional] request . . . . (2) Any lobbying made unallowable by paragraph (a)(3) of this subsection . . . in order to directly reduce contract cost, or to avoid material impairment of the contractor's authority to perform the contract. . . . [and] (3) Any activity specifically authorized by statute to be undertaken with funds from the contract." FAR 31.205-22(b).

that argument meritless, explaining that "salaries of in-house lobbyists are a prototypical lobbying expense." *Id.* at 1313. Thus, "[t]he prohibition of lobbying expenses, under the plain language of [FAR 31.205-22], bars charging salaries of in-house lobbyists to the government." *Id.*

### 2. <u>Directly Associated Costs Are Also Unallowable</u>

In this case, all of Raytheon's lobbying department costs were expressly unallowable. It is important to keep in mind, however, that even if Raytheon could establish that some portion of the lobbying department's activities are not within the list of lobbying activities made expressly unallowable by FAR 31.205-22(a), that does not make them allowable.

Even if an activity of that department were not within the bounds of FAR 31.205-22(a), costs of any activities that would not have been incurred in the absence of the unallowable activity are also unallowable, as "directly associated" costs. FAR 31.201-6(a) ("A directly associated cost is any cost that is generated solely as a result of incurring another cost, and that would not have been incurred had the other cost not been incurred. When an unallowable cost is incurred, its directly associated costs are also unallowable.").

Thus, in the lobbying context, in addition to expressly unallowable costs generated by performing lobbying activities, any costs generated for no reason other than to allow one to engage in the lobbying activities identified as expressly

unallowable under FAR 31.205-22(a) are directly associated with unallowable lobbying and therefore also unallowable. *See id.*

### 3. Costs Are Never Allowable Without Adequate Records—Especially In The Lobbying Context

Whether lobbying costs are involved or not, the FAR always imposes an obligation on the contractor—the one incurring the costs and accounting for them—to maintain adequate records. FAR 31.201-2(d) provides:

> A contractor is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles in this subpart and agency supplements. The contracting officer may disallow all or part of a claimed cost that is inadequately supported.

FAR 31.201-2(d). Thus, the FAR makes clear that adequate supporting documentation is always required, and the absence of it is reason enough for disallowance of a claimed cost. *Id.*; *accord* 48 C.F.R. § 9904.405-50(a) & (b)(1) (CAS 405 requires the contractor to, at a minimum, "maintain visib[le]" records and documentation "adequate for purposes of contract cost determination and [audit] verification.").

When lobbying costs are involved, the regulations reflect that the need for adequate records is particularly acute. Rather than rely only on the general requirements for adequate records of all costs charged to the Government, the

lobbying cost principle, FAR 31.205-22, contains an additional requirement of its own regarding the need for adequate records. FAR 31.205-22(d) ("Contractors shall maintain adequate records to demonstrate that the certification of costs as being allowable or unallowable (see 42.703-2) pursuant to this subsection complies with the requirements of this subsection.").

The heightened emphasis on maintaining adequate records of lobbying expenditures is understandable in light of the history of FAR 31.205-22. As this Court has explained, leading up the 1984 issuance of FAR 31.205-22, consideration was given to making unallowable the entire salary of in-house lobbyists, as opposed to "only the portion attributable to lobbying." *Raytheon Co.*, 940 F.3d at 1314 (citing 49 Fed. Reg. 18,260, 18,261 (Apr. 27, 1984)). "In choosing the latter 'allocation' approach that required contractors to separately document unallowable costs, the 1984 version of subsection 22 adopted a recordkeeping provision related to '[t]ime logs . . . or similar records documenting . . . an employee's time . . . [when] the employee engages in lobbying." *Id.*; 49 Fed. Reg. at 18274 ("Documentation of the amounts of allowable and unallowable costs became a necessity when the method of cost treatment was changed from total disallowance of cost items partially involved in lobbying (the January 1983 proposal) to the typical 'allocation' cost treatment.").[24]

[24] *See also id.* (discussing exception, subsequently removed from the

### B. The Records Raytheon Chose To Keep Do Not Establish The Allowability Of Any Of Its Lobbying Salary Costs

Raytheon made the choice to instruct its lobbyists not to keep records of any allowable activities. As the board found, the lobbyists "do not report the nature of any alleged non-lobbying activities." Appx20. Rather, the purpose of the lobbyists' monthly time reports "is to report time spent on unallowable activities only." *Id.*

Consequently, Raytheon cannot point to any substantial record of a lobbyist engaging in any allowable activity for any identified period of time. In Raytheon's view, such records are unnecessary, even "irrelevant." Appx23186-23187 ("Q. Are you able to describe to me the type of lobbying activity you performed that day [in February 2007]? A. No. Q. Okay, do you know if you worked eight hours that day? A. No. Q. Okay, do you know what non-lobbying activity you did that day? . . . . A. No. . . . So, no, I can't tell you now, but it's irrelevant.").

Contrary to Raytheon's position, records of how much time a lobbyist recalls spending lobbying do not establish that unaccounted-for time was for an allowable activity. Raytheon's records are inadequate under the regulations to support the recovery of its lobbying department salaries—in any amount. FAR 31.205-22(d); FAR 31.201-2(d) ("The contracting officer may disallow all or

regulation, under which absence of "logs, calendars, or similar records to document the portion of their time treated as an indirect cost" would not be grounds for "government auditors disallowing claims of allowable costs").

part of a claimed cost that is inadequately supported."); *accord* 48 C.F.R. § 9904.405-50(a) & (b)(1) (records must be adequate to permit audit verification).

### C. By Design, Raytheon Disregarded Many Lobbying Hours In Its Lobbying Withdrawal Calculation

Even if the general approach of treating unaccounted-for time as allowable were reasonable, which it is not, Raytheon's tallies of how much time its lobbyists purportedly spent lobbying are not even meaningful records of that much. The hours that the lobbyists reported cannot be construed as capturing all of their lobbying work because Raytheon, by policy, instructed the lobbyists *not* to report all of the time they spent lobbying.

As the board found, "[d]uring 2007 and all relevant times, Raytheon instructed its Government Relations personnel to exclude from their monthly time-sheet reports any time spent on unallowable lobbying activities on a weekend, holiday, or before 8 AM or after 5 PM." Appx20. When Raytheon used paper time reports, if a lobbyist reported night or weekend work, Raytheon's accounting department removed those hours from its withdrawal calculation. Appx3615-3616. When Raytheon developed an online lobbying compliance tool, which the lobbyists began using in April 2008 to submit monthly reports of the number of hours they spent lobbying, Raytheon designed the tool so that the lobbyists could not report hours spent lobbying on weekends, holidays, before 8:00 A.M., or after 5:00 P.M. Appx21290-21291; *See* Appx21.

Raytheon's policy is not in dispute, of course. Nor is there room for any genuine dispute that Raytheon's lobbyists regularly performed lobbying activities outside of Raytheon's regular business hours. Appx24 ("Outside of normal business hours he might attend early morning or late evening meetings, PAC meetings, PAC events with members of Congress, breakfasts, lunches, and dinners. . . . [O]n occasion he would attend morning fundraisers, work a full day, then attend fundraisers at night . . . ."); Appx25 ("The fundraisers were typically outside regular hours and were sometimes on weekends. . . . In 2007, Mr. Lee attended 119 political fundraisers and 44 local non-fundraising events. In 2008, he attended 103 political fundraisers and 34 non-fundraising events."); *id.* ("Outside his normal work day, and sometimes during his normal work hours, he attended trade association events and political fundraisers."); *see also* Appx23 ("In 2007, Ms. Watson reported that the Legislative Operations team hosted 24 events and attended 654 fundraisers.").

The exact number of lobbying hours Raytheon left out of its lobbying withdrawal calculation is unknowable for one reason: Raytheon instructed its lobbyists not to report those hours.[25] The board should have recognized that Raytheon's after-hours exclusion policy rendered its records meaningless.

---

[25] Notably, Raytheon takes the position that "employee calendars are not 'records' as would be defined in the FAR." Appx45. It insists, "[t]hey are not in any way used to support our claimed costs." *Id.*

Raytheon presents the lobbyists' reported hours as the total of their lobbying activities, but they are nothing of the sort. At best, they are some undefined subset of the hours that the lobbyists spent actively engaged in lobbying.

### 1. Raytheon's Lobbyists Did Not Work For Free

Raytheon attempts to justify its policy by asserting that it does not pay its lobbyists anything for work they perform outside of regular business hours. According to Raytheon, these salaried employees do large amounts of work for free. The board, which accepted that delusion, explained:

> Raytheon never withdraws time for unallowable lobbying activities occurring during those periods on the ground that its Government Relations employees are salaried and charged indirectly; they are paid based upon a 40-hour work week; and including time outside of that period would result in an overstatement of the withdrawal amount. Raytheon maintains, and the government has not rebutted, that there was no cost to it or to the government for work outside normal business hours.

Appx20; *see also id.* ("Raytheon appropriately excluded work from its lobbying cost reporting for which there was no cost to the government.").

In a footnote, the board recognized that this conclusion runs counter to logic, stating: "logically, the expectation of regular night and weekend work would be factored into the salary paid to the lobbyists." *Id.* n.12. It then dispensed with that "logic[]," *id.*, and instead ruled: "The government did not introduce testimony on

this point, so we accept Raytheon's testimony that the government was not charged for the night and weekend work." *Id.*

That conclusion is contradicted by the board's own factual findings. *See, e.g.*, Appx36 ("Raytheon's lobbyists worked early mornings, late nights, and weekends from time to time on what all of the testifying witnesses considered to be a regular part of their work duties."). Raytheon's lobbyists invariably testified that the work they performed outside of business hours was a regular and expected part of their work responsibilities. Appx21206-21211, Appx21857-21858, Appx22898-22900, Appx22936-22946. The board incorporated the lobbyists' testimony in this regard into its findings of fact. Appx23 ("She considered the functions she attended outside her normal work hours to be part of her regular work duties."); Appx24 ("He considered the functions he attended before 8 AM and after 5 PM to be part of his regular work duties."); Appx25 ("This was an expected part of the job in Government Relations and part of his regular work duties.").

Thus, the board's assertion that the "government did not introduce testimony on this point" stems from a misunderstanding of the evidence presented to it. The Government introduced evidence directly on this point when it showed that the night and weekend lobbying work was understood by the employees to constitute part of their regular work. It is unclear what more evidence the board expected.

When salaried employees testify that after-hours work is part of their regular job duties, one cannot reasonably conclude that their salaries do not compensate them for that work.

On the strength of nothing more than arguments of counsel, Raytheon convinced the board that it was accounting for the lobbyists' salaries on the basis of "time paid," rather than "time worked." *See* Appx20. That distinction is a false one.[26] There is no evidence to support the contention that time paid was any different from time worked here. Rather, the lobbyists were paid—through their salaries—for the time they worked. The board erred in accepting Raytheon's delusion that its lobbyists began working for free at 5:00 P.M.

Raytheon's lobbyists did not work for free. The lobbyists' salaries compensated them for all of their work. Raytheon's decision to present a lobbying withdrawal calculation to the Government that intentionally did not account for all of the lobbyists' hours of work was unacceptable, and the board should have upheld DCMA's disallowance of Raytheon's lobbying department costs on that basis alone.

---

[26] Contrary to a contention Raytheon presented to the board, *see* Appx20, nothing in CAS 401, 48 C.F.R. § 9904.401, or Raytheon's CAS disclosure statements, which were not even offered into evidence, allows, much less requires, Raytheon to disregard hours of work in excess of a 40-hour workweek when performing its lobbying withdrawal calculation.

### 2. <u>The Board Misinterpreted FAR 31.201-6(e)(2)</u>

Reading the cost principles of FAR Part 31 as a whole, it is clear that disregarding time spent outside of normal working hours is unacceptable when "it is evident that an employee engages so frequently in company activities during periods outside normal working hours as to indicate that such activities are a part of the employee's regular duties." FAR 31.201-6(e)(2) (addressing materiality of directly associated costs).

The board discussed FAR 31.201-6(e)(2) but misinterpreted its significance. Appx36. The board stated:

> Regarding the amount of unallowable lobbying hours reported by Raytheon, FAR 31.201-6(e)(2) provides that time spent by employees outside normal working hours should not be considered except when it is evident that an employee engages so frequently in company activities during those extra hours as to indicate that the activities are a part of the employee's regular duties (see finding 16). Raytheon's lobbyists worked early mornings, late nights, and weekends from time to time on what all of the testifying witnesses considered to be a regular part of their work duties (findings 41-42, 44-45).
>
> Since lobbying responsibilities were a regular part of the work duties, FAR 31.201-6(e), ACCOUNTING FOR UNALLOWABLE COSTS (NOV 2005), provides that these activities should be considered in determining materiality of the activities. However, that FAR subsection only applies to determining whether the costs were material. It does not instruct how the unallowable costs should be calculated.

Appx36.

The board's discussion of FAR 31.201-6(e)(2) demonstrates a misunderstanding of its significance in this case. The first sentence of FAR 31.201-6(e)(2) provides: "Salary expenses of employees who participate in activities that generate unallowable costs shall be treated as directly associated costs to the extent of the time spent on the proscribed activity, provided the costs are material in accordance with paragraph (e)(1) of this subsection (*except when such salary expenses are, themselves, unallowable*)." FAR 31.201-6(e)(2) (emphasis added). Thus, for expressly unallowable salary costs, such as Raytheon's lobbyists' salaries, *Raytheon Co.,* 940 F.3d at 1314, there is no possible immateriality exception at all.

Although there is therefore no direct application of FAR 31.201-6(e)(2) to Raytheon's lobbying salary costs, the provision severely undercuts Raytheon's position nonetheless. Given that disregarding night and weekend hours would violate the FAR even if these costs were merely directly associated costs, a policy of systematically disregarding such hours when dealing with expressly unallowable lobbying salary costs is certainly improper.

### 3. There Is No Justification For Raytheon's Failure To Account For All Of The Lobbyists' Hours Of Work

Before the board, Raytheon argued that including hours worked outside of regular business hours in the numerator of its lobbying disallowance factor would have overstated the withdrawal amount because Raytheon chooses to base the

denominator in its calculation on a 40-hour workweek. *See, e.g.*, Appx20 ("Raytheon never withdraws time for unallowable lobbying activities occurring during those periods on the ground that . . . including time outside of that period would result in an overstatement of the withdrawal amount.").

This purported problem is an illusory one. If Raytheon had simply instructed the lobbyists to report all of their time, as it should have done under FAR 31.205-22(d), it could just as easily have divided the number of total unallowable hours by the lobbyists' total hours of work. Raytheon's self-election to use an artificially constrained denominator cannot justify a policy of intentionally disregarding known lobbying hours.

### D. The Government Met Its Burden

The board's effort to characterize its ruling as a matter of the Government simply having failed to meet its burden, Appx38, is deeply misplaced. DCMA met its burden, on the undisputed evidence of Raytheon's policies alone. It was never incumbent on the Government to go through Raytheon's calculation and prove up every deficiency.

Raytheon is the one doing the calculation. Raytheon is the one responsible for maintaining adequate records to demonstrate that all of the costs it charges to the Government are allowable. In this case, the board misperceived Raytheon's failure to maintain adequate records—a basic condition for any cost to be

allowable—as a Government failure of proof. This Court should reverse the board's determination that Raytheon's lobbying salary costs were allowable.

## III. None Of Raytheon's A&D Salary Costs Were Allowable

The Court should likewise reverse the board's determination that Raytheon's Corporate Development salary costs were allowable. In calculating those costs, Raytheon used the same unacceptable approach of equating unaccounted-for time with allowable time, and its records were fundamentally inadequate to establish allowability on the same basis. Moreover, Raytheon's A&D bright-line rules are an affront to the plain language of FAR 31.205-27.

### A. Applicable Law

"[E]xpenditures in connection with . . . planning or executing the organization or reorganization of the corporate structure of a business, including mergers and acquisitions," are expressly unallowable. FAR 31.205-27(a)(1). FAR 31.205-27(a) provides:

> Except as provided in paragraph (b) of this section,[27] expenditures in connection with (1) planning or executing the organization or reorganization of the corporate structure of a business, including mergers and acquisitions, (2) resisting or planning to resist the reorganization of the corporate structure of a business or a change in the controlling interest in the ownership of a business, and (3) raising capital (net worth plus long-term liabilities), are unallowable. Such expenditures include

[27] FAR 31.205-27(b) addresses "activities primarily intended to provide compensation."

> but are not limited to incorporation fees and costs of attorneys, accountants, brokers, promoters and organizers, management consultants and investment counselors, whether or not employees of the contractor. Unallowable reorganization costs include the cost of any change in the contractor's financial structure, excluding administrative costs of short-term borrowings for working capital, resulting in alterations in the rights and interests of security holders, whether or not additional capital is raised.

FAR 31.205-27(a).

### B. Raytheon's Bright-Line Rules Fail To Comply With The Bright-Line Rule That Is Already In The FAR

Raytheon's bright-line rules are plainly inconsistent with FAR 31.205-27(a). The plain language of that regulation unambiguously makes all A&D costs—at any stage—expressly unallowable.[28] Nothing in the FAR remotely supports the rules Raytheon made up for itself. Indeed, it is particularly unreasonable to assert that "[u]nallowable acquisition costs commence with the submission of an indicative offer," Appx3107, when the pertinent regulation expressly covers "*planning* or executing . . . acquisitions." FAR 31.205-27(a)(1) (emphasis added). The same is true for divestitures. When the applicable regulation expressly references the planning of such transactions, a corporate policy decreeing that "[u]nallowable

[28] Although the word "divestitures" does not appear within FAR 31.205-27, there has never been any dispute that a divestiture is an "organization or reorganization of the corporate structure of a business," covered by FAR 31.205-27. *See* Appx4811 (Raytheon corporate policy stating "[o]rganizational costs associated with divestitures are generally unallowable.").

divestiture costs commence when the decision to 'go to market' with the offering materials is made" is blatantly out of compliance with the regulation.

Raytheon attempts to justify its corporate policy by contending that the FAR cost principles fail to draw a clear line between the A&D costs that are unallowable under FAR 31.205-27 versus economic planning costs, which are allowable under FAR 31.205-12. *See* Appx51. Contrary to Raytheon's argument and the board's decision, *see id.*, the unambiguous language of the regulations leaves no room for confusion.

In addressing allowable costs for economic planning, FAR 31.205-12 specifically states: "Economic planning costs do not include organization or reorganization costs covered by 31.205-27." FAR 31.205-12. Thus, the plain text of the regulation establishes that any cost within the scope of FAR 31.205-27 is not covered by FAR 31.205-12. Accordingly, for there to be any argument of allowability under FAR 31.205-12, one must not only establish that the cost fits within the scope of the economic planning activities described in that cost principle, but also that the cost does *not* fit within the description of unallowable corporate reorganization costs in FAR 31.205-27. There is no possibility of even the latter showing here. One cannot say that Raytheon's A&D costs—at any stage—are anything other than "expenditures in connection with . . . planning or executing the organization or reorganization of the corporate structure of a

business, including mergers and acquisitions." FAR 31.205-27.

### C. Raytheon Charged Unallowable A&D Costs To The Government

Raytheon's non-compliant A&D policy unquestionably resulted in it systematically charging the Government for expressly unallowable costs. At the board hearing, voluminous testimony and documentary evidence demonstrated that Raytheon's Corporate Development department engaged in extensive A&D work long before reaching Raytheon's bright-line thresholds, to the extent a project ever reached them at all, and Raytheon charged all of that time to the Government. *See* Appx20547 ("Q. . . [D]o you believe you performed any acquisition planning before you submitted NBIO?" A. "Yes, I do."); Appx20918 ("It is fair to say that there is a lot of work up front before an NBIO is submitted, yes."); Appx20918-20919 ("Corporate Development's job is [partly] to . . . do research and analyze particular candidates to make sure they're appropriate for NBIO"); Appx20925-20926 (agreeing that a "tremendous amount of work" goes into planning a divestiture up front, before any decision is made to move forward); Appx4593 (Raytheon graphic depicting its divestiture process).

The hearing testimony of Mr. Bailey, who played a leading role in crafting Raytheon's bright-line rules, Appx22308-22309, was particularly illustrative of the abusive nature of those rules. Appx22349-22352; *see also* Appx4849. As discussed above (Statement of the Case section IV(C.)), in a 2007 list of

accomplishments that Mr. Bailey prepared in connection with his performance review, he described the efforts he made to have Raytheon acquire three companies—code-named "Ball," "Swales," and "Argon"—none of which wished to be acquired by Raytheon. Appx4849 ("Worked with SAS to approach two businesses: Ball and Swales. Ball not interested in being acquired. Swales acquired by ATK. Worked with NCS to present Argon to Acquisition Council. Received approval to contact regarding interest. . . . Argon not interested in being acquired.").

With Raytheon never having tendered an indicative offer to any of these three companies, Mr. Bailey admitted unabashedly that he did not report one minute of the time he spent pursuing these acquisition targets as unallowable A&D time. Appx22349. So the Government was charged for all of his efforts in those fruitless acquisition pursuits. *Id.* And "Ball," "Swales," and "Argon" are merely the acquisition candidates that Mr. Bailey named specifically in his job accomplishments summary. Without naming them all, Mr. Bailey documented in his 2007 accomplishments that "23 opportunities . . . were brought forward to [Raytheon's] Acquisition Council," which "[r]esulted in 8 NBIO's submitted, 3 final offers and 2 acquisitions." Appx4849. Ultimately, out of all his work on those 23 acquisition candidates,[29] Mr. Bailey reported unallowable time for only

[29] Of course, those 23 acquisition candidates do not include any of the

two of them. Appx22350-22352.

Mr. Bailey did not find this result to be problematic in the least. *See id.* After all, he viewed his reporting of unallowable hours to be in complete compliance with Raytheon's policies. And that is the most troubling aspect of all: Mr. Bailey was in complete compliance with Raytheon's policies—and, at the same time, totally out of compliance with the FAR.

### D. The Board Erred In Failing To Uphold DCMA's Disallowance

The board should have recognized that the Raytheon policies used to prepare its A&D withdrawal calculations are unacceptable. In failing to reject Raytheon's attempt to supplant the bright-line rule in FAR 31.205-27 with incompatible corporate policies of its own design, the board misinterpreted and misapplied the FAR. Raytheon's use of a corporate policy that fails to conform to FAR 31.205-27 irredeemably tainted its A&D withdrawal calculation—in its entirety.

Even if, hypothetically, Raytheon's Corporate Development employees had performed some work on allowable activities, the decisions Raytheon made leave it without any possibility of supporting that assertion. Based on Raytheon's own decisions, there is no record of any Corporate Development employee having spent any identifiable hours on any identifiable allowable activity. Rather than maintain records of allowable activities, Raytheon chose to record only tabulations of

---

acquisition targets that were researched but never presented to Raytheon's Acquisition Council.

hours—numbers of hours with barely any description, Appx4916-4921, Appx5016-5021, that were said to be attributable to the A&D professionals' unallowable work. Those lists of unallowable hours are meaningless. They were generated on the basis of a policy that is indefensible.

In ruling that "it was not unreasonable for Raytheon to treat the costs at issue as allowable," Appx51, the board wrongly decided to interpret Raytheon's failure to comply with the FAR as a Government failure to meet its burden of proof. *See* Appx50-52. The board stated: "[A]lthough Raytheon and the government would benefit from Raytheon's application of more uniform, timely and descriptive time-keeping procedures, DCMA has not carried its burden to prove by a preponderance of the evidence that the amount of unallowable hours withdrawn by Raytheon's personnel . . . from its CY 2007 and 2008 incurred cost proposals was inaccurate, nor that any of the included Corporate Development costs were unallowable, let alone expressly unallowable and subject to penalties." Appx51-52.

The board misapplied the burden of proof to the facts of this case. That the Government bears the burden of proof, *see, e.g.*, *Raytheon Co.*, 940 F.3d at 1311, does not absolve Raytheon of its obligation to maintain adequate records. If that were the case, a contractor could simply keep no records, include all of its unallowable costs in its incurred cost submissions, and then, when challenged by the Government, advise the board or court that there is no possibility that the

Government will meet its burden because there are no records available to support the Government's case.

Indeed, no cost is ever allowable unless it complies with all of the requirements of FAR Subpart 31.2. FAR 31.201-2(a)(5). One of the requirements of Subpart 31.2 is maintaining adequate records. FAR 31.201-5(d) ("A contractor is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed . . . comply with applicable cost principles in this subpart . . . . The contracting officer may disallow all or part of a claimed cost that is inadequately supported."); *accord* 48 C.F.R. § 9904.405-50(a) & (b)(1) (records must be adequate for audit verification).

Thus, proof that a cost is inadequately supported constitutes proof that the cost is unallowable. In this case, the Government easily carried its burden in that regard. It was never in dispute that Raytheon used its A&D bright-line thresholds to track unallowable hours. The unacceptability of that policy, given its failure to conform to FAR 31.205-27, renders the only records Raytheon maintained meaningless. The non-descript listing of hours that Raytheon's A&D employees submitted do not constitute their total hours spent on unallowable activities. Rather, it is just a meaningless subset of some unknown total of unallowable hours.

Thus, even if Raytheon's barebones approach to writing down numbers of

unallowable hours were otherwise acceptable (it is not), its records are still inadequate because the instructions it gave for which hours to tally did not conform to FAR 31.205-27. As a consequence of the choices Raytheon made, it has no adequate records on which it could claim that any of its Corporate Development costs are allowable.

Finally, even putting aside the inadequacy of Raytheon's records, the board's pronouncement that DCMA failed to prove "that any of the included Corporate Development costs were unallowable" is contrary to the evidence. In spite of Raytheon's approach of avoiding the creation of meaningful records, DCMA nonetheless proved that Raytheon charged the Government for unallowable A&D costs. Nowhere in the board's opinion does it address how Raytheon charged the Government for the time that Mr. Bailey spent pursuing acquisitions of "Ball," "Swales," and "Argon," or the dozen and a half other acquisition candidates he describes presenting to Raytheon's Acquisition Council in his 2007 job accomplishments, but for which he reported no unallowable time whatsoever. The board erred—on both the law and the facts.

## CONCLUSION

For these reasons, we respectfully request that the Court reverse the board's decision regarding the allowability of Raytheon's lobbying and A&D costs, and remand for a determination of penalties.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

/s/ Patricia M. McCarthy
PATRICIA M. MCCARTHY
Director

/s/ Daniel B. Volk
DANIEL B. VOLK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 353-7955

Attorneys for Appellant

OF COUNSEL:

ALEXANDER M. HEALY
Senior Trial Attorney
Contract Disputes Resolution Center
Defense Contract Management Agency
Hanscom Air Force Base, MA 01731

January 25, 2022

# Addendum A

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| Raytheon Company and Raytheon Missile Systems | ) | ASBCA Nos. 59435, 59436, 59437 59438, 60056, 60057 60058, 60059, 60060 60061 |
| | ) | |
| Under Contract Nos. W15P7T-07-C-P207 W31P4Q-07-C-0159 | ) | |

APPEARANCES FOR THE APPELLANT: Karen L. Manos, Esq.
John W.F. Chesley, Esq.
Erin N. Rankin, Esq.
Gibson, Dunn & Crutcher LLP
Washington, DC

APPEARANCES FOR THE GOVERNMENT: Arthur M. Taylor, Esq.
DCMA Chief Trial Attorney
Alexander M. Healy, Esq.
Trial Attorney
Defense Contract Management Agency
Hanscom AFB, MA

OPINION BY ADMINISTRATIVE JUDGE SCOTT

Raytheon Company (Raytheon) and its Raytheon Missile Systems (RMS) business segment[1] have appealed under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109, from Defense Contract Management Agency (DCMA) contracting officers' final decisions (COFDs) asserting government claims. DCMA seeks payment of allegedly unallowable and expressly unallowable costs that Raytheon included in its final indirect cost proposals for 2007 and 2008, and penalties regarding some of the costs. These timely appeals were

[1] A segment is one of two or more business units or divisions that report directly to a home office. *See* CAS 403-30(4), 48 C.F.R. § 9904.403-30 (4). As reported to the Board on September 24, 2020, on April 3, 2020 United Technologies Corporation (UTC) consummated a merger with Raytheon Company. As a result, Raytheon Company, formerly a publicly traded corporation, became a wholly owned subsidiary of UTC and UTC changed its name to Raytheon Technologies Corporation. In this decision we refer to Raytheon Company as structured in the 2007-2008 period at issue. For convenience, unless otherwise indicated, we use "Raytheon" when referring to both Raytheon and RMS in their capacity as appellants.

consolidated for disposition. The Board conducted a two-week hearing, covering entitlement and quantum, in Boston, Massachusetts. The parties filed over 560 pages of post-hearing briefing.

## GENERAL FINDINGS OF FACT

### Background, Audits, COFDs, and Appeals

1. Raytheon, headquartered in Waltham, Massachusetts, is a global technology company specializing in defense, security, and civil markets. Raytheon and its business segments collectively had more than 70,000 employees in 2007 and 2008. RMS, a wholly owned business segment, is headquartered in Tucson, Arizona. It manufactures defensive and offensive weapons for air, land, sea, and space. In 2007 and 2008, it had about 12,000 employees. (App. undisputed[2] proposed findings of fact (AUPFF)[3] ¶¶ 1-2)

2. Each year, in connection with the determination of its indirect rates, Raytheon and its businesses submit final indirect cost proposals to the government (*see* tr. 3/10). These appeals pertain to the following proposals: (a) Raytheon Company's contractor fiscal year (which, for the company is its calendar year (CY) (tr. 3/10)) 2007 certified final indirect cost proposal, submitted on June 23, 2008, including $2.34 billion of indirect corporate office costs (app. supp. R4, tab 208 at 3032, 3317); (b) Raytheon Company's 2008 certified final indirect cost proposal, submitted on June 23, 2009, including $2.45 billion of indirect corporate office costs (app. supp. R4, tab 331 at 5096, 5297); (c) RMS' 2007 certified final indirect cost proposal, submitted (as revised) on October 27, 2010 (app. supp. R4, tab 260 at 4117); and (d) RMS' 2008 certified final indirect cost proposal, submitted (as revised) on October 22, 2010 (app. supp. R4, tab 350 at 5872). A high level company officer certified that the costs included in each proposal were allowable in accordance with the cost principles in the Federal Acquisition Regulation (FAR) and its supplements and that the proposal did not include any costs that were expressly unallowable under the FAR's applicable cost principles or its supplements (*see*, e.g., app. supp. R4, tab 331 at 5297).

3. As discussed below, two groups within Raytheon's Corporate Office worked together to prepare the 2007 and 2008 corporate proposals: Corporate Government Accounting (CGA) and Corporate Administration and Services (A&S), which prepared various schedules for the proposals. (*See, e.g.*, tr. 6/252, 8/8-9) CGA and RMS have training in preparing the proposals. RMS follows CGA's written guidelines; it has work and desk instructions for each schedule; and it conducts testing and internal audits. It has a "very rigorous review process" (tr. 3/12), described by Rachel Garcia, Senior Manager of Government Accounting and Internal Controls Excellence at RMS, whose office is responsible for preparing RMS' incurred cost proposal. (Tr. 2/264-265, 3/9-13)

---

[2] If a proposed fact is not undisputed, it will be entitled "APFF."

[3] The proposed findings of facts are found in the corresponding parties' post-hearing briefs, and reference the applicable paragraph numbers.

4. The Defense Contract Audit Agency (DCAA) audited the proposals (app. supp. R4, tab 208 (Corporate Audit Report for 2007); tab 260 (RMS Audit Report for FY 2007); tab 331 (Corporate Audit Report for 2008); and tab 350 (RMS Audit Report for 2008)). DCAA opined that some included costs were unallowable and others were expressly unallowable and subject to "level one" penalties under FAR 42.709(a)(1). (*See*, *e.g.*, app. supp. R4, tab 208 at 3183-88 (lobbying-related costs)). Based upon Raytheon's inclusion of allegedly unallowable costs in its proposals, DCAA also issued two audit reports alleging that Raytheon had not complied with Cost Accounting Standard (CAS) 405, 48 C.F.R. § 9904.405, Accounting for Unallowable Costs, for 2007 and 2008 (app. supp. R4, tab 215 (CAS 405 Audit Report for 2007) and tab 344 (CAS 405 Audit Report for 2008)). DCMA's corporate administrative CO (CACO), Thomas Forbush, and the divisional administrative CO (DACO) for RMS, Jack Bradley, largely based the following COFDs at issue upon the six audit reports (app. supp. R4, tabs 276-277, 279, 281, 283, 356-358, 363-365). We describe them here, and address them further below, as pertinent to the instant appeals.

5. The CACO's June 20, 2014 COFD (Corporate COFD for 2007) asserted a $10,468,740 government claim for disallowed costs, penalties and interest, due to Raytheon's inclusion of allegedly unallowable and expressly unallowable costs in its CY 2007 incurred cost proposal, and denied its request for a waiver of penalties under FAR 42.709-5(c). It cited the captioned flexibly-priced contract and Contract No. W31P4Q-07-C-0159 as representative contracts. (App. supp. R4, tab 279 at 4556-58) The CACO found that certain Corporate Development compensation costs were expressly unallowable under FAR 31.205-27, ORGANIZATION COSTS (APR 1988). Raytheon's Government Relations compensation costs were expressly unallowable under FAR 31.205-22, LOBBYING AND POLITICAL ACTIVITY COSTS (OCT 1997); and bonus, incentive compensation, and restricted stock costs for employees alleged to have engaged in expressly unallowable activities were expressly unallowable. (*Id*. at 4563-66, 4568) Raytheon's appeal from this COFD is docketed as ASBCA No. 59435.

6. The CACO issued a second COFD, dated June 20, 2014 (CAS 405 COFD for 2007), asserting a $7,469,506 government claim in total. The portion on appeal is the government's $1,870,428 claim for noncompliance with CAS 405 and FAR 31.201-6, ACCOUNTING FOR UNALLOWABLE COSTS (NOV 2005), due to Raytheon's inclusion of allegedly expressly unallowable Government Relations costs in its 2007 incurred cost proposal, and a $307,776 government claim for noncompliance with CAS 405, due to Raytheon's inclusion of allegedly expressly unallowable Corporate Development costs in that proposal. The COFD also claimed, and Raytheon challenged, that bonus and restricted stock costs for employees alleged to have engaged in expressly unallowable activities were expressly unallowable. The CAS 405 COFD for 2007 cited the captioned contract as a flexibly-priced contract affected by the alleged CAS noncompliance, and Contract No. N00019-07-C-0093 as a representative firm-fixed-price

contract so affected. (App. supp. R4, tab 281 at 4573, 4575, 4579-81) Raytheon's appeal from this COFD is docketed as ASBCA No. 59436.

7. On June 22, 2015, the CACO issued a COFD (Corporate COFD for 2008) asserting a $1,154,383 government claim, including penalties and interest, due to Raytheon's inclusion of allegedly unallowable and certain expressly unallowable costs in its final indirect cost rate proposal for CY 2008 and denying Raytheon's request for a waiver of penalties. The CACO cited allegedly expressly unallowable Corporate Development, Government Relations, and bonus and incentive compensation costs. He also cited what Raytheon refers to as "Recruitment Reminder" item costs (APFF ¶ 10) and DCMA refers to as "Souvenir 'Reminder Item' Advertising" costs (gov't reply br. at 4 (chart)), said to be unallowable under FAR 31.205-1, PUBLIC RELATIONS AND ADVERTISING COSTS (AUG 2003).[4] The COFD named representative Contract No. W15P7T-08-C-P203. (App. supp. R4, tab 364 at 5954-56, 5961) Raytheon's appeal from this COFD is docketed as ASBCA No. 60056.

8. On June 22, 2015, the CACO also issued a COFD pertaining specifically to airfare (Corporate Airfare COFD for 2008) asserting a $760,861[5] government claim due to Raytheon's inclusion of airfare costs in its final indirect cost proposal for CY 2008 that were allegedly unallowable under FAR 31.205-46, TRAVEL COSTS (OCT 2003). He cited Contract No. W15P7T-08-C-P203 as a representative contract. (App. supp. R4, tab 363 at 5946-48) Raytheon's appeal from this COFD is docketed as ASBCA No. 60057.[6]

9. On June 22, 2015, the CACO also issued a COFD asserting a $2,030,636 government claim under CAS 405 and FAR 31.201-6 (CAS 405 COFD for 2008). He found $981,822 in Government Relations costs to be expressly unallowable under FAR 31.205-22 and $831,797 in Corporate Development costs to be expressly unallowable under FAR 31.205-27. He cited flexibly-priced Contract No. W15P7T-08-C-P203 and firm fixed-price Contract No. W15P7T-07-C-M204 as representative contracts affected by the alleged CAS noncompliance. (App. supp. R4, tab 365 at 5966, 5968-69; AUPFF ¶¶ 9, 12) Raytheon's appeal from this COFD is docketed as ASBCA No. 60058.

10. On June 12, 2014, the DACO issued a COFD (RMS COFD for 2007) concluding, among other things, that substantial portions of RMS' costs for airfare, outside legal patent, and employee recruiting were unallowable under FAR 31.205-46, TRAVEL COSTS (OCT 2003); FAR 31.205-30, PATENT COSTS (JUL 2005); and FAR

[4] This regulation has been updated since the 2007-2008 period at issue.

[5] The parties settled part of DCMA's airfare cost claims. The Board docketed the settled portion as ASBCA Nos. 61136, 61137, 61138, and 61139 and dismissed those appeals with prejudice on May 24, 2017, pursuant to the settlement agreement. The portion still in dispute amounts to $76,556 (*see* finding 14).

[6] Numerous appeals from government claims relating to corporate airfare costs have been stayed pending the outcome of the instant appeals.

31.205-34, RECRUITMENT COSTS (JUL 2005), respectively. The DACO also alleged a lack of documentation under paragraph (d) of FAR 31.201-2, DETERMINING ALLOWABILITY (MAY 2004). Although the COFD did not name a representative contract, it was based upon the RMS Audit Report for 2007, which lists affected contracts. (App. supp. R4, tab 260 at 4098, tab 277; ex. G-10; AUPFF ¶¶ 13-14) Raytheon's and RMS' appeal from this COFD is docketed as ASBCA No. 59437.

11. The DACO issued another COFD on June 12, 2014 (RMS Penalties COFD for 2007), asserting a $94,905 government claim for penalties, due to Raytheon's inclusion of various allegedly expressly unallowable costs, totaling $135,763, in its incurred cost proposal for FY 2007. The DACO denied Raytheon's request for a penalty waiver. (App. supp. R4, tab 276 at 4535-36, 4538; AUPFF ¶ 15) Although the COFD did not name a representative contract, it was based upon the RMS Audit Report for 2007, which lists affected contracts (app. supp. R4, tab 260 at 4098). Raytheon's appeal from this COFD is docketed as ASBCA No. 59438.

12. For 2008, the DACO issued a COFD on June 11, 2015, disallowing RMS' indirect airfare costs. He did not make a payment demand because the amount of costs claimed to be unallowable, plus an amount Raytheon had agreed to remove from its claim for other indirect costs, was less than the amount being withheld from current approved billing rates for 2008. (App. supp. R4, tab 358; AUPPF ¶ 16) Raytheon's appeal from this COFD is docketed as ASBCA No. 60059.

13. On June 11, 2015, the DACO also issued two COFDs disallowing RMS' direct airfare costs that had been included in its billings under two named contracts and demanding payment of $167,427 and $17,274, respectively (RMS Direct Airfare COFDs for 2008) (app. supp. R4, tabs 356-57; AUPFF ¶ 17). Raytheon's appeals from these COFDs are docketed as ASBCA Nos. 60060 and 60061.

14. A summary of the costs remaining in dispute in these appeals follows. The chart was submitted by Raytheon (APFF ¶ 18). Government disagreements or comments are highlighted (gov't reply br. at 4).

| **Business** | **Cost Type** | **Years** | **Disputed Amount** | **COFD Basis for Disallowance** |
|---|---|---|---|---|
| Corporate | Travel (airfare) | 2008 | $76,556 | 31.205-46, Travel costs. |
| RMS | Indirect Travel (airfare) | 2007<br>2008 | $815,036<br>$978,429 | 31.201-2(d) (supporting documentation).<br>31.205-46, Travel costs. |
| RMS | Direct Travel (airfare) | 2008 | $184,701 | 31.205-46, Travel costs. |
| Corporate | Corporate Development | 2007<br><br>2008 | $307,776<br>**(Gov't $862,010)**<br>$868,322<br>**(Gov't $831,797)** | 31.205-27, Organization costs.<br>Expressly unallowable |
| Corporate | Government Relations | 2007<br>2008 | $1,870,428<br>$1,065,481[7] | 31.205-22, Lobbying and political activity costs.<br>Expressly unallowable. |
| RMS | Outside Legal Patent | 2007 | $120,600 | 31.201-2(d) (supporting documentation).<br>31.205-30, Patent costs. |
| RMS | Engineering Labor Overhead | 2007 | $96,701 | 31.205-30, Patent costs.<br>Expressly unallowable. |
| RMS | Recruiting Travel | 2007 | $51,436 | 31.201-2(d) (supporting documentation).<br>31.205-34, Recruitment costs. |
| Corporate | Restricted Stock, Incentive Compensation, Bonus | 2007<br>2008 | $1,242,895<br>$125,280 | FAR 31.205-22, Lobbying & political activity costs; FAR 31.205-27, Organization costs; FAR 41.205-47, Costs related to legal and other proceedings.<br>Expressly unallowable. |
| Corporate | Recruitment Reminder Items **or Souvenir Advertising costs.** | 2008 | $17,780 | 31.205-1, Public relations and advertising costs.<br>31.205-27, |
| Corporate | CAS 405 Noncompliance | 2007<br>2008 | $2,178,204<br>$1,813,619 | Organization costs.<br>31.205-22, Lobbying and political activity.<br>Expressly unallowable. |

[7] Per DCMA, of the $1,065,481, $981,822 is expressly unallowable and $83,659 is unallowable (*see* app. supp. R4, tab 364 at 5955, 5962; gov't reply br. at 4 n.3).

Statutory and Regulatory Provisions Applicable to All or Several of the Subject Appeals

15. Among others addressed separately below, the following statutory, FAR and CAS provisions are pertinent:

> FAR 31.201-2, DETERMINING ALLOWABILITY (MAY 2004), provides in part:
>
> (a) A cost is allowable only when the cost complies with all of the following requirements:
>
> (1) Reasonableness.
>
> (2) Allocability.
>
> (3) Standards promulgated by the CAS Board, if applicable, generally accepted accounting principles and practices appropriate to the circumstances.
>
> (4) Terms of the contract.
>
> (5) Any limitations set forth in this subpart.
>
> . . . .
>
> (d) A contractor is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles in this subpart and agency supplements. The [CO] may disallow all or part of a claimed cost that is inadequately supported.
>
> FAR 31.201-3, DETERMINING REASONABLENESS (JUL 1987), provides in part:
>
> (a) A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business.… No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the [CO] or the [CO's] representative, the burden of proof

shall be upon the contractor to establish that such cost is reasonable.

(b) What is reasonable depends upon a variety of considerations and circumstances, including –

(1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;

(2) Generally accepted sound business practices, arm's length bargaining, and Federal and State laws and regulations;

(3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and

(4) Any significant deviations from the contractor's established practices.

FAR 52.216-7, ALLOWABLE COST AND PAYMENT (DEC 2002), incorporated into the cost contracts at issue,[8] provides in part that:

(a) Invoicing.

(1) The Government will make payments to the Contractor when requested as work progresses … in amounts determined to be allowable by the [CO] in accordance with [FAR] subpart 31.2 in effect on the date of this contract and the terms of the contract.

…

(d) Final indirect cost rates.

(1) Final annual indirect cost rates and the appropriate bases shall be established in accordance with Subpart 42.7 of the [FAR] in effect for the period covered by the indirect cost rate proposal.

Title 10 U.S.C. § 2324, Allowable costs under defense contracts, provides:

---

[8] *See, e.g.*, ASBCA Nos. 60056-61, R4, tab 2 at 158.

(a) **Indirect Cost That Violates a FAR Cost Principle.-**

The head of an agency shall require that a covered contract provide that if the contractor submits to the agency a proposal for settlement of indirect costs incurred by the contractor for any period after such costs have been accrued and if that proposal includes the submission of a cost which is unallowable because the cost violates a cost principle in the [FAR] or applicable agency supplement to the [FAR], the cost shall be disallowed.

(b) **Penalty for Violation of cost principle.-**

(1) If the head of the agency determines that a cost submitted by a contractor in its proposal for settlement is expressly unallowable under a cost principle referred to in subsection (a) that defines the allowability of specific selected costs, the head of the agency shall assess a penalty against the contractor in an amount equal to-

(A) the amount of the disallowed cost allocated to covered contracts for which a proposal for settlement of indirect costs has been submitted; plus

(B) interest (to be computed based on provisions in the [FAR]) to compensate the United States for the use of any funds which a contractor has been paid in excess of the amount to which the contractor was entitled.

(2) If the head of the agency determines that a proposal for settlement of indirect costs submitted by a contractor includes a cost determined to be unallowable in the case of such contractor before the submission of such proposal, the head of the agency shall assess a penalty against the contractor in an amount equal to two times the amount of the disallowed cost allocated to covered contracts for which a proposal for settlement of indirect costs has been submitted.

> (c) **Waiver of Penalty**. --The [FAR] shall provide for a penalty under subsection (b) to be waived in the case of a contractor's proposal for settlement of indirect costs when-
>
> . . . .
>
> (1) The contractor demonstrates, to the [CO's] satisfaction, that--
>
> (A) it has established appropriate policies and personnel training and an internal control and review system that provide assurances that unallowable costs subject to penalties are precluded from being included in the contractor's proposal for settlement of indirect costs; and
>
> (B) the unallowable costs subject to the penalty were inadvertently incorporated into the proposal.

FAR 42.709, SCOPE (NOV 2016), and its subsections implement the statutory penalty and waiver provisions as does FAR 52.242-3, PENALTIES FOR UNALLOWABLE COSTS (MAR 2001).

CAS 405-40, Fundamental Requirement, states in part that:

> (a) Costs expressly unallowable or mutually agreed to be unallowable, including costs mutually agreed to be unallowable directly associated costs, shall be identified and excluded from any billing, claim, or proposal applicable to a Government contract.

48 C.F.R. § 9904.405-40(a).

FAR 31.201-6 reflects CAS 405's requirements and provides, in part:

> (a) Costs that are expressly unallowable or mutually agreed to be unallowable, including mutually agreed to be unallowable directly associated costs, shall be identified and excluded from any billing, claim, or proposal applicable to a Government contract. A directly associated cost is any cost that is generated solely as a result of incurring another cost, and that would not have been incurred had the other cost not been incurred. When

> an unallowable cost is incurred, its directly associated costs are also unallowable.

ASBCA NO. 59435 -- GOVERNMENT RELATIONS COSTS

FINDINGS OF FACT CONCERNING GOVERNMENT RELATIONS COSTS

16. The following statutory and regulatory provisions apply to lobbying:

Title 31 U.S.C. § 1352, Limitation on Use of Appropriated Funds to Influence Certain Federal Contracting and Financial Transactions, provides in part:

> (a)(1) None of the funds appropriated by any Act may be expended by the recipient of a Federal contract, grant, loan, or cooperative agreement to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with any Federal action described in paragraph (2) of this subsection [including the awarding of any Federal contract].

Title 10 U.S.C. § 2324(e), Specific Costs Not Allowable, provides in part:[9]

> (1) The following costs are not allowable under a covered contract:
>
> . . . .
>
> (B) Costs incurred to influence (directly or indirectly) legislative action on any matter pending before Congress, a State legislature, or a legislative body of a political subdivision of a State.

FAR 31.201-6(c)(1), ACCOUNTING FOR UNALLOWABLE COSTS (NOV 2005), provides that "The practices for accounting for and presentation of unallowable costs must be those described in 48 CFR 9904.405, Accounting for Unallowable Costs [CAS 405]."

---

[9] *See also* Title 10 U.S.C. § 2249, Prohibition on Use of Funds for Documenting Economic or Employment Impact of Certain Acquisition Programs, and DOD FAR Supplement (DFARS) 231.205-22, Legislative Lobbying Costs, which implements that statute and makes such costs unallowable.

FAR 31.201-6(e)(2), ACCOUNTING FOR UNALLOWABLE COSTS (NOV 2005), provides:

> Salary expenses of employees who participate in activities that generate unallowable costs shall be treated as directly associated costs to the extent of the time spent on the proscribed activity, provided the costs are material in accordance with subparagraph (e)(1) above (except when such salary expenses are, themselves, unallowable). The time spent in proscribed activities should be compared to total time spent on company activities to determine if the costs are material. Time spent by employees outside the normal working hours should not be considered except when it is evident that an employee engages so frequently in company activities during periods outside normal working hours as to indicate that such activities are a part of the employee's regular duties.

FAR 31.205-22, LOBBYING AND POLITICAL ACTIVITY COSTS (OCT 1997), provides in part:

> (a) Costs associated with the following activities are unallowable:
>
> (1) Attempts to influence the outcomes of any Federal, State, or local election, referendum, initiative, or similar procedure, through in kind or cash contributions, endorsements, publicity, or similar activities;
>
> (2) Establishing, administering, contributing to, or paying the expenses of a political party, campaign, political action committee [PAC], or other organization established for the purpose of influencing the outcomes of elections;
>
> (3) Any attempt to influence
>
> (i) the introduction of Federal, state, or local legislation, or
>
> (ii) the enactment or modification of any pending Federal, state, or local legislation through communication with any member or employee of the Congress or state legislature (including efforts to influence state or local officials to engage in

> similar lobbying activity), or with any government official or employee in connection with a decision to sign or veto enrolled legislation;
>
> (4) Any attempt to influence
>
> (i) the introduction of Federal, state, or local legislation, or
>
> (ii) the enactment or modification of any pending Federal, state, or local legislation by preparing, distributing or using publicity or propaganda, or by urging members of the general public or any segment thereof to contribute to or participate in any mass demonstration, march, rally, fund raising drive, lobbying campaign or letter writing or telephone campaign;
>
> (5) Legislative liaison activities, including attendance at legislative sessions or committee hearings, gathering information regarding legislation, and analyzing the effect of legislation, when such activities are carried on in support of or in knowing preparation for an effort to engage in unallowable activities; or
>
> (6) Costs incurred in attempting to improperly influence..., either directly or indirectly, an employee or officer of the Executive branch of the Federal Government to give consideration to or act regarding a regulatory or contract matter.

FAR 31.205-22(b) excepts certain activities from paragraph (a)'s coverage, e.g. "providing technical and factual . . . information on a topic directly related to performance of a contract . . . in response to a documented request" from a member of Congress, or any activity specifically authorized by statute to be undertaken with contract funds.

FAR 31.205-22(c) provides:

> When a contractor seeks reimbursement for indirect costs, total lobbying costs shall be separately identified in the indirect cost rate proposal, and thereafter treated as other unallowable activity costs.

FAR 31.205-22(d) provides:

> Contractors shall maintain adequate records to demonstrate that the certification of costs as being allowable or unallowable (see 42.703-2) [requirement for certification of indirect costs] pursuant to this subsection complies with the requirements of this subsection.

CAS 405-40(e), Fundamental Requirement, 48 C.F.R. § 9904.405-40(e) provides:

> All unallowable costs covered by paragraphs (a) through (d) of this subsection shall be subject to the same cost accounting principles governing cost allocability as allowable costs. In circumstances where these unallowable costs normally would be part of a regular indirect-cost allocation base or bases, they shall remain in such base or bases. Where a directly associated cost is part of a category of costs normally included in an indirect-cost pool that will be allocated over a base containing the unallowable cost with which it is associated, such a directly associated cost shall be retained in the indirect-cost pool and be allocated through the regular allocation process.

<u>Raytheon's Government Relations Department Activities</u>

17. At all relevant times, Raytheon maintained an office in Arlington, Virginia, known as the Washington Office or Washington Area Office (*see, e.g.*, tr. 5/23). In 2007 and 2008 the office included a Government Relations Department, among others. Costs associated with Government Relations were collected in cost center 90206. The Department's name has changed from time to time (e.g., "Congressional Relations;" "Legislative Affairs;" or "Legislative Operations") but the cost center designation has remained the same. We use "Government Relations" for convenience. (*See* Rule 4, tabs 121, 169; app. supp. R4, tab 208 at 3184; tr. 5/19, 176, 6/85, 10/105; AUPFF ¶ 19) Government Relations serves as Raytheon's primary interface with the United States Congress (gov't undisputed proposed finding of fact (GUPFF) ¶ 35 (first sentence only)).

18. In 2007 and 2008 Government Relations had approximately 20-22 employees, of whom approximately 12-13 were federal government relations specialists, managers or directors; two were responsible for state and local government relations; two were responsible for PAC activities; and the remainder were administrative specialists. In its 2008 annual Lobbying Report to Congress, Raytheon identified up to 13 individuals who

had acted as lobbyists[10] in given areas (usually fewer per area). (R4, tab 169; tr. 5/24, 10/171; AUPFF ¶¶ 20-21 (excluding n.8))

19. Raytheon's General Policies and Procedures, No. 23-3045-110, "IDENTIFYING AND REPORTING LOBBYING ACTIVITY COSTS," effective December 13, 1984 and continuing through 2007 and 2008 (Lobbying Policy), covered how Government Relations employees were to log their time to comply with FAR 31.205-22 and exclude unallowable lobbying costs (app. supp. R4, tab 1; tr. 5/283-84, 9/284-85). The Lobbying Policy provided in part:

> 5.1 <u>Unallowable Costs</u>
>
> 5.1.1 <u>Lobbying Activity Costs</u>—These activities include:
>
> a. Attempts to influence the outcomes of any Federal, state, or local election, referendum, initiative, or similar procedure, through in kind or cash contributions, endorsements, publicity, or similar activities;
>
> b. Establishing, administering, contributing to, or paying the expenses of a political party, campaign, [PAC], or other organization established for the purpose of influencing the outcomes of elections;
>
> c. Any attempt to influence (1) the introduction of Federal or state legislation, or (2) the enactment or modification of any pending Federal or state legislation through communication with any member or employee of the Congress or state legislature (including efforts to influence state or local officials to engage in similar lobbying activity), or with any government official or employee in connection with a decision to sign or veto enrolled legislation;
>
> d. Any attempt to influence (1) the introduction of Federal or state legislation, or (2) the enactment or modification of any pending Federal or state legislation by preparing, distributing, or using publicity or propaganda, or by urging members of the general public or any segment thereof to contribute to or participate in any mass

[10] Raytheon objects to the term "lobbyist" in some cases, stating that it has no such job title. We use the term for convenience, without making any substantive determination on the question of lobbying costs, unless we so state.

demonstration, march, rally, fund raising drive, lobbying campaign, or letter writing or telephone campaign; or

e. Legislative liaison activities only when carried on in support of or in knowing preparation for an effort to engage in unallowable activities. Thus, only those legislative liaison activities which, from their timing and subject matter, can reasonably be inferred to have had a clearly foreseeable link with later lobbying fall within the "knowing preparation" standard of this section.

5.1.2 Associated Lobbying Activity Costs

a. The lobbying activity costs defined above include the applicable portions of salaries of employees and fees of individuals or firms engaged in lobbying activity on behalf of Raytheon (whether or not such employees or firms are registered as lobbyists under any applicable law).

b. Also unallowable are costs that are "directly associated" with lobbying activity costs, as defined in Section 5.1.1 above. A "directly associated" cost as defined by the [CAS] Board (CASB) is a "cost which is generated solely as the result of the incurrence of the (unallowable lobbying cost) and which would not have been incurred had the (unallowable lobbying cost) not been incurred." . . . .

5.2 Allowable Costs

5.2.1 Non-Lobbying Activity Costs—These activities include:

a. Providing a technical and factual presentation of information, on or off Raytheon premises, on a topic directly related to the performance of a contract through hearing testimony, statements or letters to the Congress or a state legislature, or subdivision, member, or cognizant staff member thereof, in response to a documented request (including a Congressional Record notice requesting testimony or statement for the record at a regularly scheduled hearing) made by the recipient member, legislative

body or subdivision, or a cognizant staff member thereof; provided such information is readily obtainable and can be readily put in deliverable form; and further provided that costs under this section for transportation, lodging or meals are unallowable unless incurred for the purpose of offering testimony at a regularly scheduled Congressional hearing pursuant to a written request for such presentation made by the Chairman or Ranking Minority Member of the Committee or Subcommittee conducting such hearing.

b. All legislative liaison activities not in support of unallowable lobbying activity costs as defined in Section 5.1 above. Allowable legislative liaison includes gathering information or legislation, analyzing the [e]ffect of legislation, and attending legislative sessions or hearings and reporting on the subject matter of such legislative sessions or hearings.

. . . .

6. <u>PROCEDURE</u>

. . . .

NOTE: The applicable portion of employees' salaries is withdrawn through the overhead rate submission . . .

b. In addition to the above reporting requirement, employees who spend more than 25% of their compensated hours during the month on lobbying activity are also required by Government regulation to maintain time logs, calendars, or similar records documenting all of their lobbying activity.

NOTE: Time spent on lobby activity after the scheduled working day is not reported.

. . . .

6.2.2 Raytheon is required to maintain "adequate records" to support a required certification in its annual indirect cost rate proposal that Raytheon has properly segregated and not claimed for reimbursement the cost of any unallowable lobbying activity.

(App. supp. R4, tab 1 at 1-4)[11]

20. Raytheon's Company Policy No. 6-RP, "Overhead and G&A Rates for Accounting and Provisional Billing Purposes (Excluding Unallowable Costs)," effective June 26, 2002, identifies lobbying costs as expressly unallowable (R4, tab 112 at ¶ 6.2).

21. In 2007 and 2008 Raytheon's CGA, particularly James Pflaumer, Manager of Government Accounting, promulgated "Guidelines - Accounting for Selected Costs In Accordance With FAR Part 31" (Unallowable Guidelines), which addressed lobbying, among other costs (app. supp. R4, tab 48 at 797-98, tab 101 at 1587; tr. 3/9-10, 5/298, 6/19). Two of the testifying lobbyists did not recall seeing the Unallowable Guidelines prior to this litigation (tr. 7/9 (Robert Neal), 10/149 (Joseph Zummo)). PAC Manager Courtney Watson was fully aware of the Lobbying Policy and the Unallowable Guidelines, which were available to all of the lobbyists. The Unallowable Guidelines were subordinate to the Lobbying Policy. (Tr. 5/177, 220-21, 6/19, 27)

22. Ms. Watson found the distinction between allowable and unallowable costs to be fairly clear. In her experience Government Accounting took accurate time reporting very seriously. These considerations led to the development of the Lobbying Tool (below). (Tr. 5/217-21)

23. In addition to in-house training, the Government Relations department was trained by outside counsel concerning what were allowable and unallowable costs, for purposes of recording time accurately. The training, which was at least annual, included compliance with the FAR's lobbying provisions. (Tr. 5/218-19, 7/24, 45-46) By email dated January 4, 2008 to the Government Relations personnel and others, Robert Shanks, Raytheon's corporate counsel, sent "Additional Guidance: New Lobbying and Ethics Reform Act" (R4, tab 151 at 71755-56; tr. 7/23-24). The document gave statistical order numbers and charge numbers for purposes of charging lobbying costs and described lobbying as follows:

> Direct lobbying is the communication of Raytheon's view to a federal, state or local legislator or a staff member or any other government employee who may help develop legislation. Even if there is no pending legislation, you would be engaged in lobbying if you asked a legislator or covered Executive Official to take an action that would require legislation, such

---

[11] The only material difference between the Lobbying Policy's recital of unallowable lobbying costs and those contained at FAR 31.205-22(a) is that the Policy did not include a counterpart to FAR 31.205-22(a)(6), concerning illegal attempts to improperly influence an Executive Branch employee or officer. Raytheon maintains, without challenge, that these prohibitions are addressed elsewhere in its policies and are not in dispute in these appeals. (App. br. at 18, n.9)

> as funding an agency or program. PLEASE NOTE: Lobbying includes preparation time for "white papers" and other written or oral lobbying activities, as well as time spent supporting the PAC.

(R4, tab 151 at 71762) The Government Relations team had worked with Raytheon's Business Development, Finance and Legal Teams to prepare these "basic instructions" (tr. 7/27-28). In addition to providing charge instructions to Raytheon's various businesses, Raytheon had separate training for them concerning the definitions of lobbying (tr. 7/28-30).

24. In 2007 and 2008 Raytheon withdrew unallowable costs from its Government Relations cost center 90206 through A&S, which was responsible for preparing the Corporate incurred cost submissions. Donna Ferrero, a Consulting Budget Analyst, was responsible for collecting costs from cost center 90206, ensuring that the unallowable portion was withdrawn, and calculating the cost disallowance factor (below). She had no written instructions on how to complete the lobbying withdrawal calculation but had consulted with her predecessor and supervisor on the matter and, based upon her several years' experience, she knew what was required. (Tr. 6/252-54; AUPFFs 48-49) Ms. Ferraro was making mathematical calculations, not evaluating the substance or purpose of the time reported (tr. 6/260-61, 267). Ms. Watson noted that "the onus [was] on each individual employee" to enter his or her time accurately (tr. 5/209-10).

25. During the relevant time periods Raytheon's paper time sheets for its Washington Office defined "Lobbying" as follows:

> Lobbying is defined by the Lobbying Disclosure Act (LDA) as any oral or written communication (including e-mail) to an executive or legislative branch official with regard to the formulation, modification, or adoption of federal legislation, a federal rule, regulation, Executive Order, or any other program, policy, or position of the U.S. Government. Exclusions include written responses to requests for information, testimony before a committee and administrative requests.

(R4, tab 127 at 144664) This definition was to provide guidance regarding lobbying activities but there was no specific training on how to fill out the time sheets (tr. 5/229).

26. Congressional "[LDA] Guidance," effective January 1, 2008, revised February 15, 2013, states that the LDA "does not contain any special record keeping provisions" but, for an organization employing in-house lobbyists, it "requires a good faith estimate of the total expenses of its lobbying activities" (R4, tab 229 at 14; tr. 5/38-40).

27. In addition to the LDA's definition of lobbying, at least Messrs. Neal, Zummo, and Woody Lee were also familiar with the FAR definition of lobbying and used the concepts embodied in each in recording unallowable time (tr. 7/17, 9/287-88, 10/135).

28. During 2007 and all relevant times, Raytheon instructed its Government Relations personnel to exclude from their monthly time-sheet reports any time spent on unallowable lobbying activities on a weekend, holiday, or before 8 AM or after 5 PM. Raytheon never withdraws time for unallowable lobbying activities occurring during those periods on the ground that its Government Relations employees are salaried and charged indirectly; they are paid based upon a 40-hour work week; and including time outside of that period would result in an overstatement of the withdrawal amount. Raytheon maintains, and the government has not rebutted, that there was no cost to it or to the government for work outside normal business hours.[12] (R4, tab 103 at 65-68; tr. 5/52, 235-37, 240-44, 6/276-77, 9/288-89; *see similarly* tr. 10/138-40; GUPFF ¶ 53 as restated in APFF ¶ 53)

29. Accounting for labor costs as a function of time paid, rather than time worked, is one common industry method. Raytheon asserts that it is required to use that method under CAS 401, 48 C.F.R. § 9904.401, Consistency in Estimating, Accumulating and Reporting Costs, because that is its disclosed accounting practice and the one it uses in bidding. (Tr. 1/199-200, 2/59, 6/109-10) We find that Raytheon appropriately excluded work from its lobbying cost reporting for which there was no cost to the government.

30. For the most part, other than some identification of weekends, travel, paid time off, holidays or leave, Raytheon's paper time sheets are not detailed. Their purpose is to report time spent on unallowable activities only. Normally, they identify the hours spent on lobbying for a given day, not the specific activities. They also do not report the nature of any alleged non-lobbying activities. (R4, tabs 127-32, 134-35, 137, 139, 141-42; tr. 9/286, 349, *see* tr. 5/93 (Raytheon did not provide the auditors with detailed logs of employees' work activities), *but see* finding 60 (auditors did not ask for such materials)). A few of the time sheets describe at least some of the reporting individual's activities (*see, e.g.*, R4, tabs 133, 136, 138, 140).

31. In 2008, Raytheon transitioned from paper time sheets to an online Lobbying Compliance Tool (Lobbying Tool), in response to the Honest Leadership and Open Government Act of 2007, Pub. L. 110-81, 121 Stat. 735 (Sept. 14, 2007), and to new procurement laws in several states. From January 1, 2008 until March 31, 2008, before Raytheon implemented the Lobbying Tool, its lobbyists used internal "statistical orders" to track their lobbying hours. Like the time sheets, the orders did not describe specific

[12] Raytheon's cost accounting does not allocate costs to the night and weekend work. However, logically, the expectation of regular night and weekend work would be factored into the salary paid to the lobbyists. The government did not introduce testimony on this point, so we accept Raytheon's testimony that the government was not charged for the night and weekend work.

activities. (*See* R4, tabs 151, 177 at 2, tab 214 at 1-2, tab 217 at spreadsheet attachment; tr. 5/55-56, 202-03, 217-18; GUPFF ¶¶ 56-58 as restated in APFF 43, GUPFF ¶ 60).

32. Raytheon implemented the Lobbying Tool in April 2008. It allowed its lobbyists to log on to Raytheon's internal intranet in order to report their lobbying hours monthly (*see* R4, tabs 190, 193; GUPFF ¶ 61). The Lobbying Tool accounted separately for LDA lobbying activities and those that were unallowable under FAR 31.205-22. For example, PAC activities are not lobbying for purposes of the LDA but are unallowable under the FAR. The Lobbying Tool tracked total lobbying hours per employee, including for the LDA, the Internal Revenue Service, and FAR compliance. As of the audit (below), each employee who lobbied prepared a one-page monthly time log showing the total number of hours that the employee engaged in disallowed lobbying or PAC efforts each day. At the end of every month, the employee entered the hours spent on lobbying-related activities into the Lobbying Tool. The time logs were then consolidated and formed the basis for Raytheon's voluntary cost withdrawal for lobbying activities. The unallowable lobbying withdrawal percentage was calculated by dividing the total hours spent on lobbying activity by the total annual hours worked. (App. supp. R4, tab 208 at 3185-87; tr. 5/61, 211-14)

33. As with the predecessor paper time sheets, under the Lobbying Tool lobbyists were not to record more than 8 hours a day or enter any weekend or holiday lobbying (tr. 5/243-44, 280-81, 10/139-40; GUPFF ¶ 63). The tool did not provide information regarding the nature of Raytheon's lobbyists' activities (R4, tab 215 at attachment; tr. 6/294-95; GUPFF ¶ 65).

34. For all relevant times, Raytheon relied upon the lobbying time reported by its Government Relations lobbyists to determine its unallowable lobbying activity costs under FAR 31.205-22, which it referred to as its "lobbying withdrawal calculation." Raytheon's A&S Budgets Group, in particular analyst Ferrero, was responsible for the calculation as part of the preparation of Raytheon Corporate's annual indirect cost proposals, including for FYs 2007 and 2008. Ms. Ferrero did not know the process by which Raytheon's lobbyists recorded their time. (R4, tab 103 at 62-64 (app. resp. to interrog. No. 24); tabs 160, 184; tr. 6/252-61; GUPFF ¶¶ 66-67)

35. For the lobbying cost withdrawal calculation, Raytheon established a ratio of unallowable hours worked by the Government Relations employees to their total hours worked. The ratio's numerator was the total number of unallowable hours reported by the lobbyists. The denominator was the total number of work hours available during a given year to the employees who reported unallowable hours, based upon a 40-hour work week less vacation and holidays. Dividing the numerator by the denominator yielded a percentage—the lobbying disallowance factor. Raytheon applied this factor to what it deemed to be Government Relations' recoverable expenses (including the salary and fringe benefits paid to its lobbyists and their administrative staff) to determine the costs associated with unallowable lobbying activities under FAR 31.205-22. (R4, tab 103 at 62-64 (app. resp. to interrog. No. 24); tabs 160, 184, 710 ¶ 69; tr. 6/255-60

(disallowance factor applied to labor, salary, and some other general ledger accounts); GUPFF ¶¶ 68-69)

36. For Raytheon Corporate's 2007 and 2008 incurred cost proposals, Ms. Ferrero calculated the disallowance factors at 53.3% and 50%, respectively, resulting in withdrawals of $2,466,654.88 and $2,558,450.79 (R4, tabs 160-61, 184 at tab entitled "cc902906 Withdrawal," tab 185; tr. 6/255-60, 318-23, 333; GUPFF ¶¶ 70-73).

37. By the time of the 2007 and 2008 withdrawals, Ms. Ferrero had enhanced the process to avoid some past inadvertent errors. She personally reviewed every Government Relations time sheet submitted in 2007; ensured that employees who joined or left the cost center received a prorated allocation for purposes of the withdrawal factor; confirmed that the list of employees for each year's withdrawal was correct; and confirmed her draft analysis with the Corporate A&S Finance Manager embedded in the Washington Office. Her supervisor, Charles Vilandre, also exercised closer supervision over the withdrawal process than he had previously. (Tr. 6/312-313, 315-16, 319-21, 333-34) Two State and Local Government Relations specialists did not prepare paper timesheets in 2007. They were not required to do so under the LDA. However, with Ms. Watson's assistance, Ms. Ferrero made reasonable efforts to ascertain and report their unallowable lobbying time. (R4, tabs 157-59; tr. 5/245-48, 6/283-87)

<u>DCAA's Corporate Audit for 2007 and Corporate COFD for FY 2007</u>

38. In 2008, Catherine Grindlay (now Quinn, as we refer to her) of DCAA began the initial Corporate Audit of Government Relations cost center 90206 for 2007. Along with two others from DCAA, Ms. Quinn interviewed Government Relations employees during one visit in December 2008 regarding CY 2007 lobbying costs, as reflected in typewritten interview summaries, which were not sworn transcripts. (R4, tab 218; tr. 8/236-38, 241-42) The purpose of her interviews was to determine if the amount of unallowable lobbying costs Raytheon recorded coincided with the employees' stated job roles and activities (app. supp. R4, tab 208 at 3184-86). The employees interviewed, in 2008 and later, were not given copies of DCAA's interview notes for review (tr. 5/142, 151, 8/241, 9/308)

39. On November 3, 2008, Michael Logsdon, a Raytheon manager of the Government Relations cost center and the Washington Area Office's point of contact with DCAA (tr. 6/51, 8/233)[13], responded to an inquiry from Ms. Quinn concerning lobbying costs. He noted that, in 2006, DCAA had conducted a comprehensive review of Raytheon's "processes to review, collect and withdraw" lobbying and directly associated lobbying costs at its Washington Office. He represented that there were no deficiencies noted regarding those costs and Raytheon's fundamental identification of the costs was unquestioned. (Ex. A-18 at 6681)

---

[13] Mr. Logsdon's name was misspelled as "Loxton" in the hearing transcript (*see, e.g.*, app. supp. R4, tab 148 at 002081).

40. A draft report, later superseded (below), was sent to Raytheon on July 14, 2009. It recommended changing Raytheon's total disallowance factor from 53.3% to 65.9%. The change was made by adjusting the withdrawal percentages for four Government Relations employees. For Douglas Baragar (employee ID 1019110), Ms. Quinn reported that, in his interview, he stated that he spent 65-70% of his time on unallowable lobbying activities. However, he had withdrawn 42% of his time for 2007. The auditors raised his withdrawal percentage from 42% to 65%. For William "Woody" Lee (employee ID 09033), the auditors raised his withdrawal percentage from 13% to 85% on the ground that he was the only lobbyist covering Raytheon's civil programs. For William Lynn (employee ID 1030582), the auditors raised his withdrawal percentage from 12% to 85%[14] and for Ms. Watson (employee ID 105056),[15] they raised the percentage from 67% to 100%. DCAA was concerned that the Government Relations employees were not capturing time spent preparing for lobbying, although, as reflected in Ms. Quinn's interview notes, the employees she questioned responded that they classified such time as unallowable. (R4, tab 218 at 6790, 6798, 6805, 6812, 6814-15, 6819, 6827; app. supp. R4, tab 126 at 1929, tab 148 at 2083-85; tr. 5/88-90, 8/244-47, 250-51, 255-56; ex. A-18 at 6679-80; APFF ¶ 77) Essentially, DCAA viewed some of Government Relations' activities as related to lobbying and expressly unallowable and Raytheon viewed them as allowable (tr. 5/129).

41. Four members or alumni of Government Relations, all of whom were there in 2007/2008, testified at the hearing (Ms. Watson and Messrs. Neal, Lee, and Zummo). Ms. Watson, who was a credible witness, joined Government Relations in 2005 as the PAC Manager (tr. 5/177). She was responsible for ensuring that Raytheon's PAC, or "RAYPAC," complied with all federal election campaign laws. She raised funds from eligible employees for the PAC and distributed them to candidates who supported Raytheon's views (tr. 5/192; APFF ¶ 21 (undisputed portion)). Ms. Watson worked outside her normal 8:30 AM – 5:30 PM workday about 10% of the time. She considered the functions she attended outside her normal work hours to be part of her regular work duties. She recorded her activities on a daily log, notes on her desk calendar and Lotus notes. She archived her emails. She was not a registered lobbyist as of the hearing and was not in 2007. It was not part of her duties to pursue "earmarks" or directed appropriations in 2007. She spent 1-2 hours per week engaged in internal discussions on lobbying strategies. She classified the meeting time regarding lobbying as nonrecoverable as well as time spent at meals with other contractors that were also attended by members of Congress or Congressional staff. She attended political fundraising events both during and outside normal work hours and accounted for her time. In 2007, Ms. Watson reported that the Legislative Operations team hosted 24 events and attended 654 fundraisers. She considered all of her time administering Raytheon's PAC to be unallowable. She deemed her role in lobbying compliance, internal efforts to support business development,

[14] Mr. Lynn's and employee Judith Pauletich's costs are no longer at issue (tr. 5/35).

[15] The audit report mistakenly identified Ms. Watson as employee ID 1050586, rather than 105056 (*see* R4, tab 145 at 1, app. supp. R4, tab 148 at 2084).

training, staff meetings, and the like to be allowable costs and opined that responding to requests and giving hearing testimony were Government Relations' activities that were not lobbying. She was a salaried employee paid based upon a 40-hour work week and recorded lobbying and political events as unallowable up to her normal business hours. Ms. Watson estimated that she spent 65% to 70% of her time a year on PAC lobbying activities. (R4, tab 145 at 2; tab 218 at 6803-07; tr. 5/196, 201-02, 206, 235, 237, 239, 243, 260-61). Ms. Watson was confident that she had captured all of her unallowable time in 2007 and 2008 (tr. 5/285).

42. Mr. Neal, a credible witness, joined Government Relations in January 2007 as a Senior Manager. During 2007 and 2008 he was the chief interface between RMS and the legislative branch of government. (Tr. 7/6, 44; APFF ¶ 22 (undisputed portion)) He was a registered lobbyist as of the hearing and in 2007 (R4, tab 218 at 6787). On some days in 2007 and 2008, Mr. Neal worked over eight hours on lobbying activities. Outside of normal business hours he might attend early morning or late evening meetings, PAC meetings, PAC events with members of Congress, breakfasts, lunches, and dinners. In 2007 and 2008, on occasion he would attend morning fundraisers, work a full day, then attend fundraisers at night (tr. 7/22). Mr. Neal recorded his activities on a daily log, notes on his desk calendar, and Lotus notes calendar, which was usually "pretty detailed" (tr.7/11). He archived his emails (R4, tab 218 at 6787). He considered the functions he attended before 8 AM and after 5 PM to be part of his regular work duties. He opined that business development activity, learning about programs, reading trade/industry press, clerical activity, responding to requests from Congressional staffers, and explaining the nature of program funding that had been provided in a fiscal funding bill, were allowable costs. He considered time spent providing facts was allowable, but if the time were colored in any way by an attempt to influence, it was not allowable. He classified time spent at meals with other contractors that were also attended by members of Congress or their staff as lobbying or political time. Mr. Neal evaluated whether an activity was lobbying on a case by case basis. The time he spent on lobbying activities varied, with less time spent when Congress was in recess. He deemed his annual lobbying percentage to be 60%-70%. (*Id*. at 6793; tr. 7/37, 80-81, 86, *see also* tr. 7/41)

43. Mr. Neal "didn't estimate" his time; he entered his time as appropriate on a daily basis, applying a "conservative bias on each day" as to what was unallowable (tr. 7/13). Mr. Neal logged "mixed purpose" activities as lobbying (tr. 7/52). He collected and submitted his time at the end of the month (tr. 7/11-12). Mr. Neal credibly vouched for the accuracy of his recorded unallowable lobbying time on his 2007 time sheets (app. supp. R4, tab 69; tr. 7/70, 77-78).

44. Mr. Lee, a credible witness, joined Raytheon as a Government Relations Manager in 1995, after a career in the United States Coast Guard, and was promoted to Senior Manager of Government Relations. He was responsible for Civil Programs until his retirement in 2014. (Tr. 9/276-78, 281-82, 317; APFF ¶ 23) (undisputed portion)) Mr. Lee spent less than 3% of his time working on obtaining earmarks for Raytheon. He classified that work, and internal discussions on lobbying activities, as non-recoverable

lobbying costs. The amount of time he spent on the internal discussions varied depending upon the time of year, with February to April as the busiest. Mr. Lee was a registered federal lobbyist, because he spent, or might spend at a given time, more than 20% of his time in lobbying activities, although he described his allowable activities as "much greater" (tr. 9/307). He travelled infrequently overnight to attend events also attended by Executive or Legislative Branch officials or lobbying firms. He designated those costs as non-recoverable unless a member of Congress or staffer had requested the visit. Mr. Lee opined that information gathering (reading reports, papers, learning programs and the status of matters, professional development and internal staff meetings that did not involve lobbying) generated allowable costs. Unallowable activities included attempts to influence. Mr. Lee advised DCAA auditor Quinn that he normally worked about 8 hours per day, but he attended fundraisers and Hill events both during the regular work day and after hours. The fundraisers were typically outside regular hours and were sometimes on weekends. This was an expected part of the job in Government Relations and part of his regular work duties. In 2007, Mr. Lee attended 119 political fundraisers and 44 local non-fundraising events. In 2008, he attended 103 political fundraisers and 34 non-fundraising events. No matter how many hours he worked on unallowable activities, he would report only 8 hours per day on the ground that he was an exempt salaried employee. He recorded his work activities on Palm Calendar software and on his time sheets, daily or close thereto. The purpose of the time sheets was to record time spent on unallowable activities only. Mr. Lee credibly estimated that he spent 20%-30% of his time annually on lobbying. (R4, tab 143 at 9518, tab 175 at 9587, tab 218 at 6816-22; tr. 9/286-88, 291-92, 315-16, 328, 335, 337-38, 349)

45. Joseph Zummo, a credible witness, was Director of Government Relations as of the hearing. He joined Government Relations as a Senior Manager in 2005, after serving as an aviator in the United States Navy. During 2007 and 2008, he was the Senior Manager principally responsible for programmatic and policy issues of interest to Raytheon. He was a registered lobbyist as of the hearing and in FY 2007. When interviewed by Ms. Quinn in 2008, Mr. Zummo reported that he usually worked about 10 hours a day. Outside his normal work day, and sometimes during his normal work hours, he attended trade association events and political fundraisers. He accounted for his time and considered his activities before 8 AM and after 5 PM to be part of his regular work duties. His primary duties for Raytheon were as a lobbyist and working on policy. Part of his duties in 2007 was to pursue earmarks or directed appropriations, but he spent very little time on this. He reported that time as non-recoverable. Mr. Zummo often engaged in internal discussions within his department on lobbying strategies. He classified this time, or some of it, as non-recoverable. Mr. Zummo attended meetings with other contractors that were also attended by members of Congress or Congressional staff. He classified his time as recoverable or not, depending upon the meeting's purpose. About 15 times a year Mr. Zummo traveled for Congressional staff site visits or fundraising in districts or states. He reported that time as non-recoverable lobbying. He attended fundraising events for the Raytheon PAC. He opined that his internal meetings and data gathering activities resulted in allowable costs. Mr. Zummo opined that, during

2007-08, an active period for him, he was "probably incredibly conservative" and "erred on the side of reporting most of [his activity]" as unallowable (tr. 10/115). If there were "any room for interpretation," Mr. Zummo recorded his activity as unallowable (tr. 10/134). He recorded his activities on a daily log, notes on his desk calendar, and Lotus notes. He archived his emails. Mr. Zummo credibly estimated that he spent 90% of his time performing lobbying activities on a yearly basis. (R4, tab 218 at 6823-29; tr. 10/103, 105, 107, 138-39; APFF ¶ 24 (undisputed portion))

46. Messrs. Neal, Lee, and Zummo had similar views that unallowable lobbying constituted attempts to influence legislation; preparing to influence legislation; attempts to influence elections and preparing to do so; and political activity, such as fund raisers or grass roots political activity or preparing to do either; or organizing or participating in PAC-related activities and preparing to do so (tr. 7/17, 52, 9/283-84, 10/114).

47. Government Relations personnel engaged in some allowable non-lobbying activity. Whether an activity was lobbying or non-lobbying could be "situational dependent" (tr. 10/162, 164) (Zummo) or dependent upon the purpose and evaluated on a case-by-case basis (tr. 7/53, 57-58) (Neal). For example, Mr. Zummo considered internal strategy sessions concerning Congressional outreach to be lobbying, which he reported as such (tr. 10/162). His description of non-lobbying activity, which he opined was compliant with the LDA and the FAR, was "anything that's not advocating or trying to influence legislation . . ." (tr. 10/114). Some examples were planning and administrative matters; human resources issues; conferences; external and internal matters that had nothing to do with trying to influence legislation; interpreting existing law for Raytheon headquarters or business divisions; budget analysis after a statute had been enacted; and examining international issues (tr. 10/160-63). Mr. Zummo used his judgment, training, and understanding of the LDA, FAR and Internal Revenue Code in classifying his time (tr. 10/132-33). The views of other testifying Government Relations personnel were similar. For example, Mr. Neal considered lobbying to depend upon whether he was attempting to influence legislation or preparing to influence legislation, "broadly speaking," engaging with a member of Congress, or organizing or participating in PAC-related activities. (Tr. 7/17) Ms. Watson described lobbying activities as attempts to influence (tr. 5/261).

48. A few more examples, from the testifying Government Relations personnel, of what they consider to be non-lobbying activities, include attending legislative hearings and gathering information for Raytheon's senior leadership, without attempting to influence the legislators (tr. 7/53-54); monitoring public sources for information that might affect Raytheon's programs and policies (tr. 9/293, 10/114); responding to Congressional oversight inquiries that did not involve attempts to influence legislation (tr. 9/295-96, 10/164-65); budget analysis after a statute has been enacted (tr. 10/163); and training and lobbying compliance activities, staff administrative meetings, ethics matters, internal efforts to support business development, diversity, health and safety, and human resources work (tr. 5/202, 9/313-14, 10/160).

49. While DCAA's initial audit report recommended changing Raytheon's total disallowance factor from 53.3% to 65.9% (finding 40), during her testimony Ms. Quinn disavowed that report (tr. 8/311). Her focus during her testimony was upon the lack of records of any Congressional requests to Raytheon for information (e.g., tr. 8/273, 285, 287, 312, 314).

50. By memorandum dated December 30, 2010, DCAA Raytheon Corporate requested an assist audit from DCAA's Mount Vernon Branch Office, which specialized in audits of defense contractors' lobbying costs (app. supp. R4, tab 172 at 2562; tr. 5/9-10). Although the initial audit report had not questioned all of cost center 90206's costs, even before they requested the assist audit the DCAA Raytheon Corporate auditors now planned to question the entire cost center 90206. That was their "strategy." (Tr. 8/245, 286-87) The audit request stated that Raytheon did not keep records of Congressional requests and did not obtain requests in writing. The auditors questioned all of cost center 90206's costs due to an alleged lack of adequate records. They deemed the employees in question to be lobbyists and stated that Raytheon "cannot justify the lobbyists['] time was allowable" (app. supp. R4, tab 172 at 2563). They speculated that employees other than those interviewed might have assisted lobbyists with the creation of white papers or with technical information; many of those employees had trouble remembering their activities during FY 2007; and, because they did not normally take part in lobbying activities, they might not have known how to record their time. (*Id.* at 2562-63) We have not been directed to any evidence to support this speculation.

51. On December 17, 2009, Mr. Logsdon responded to an inquiry from Ms. Quinn concerning records of Congressional requests as follows:

> I did discuss this with John Barnes [[16]] and Doug Hughes in Legislative Operations. They told me that it is very rare to receive written requests for information. Requests for information are overwhelmingly received via telephone call, or when in meetings with a staffer. They may get the occasional e-mail, but formally documented requests are extremely rare, and therefore not separately tracked. John and Doug also said that the time that they or their staff would spend in responding to these requests would be recorded as lobbying time in our tool, and therefore not claimed, because while the staffer may be asking for factual data, in most instances we would use the request to make our case, which would cross over to lobbying activity.

(App. supp. R4, tab 165 at 2472)

---

[16] In 2008 John Barnes was Vice President of Legislative Operations. Doug Hughes was Program Integrator. (R4, tab 169; tr. 5/185, 187)

52. Ms. Quinn based her ultimate conclusion that all of cost center 90206's costs should be disallowed on the fact that she did not find documentation "either way" on whether the costs were allowable or not (tr. 8/267, 276, 278), or claimed or not (tr. 8/290).

53. As of January 2012, Nathaniel Yesner supervised the Branch Office audit team (tr. 5/9-12). The Branch Office made an effort to "sell" its services internally to DCAA and to solicit assist audit requests, deeming the audit of lobbying costs to be a "unique area," unlike verifying numbers on a page (tr. 5/12, 120; *see* R4, tab 191).

54. The Branch Office auditors did not rely upon the interviews DCAA had already conducted; they wanted to perform an independent review (tr. 5/109-10). Out of the 20 members of Government Relations, the assist auditors interviewed Messrs. Lee, Neal and Zummo, Ms. Watson, Caroline Cooper and Carla Zeppieri in February, April and May 2012, several years after the indirect cost proposals in question. They also reviewed the work product of lobbying consultants hired by Raytheon.[17] (R4, tab 211 at A (2/5); tr. 5/159-60)

55. Mr. Yesner's June 6, 2012 Audit Summary for FY 2007 stated that this field work confirmed that 90-100% of the employees' time was spent on lobbying efforts and supported DCAA Raytheon Corporate's decision to question 100% of cost center 90206. The largest discrepancy between the percentage of costs withdrawn by Raytheon for cost center 90206 and the audit-determined unallowable percentage applied to Mr. Lee's costs, where the auditors determined that 13% was withdrawn but 100% should have been withdrawn. The next largest discrepancy applied to Mr. Neal's costs, where the auditors determined that 54% was withdrawn but 100% should have been withdrawn. The auditors also concluded that 100% of Mr. Zummo's costs should have been withdrawn, rather than the 85% that was withdrawn. The other alleged discrepancies were Ms. Cooper, for whom Raytheon withdrew 82%, but the auditors determined that there was an over-withdrawal and only 65% should have been withdrawn; Ms. Watson, where the auditors determined that 67% was withdrawn but 91% should have been withdrawn; and Ms. Zeppieri, where the auditors determined that 86% was withdrawn but 90% should have been withdrawn. The auditors averaged the percentage of lobbying costs that Raytheon withdrew at 64% and those that allegedly were unallowable at 91%. (R4, tab 211 at A (1/5) – (2/5))

56. The Branch Office auditors questioned 100% of the costs of Raytheon's "State and Local" Government Relations employees and of its office assistants without interviewing them (tr. 5/161-62). The auditors concluded that 100% of Government Relations' 2007 costs, allegedly representing direct lobbying and lobbying-related effort, was expressly unallowable under FAR 31.205-22 (tr. 5/22-23).

57. Mr. Yesner confirmed that Government Relations employees were good about recording direct lobbying activities as unallowable and that Raytheon appropriately

[17] However, consultants are not at issue in these appeals (tr. 10/176).

accounted for its PAC costs (tr. 5/121). He also acknowledged that the employees he interviewed in 2012 (Watson, Zeppieri, and Zummo) reasonably accounted for their time (tr. 5/152-54, 168), but he further stated that "[w]e don't really know, to be honest with you, the accuracy of the direct lobbying time . . ." (Tr. 5/168) The auditors speculated that the employees might not be tracking research, preparation, strategy and other time spent in what DCAA considered to be lobbying-related activities or preparation for direct lobbying (tr. 5/121-22, 168, 8/255-56). However, auditor Quinn acknowledged that nothing in her notes gave her concern that Raytheon's employees were not withdrawing pre-lobbying or lobbying preparation costs (tr. 8/268) and we have not been directed to any evidence to support this speculation.

58. DCAA held a March 19, 2013 exit conference with Mr. Vilandre, Senior Manager of A&S. DCCA received Raytheon's response to its draft audit report on April 3, 2013. Raytheon disputed that the questioned costs –then all of its submitted costs for cost center 90206 -- were unallowable. Raytheon alleged that, other than the time entered in the Lobbying Tool, Government Relations employees were not required to track their time because they charged it as indirect costs. Moreover, their time not entered into the Lobbying Tool was spent on allowable non-lobbying activities such as research and analysis of legislation's impact; monitoring and reporting to Raytheon's management upon current trends and issues; business development, such as internal staff meetings and events; professional development; and office administration. Raytheon contended that DCAA had arbitrarily and incorrectly concluded that, under FAR 31.205-22(b)(1), the only allowable activity would be related to documented requests for white papers. Raytheon asserted that its Lobbying Tool captured its unallowable lobbying activities and fully complied with FAR 31.201-2(d). Raytheon also pointed out that the 2012 interviews were 5 years after the 2007 year in question whereas the Lobbying Tool entries were contemporaneous with the reported lobbying activities. (App. supp. R4, tab 208 at 3186-87)

59. DCAA replied in its October 25, 2013 Corporate Audit Report for FY 2007 that, through interviews, the auditors had determined that Raytheon's lobbyists spent 90 to 100 percent of their time on lobbying-related activities, directly or indirectly, which was much more than Raytheon had reflected in its lobbying analysis. The auditors considered that the only lobbying-related costs that were allowable were those that satisfied FAR 31.205-22(b)'s requirement for "documented requests" from Congress and the like for information regarding contract performance and Raytheon maintained that such requests were seldom formally documented and were usually made by email or telephone. Because Raytheon could not provide documented requests, DCAA concluded that the costs DCAA deemed to be lobbying-related were expressly unallowable under FAR 31.205-22. Of the adjusted claimed cost center 90206 costs, the auditors reported that $1,870,428 were expressly unallowable and subject to a level one penalty. (App. supp. R4, tab 208 at 3029, 3184-85, 3188)

60. Auditor Quinn acknowledged that, during her audit for 2007, she did not ask to review any of the materials (calendars, notes, emails, etc.) that each of the employees

interviewed cited in support of his or her work activities (tr. 8/264-68). Similarly, the assist auditors did not ask the Raytheon interviewees for their calendars (tr. 5/151).[18]

61. Based upon DCAA's audit report, the CACO found in his June 20, 2014 Corporate COFD for 2007 that, among other disallowed costs (*see* finding 5), Raytheon had included $1,870,428 in its proposal for salary and labor costs paid to its Government Relations lobbyists that were expressly unallowable lobbying costs under FAR 31.205-22 and subject to penalties and CAS 405 damages (app. supp. R4, tab 279 at 4556, 4566; tr. 7/258-59; ex. G-5; GPFF ¶ 19) (undisputed portion)). On the same day, the CACO issued the 2007 CAS 405 COFD, finding that Raytheon's submission of alleged expressly unallowable lobbying and political activity costs in the amount of $1,972,355, among other disallowed costs, violated CAS 405. The CACO cited Raytheon's failure to supply documented requests from Congress in support of allowable lobbying activity as a basis for his decision. (App. supp. R4, tab 281 at 4573, 4579-80) Raytheon's appeals ensued as reported above (findings 5-6).

<u>DCAA's Corporate Audit Report for 2008 and Corporate COFD for 2008</u>

62. For 2008, the auditors interviewed five registered lobbyists and the PAC manager out of 20 Congressional Relations Office employees. The auditors used their "judgmental selection" in determining who they would interview. (App. supp. R4, tab 331 at 5214; tr. 5/159-60)

63. Although they did not interview all employees, the auditors checked whatever facts they might have had concerning each employee (tr. 5/161). The auditors reviewed Raytheon's LDA filings for 2008, including those made by its consultants; consultant invoices and agreements; Raytheon's voluntary withdrawals of cost center 90206 costs; executive biographies; organization charts and employee listings and distribution data; and performance goals and appraisals. DCAA found that Raytheon had determined that an average of 50% of its Congressional relations employees' time was unallowable and had therefore withdrawn 50% of the cost center 90206 costs. (R4, tab 184 at first tab, entitled "7.15"; app. supp. R4, tab 331 at 5213-15; tr. 5/102-03, 6/259)

64. For 2008, Raytheon included what it characterized as the unallowable lobbying time of its Government Relations administrative staff in its lobbying withdrawal

---

[18] DCMA points out that, in 2012, when DCAA asked Raytheon for its 2007 calendars in connection with Raytheon's acquisition and divestiture (A&D) costs (below), Raytheon claimed that the calendars in practicality were likely no longer retained, were not records under the FAR, and were not used to support Raytheon's claimed costs (R4, tab 298 at 147551-52). The calendar question is not material to our decision. DCAA did not ask for calendars, etc. in connection with its lobbying cost audits and Raytheon has relied upon other evidence, such as time sheets, its lobbying tool, and credible witness testimony.

calculation, which the government contends mathematically reduced its disallowance factor (*see* R4, tab 184 at first tab, entitled "7.15"; tr. 6/302-07; GPFF ¶ 92).

65. On December 19, 2014, DCAA issued its Corporate Audit Report for 2008 (app. supp. R4, tab 331). The auditors questioned $1,187,981 in claimed employee compensation costs of the Government Relations cost center based upon FAR 31.205-22 and FAR 31.201-6 (*id*. at 5097, 5099, 5215). Of the questioned amount, $985,144 was said to be subject to a level one penalty (*id*. at 5211). The auditors analyzed the above interviews and documents to develop "estimated percentages of each employee's time spent on unallowable effort in 2008" (*id*. at 5214).

66. The government also relies upon an internal Raytheon online article dated January 31, 2005 (R4, tab 115; tr. 6/50; ex. A-7). The article profiles Chris Lombardi, then manager of Government Relations. It reports that "[the] job necessitates most of the team [spend] one-half to two-thirds of their days canvassing Capitol Hill" (R4, tab 115 at 15414) and that Mr. Lombardi discussed attempts to influence the outcome of legislation, among other things (*id*. at 15413-15). DCAA reported in a 2006 work paper that, during a DCAA interview, Mr. Lombardi stated that he had taken "poetic liberties" for the article (ex A-7). Mr. Neal described the article as a public relations "puff piece" and that, while he sometimes worked one-half to two thirds of his time on Capitol Hill, to characterize it as a daily occurrence was "broadly overstated" (tr. 7/68). Mr. Lombardi was not called to testify. We find that the accuracy of the 2005 hearsay article has been undermined and, in any event, the article is not probative of the amount of unallowable lobbying hours spent by Government Relations personnel in CYs 2007 and 2008.

67. The auditors questioned 100 percent of the time of 17 employees, including employees they did not interview (app. supp. R4, tab 331 at 5215; tr. 5/161-62).

68. DCAA's 2008 audit of Government Relations followed materially the same plan as for 2007 and, with minor exceptions, DCAA questioned nearly the entire cost center costs as expressly unallowable. Raytheon alleged, *inter alia*, that DCAA had misinterpreted FAR 31.205-22. (App. supp. R4, tab 331 at 5216; AUPFF ¶ 94)

69. On June 22, 2015, the CACO issued his Corporate COFD for 2008. He largely adopted DCAA's recommendations and concluded that Raytheon had included $1,065,481 in its proposal for salary and labor costs paid to its Government Relations lobbyists and administrative staff for performing and supporting unallowable lobbying activities, of which $981,822 was for expressly unallowable salary expenses paid to Raytheon's lobbyists (app. supp. R4, tab 364 at 5954, 5961; GPFF ¶ 20 (undisputed portion), APFF ¶ 96 (undisputed portion)). The same day, the CACO issued the 2008 CAS 405 COFD, finding that Raytheon's submission of expressly unallowable lobbying and political activity costs, among other allegedly expressly unallowable costs, violated CAS 405. The CACO cited Raytheon's failure to supply documented requests from Congress in support of allowable lobbying activity as a basis for his decision. (App. supp. R4, tab 365 at 5966, 5969) Raytheon's appeals ensued as set forth above (findings 7, 9).

70. The government contends that Raytheon's withdrawal of unallowable lobbying costs has "dramatically increased" since 2001, both in terms of the "gross" percentage it withdraws from its entire Government Relations office and the "lobbying disallowance factor" it applies to the "recoverable expenses" of that cost center (gov't br. at 62; *see* exs. G-1 – G-4; GPFF ¶¶ 145-50). The government alleges that this is a "troubling indictment" of Raytheon's lobbying withdrawal practices through 2015 and supports a conclusion that it under withdrew in 2007 and 2008 (gov't br. at 62).

71. John G. Panetta, Sr., Raytheon's senior director of government accounting, disagrees with the government's position. He demonstrated that, from 2007 forward the amount of costs Raytheon withdrew remained about $4 to $5 million – closer to $4 million in recent years – while the gross cost amount has been substantially reduced, thereby mathematically affecting the gross withdrawal percentage and the lobbying disallowance factor. (Tr. 1/110, 10/193; exs. G-1, -2) Mr. Panetta noted that the source of the cost center costs, and the nature of the withdrawal, have changed significantly over the years. Consultant costs in particular were substantially reduced, from the 2007-2008 period in dispute to 2015. However, the lobbying work remained and internal Raytheon personnel had to absorb the workload. Also, Government Relations' headcount dropped from about 20 in 2007 to 12 at the end of 2015. Thus, Raytheon's personnel are engaged in more unallowable activity per person today than they were previously. Raytheon was not reporting more unallowable lobbying activity; it was reporting the same. (App. supp. R4, tabs 126, 142; tr. 10/194, 202-04; exs. A-22, -23). We find the government's position concerning cost reporting in years other than 2007 and 2008, in dispute, to be unpersuasive in view of Mr. Panetta's credible, persuasive testimony to the contrary.

## DISCUSSION OF GOVERNMENT RELATIONS COSTS

### I. The Parties' Contentions[19]

#### A. The Government's Contentions

DCMA alleges that Raytheon has claimed lobbying costs that are expressly unallowable and that Raytheon has not provided any meaningful support for its assertion that they are allowable. DCMA contends that job descriptions, performance appraisals, organizational goals, and the 2005 internal article profiling a former manager of Government Relations (finding 66), demonstrate that the overwhelming majority of time spent by that department is on unallowable lobbying (gov't br. at 48-52).

---

[19] Here, and with regard to the cost issues below, we discuss the parties' principal contentions. We have considered all of their arguments, whether or not we address them. We have considered and reject the government's argument that the Board erred in not admitting certain documents into evidence at the hearing.

DCMA further contends that Raytheon's lobbying estimates[20] and withdrawal calculations are severely flawed, in part because it inappropriately relied upon the LDA for guidance; its lobbyists were not trained on FAR Part 31 or on Raytheon's lobbying policies; and because there are flaws in Raytheon's withdrawal calculations, which wrongly diluted its lobbying withdrawal factor. The alleged flaws are that there was no oversight regarding the accuracy of lobbyists' estimations of their unallowable lobbying time; the lobbyists were instructed not to include weekend, holiday, or any time outside of normal business hours in their estimates; there were various estimation or calculation errors, including pertaining to Raytheon's State lobbyists; and Raytheon wrongly included the lobbying hours of its administrative staff, and of an employee who worked only half of his time for Government Relations.

B. Raytheon's Contentions

Raytheon denies all of DCMA's allegations and relies upon its contemporaneous time documentation and first-hand witness testimony. It contends that DCMA's criticisms of its process for withdrawing unallowable lobbying costs from its cost proposals are unfounded. Raytheon identifies the key costs at issue as pertaining to alleged "pre-lobbying" or "preparation for lobbying" activities. It asserts that its unrefuted time records and testimony establish that it excluded these activities as unallowable. (App. br. at 146) Raytheon also contests DCAA's conclusion that Raytheon claimed costs for time spent responding to Congressional requests but did not document the requests.

Raytheon concludes that, should the Board nonetheless determine that the questioned costs are unallowable lobbying costs, DCMA has not met its burden to prove that they are expressly unallowable and subject to penalties.

DCMA replies that Raytheon is required by regulation to establish its entitlement to costs. That is, FAR 31.201-2(d) requires contractors to maintain records, including supporting documentation, adequate to demonstrate that claimed costs have been incurred and that they comply with applicable cost principles in FAR subpart 31.2, and the CO may disallow all or part of a claimed cost that is inadequately supported (*see* finding 15). Thus, according to DCMA, Raytheon has the burden to provide adequate records for all of its costs (gov't br. at 6).

Moreover, according to DCMA, regarding lobbying costs in particular, FAR 31.205-22(d) requires that a contractor maintain adequate records to demonstrate that its certification of lobbying costs as being allowable or unallowable complies with FAR 31.205-22 (*see* finding 15). DCMA contends that this shifts the burden to Raytheon "to establish entitlement to its Lobbying costs" (gov't br. at 7).

---

[20] DCMA uses the term "estimate" or the like, to which Raytheon objects. Witnesses for both parties used the term. The Board deems some estimation to be common when assessing time spent. In any case, the issue is immaterial to our decision.

Raytheon responds that, in the 2007 and 2008 Corporate Audit reports, DCAA did not question the salary and labor costs of Government Relations personnel on the basis of FAR 31.201-2(d), nor did the CACO in the 2007 and 2008 Corporate COFDs (app. br. at 107 (disputing portion of GPFFs 19-20)). Raytheon alleges that DCMA's attempt to shift the burden to Raytheon to establish that the "lobbying costs" are supported by documentation and are allowable fails. Raytheon asserts that, first, the costs at issue are not lobbying costs and, in any case, the fact that claimed costs must be supported is a general principle governing all costs and does not shift the specific burden of proof regarding lobbying costs from the government to Raytheon.

I. <u>DCMA Has The Burden to Prove That Raytheon Submitted Expressly Unallowable Costs</u>

We addressed the government's burden to prove that costs are expressly unallowable, and subject to penalty in *Raytheon Company*, ASBCA No. 57743 *et al*., 17-1 BCA ¶ 36,724 (*Raytheon I*), *recon. denied*, 18-1 BCA ¶ 37,129, *aff'd*, *Raytheon Co. v. Sec. of Defense*, 940 F.3d 1310 (Fed. Cir. 2019) [21]:

> The government acknowledges that the CO's decision that a cost is expressly unallowable and subject to penalty is subject to the Board's *de novo* review under the CDA . . . . *See* 41 U.S.C. § 7103(e); *Wilner v. United States*, 24 F.3d 1397, 1401-02 (Fed. Cir. 1994) (en banc); that it bears the burden to prove that costs are expressly unallowable; and that "the bar is high" . . . . The government also bears the burden of proof that a penalty assessment was warranted.
>
> In *General Dynamics Corp*., ASBCA No. 49372, 02-2 BCA ¶ 31,888 at 157,570, *rev'd in part on other grounds*, *Rumsfeld v. General Dynamics Corp.*, 365 F.3d 1380 (Fed. Cir. 2004), the Board described the government's burden to show that costs are expressly unallowable and subject to penalty:
>
>> The FAR and CAS definitions of "expressly unallowable" point to the need to examine the particular principle involved in light of the surrounding circumstances. Moreover, since Congress adopted the "expressly unallowable" standard to make it clear that a penalty should not be assessed where there were reasonable differences of opinion about the allowability

[21] Raytheon appealed to the Federal Circuit from that part of the Board's decision in *Raytheon I* concerning lobbying cost issues. This was the only part of the Board's decision that was appealed. The government did not appeal from the Board's decision on corporate development costs.

> of costs, we think *the Government must show that it was unreasonable under all the circumstances for a person in the contractor's position to conclude that the costs were allowable*. The scope of the inquiry will vary with the clarity and complexity of the particular cost principle and the circumstances involved. [Emphasis added]

*Raytheon I*, 17-1 BCA ¶ 36,724 at 178,845 (citations to government's brief in *Raytheon I* omitted).

DCMA acknowledges that it generally has the burden to prove its claims that costs at issue are unallowable under a regulation and that they are "expressly unallowable" as defined by the CAS and the FAR (gov't br. at 6). It notes, however, that the Board has previously pointed out that:

> If a cost is allocable to a contract and is reasonable, the government normally has the burden to prove that it is unallowable due to a contract provision, statute or regulation, *Lockheed Martin Western Development Laboratories*, ASBCA No. 51452, 02-1 BCA ¶ 31,803 at 157,102. However, a given regulation may require the contractor to establish entitlement to costs.

*Fiber Materials, Inc.*, ASBCA No. 53616, 07-1 BCA ¶ 33,563 at 166,252.[22]

Auditor Yesner described auditing lobbying costs as a "unique area" (finding 53). Indeed, the Government Relations lobbying cost issues do not lend themselves to resolution with certainty. In any case, we concur with Raytheon that DCMA has not justified shifting the burden of proof to the contractor. Thus, DCMA bears the burden to prove that the costs in question are unallowable lobbying costs.

I. DCMA Has Not Met its Burden to Prove that the Government Relations Costs at Issue Are Unallowable Lobbying Costs and Thus Has Also Not Met its Burden to Prove that Raytheon Violated CAS 405 Regarding Those Costs.

Raytheon contends that DCMA has not met its burden to prove that the Government Relations costs that Raytheon did not withdraw from its cost proposals in 2007 and 2008 were unallowable lobbying costs under FAR 31.205-22. Raytheon asserts that it appropriately withdrew its lobbying costs from its cost proposals; the costs at issue are not lobbying costs; and DCMA has not established that they are. Raytheon maintains that, in contrast to DCAA's speculation, Raytheon kept contemporaneous records of the

[22] *See Thomas Associates, Inc.*, ASBCA No. 57126, 11-2 BCA ¶ 34,858 at 171,477 for clarification of the $10,000 penalty threshold addressed in *Fiber Materials*.

time it spent on lobbying, including time sheet reporting in 2007; its lobbying tool in 2008; and calendars, notes, and the like, which DCAA did not ask to see. This was corroborated by the credible hearing testimony of current and former members of Government Relations. (*See* findings 31-32, 41-45)

DCMA alleges that Raytheon's personnel were not adequately trained in the FAR's lobbying reporting requirements. The evidence is to the contrary. Raytheon, *inter alia*, provided in-house and outside counsel training, at least annually, and published its "Lobbying Policy" and "Unallowable Guidelines. (Findings 19-21, 23)

Regarding the amount of unallowable lobbying hours reported by Raytheon, FAR 31.201-6(e)(2) provides that time spent by employees outside normal working hours should not be considered except when it is evident that an employee engages so frequently in company activities during those extra hours as to indicate that the activities are a part of the employee's regular duties (*see* finding 16). Raytheon's lobbyists worked early mornings, late nights, and weekends from time to time on what all of the testifying witnesses considered to be a regular part of their work duties (findings 41-42, 44-45).

Since lobbying responsibilities were a regular part of the work duties, FAR 31.201-6(e), ACCOUNTING FOR UNALLOWABLE COSTS (NOV 2005), provides that these activities should be considered in determining materiality of the activities. However, that FAR subsection only applies to determining whether the costs were material. It does not instruct how the unallowable costs should be calculated. The FAR provides that "[t]he practices for accounting for and presentation of unallowable costs must be those described in 48 CFR 9904.405, Accounting for Unallowable Costs." FAR 31.201-6(c)(1) (finding 16). CAS 405, in turn, provides that unallowable costs "shall be subject to the same cost accounting principles governing cost allocability as allowable costs." CAS 405-40(e) (finding 16).

Here, Raytheon's Lobbying Policy provides that "[t]ime spent on lobby activity after the scheduled working day is not reported" and the Policy's record-keeping requirements apply to "employees who spend more than 25% of their *compensated* hours during the month on lobbying activity" (finding 19) (emphasis added). Accounting for labor costs as a function of time paid, rather than time worked, is a common industry method. Raytheon asserts that it is required to use that method under CAS 401, Consistency in Estimating, Accumulating and Reporting Costs, because that is its disclosed accounting practice and the one it uses in bidding. (Finding 29) Thus, we find that Raytheon's method of removing the unallowable costs was proper, based on its disclosed accounting practice.

Raytheon instructed its employees not to report lobbying time in excess of "normal" work hours because they were salaried employees who are charged indirectly; they are paid based upon a 40-hour work week; and including time outside of that period would result in an overstatement of the lobbying withdrawal amount. There was no cost to Raytheon or the government for work outside normal business hours. (Finding 28) We

have found that Raytheon appropriately calculated its lobbying costs consistent with its disclosed accounting practice and that there was no additional cost to the government, under this accounting (finding 29).

Like DCAA, DCMA focuses upon an alleged lack of documented requests from Congress for information, which, under FAR 31.202-22 (b), would be an exception to FAR 31.202-22(a)'s unallowable lobbying activities (findings 16, 49-50, 59, 61, 69). However, Raytheon asserts that, because it is not claiming lobbying activity costs, it is not relying upon any exception to unallowable lobbying activities. It also points out that formal documented requests from Congress are "extremely rare," with most communication being in person or by telephone, with an occasional email (finding 51).

Mr. Neal opined that responding to requests from Congressional staffers and providing facts were allowable, but if the time were colored in any way by an attempt to influence, it was not allowable (finding 42). This is consistent with Raytheon's representation to DCAA that it's normal practice was not to claim the costs of responding to Congressional inquiries because presenting facts could "cross over" into lobbying (finding 51). Like Mr. Zummo (finding 45), Mr. Neal evaluated his time on a case by case basis, with a conservative bias towards unallowability, if there were any question. He recorded his activities on a daily log, and on a "pretty detailed" Lotus notes calendar, and he archived his emails (finding 42), as did Ms. Watson (finding 41). Mr. Lee recorded his work on Palm Calendar software and on his time sheets (unallowable activities only), daily or close thereto (finding 44).

The auditors questioned 100% of the costs of Raytheon's "State and Local" Government Relations employees and of its office assistants without interviewing them. The auditors concluded that 100% of Government Relations' 2007 costs, allegedly representing direct lobbying and lobbying-related effort, was expressly unallowable under FAR 31.205-22. (Finding 56) Nonetheless, Mr. Yesner confirmed that Government Relations employees were good about recording direct lobbying activities as unallowable and that Raytheon appropriately accounted for its PAC costs. He also acknowledged that the employees he interviewed in 2012 reasonably accounted for their time. (Finding 57)

In contrast, Mr. Yesner also stated that the auditors did not really know the accuracy of the direct lobbying time. They speculated that employees might not be tracking time spent in what DCAA considered to be lobbying-related activities or preparation for direct lobbying, although Raytheon's Lobbying Policy described legislative liaison activities as unallowable costs "when carried on in support of or in knowing preparation for an effort to engage in unallowable activities" (finding 19). Moreover, as reflected in auditor Quinn's interview notes, the employees she questioned responded that they classified such time as unallowable. She acknowledged that nothing in her notes gave her concern that Raytheon's employees were not withdrawing pre-lobbying or lobbying preparation costs. (Finding 57) The auditors also speculated that employees other than those interviewed might have assisted lobbyists with the creation of white papers or with technical information; many of those employees had

trouble remembering their activities during FY 2007; and, because they did not normally take part in lobbying activities, they might not have known how to record their time. We have found no support for either of these speculations. (Findings 50, 57)

The initial audit report had not questioned all of cost center 90206's costs. However, Ms. Quinn disavowed that report. (Finding 49) Even before they requested the assist audit, DCAA's Corporate auditors developed a "strategy" to question the entire cost center 90206 (finding 50). Ms. Quinn based her ultimate conclusion that all of cost center 90206's costs should be disallowed on the fact that she did not find documentation "either way" on whether the costs were allowable or not, or claimed or not (finding 52). Her conclusion, as self-described, is unsupportable and underscores the fact that DCMA has not met its burden of proof.

DCAA changed its audit position, apparently as of 2006 (finding 39), but at least from 2009 through 2012, getting successively further away from the CY 2007 and 2008 years in question, and each time increasing the lobbying cost disallowance factor (e.g., findings 38, 40, 54-55). DCAA's and DCMA's conclusions are undermined by contradictory evidence, general beliefs rather than specific proof, and speculation.

We conclude that DCMA has not met its burden to prove that Raytheon's costs in question are unallowable lobbying costs. Therefore, it also has not met its burden to prove that Raytheon did not comply with CAS 405 with regard to those costs.

DECISION

ASBCA Nos. 59435, 59436, 60056 and 60058**,** to the extent that they cover alleged unallowable lobbying costs, are sustained.

ASBCA Nos. 59435, 59436, 60056 -- CORPORATE DEVELOPMENT COSTS

FINDINGS OF FACT CONCERNING CORPORATE DEVELOPMENT COSTS

72. The following regulations are pertinent to the parties' dispute over corporate development costs:

> FAR 31.205-12, ECONOMIC PLANNING COSTS (OCT 2003), provides in part:
>
> Economic planning costs are the costs of general long-range management planning that is concerned with the future overall development of the contractor's business and that may take into account the eventual possibility of economic dislocations or fundamental alterations in those markets in which the contractor currently does business. Economic planning costs are allowable. Economic planning costs do not include

organization or reorganization costs covered by 31.205-27. See 31.205-38 for market planning costs other than economic planning costs.

FAR 31.205-27, ORGANIZATION COSTS (APR 1988), provides in part that:

(a) Except as provided in paragraph (b) of this subsection, expenditures in connection with-

(1) planning or executing the organization or reorganization of the corporate structure of a business, including mergers and acquisitions,

(2) . . . .

(3) raising capital (net worth plus long-term liabilities), are unallowable. Such expenditures include but are not limited to incorporation fees and costs of attorneys, accountants, brokers, promoters and organizers, management consultants and investment counselors, whether or not employees of the contractor. Unallowable reorganization costs include the cost of any change in the contractor's financial structure, excluding administrative costs of short-term borrowings for working capital, resulting in alterations in the rights and interests of security holders, whether or not additional capital is raised.

(b) The cost of activities primarily intended to provide compensation will not be considered organizational costs subject to this subsection, but will be governed by 31.205-6. These activities include acquiring stock for-

(1) executive bonuses,

(2) employee savings plans, and

(3) employee stock ownership plans.

FAR 31.205-38, SELLING COSTS (AUG 2003), provides in part:

(a) "Selling" is a generic term encompassing all efforts to market the contractor's products or services, some of

> which are covered specifically in other subsections of 31.205. The cost of selling efforts other than those addressed in this cost principle are unallowable.
>
> (b) Selling activity includes the following broad categories:
>
> . . . .
>
> (4) Market planning. Market planning involves market research and analysis and general management planning concerned with development of the contractor's business. Long-range market planning costs are subject to the allowability provisions of 31.205-12. Other market planning costs are allowable.

Raytheon's Corporate Development Office

73. At all times relevant to these appeals, Raytheon maintained an office at its corporate headquarters which we refer to as "Corporate Development." At some point that office split from "Strategic Planning," also referred to as "Corporate Strategic Development Group" or "Strategic Business Development." (*See* app. supp. R4, tab 208 at 3195, tab 331 at 5224; tr. 1/185-86, 3/215-16, 255) In 2007 and 2008 Corporate Development, identified as cost center 90043, had seven or eight employees, six of whom were focused upon strategic business transactions and acquisition and divestiture (A&D) or merger activities, and one or two of whom were administrative assistants (*see* app. supp. R4, tab 208 at 3195-97, tab 331 at 5221, 5228).

74. As we found in *Raytheon I* regarding Corporate Development's status as of Raytheon's 2004 incurred cost submission:

> Raytheon's Corporate Development department was responsible for working with its business units in strategic development and growth opportunities, including strategic analysis of a business' capabilities to market its products and services to the government and function in government work. Where there were gaps in business' capabilities, Corporate Development would work with them to determine the right ways to fill the gaps, either through, *inter alia*, internal investment, research and development, licensing of intellectual property (IP), partnerships or acquisitions. This process was known as "gap analysis." Working with Raytheon's businesses on M&A and divestitures was not Corporate Development's primary role but was part of its work to find strategic growth initiatives.

*Raytheon I* at 178,840 (finding 68) (citations to record omitted).

75. The testimony in the instant appeals, concerning the calendar year 2007 and 2008 incurred cost submissions, which was credible, was to the same effect (*e.g* tr. 8/47-48 (Corporate Development's role is to work with Raytheon's businesses with their strategic development plans); tr. 7/127 ("understanding what [the businesses are] trying to do ultimately to ensure mission success and then looking for opportunities, whether they be acquisitions, divestitures, partnerships, teaming agreements, joint ventures, IP licensing, to help execute that mission"); tr. 3/223 (Corporate Development does full spectrum of A&D activities); tr. 7/128 (gap is distance between current capabilities and customer requirements); tr. 3/249 (gaps are market based, technically based and/or customer based); tr. 3/257 (strategic GAP analysis is assessment undertaken principally by business unit, but it includes Corporate Strategy and Corporate Development); tr. 3/259 (gap analysis includes pursuit of multiple avenues); tr. 3/273 (Corporate Development expected to drive the gap process); tr. 4/239, 269-70, 277-78, 299-300, tr. 7/100-01, 104-05 (all activities have an eye toward A&D, but there is a lot of activity prior to the ultimate decision, including market analysis and gap analysis); tr. 4/239, 262, 270, 277-78, 295, tr. 7/128-29, tr. 8/48-49 (gap analysis; methods to fill gap); tr. 4/240, 242 (not uncommon that Corporate Development would change paths along the way)).

76. Corporate Development made proposals for acquisitions or divestitures to the Acquisition Council which, in 2007 and 2008, consisted of senior Raytheon leaders, including the Chief Executive Officer, Chief Financial Officer, General Counsel and Vice President of Corporate Development (tr. 3/227, 8/53-54). Raytheon declared its intentions regarding potential acquisitions and divestitures through the Acquisition Council (tr. 8/57). Corporate Development did not know which route Raytheon was going to follow until after the Acquisition Council made its decision (tr. 3/261, 8/56). Occasionally, even after an Acquisition Council decision, Raytheon would change course based upon information developed during the acquisition or divestiture process (tr. 3/265, 4/297, 300-01).

<u>Raytheon's Guidelines and Policies Regarding Organization Costs</u>

77. Raytheon's FAR Part 31 Guidelines, as of August 31, 2004, Revision No. 2, provided concerning Acquisition, Merger, Divestiture and Other "Organization" Costs:

> Unallowable acquisition costs commence with the submission of an indicative offer. Unallowable divestiture costs commence when the decision to "go to market" with the offering materials is made. Commencement of unallowable merger costs should be discussed with business segment or Corporate Counsel. These unallowable costs end at the completion of the final balance sheet adjustment for the

> transaction. The unallowable cost categorizations are applicable to both Business and Corporate personnel.

(R4, tab 106 at 2109, 2116)

78. Raytheon's FAR Part 31 Guidelines further state that the following Acquisition, Merger, Divestiture and Other "Organization" Costs are to be claimed:

> A general review of other companies as part of marketing strategy or strategic planning activities (e.g. economic planning) including preliminary discussions and advice about the advisability of [M&A] prior to identification of a specific opportunity. This also includes technical review, review of structure, facilities and modes of operation.

(R4, tab 106 at 2117)

79. Raytheon's November 2, 2004 Company Policy No. 121-RP, "Mergers and Acquisitions" (2004 M&A policy), "[e]stablishes the guidelines and responsibilities for activities concerning [M&A]" (R4, tab 256 at ¶ 2.1). It provides that "[a]ll activities concerning [M&A] by any Business, including opportunities presented by a third party, must be coordinated with Corporate Development. . ." (*Id*. at ¶ 5.1). It further states:

> Prior to receipt of Corporate approval to proceed with a transaction, all communication by a Business with an acquisition candidate concerning its interest in a transaction must be coordinated with Corporate Development. Communications with third parties, such as investment bankers, venture capitalists or other financing sources, related to an acquisition opportunity or transaction must also be coordinated in advance with Corporate Development. . . . Corporate Development is responsible for issuance and execution of any engagement letter entered into with investment bankers . . . .

(*Id*. at ¶ 5.4)

80. The 2004 M&A policy also provides:

> Relating to costs associated with [M&A], all Businesses must establish and maintain adequate internal controls necessary to ensure compliance with applicable [FAR] and [CAS] Board rules and regulations. Organizational costs associated with [M&A] are generally unallowable. Unallowable acquisition costs commence with the submission of an indicative offer.

> These unallowable costs for [M&A] end at the completion of the final balance sheet adjustment for the transaction.

(*Id*. at ¶ 5.7)

81. Effective December 23, 2004, Raytheon issued Company Policy No. 126-RP, Divestitures (2004 Divestiture Policy) (R4, tab 257). The 2004 Divestiture Policy contained similar provisions to those quoted above from the 2004 M&A policy (*see id*. at ¶¶ 2.1, 5.1, 5.4), including that "[o]rganizational costs associated with divestitures are generally unallowable" (*id*. at ¶ 5.7).

<u>Corporate Development's Time-Keeping Practices</u>

82. Dr. Charles Mueller, "Director III" of Corporate Development during the relevant time periods (tr. 3/216), described Raytheon's "bright line" rule, articulated above. At the point, on the acquisition side, when Raytheon submitted a non-binding indicative offer (NBIO), or on the divestiture side, when it made the decision to go to market, the company switched from recording costs as allowable to recording them as unallowable. (Tr. 3/227-28, 261-64) Even if Raytheon changed course after the Acquisition Council's initial decision about an NBIO or going to market, Corporate Development employees continued to withdraw their time as unallowable because the reconsideration "was after the bright line moment" (tr. 3/265).

83. In formulating its "bright line" rule Raytheon officials took into consideration the economic planning, organization, and selling cost principles, FAR 31.205-12, -27, and -38 (tr. 6/24-25).

84. Kathy Giovannini, a consulting budget analyst in the corporate A&S office, with many years' experience, collects Corporate Development's time withdrawal information (tr. 3/269-70, 6/337-39, 351). When the employees reported their time in days, she converted each day to eight hours, which is "a normal work day for exempt employees" at Raytheon (tr. 6/351). The time collecting process is similar to that described above for Government Relations employees. The following are a few examples of senior employee timekeeping.

85. At one point, Corporate Development employees submitted their unallowable time, after the "bright line," annually, but later changed to quarterly reporting. Dr. Mueller relied upon his memory in submitting his time, past the "bright line," to his administrative assistant, who kept a calendar for his benefit. His time was not hard to track because his projects were serial and he typically worked only one project at a time. The work, particularly divestitures, was focused and demanding and could last many months. He was a professional and worked significant hours, whatever it took to accomplish the job. In 2007, Dr. Mueller withdrew 97% of his time as unallowable. In 2008, he withdrew 83%. (R4, tab 268 at 9682, tab 279, 284; app. supp. R4, tabs 79, 110; tr. 3/230-33, 267, 269-70, 272, 277-78, 6/389, 391; *see* app. br. at 48, n.26)

86. Thomas O'Rourke was a director of Corporate Development during the relevant time period (tr. 4/236). As a professional, he worked the hours needed. They varied from project to project and with the status of a project at a given point. (Tr. 4/279) Mr. O'Rourke followed Raytheon's "bright line" guidance in submitting his time (tr. 4/283, 303). His office used calendars, notes and meeting information to submit their time (tr. 4/293-94). For the time he submitted in 2007, he aggregated all the efforts throughout the year by project, including source information, calendar invitations for meetings, email correspondence, and handwritten notes. He recorded 226 days for acquisition work in 2007, approximately 98-99% of his time, and no days for divestitures. That was a very busy year for acquisitions, with about 23 projects submitted to the Acquisition Council. In 2008, following the same documentation process, he recorded about 65% of his time on acquisitions and none for divestitures. (App. supp. R4, tabs 80, 111; tr. 4/303-07, 315)

87. Yiannis Rexinis was a consulting financial analyst in Corporate Development, starting in May 2007 and continuing throughout the relevant time period. All of his activities were acquisition related; he never worked on divestitures. (Tr. 7/89, 125, 129-30) He understood and followed the "bright line" rule in recording his time (e.g., tr. 7/130-32). In recording his time Mr. Rexinis used, e.g., Lotus Notes, a calendar, email functions, notes and call logs (tr. 7/113). In 2007 he withdrew approximately 76% of his time as unallowable and in 2008 he withdrew about 68%. Mr. Rexinis recalled allowable activities in 2007-2008 as including his work on Raytheon's strategic dialog process. He stands by the accuracy of his time records. (R4, tab 289; app. supp. R4, tab 81; tr.-7/135--40)

88. In tracking his time, Paul Bailey, Director of Corporate Development, follows the "bright line" rule, which he was involved in formulating (R4, tab 105; tr. 8/46, 52-55, 57-58). Mr. Bailey's time varies considerably. In 2007, he withdrew 59% of his time as unallowable and in 2008, 64 % (app. supp. R4, tabs 77, 109; tr. 8/62-64). He does not start collecting and submitting his time until the bright line has passed (tr. 8/70). On a quarterly basis he checks his calendar, his project notebooks, his project files, documents that were created, presentations, and Excel spreadsheets and calculates how much time he spent after the NBIO and go to market dates (tr. 8/61, 87, 110).

89. The withdrawal percentages for the Corporate Development cost center's six employees, including non-salary costs and salary costs for support personnel, were 53.4% in 2007 and 48.8% in 2008 (R4, tab 102 at 57-58 (response to interrogatory No. 20), tab 302 (unallowable cost percentages derived from percentage of allowable costs)).

90. In July 2012, a DCAA auditor asked Raytheon's Mr. Vilandre for the 2007 calendars of three Raytheon employees, acknowledging that, "I know this may be a far stretch (as this is about five years ago)" (R4, tab 298 at 147553). Mr. Vilandre responded to another DCAA auditor, with a copy to the requesting auditor and to Raytheon's Mr. Panetta:

> I am not clear as to why at this point DCAA is asking for this information. For example, Raytheon withdrew the cost associated with 1,880 hours of Thomas O'Rourke's cost for [A&D] activity in 2007. According to the view that DCAA has taken with regard to lobbying activities, that is essentially all of the time that an average employee would normally work during the year, considering holidays and paid time off. Further, DCAA has indicated to me on more than one occasion that it intends to question the entire claimed cost in cost center 90043, in which Mr. O'Rourke resides. So why would it be necessary to review his calendar?
>
> [Explanation of withdrawals for the other two Raytheon employees]
>
> Finally, as a practical matter, I would not expect employees to retain their calendars for five years. I know I no longer have my own 2007 calendar. We have provided DCAA with the documentation we received from the corporate functions to support the withdrawn costs, and DCAA has interviewed these employees. I am unclear on the benefit of requesting these employees to search for and produce these calendars. What are your thoughts?

(R4, tab 298 at 147552) As referred to above, Mr. Panetta added: "employee calendars are not 'records' as would be defined in the FAR. They are not in any way used to support our claimed costs" (R4, tab 298 at 147551).

<u>Corporate Audit Report for 2007, COFDs and Appeals</u>

91. The Corporate Audit report for 2007, dated October 15, 2013, questioned $903,817 of Corporate Development's costs, citing FAR 31.201-2, DETERMINING ALLOWABILITY (MAY 2004), and 31.205-27, ORGANIZATION COSTS (APR 1988). Except for several adjustments for cost categories subject to different audits, DCAA alleged that all costs within Corporate Development cost center 90043 were expressly unallowable. This was a significant departure from prior years' audits. After other adjustments for alleged calculation errors for related costs outside Corporate Development's cost center, the questioned amount was $862,010, said by DCAA to be subject to a "level one" penalty. (App. supp. R4, tab 208 at 3194-99, tab 331 at 5224-25; AUPFF ¶¶ 131-132)

92. Raytheon submitted to DCMA an "initial response," dated November 22, 2013, to the Corporate Audit Report for 2007, addressing all disputed issues, including Corporate Development A&D issues (app. supp. R4, tab 217). Incurred cost negotiations

followed in the spring of 2014 (*see* app. supp. R4, tab 266; tr. 8/11). A DCMA price cost analyst, who assisted in the negotiations (tr. 8/11, 113-15), recorded a potential settlement in the following email to DCAA:

> After reviewing the additional documentation Raytheon provided, showing all different phases and activities of the Corporate Development employees, a portion of the cost seem [sic] to be economic planning. The phases which we deem to be economic planning are the stages where Raytheon has yet to identify a target to acquire or divest. In order to amicably resolve this matter we have agreed to split the cost, not to include the credit of $82,153. In addition we are putting together a partial settlement, A&D will be included in it, that states this is not precedent setting.

(App. supp. R4, tab 265 at 4185) DCMA had misunderstood that Raytheon had agreed to accept a 50-50 split of the disputed A&D costs and the parties did not settle this issue (app. supp. R4, tab 353 at 5890-91; tr. 7/293-94, 8/23, 129-30).

93. The June 20, 2014 Corporate COFD for 2007, the June 20, 2014 CAS 405 COFD for 2007, and the ensuing appeals are described above (findings 5-6). The former COFD adopted the findings in the Corporate Audit Report for 2007, except for the $862,010 recommended amount to be recovered by the government, and concluded that $307,776 in what the parties agree are Corporate Development salary costs were expressly unallowable and subject to penalty and it denied Raytheon's request for a penalty waiver (app. supp. R4, tab 208 at 3194-95, tab 279 at 4558, 4566; AUPFF ¶ 144). The latter COFD declared that the submission of those costs violated CAS 405 (app. supp. R4, tab 281; AUPFF ¶ 144).

94. The $307,776 demanded in the Corporate COFD had the effect of reducing DCAA's $862,010 recommended recovery by $554,234 (app. supp. R4, tab 285 at 4630-31). There was no difference between these costs and those penalized as expressly unallowable (tr. 8/33). At the hearing the CACO attributed the reduced demand to a mistake. He testified that he had not been involved in the negotiations but had understood that there had been a settlement. (Tr. 7/282-87) However, his COFD states that "[t]he undersigned conducted joint fact-finding with Raytheon and determined that of the amount questioned by DCAA [$862,010], this amount [$307,776] constituted unallowable organization costs" (app. supp. R4, tab 281 at 4580). Prior to the hearing, the government purported to increase its claim back to the $862,010 questioned by DCAA (gov't br. at 12, n.4).

Corporate Audit Report for 2008, COFDs and Appeals

95. DCAA's audit of Corporate Development's costs for 2008 began in April 2014 (tr. 6/205-06). Anthony Vegelante,[23] the senior auditor who conducted the audit (tr. 6/127, 130) recommended in his April 30, 2014 work paper, before DCAA had interviewed Raytheon employees regarding 2008, that DCAA should continue to question 100% of A&D cost center 90043's activities because they were predominantly unallowable. He asserted at the hearing that he had nonetheless maintained an open mind. (Tr. 6/227, 242; ex. A-15 at B-05 (2/8))

96. DCAA interviewed the six cost center 90043 employees who had voluntary cost withdrawals from Raytheon's 2008 Corporate Incurred Cost submission concerning, among other things, the percentage of their time spent on A&D activities or non-A&D activities (R4, tabs 309-14 at questions and answers Nos. 10, 12): Mr. Bailey, Ms. Brezinsky, and Messrs. Josh Burack, Mueller, O'Rourke, and Rexinis (R4, tab 308). According to Mr. Vegelante's interview notes, Mr. Bailey responded that he spent "a lot" of time on non-A&D activities but that it varied "quite a bit" annually from 75% to 25%. The time he spent on A&D activities was also "quite variable and ranged from 25% to 75% depending upon the year. (R4, tab 309 at 3) Ms. Brezinski responded that it depended. She currently spent 30% of her time on non-A&D activities but in 2008 she spent 100% of her time on non-A&D activities. (R4, tab 310 at 3) Mr. Burack responded that none of his activities were non-A&D and all were "transaction activities or related" (R4, tab 311 at 2-3). Mr. Mueller responded that "very little" of his time was spent on non-A&D activities; the time spent on A&D activities was "quite variable;" and "all his time is allowable or unallowable A&D" (R4, tab 312 at 3). Mr. O'Rourke responded that 10% of his activities were non-A&D and 90% were A&D (R4, tab 313 at 3). Mr. Rexinis responded that none of his time was spent on non-A&D activities and 100% was A&D (R4, tab 314 at 3).

97. Auditor Vegelante did not define to the interviewees what he meant by "A&D activities." He did not know whether they interpreted it to mean all A&D activities or just those that occurred after the "bright lines" had been crossed. (Tr. 6/243-46)

98. Mr. Vegelante concluded that Raytheon's practices, policies and procedures and other guidance were consistent in that "they do not consider [A&D] activities before a specific A&D project is approved (NBIO/go to market decision) to be unallowable and do not track those hours/costs." He stated that "[t]his interpretation directly contradicts our interpretation of the FAR . . ." (Tr. 6/208; ex. A-14 at 1/3; *see also* ex. A-15 at 1/8)

99. Mr. Vegelante agreed with Raytheon's counsel that the basic issue between the parties was that they had different interpretations of the interaction among various FAR cost principles, such as economic planning costs under FAR 31.205-12 and

---

[23] The hearing transcript misspelled Mr. Vegelante's name as "Begelante" (*see*, *e.g.*, tr. 6/3).

organization costs under FAR 31.205-27 (tr. 6/ 218-19). Raytheon viewed activities in the A&D cycles prior to the "bright line" to be allowable economic planning and market planning costs whereas DCAA deemed them to be directly associated with unallowable costs per FAR 31.201-6 (tr. 6/221; ex. A-15 at 1/8). However, Mr. Vegelante stated that DCAA did not question those costs on the ground that they were "directly associated" with unallowable costs but because the activities were themselves unallowable (tr. 6/222).

100. The 2008 Corporate Audit Report, dated December 19, 2014, questioned all salary costs from Corporate Development's cost center, amounting to $831,707, as expressly unallowable under FAR 31.205-27, 31.201-6 and 31.201-2. It concluded that a level one penalty applied. (App. supp. R4, tab 331 at 5219-20; UAPFF ¶ 136)

101. The June 22, 2015 Corporate COFD for 2008, and the ensuing appeals are described above (findings 7, 9). The former COFD adopted DCAA's recommendations, found all $831,797 in Corporate Development employee salary costs claimed by Raytheon to be expressly unallowable and subject to penalty, and denied Raytheon's waiver request (app. supp. R4, tab 364 at 5954, 5957, 5961; UAPFF ¶ 148). The latter COFD declared that the submission of those costs violated CAS 405 (app. supp. R4, tab 365; UAPFF ¶ 148).

DISCUSSION OF CORPORATE DEVELOPMENT COSTS

I. The Parties' Contentions

A. The Government's Contentions

DCMA contends that Raytheon violated FAR 31.205-27, ORGANIZATIONAL COSTS (APR 1988), by charging the government for expressly unallowable A&D labor and salary costs such that the government is entitled to penalties, interest and CAS 405 damages. The government seeks, through the dates of the applicable COFDs, $1,601,141.20 for 2007 and $1,380,549.72 for 2008. (Gov't br. at 86)

DCMA first asserts that Raytheon's published policies confirm that it recognizes that its A&D costs are expressly unallowable organizational costs under FAR 31.205-27. Secondly, DCMA alleges that Raytheon failed to support its A&D cost withdrawals from its incurred cost submissions. DCMA also disputes the accuracy of Raytheon's time sheets, characterizing them as general approximations of the time worked after the "bright lines" (submission of indicative offer/decision to go to market) had been crossed, sometimes recorded up to a year after the work had occurred. DCMA asserts "that Raytheon has violated its responsibilities under FAR 31.201-2(d)" (gov't br. at 89), which requires a contractor to maintain records, including supporting documentation, adequate to demonstrate that claimed costs have been incurred and that they comply with applicable cost principles.

DCMA also alleges that Raytheon's calculation of its unallowable A&D costs is based upon a "deeply distorted reading of FAR 31.205-27" and "fundamentally wrong 'bright line' rules" (gov't br. at 89 (emphasis in original omitted). DCMA contends that "Corporate Development plans for [A&D]," not for long-term strategy; and it "does not perform any meaningful long-term economic planning under FAR 31.205-12," nor "long-range market planning under FAR 31.205-38(b)(4)" (gov't br. at 94, 96). DCMA asserts that Raytheon's application of its "bright line" rules is contrary to *Raytheon I* and *Dynalectron Corp*., ASBCA No. 20240, 77-2 BCA ¶ 12,835. It contends that those decisions stood for the proposition that, with respect to the disallowance of organization costs, FAR 31.205-27 (formerly Armed Services Procurement Regulation (ASPR) 15-205.23, as discussed in *Dynalectron*) did not distinguish between costs associated with unconsummated acquisitions and those associated with consummated acquisitions. Rather, the FAR stricture applied to all activities associated with the "planning" of acquisitions or divestitures. (Gov't br. at 93)

DCMA further contends that Raytheon made several mistakes in its withdrawal of expressly unallowable A&D costs and that contemporaneous records demonstrate that Corporate Development performs significant amounts of unrecorded expressly unallowable activities.

B. Raytheon's Contentions

Raytheon responds that DCMA has not met its burden to prove that Raytheon's Corporate Development costs are unallowable, expressly unallowable or subject to penalties. Raytheon asserts that its "bright line" rules accurately reflect the relationship among FAR 31.205-12, -27 and -38(b)(4), in accordance with *Raytheon I*, and it posits that all "planning" is not unallowable, pointing to allowable economic or market planning (app. br. at 154-55). Raytheon also alleges that DCMA misreads *Dynalectron, Raytheon I*, and Raytheon's policies and procedures. Raytheon represents that, if it changed paths after a "bright line" was crossed, it "appropriately withdrew those post-threshold costs as unallowable, unconsummated organizational activities" (app. br. at 156). Raytheon also disclaims that it made the mistakes in its cost withdrawal process cited by DCMA.

Regarding damages, Raytheon asserts that DCMA has not presented any specific evidence of quantum damages. The contractor also contends that, due to judicial admission and lack of jurisdiction, the Board cannot consider DCMA's post-2007 Corporate COFD claim that 100% of Corporate Development's 2007 costs are expressly unallowable. The COFD had claimed that about 35% of those costs, or $307,776, were expressly unallowable and had reinstated 65% as allowable. However, close to the hearing, DCMA increased its claim by 189%, to $862,010, which was all of cost center 90043's costs (*see* findings 91, 94). Raytheon contends that this increase is barred by the doctrine of judicial admission, because DCMA admitted in its Answer to the Complaint that only $307,776 was in dispute. Raytheon also contends that the greatly increased claim was, in fact, a new claim, not covered by any COFD, resulting in the alleged jurisdictional impediment.

Raytheon summarizes that the disputed Corporate Development costs are allowable and, even if they are not, they are not expressly unallowable and subject to penalties. Moreover, even if they were subject to penalties, DCMA has not met its burden to prove the amount of the penalties. It also it has not met its burden to prove that Raytheon violated CAS 405 regarding the Corporate Development costs.

I. DCMA Has Not Met Its Burden To Prove That The Disputed Corporate Development Costs Are Unallowable Organization Costs And Thus Has Also Not Met Its Burden To Prove That Raytheon Violated CAS 405 Regarding Those Costs.

First, DCMA's claim that Raytheon's published policies confirm that it recognizes that its A&D costs are expressly unallowable organizational costs under FAR 31.205-27, is groundless, as evidenced by this litigation. Secondly, DCMA has not challenged the reasonableness or allocability of the corporate development costs in question.

In fact, the government acknowledges that the key issue is whether the disputed corporate development costs are unallowable organization costs under FAR 31.205-27 or allowable economic or market planning costs under FAR 31.205-12. Raytheon views activities prior to crossing the "bright lines" to generate allowable costs whereas the government deems them to be unallowable.

Contrary to DCMA's stance, Raytheon's "bright line" practice does not run afoul of *Dynalectron* or *Raytheon I*. *Dynalectron*, which focused upon a regulatory change concerning the costs of unconsummated acquisitions, did not address the interplay among the regulations that are now FAR 31.205-27, FAR 31.205-12 and FAR 31.205-38. In *Raytheon I,* in deciding that the costs at issue were allowable economic and market planning costs and not expressly unallowable organization costs subject to penalty, the Board reasoned:

> Under FAR 31.205-12 costs of "generalized long-range management planning that is concerned with the future overall development of the contractor's business" are allowable but the regulation excludes organization and reorganization costs covered by FAR 31.205-27 . . . . FAR 31.205-38 states that market planning involves market research and analysis and generalized management planning concerned with the contractor's business development; the allowability of long-range market planning costs is controlled by FAR 31.205-12; and other market planning costs are allowable to the extent that they are reasonable and not in excess of certain limitations . . . . FAR 31.205-27 provides in relevant part that "expenditures in connection with" planning "the organization or reorganization" of a business' corporate structure,

> "including mergers and acquisitions," are unallowable . . . . The regulation does not clearly limit its coverage to costs of targeting a specific merger or acquisition. Although it mentions "the" organization or reorganization of a business, in the singular, it also refers to costs in connection with mergers and acquisitions broadly, in the plural, not to "a" merger and acquisition.
>
> Thus, the distinction between allowable economic planning costs under FAR 31.205-12 and unallowable organization costs under FAR 31.205-27 is unclear. The regulations themselves do not draw a defined line between the two. However, reading the regulations together, including with FAR 31.205-38, the intent appears to be that costs in connection with actually planning the organization or reorganization of a business, such as by a specific merger or acquisition, are unallowable whereas generalized long-range management planning costs are allowable. A learned treatise, in discussing the interplay between organization costs under FAR 31.205-27 and economic planning costs under FAR 31.205-12, supports this analysis:
>
>> [C]are should be taken to distinguish between the costs of planning an organizational change, the costs of which are unallowable, and the costs of generalized long range planning. Under FAR 31.205-12, Economic Planning Costs, the costs of surveying various business opportunities, making demographic and economic studies, and evaluating potential markets or firms for mergers or acquisitions would be allowable. Conversely, once a target has been identified, the costs of planning or executing organizational changes would be unallowable.
>
> (Ex. A-21 (John Cibinic, Jr. & Ralph C. Nash Jr., Cost-Reimbursement Contracting at 943 (3d ed. 2004))

*Raytheon I,* 17-1 BCA ¶ 36,724 at 178,852.

In sum, Raytheon's "bright-line" policy represents a reasonable reading of the FAR provisions governing organization, economic planning, market planning and selling costs and, applying the *General Dynamics* standard, it was not unreasonable for Raytheon to treat the costs at issue as allowable. Moreover, although Raytheon and the government would benefit from Raytheon's application of more uniform, timely and descriptive

time-keeping procedures,[24] DCMA has not carried its burden to prove by a preponderance of the evidence that the amount of unallowable hours withdrawn by Raytheon's personnel, which is supported by documentation[25] and credible witness testimony (*see*, e.g., findings 41-45, 57-58, 60), from its CY 2007 and 2008 incurred cost proposals was inaccurate, nor that any of the included Corporate Development costs were unallowable, let alone expressly unallowable and subject to penalties. Thus, DCMA has also not met its burden to prove that Raytheon violated CAS 405 regarding those costs.

Therefore, we need not consider whether DCMA's increase in its claim that about 35% of Corporate Development's 2007 costs were expressly unallowable to 100% were expressly unallowable was tantamount to a new claim that the Board lacks jurisdiction to entertain, or whether the doctrine of judicial admission applies.

## DECISION

ASBCA Nos. 59435, 59436, and 60056, to the extent that they cover alleged unallowable Corporate Development costs, are sustained.

## ASBCA NO. 59438 -- ENGINEERING LABOR OVERHEAD/PATENT COSTS[26]

## FINDINGS OF FACT CONCERNING ENGINEERING LABOR OVERHEAD/PATENT COSTS

102. The following regulation is pertinent to the parties' disputes over RMS' invention disclosure costs and patent legal costs (below):

> FAR 31.205-30, PATENT COSTS.
>
> (a) The following patent costs are allowable to the extent that they are incurred as requirements of a Government contract (but see 31.205-33 [Professional and consultant service costs]):
>
> (1) Costs of preparing invention disclosures, reports, and other documents.
>
> (2) Costs for searching the art to the extent necessary to make the invention disclosures.

---

[24] The same is true of Government Relations' time-keeping methods.

[25] We do not disclaim the value of diaries, calendars, log books, Lotus Notes, etc. as time keeping records.

[26] DCMA refers to the costs at issue as "patent" costs. Raytheon denies that they are patent costs and refers to them as "engineering labor overhead" costs (e.g., app. br. at 187-88). We use various cost terms as appropriate.

(3) *Other costs in connection with the filing and prosecution of a United States patent application* where title or royalty-free license is to be conveyed to the Government.

(b) General counseling services *relating to patent matters*, such as advice on patent laws, regulations, clauses, and employee agreements, are allowable (but see 31.205-33).

(c) Other than those for general counseling services, patent costs not required by the contract are unallowable. (See also 31.205-37. [Royalties and other costs for use of patents])

(Emphasis added)

103. The parties agree that the costs at issue are not "general counseling services" as set forth in FAR 31.205-30(b) (GPFF ¶ 256; app. br. at 128).

104. Raytheon's Policy on "Intellectual Property" was reissued effective January 2, 1990 (1990 IP Policy) (R4, tab 353 at 9477). It remained in effect until July 26, 2013, when it was superseded (R4, tab 366 at § 1.1; tr. 3/100; GUPFF ¶ 259).

105. The 1990 IP Policy provided in part:

1. <u>PURPOSE</u>

The intellectual property of the Company requires certain controls and documentation to:

1.1 Protect such intellectual property from disclosure and/or use that is not in the best interest of the Company.

. . . .

5. <u>DEFINITIONS</u>

. . . .

5.2 <u>Invention Disclosure</u> -- A complete written description of the invention. The information to be provided is spelled out on the face of the Record of Invention, Form 10-5876, and the written description together with the

> Record of Invention form is essential to constitute a complete Invention Disclosure.

(R4, tab 353 at 9477-78)

106. The 1990 IP Policy's Exhibit A, "Types of Intellectual Property," stated that "Raytheon's research and development programs should result in a flow of invention disclosures to the Patent Counsel" (R4, tab 353, § 2.2 at 9480) and that "[a] patent is the principal mechanism for protecting rights in an invention or discovery" (R4, tab 353, § 3.1 at 9481).

107. Effective September 3, 2004, Raytheon issued "Invention Disclosure" Policy No. 13-RP (2004 Invention Disclosure policy), which was in effect in 2007 and remained in effect until June 9, 2009. (R4, tabs 354, 363; tr. 9/15; *see* GUPFF ¶ 263) The policy's "Purpose" was:

> 1.1 To document the Company policy with respect to inventions and software improvements and to provide incentives for the creation of certain intellectual property rights in the form of technical inventions which may or may not be patentable or which may qualify for protection as a trade secret.
>
> 2.2 To assure that a subject invention is reported as required and defined by a Government contract.
>
> 2.3 To stimulate continued growth by providing recognition of employees who conceive significant technological advances.

(R4, tab 354 at 9463)

108. Section 4.2 of the 2004 Invention Disclosure Policy defines a "subject invention" as "[a]n invention first conceived or reduced to practice in the course of or under a U.S. Government contract, and under which the Government has certain rights. The rights usually take the form of a non-exclusive royalty-free license to use the invention for Government purposes." (R4, tab 354 at 9463)

109. Under the 2004 Invention Disclosure policy, when a "new invention" is conceived, RMS engineers must prepare an invention disclosure report, which in 2007 was submitted through Raytheon's Intellectual Property Center's (RIPC) website (tr. 9/12-14; *see* tr. 9/37-38).

110. Invention Disclosures are submitted on Raytheon Form 10-5876 (R4, tab 353 ¶ 5.2 at 9478; app. supp. R4, tab 33 ¶ 4.3 at 253-54, tab 390). There is no separate patent

disclosure form (tr. 9/88). Form 10-5876 requires the inventor to describe the invention technically and to explain how it is new (app. supp. R4, tab 389; tr. 9/29-30). It also requires identification of the labor charge code applicable to the time the inventor spent conceiving of or reducing the invention to practice. If the invention was discovered separately from government contract work, the inventor must identify the charge code for the company-funded program or overhead. If the work was performed under a government contract, the invention disclosure reports the contract number and the applicable FAR and Defense Federal Acquisition Regulation Supplement (DFARS) patent rights clauses. (App. supp. R4, tab 85 at 1300, tab 86 at 1325, 1331, tab 87 at 1342, 1346; tr. 9/48-49, 53-56, 59-60; APFF ¶ 242)

111. According to the 2004 Invention Disclosure Policy, new Invention Disclosures were to be submitted to the "Patent Evaluation Committees," which had the "primary function of evaluating inventions" (R4, tab 354 § 5.4; *see also* § 4.4 ("Patent Evaluation Committee – A decision-making body . . . which, as a primary function, reviews and evaluates the technical and economic (business) merits of an invention and determines whether patent, trade secret or other types of protection or courses of action should be pursued;" GUPFF ¶ 264) RMS did not have a Patent Evaluation Committee. For all relevant times, the Business Unit Invention Review Committee (BUIRC) assumed those responsibilities. (R4, tab 354 § 7.6; tr. 9/20, 89-90; GUPFF ¶ 265)

112. The 2004 Invention Disclosure Policy was not limited to patents but applied to all intellectual property (tr. 9/15-16). Under that policy, Raytheon issued "Invention Disclosure Instructions" and an "Invention Disclosure Questionnaire And Detailed Description" (R4, tabs 355-56). The instructions called for the employee/inventor to "fill in the Business, Business Unit, and Site to which the invention pertains" stating that "[t]his will allow [Raytheon Corporate's Intellectual Process & Licensing Office (IP&L)] to determine which Intellectual Property Attorney, Patent Engineer, and Patent Evaluation Committee will process the disclosure" (R4, tab 355 at 1092).

113. The questionnaire provided that the inventor was to prepare the Invention Disclosure Form and to send one copy to the Regional Patent Engineer. After review, comments and signatures, including by the manager of the program office or business area "most likely to benefit from protection (via patent or trade secret)" of the invention, the executed copy of the disclosure form was also to be sent to the Regional Patent Engineer. (R4, tab 356 at 1095)

114. Sherry Botos is RMS' "Patent Engineer" (tr. 9/15). Among her primary responsibilities is to "[f]acilitate the preparation, submission and critical review of invention disclosures" (R4, tab 361 at 265969-70; tr. 9/74). She helps inventors get through RMS' invention review committee, which reviews invention disclosures for all types of intellectual property protection (tr. 9/15-16, 77).

115. During the relevant period, the inventor's manager and the Program Management Office reviewed the invention disclosure. The initial reviews primarily

assessed whether it was technically feasible to protect the specific invention. If approved, the invention disclosure was submitted to the Patent Engineer and docketed in the internal Raytheon Intellectual Property Docketing tool (RIPD) to track key dates and actions. The BUIRC then evaluated the technical and economic merits of the invention disclosure to determine whether Raytheon should file for a patent or treat the intellectual property as a trade secret, innovation award, or a different type of intellectual property. If the BUIRC decided not to seek a patent, the invention was not disclosed to the public and remained confidential. If the BUIRC decided to seek a patent, the invention disclosure was "rated to file" (tr. 9/93) and submitted to IP&L. It was at this decision point that RMS deemed the associated costs to be patent costs. IP&L reviewed the invention disclosure and submitted it to Raytheon's external legal counsel, who prepared and submitted a patent application to the United States Patent and Trademark Office (PTO). In 2010, the RIPC and RIPD were consolidated and invention disclosures were submitted through an "IP Track" tool, which can run automated reports of data from prior years and was used by Raytheon at the hearing, without objection, to reflect 2007 data. (App. supp. R4, tab 373; tr. 9/12-14, 18-22, 24-25, 28, 91-93)

116. RMS does not consider the costs to discover new inventions, of preparing and submitting invention disclosures, of a manager's review of invention disclosure forms, or of BUIRC's review to be patent costs (tr. 9/14, 17-19, 24, 76, 86). Regarding the BUIRC in particular, Raytheon does not consider its review and other costs to be patent costs because "there's no patent at that stage" (tr. 9/24). The rationale is that, at the time an invention disclosure is being prepared and reviewed, RMS does not know whether a patentable invention is involved (tr. 9/82-83).

117. Prior to a decision to seek a patent for an invention, the labor costs for the preparation and internal review, including by BUIRC, of invention disclosures are collected in RMS' engineering labor overhead pool. RMS considers them to be allowable labor costs, even if the invention is ultimately deemed to be patentable. The costs are built into RMS' indirect cost rates and charged to the government. (App. br. at 130 (resp. to GPFF ¶ 269); tr. 9/82-83, 86)

118. RMS considers the costs of filing a patent application and prosecuting the patent to be patent costs. It segregates the patent costs as allowable, if they pertain to "subject inventions" or, if not, the costs are deemed to be unallowable. (Tr. 9/25-26)

119. In 2007, 149 invention disclosures were prepared and submitted internally by RMS engineers. BUIRC ultimately approved 110 of these invention disclosures as "patent worthy" and patent applications were filed with the PTO. Of the 149 invention disclosures, 26 were "subject inventions." (App. supp. R4, tab 373; tr. 9/37-38, 85-86; app. br. at 128, 130-31 (unrebutted resp. to GPFF ¶¶ 256, 271 (undisputed portion)))

120. DCMA contends that "if and when a patent is pursued, the invention disclosure itself is literally submitted as part of the application," citing Rule 4, tabs 354-56 (gov't br. at 105-06; GPFF ¶ 268). The Board did not locate support for the contention in

the cited documents. Raytheon has not denied it but it responds that "there is no evidentiary support" for it (app. br. at 130 (addressing GPFF ¶ 268)). Thus, this matter remains unclear.

121. DCAA noted in its March 18, 2014 RMS Audit Report for 2007, regarding patent costs, that it considered "all effort incurred by RMS employees to prepare, review, and approve/disapprove invention disclosures *for patent applications* to be patent costs" subject to the strictures of FAR 31.205-30 (app. supp. R4, tab 260 at 4042) (emphasis added). Therefore, all such efforts not specifically required by a government contract were expressly unallowable costs. DCAA described RMS' position as: "the costs incurred to prepare, review, and submit an [i]nvention [d]isclosure, which may or may not result in a patent filing, [are] allowable and allocable indirect expenses claimed as part of the engineering overhead pool" (*id*.). RMS' Senior Manager of Government Accounting, Ms. Garcia, confirmed that this was RMS' stance (tr. 2/274).

122. DCAA based its cost evaluation upon information RMS provided (tr. 3/90-92). DCAA reported that, in response to its request for documentation of actual labor costs and directly associated costs incurred for invention disclosure and patent efforts, RMS advised that the costs were not segregated. It provided estimates, upon which DCAA based its questioned amount of $96,701 in "engineering labor costs claimed in the engineering overhead pool for RMS *patent activities* not required by contract." DCAA speculated that the actual costs incurred could be "substantially more." (App. supp. R4, tab 260 at 4043) (emphasis added) DCAA concluded that RMS had violated CAS 405 by failing to identify adequately and exclude the expressly unallowable patent costs.

123. RMS responded that DCAA had misinterpreted its invention disclosure practice and that its Record of Invention form, as described in its 1990 IP Policy concerning invention disclosures, was used to document and catalog an invention regardless of whether it was subsequently submitted for patent approval or protected as intellectual property in some other manner. RMS asserted that DCAA had questioned costs based upon terminology identifying a general procedure and that those costs were allowable business expenses unrelated to patent filings. DCAA replied that, unlike RMS' practice, FAR 31.205-30 did not exclude costs of invention disclosures not submitted for patent approval, or protected as intellectual property in some other way, from its unallowable cost restrictions. (App. supp. R4, tab 260 at 4044)

124. DCAA changed its position from the time the audit of RMS' 2007 costs began at the end of 2008 until the audit concluded, after a long hiatus, in or about December 2013, with the audit report issuing in March 2014 (app. supp. R4, tab 260; tr. 3/16-17; *see* APFF ¶¶ 249-50). Due to a lack of employee recall and of specific time recording requirements, the auditors initially found "insufficient audit evidence upon which [to] question any related labor costs" (app. supp. R4, tab 180 at 2698).

125. The DACO's June 12, 2014 RMS Penalties COFD for 2007 was based in large part upon DCAA's RMS Audit Report for 2007. He cited $96,701 in "engineering labor overhead costs," *i.e.* "costs to prepare, review, and approve/disapprove invention disclosures *for patent applications*" as expressly unallowable under FAR 31.205-30 and subject to a level one penalty (app. supp. R4, tab 276 at 4536) (emphasis added). He stated that the costs were incurred in connection with invention disclosures for patent applications, not due to a contract requirement, and that, contrary to RMS' contention, FAR 31.205-30 did not base cost allowability on whether the costs lead to a patent filing (*id.*). DCMA withheld the questioned engineering labor overhead costs (tr. 3/28-30).

126. DCMA based its calculation of disallowed costs upon information provided by RMS, which did not provide documentation pertaining to invention disclosures related to government contract requirements until shortly before the DACO issued his final decision. By that time he had statute of limitations concerns and apparently did not consider the documentation. (Tr. 4/195)

127. Raytheon states that DCAA auditors who examined alleged patent-related activities at another Raytheon business segment, known as Intelligence and Information Systems (IIS), did not question the inventors' labor costs because they determined they were not patent expenses and the inventors charged their time spent on inventions to Independent Research and Development. DCAA also did not question the labor costs for IIS' invention review committee members' time because their time spent on meetings was charged to overhead, not patent expense. (App. supp. R4, tab 187 at 2792-94; *see* APFF ¶ 248) DCMA does not dispute that the IIS review occurred but alleges that there is a lack of evidence concerning what was "clearly a superficial review" by DCAA of IIS' patent costs, which, in any case, are not at issue here and are irrelevant (gov't reply at 50-51, citing APFF ¶¶ 247-51).

128. The government alleges that "RMS Has Acknowledged That Such Patent/Invention Disclosure Costs Are Expressly Unallowable" (gov't br. at 106). DCMA contends that a DCAA audit covering FY 2006 examined the same type of patent/invention disclosure costs at issue here, used the same methodology, and determined that they were expressly unallowable. The 2007 audit report states that: "Using the contractor's estimates, we calculated the number of disclosures not related to Government contracts, an estimate of the number of hours required to create and file the disclosures, and the number of hours required to administer the BUIRC" (app. supp. R4, tab 260 at 4042). However, contemporaneously, the contractor expressed its disagreement with DCAA and the CACO's final decision assessing a penalty. It asserted that DCAA had "incorrectly conflated the preparation of invention disclosures with the preparation of patent applications" (app. br. at 131, discussing GPFF ¶ 272), but it did not appeal the decision and paid the invention disclosure costs at issue. (R4, tab 362 at 112290-93, tab 364 at 2, tab 365; tr. 3/25-26, 28-29, 92-93, 95-96) Raytheon states that it paid the costs not because it acknowledged that they were unallowable but "in order to facilitate negotiations, and settle costs in avoidance of litigation" (tr. 3/29; *see* app. br. at 131, discussing GPFF ¶ 272).

129. Raytheon disagrees that DCAA used the same methodology in 2006 and 2007 to calculate RMS' allegedly unallowable patent costs. Raytheon states, and the record supports, that, for 2006, DCAA segregated the disclosures required by government contracts from its calculation of unallowable patent costs (R4, tab 362 at 112291-92; app. br. at 131). Raytheon contends that, although the RMS Audit Report for FY 2007 states that the auditors calculated the number of disclosures not related to government contracts, an audit work paper contradicts this. It lists all 149 invention disclosures submitted on RMS' invention disclosure forms, without reduction for work performed pursuant to a government contract. (*See* app. supp. R4, tab 373; tr. 9/37-38) DCMA replies that Raytheon has not confirmed that any of the disputed costs were incurred as requirements of a government contract (gov't reply at 67, addressing GPFF ¶¶ 256, 272)

130. DCMA also cites to deposition and hearing testimony by Ms. Garcia allegedly admitting that FAR 31.205-30 means that invention disclosure costs not required by a government contract are expressly unallowable (tr. 2/284-87). Raytheon replies that the government relies upon excerpts of testimony taken out of context and ignores that the balance of Ms. Garcia's testimony, which was that the costs at issue are allowable. She also distinguished RMS' view of patent costs and DCMA's position. (App. br. at 131-32, addressing GPFF ¶ 273 and citing tr. 2/270, 273-75, 286, 3/22) Ms. Garcia's testimony is not entirely clear, but we find no admission by her that the invention disclosure costs at issue are unallowable. In any case, the interpretation of FAR 31.205-30 is the province of the Board.

131. Based upon the foregoing, it appears, but is unclear, that the $96,701 disallowed amount includes costs for, or related to, invention disclosures, including managers' and BUIRC's reviews (*see* tr. 3/91), with regard to which RMS ultimately sought patents, and invention disclosures and related costs for which it did not seek patents.

132. The Board docketed Raytheon's and RMS' appeal from the penalties COFD as ASBCA No. 59438.

## DISCUSSION OF ENGINEERING LABOR OVERHEAD/PATENT COSTS

### I. The Parties' Contentions

#### A. The Government's Contentions

DCMA principally asserts that FAR 31.205-30(a) and (c) expressly make all patent costs unallowable except for general counseling services and costs incurred as requirements of a government contract (gov't br. at 107). DCMA contends that the FAR expressly defines unallowable "[p]atent costs" to include the "[c]osts of preparing invention disclosures, reports, and other documents." (*Id*. (emphasis in original omitted)) Therefore, according to DCMA, it is absolutely clear that the costs of preparing invention

disclosures that are not a government contract requirement are expressly unallowable. DCMA claims that the FAR specifically defines "preparation" of "invention disclosures" "as an initial but essential step in the [p]atent application process (whether or not a patent is ultimately submitted, rejected, or obtained)" (*id*.). At the hearing government counsel stated that "the FAR specifically names that certain patent costs are unallowable" (tr. 2/278).

DCMA asserts that RMS' costs to prepare and review invention disclosure forms "associated with its patent application process" that were not specifically required by a government contract are expressly unallowable and subject to penalties that the DACO was not required to waive (gov't br. at 110). DCMA further contends that Raytheon's own invention disclosure policies, and its past payment of penalties regarding invention disclosure costs, reflect the legitimacy of DCMA's position.

B. Raytheon's Contentions

Raytheon responds that the threshold issue is whether FAR 31.205-30 "is specific to costs for patents, or whether it applies to a broader category of costs relating to inventions and intellectual property generally" (app. br. at 187). Raytheon advocates the former interpretation, based upon the FAR's "plain meaning" (*id*.) and asserts that DCMA's interpretation is unreasonably broad.

Raytheon alleges that DCMA "cannot show that the preparation, review, and evaluation of Form 10-5876 and new inventions are patent costs," stating that RMS' invention disclosures were prepared for all types of inventions whether or not they were patentable; many times they were not patented; and, "in all cases, the activities occurred before RMS decided whether or not it would seek a patent on the invention" (app. br. at 189). Raytheon posits that the fact that a preliminary activity might in the future result in unallowable costs is not dispositive, citing *Raytheon I* at 178,851 regarding a mergers and acquisitions (M&A) database. Raytheon adds that, even if it went through its patent submission review process and applied for a patent, if it did not receive one, there was no patent and thus no unallowable patent costs under FAR 31.205-30.

Raytheon continues that the only reasonable interpretation of FAR 31.205-30(a)(1) is that it refers to those disclosures required by government contracts, "*i.e.* the requirement to disclose subject inventions to the [CO] set forth in the FAR and DFARS patent rights clauses . . ." (app. br. at 190) (citations to DFARS omitted). Raytheon contends that, at a minimum, even under the government's FAR interpretation, a portion of the disallowed costs are allowable, *i.e.*, the costs of 26 disclosures, including BUIRC review, because they were required by government contracts.

Raytheon further contends that, if the Board determines that any of RMS' 2007 engineering costs for preparation of invention disclosures and evaluation of inventions are unallowable, the government nonetheless has not met its burden to prove that they are expressly unallowable under FAR 31.205-30 and subject to penalties. Raytheon alleges

that the FAR does not "specifically name and state" that the costs of the activities at issue are unallowable, citing *Raytheon I* at 176,050, and even if it did, DCMA has not established that it was unreasonable under all of the circumstances for RMS to believe the costs were allowable. (App. br. at 190-91) Raytheon contends that RMS reasonably believed the costs were not covered by FAR 31.205-30 because they related to activities prior to any determination to seek a patent. Often no patent was sought. Raytheon alleges that, given the regulation's "gray area," RMS reasonably drew an "unallowable" line regarding non-subject contracts at the point the BUIRC determined that a patent application should be filed. (App. br. at 192) Raytheon notes that DCAA considered the same sort of costs to be allowable in its audit of IIS and initially in auditing the costs at issue. Therefore, the costs cannot be expressly unallowable. At worst, there is a reasonable difference of opinion.

Alternatively, Raytheon alleges that, should the Board determine that the costs were expressly unallowable, the DACO was required to waive penalties and his determination not to do so was arbitrary and capricious and in contravention of FAR 42.709-5(c)(1)-(2) (app. br. at 193).

II. <u>FAR 31.205-30</u>

DCAA considered "all effort incurred by RMS employees to prepare, review, and approve/disapprove invention disclosures *for patent applications* to be patent costs" subject to FAR 31.205-30 (finding 121) (emphasis added). DCAA based its questioned amount of $96,701 in "engineering labor costs claimed in the engineering overhead pool for RMS *patent activities* not required by contract" (finding 122) (emphasis added). Following suit, the DACO's June 12, 2014 RMS Penalties COFD for 2007 cited "engineering labor overhead costs," *i.e.* "costs to prepare, review, and approve/disapprove invention disclosures *for patent applications*" as expressly unallowable under FAR 31.205-30 (finding 125) (emphasis added).

DCMA based its calculation of disallowed costs upon information provided by RMS, which did not provide documentation pertaining to invention disclosures related to government contract requirements until shortly before the DACO issued his final decision. By that time he had statute of limitations concerns and apparently did not consider the documentation. (Findings 122, 126)

Raytheon contends that DCAA did not limit its disallowances to patent costs that were not required by a government contract, but rather excluded all of RMS' invention disclosure and review costs, even if they were incurred pursuant to a government contract requirement or no patents were involved. The crux of appellant's argument is that the disallowed costs were not for patent activities or patent applications but were general engineering and overhead costs of invention disclosures and review that might or might not result in patent applications. When there ultimately was no decision to pursue a patent, there were no patent costs. (Findings 115-118)

Both parties misconstrue FAR 31.205-30. Paragraph (a) provides that certain "patent costs" are "allowable to the extent that they are incurred as requirements of a Government contract." Subparagraph (a)(1) lists the costs of "preparing invention disclosures" as among the allowable "patent costs" under the stated circumstances. Subparagraph (b) states that general counseling services relating to patent matters are allowable, but the parties agree that such services are not at issue (finding 103). Paragraph (c) provides that, other than patent costs for general counseling services, patent costs not required by a government contract are unallowable.

The government misreads FAR 31.205-30 to apply more broadly than it does, and it adds language to the regulation that is not there. The regulation certainly does not specifically define "preparation" of "invention disclosures" "as an initial but essential step in the [p]atent application process (whether or not a patent is ultimately submitted, rejected, or obtained) (*see* finding 102). Moreover, it does not state that all invention disclosures are patent costs, regardless of whether patents are involved. Indeed, some of RMS' invention disclosures are associated with forms of intellectual property other than patents, or with RMS' recognition of invention efforts that did not lead to patent applications (*see, e.g.*, findings 107, 112, 114-15, 118, 121, 123). It is not clear whether such costs are among the costs at issue.

On the other hand, Raytheon also misreads FAR 31.205-30. RMS does not consider the costs to discover new inventions, of preparing and submitting invention disclosures, of a manager's review of invention disclosure forms, or of BUIRC's review to be patent costs, on the ground that there is not yet any patent and RMS does not know whether there will be one. RMS defines patent costs to be those occurring after the BUIRC decides to pursue a patent. (Findings 115-118)

Raytheon likens RMS' invention disclosure costs to M&A data base consultant costs at issue in *Raytheon I*. Raytheon compares RMS' invention disclosure activities to what they describe as the preliminary data base activities in *Raytheon I* that might or might not have resulted in unallowable organization costs. (App. br. at 189) *Raytheon I*, in part, involved the interplay among FAR 31.205-12, Economic planning costs, FAR 31.205-27, Organization costs, and FAR 31.205-38, Market planning costs. The Board stated that, reading the regulations together, "the intent appears to be that costs in connection with actually planning the organization or reorganization of a business, such as by a specific merger or acquisition, are unallowable whereas generalized long-range management planning costs are allowable." *Raytheon I* at 178,852. The Board noted that the database was intended to be used both for general planning and specific M&A purposes when ultimately configured. However, Raytheon terminated the design and build of the M&A application, which was never completed or used in connection with any M&A target. The Board held that the disputed costs were allowable economic and market planning costs. *Id.* The Board's decision in *Raytheon I* concerning consultant costs to design and build an M&A database, and the interplay of three regulations, is not apt here.

Raytheon's interpretation of FAR 31.205-30 is unreasonable. Under its interpretation, patent-related invention disclosure costs would never be unallowable, even if no government contract requirement were involved, and the FAR's reference to allowable patent invention disclosure costs would be superfluous.

The reasonable interpretation of FAR 31.205-30 is that, when patents are involved, the costs of the associated invention disclosure and review are patent costs. They are allowable if incurred due to government contract requirements. Otherwise, they are not allowable. There is no exception for costs incurred during the invention disclosure preparation and review process prior to the decision to pursue a patent. If patents are not involved, the invention disclosure and related costs are allowable.

In 2007, RMS engineers prepared 149 invention disclosures and submitted them internally. BUIRC ultimately approved 110 of them as "patent worthy" and patent applications were filed with the PTO. Of the 149 invention disclosures, 26 were "subject inventions." (Finding 119) It appears that the $96,701 disallowed amount at issue improperly includes costs for subject inventions and might include costs for non-patent invention disclosures and review that are allowable. The Board cannot determine from the record what the proper amount of unallowable costs should be. This is a failure of proof by the government leading us to sustain the appeal.[27]

DECISION

ASBCA No. 59438 is sustained.

ASBCA NO. 59437 – OUSIDE PATENT LEGAL COSTS

FINDINGS OF FACT CONCERNING OUTSIDE PATENT LEGAL COSTS

133. The following FAR and CAS provisions are relevant to the parties' dispute concerning outside patent legal costs:

> FAR 31.201-4, DETERMINING ALLOCABILITY (APR 1984), provides in part:
>
> A cost is allocable if it is assignable or chargeable to one or more cost objectives on the basis of relative benefits received

[27] In any case, if the government could have established the proper amount of unallowable costs, its various treatments of FAR 31.205-30 (*see* findings 124, 127), including its overly broad interpretation in this appeal, would have undermined its contention that the invention disclosure and review costs at issue were "expressly unallowable" under FAR 42.709-1(a)(1). The government's demand for a level one penalty was unwarranted.

or other equitable relationship. Subject to the foregoing, a cost is allocable to a Government contract if it—

(a) Is incurred specifically for the contract;

(b) Benefits both the contract and other work, and can be distributed to them in reasonable proportion to the benefits received; or

(c) Is necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown.

FAR 31.202, DIRECT COSTS (MAY 2004), provides in part:

(a) No final cost objective shall have allocated to it as a direct cost any cost, if other costs incurred for the same purpose in like circumstances have been included in any indirect cost pool to be allocated to that or any other final cost objective. Direct costs of the contract shall be charged directly to the contract. All costs specifically identified with other final cost objectives of the contractor are direct costs of those cost objectives and are not to be charged to the contract directly or indirectly.

(b) For reasons of practicality, the contractor may treat any direct cost of a minor dollar amount as an indirect cost if the accounting treatment—

(1) Is consistently applied to all final cost objectives; and

(2) Produces substantially the same results as treating the cost as a direct cost.

FAR 31.203, INDIRECT COSTS (MAY 2004), provides in part:

(a) For contracts subject to full CAS coverage, allocation of indirect costs shall be based on the applicable provisions. For all other contracts, the applicable CAS provisions in paragraphs (b) through (h) of this section apply.

(b) After direct costs have been determined and charged directly to the contract or other work, indirect costs are those remaining to be allocated to intermediate or two or more final cost objectives. No final cost objective shall have allocated to it as an indirect cost any cost, if other costs incurred for the same purpose, in like circumstances, have been included as a direct cost of that or any other final cost objective.

(c) The contractor shall accumulate indirect costs by logical cost groupings with due consideration of the reasons for incurring such costs. The contractor shall determine each grouping so as to permit use of an allocation base that is common to all cost objectives to which the grouping is to be allocated. The base selected shall allocate the grouping on the basis of the benefits accruing to intermediate and final cost objectives. When substantially the same results can be achieved through less precise methods, the number and composition of cost groupings should be governed by practical considerations and should not unduly complicate the allocation.

(d) Once an appropriate base for allocating indirect costs has been accepted, the contractor shall not fragment the base by removing individual elements. All items properly includable in an indirect cost base shall bear a pro rata share of indirect costs irrespective of their acceptance as Government contract costs. For example, when a cost input base is used for the allocation of G&A costs, the contractor shall include in the base all items that would properly be part of the cost input base, whether allowable or unallowable, and these items shall bear their pro rata share of G&A costs.

CAS 402-20, Purpose, states that:

> The purpose of this standard is to require that each type of cost is allocated only once and on only one basis to any contract or other cost objective. The criteria for determining the allocation of costs to a product, contract, or other cost objective should be the same for all similar objectives. Adherence to these cost accounting concepts is necessary to guard against the overcharging of some cost objectives and to prevent double counting. Double counting occurs most

> commonly when cost items are allocated directly to a cost objective without eliminating like cost items from indirect cost pools which are allocated to that cost objective.

48 CFR § 9904.402-20.

CAS 402-30, Definitions, states under subsection (a) that:

> (1) Allocate means to assign an item of cost, or a group of items of cost, to one or more cost objectives. This term includes both direct assignment of cost and the reassignment of a share from an indirect cost pool.
>
> ….
>
> (3) Direct cost means any cost which is identified specifically with a particular final cost objective. Direct costs are not limited to items which are incorporated in the end product as material or labor. Costs identified specifically with a contract are direct costs of that contract. All costs identified specifically with other final cost objectives of the contractor are direct costs of those objectives.
>
> ….
>
> (5) Indirect cost means any cost not directly identified with a single final cost objective, but identified with two or more final cost objectives or with at least one intermediate cost objective.

48 CFR § 9904.402-30 (a).

CAS 402-40, Fundamental Requirement, provides in part that:

> All costs incurred for the same purpose, in like circumstances, are either direct costs only or indirect costs only with respect to final cost objectives.

48 CFR § 9904.402-40.

134. Raytheon withdraws the "vast majority" of patent costs it pays to its external counsel to prepare and submit patent applications, but it charges the government the costs associated with the preparation of its patent application if it considers the patent to be a "subject invention" conceived of as a requirement of a government contract under

FAR 31.205-30. These costs are charged to the government as indirect costs and are not charged directly to the contract. (GUPFF ¶ 270)

135. The $120,600 costs at issue are for outside counsel to prepare patent applications and related filings for subject inventions. The questioned costs constitute 100% of RMS' claimed outside legal costs relating to patents for 2007. Raytheon and RMS fist claimed that the costs were for general counseling services related to patent matters, which the parties now agree is not the case (finding 103). Raytheon ultimately alleged that they were incurred in connection with subject inventions. (App. supp. R4, tab 260 at 4071-73; tr. 2/293-94, 3/41-43, 4/196-97; AUPFF ¶ 252)

136. RMS collected all outside legal costs, including patent-related costs, in its G&A expense pool (tr. 2/294-95). Raytheon contends that this practice was in accordance with RMS' 2007 CAS disclosure statement and CAS 402, Consistency in Allocating Costs Incurred for the Same Purpose (APFF ¶ 253). The costs were then segregated as allowable and were claimed, or as unallowable, and were not claimed, as follows: When inventors discovered a new invention in performing a government contract, Raytheon tracked the subject invention as it proceeded through the invention disclosure process. The outside legal invoices for patent applications and maintenance were segregated as either allowable or unallowable legal costs by Raytheon's corporate legal department. Raytheon coded the invoices as allowable only if the patent activities involved a subject invention and were conducted as part of a government contract requirement. RMS received those costs from Raytheon corporate as a legal allowable "stat order." Raytheon's corporate legal department coded the invoices as unallowable if they related to an invention that was not a subject invention. In 2007, RMS incurred approximately $2.5 million in unallowable outside legal costs relating to patents, which RMS withdrew from its incurred cost proposal. (Tr. 3/41-44; APFF ¶ 253) (undisputed portion) Raytheon alleges, without contradiction, that this amounts to a 95% withdrawal by RMS (APFF ¶ 253).

137. DCMA does not dispute the general process described by Raytheon but contends that "it is false that such a process is specifically identified in Raytheon's CAS disclosure statement" (gov't reply br. at 51-52 (resp. to APFF ¶ 253)). The disclosure statement is not of record. However, DACO Bradley testified credibly that the patent legal cost process was not noted in the disclosure statement (tr. 4/200). On the other hand, Ms. Garcia testified credibly that, while the disclosure statement did not mention patent legal costs in particular, it referred to all legal costs, to be collected in the G&A pool and charged indirectly (tr. 2/295).

138. Shortly prior to the COFD at issue, Raytheon provided a sample of the questioned invoices to DCAA, along with the associated government contracts and invention disclosures referencing the contracts (app. supp. R4, tab 274; tr. 3/68-69). RMS also provided a spreadsheet (ex. A-20) concerning the questioned invoices that tied them to the particular government contract involved. (R4, tab 357; app. supp. R4, tab 85 at 1300, tab 86 at 1325, tab 274 at 4531, tab 305; tr. 3/46-54, 4/195, 9/27-28, 34-36)

Ms. Botos testified credibly to the accuracy of the spreadsheet. She had verified the underlying documents. (Tr. 9/34, 36) DCMA did not rebut her testimony or refute the contents of Exhibit A-20. Ms. Garcia also researched the $120,600 costs at issue and found that they were for outside patent legal work required by contract (tr. 2/293-94). DCMA did not rebut her credible testimony.

139. As we found above, DACO Bradley assessed that, in order to issue a timely COFD, and not exceed the CDA's six-year statute of limitations, he and DCAA did not have time to review RMS' documentation (tr. 3/187-88, 4/195; finding 126).

140. DACO Bradley's June 12, 2014 2007 RMS COFD questioned $120,600 in "Legal Allowable (Patent Legal Costs)" on the ground that they were identified with patent disclosures that were not required by a government contract and therefore were unallowable (app. supp. R4, tab 277 at 4544). The COFD stated that the costs were unallowable per FAR 31.201-2 and FAR 31.205-30 as directly associated costs of patent disclosures. The DACO concluded that RMS had not provided sufficient documentation to demonstrate that the patent legal costs were allowable in that they were either incurred as a government contract requirement or were for general counseling services related to patent matters. (*Id*.) DCMA did not withhold the questioned costs because RMS' decrements to its billing rates had covered those costs (tr. 3/30-31, 37-40).

141. DCMA has not rebutted Raytheon's representation, and we so find, that:

> . . . RMS's Government contracts contain patent rights clauses obligating RMS to pursue patents of subject inventions to which they take title and to grant the Government a license for Government purpose rights . . . . [T]he costs at issue were incurred as requirements of Government contracts.

(APFF ¶ 257) RMS submitted supporting documentation to the government, albeit late in the process. Accordingly, and due to Ms. Botos' and Ms. Garcia's unrebutted credible testimony, we find that the costs at issue were incurred due to government contract requirements. (*See* R4, tab 357; tr. 2/293-94, 9/27-28; ex. A-20; finding 138)

142. DCMA also has not rebutted Raytheon's representation, and we so find, that, in accordance with CAS 402, RMS has consistently classified all of its outside legal costs as indirect expenses. This includes the legal costs for subject inventions, which benefit the government contract under which they were discovered and benefit Raytheon as a whole because it owns the patent. (*See* tr. 2/294-95; app. br. at 100-101 (APFF ¶ 253), 196)

143. Raytheon and RMS' appeal from this COFD was docketed as ASBCA No. 59437 and consolidated with ASBCA Nos. 59435, 59436, and 59438.

## DISCUSSION OF OUTSIDE PATENT LEGAL COSTS

### I. The Parties' Contentions

#### A. The Government's Contentions

We dispense with some of the parties' contentions because we have addressed them above. Of the remaining allegations, DCMA contends that FAR 31.205-30(a) requires that, in order to qualify as direct costs of government contracts, Raytheon must prove that they are "literal line item requirements" of the contracts (gov't reply at 87). Additionally, even if Raytheon were able to demonstrate that the outside patent legal costs were required by government contracts, the costs should have been charged directly to the government contract involved, in accordance with FAR 31.201-2(a)(2), FAR 31. 201-4, and CAS 402. They were not and are therefore unallowable. (*Id*.)

#### B. Raytheon's Contentions

Raytheon alleges that the costs at issue are expressly allowable because each of the disallowed invoices was associated with a subject invention developed under a government contract. Raytheon asserts that RMS met its obligation under FAR 31.201-2(d) to maintain documentation supporting the allowability of its patent legal costs but the government chose to ignore the submitted documentation due to its statute of limitation concerns (app. br. at 194). Raytheon further asserts that DCMA has not met its burden to show that the costs are unallowable under FAR 31.205-30, which does not limit its allowability provisions to direct costs. It adds that, under the government's "line item" contention, "other than contracts for the purpose of acquiring patent application filing services, it is difficult to fathom what costs would be allowable . . . ." (App. br. at 195)

Regarding allocability, Raytheon urges, and we have found, that, in accordance with CAS 402, RMS has consistently classified all of its legal costs as indirect expenses. This includes the legal costs for subject inventions, which benefit not just the government contract under which they were discovered but benefit Raytheon as a whole because it owns the patent. Therefore, the outside legal patent costs in question are properly allocable as indirect costs. (Finding 142; app. br. at 196)

### II. RMS' Outside Legal Patent Costs Are Allowable and Allocable As Indirect Costs

The FAR governs cost allowability. When the CAS applies, as here, if there is any conflict between the CAS and the FAR, the CAS governs allocability. *See Raytheon Co. v. United States*, 747 F.3d 1341, 1350 (Fed. Cir. 2014), *United States v. Boeing Co*., 802 F.2d 1390, 1394-95 (Fed.Cir.1986).

The outside patent legal costs at issue are allowable. They were incurred due to government contract requirements (finding 141). FAR 31.205-30 does not specify that

there be a "line item" link to a government contract. Indeed, it is established that the regulation applies to indirect patent costs as well as direct patent costs. *Rocket Research Co.*, ASBCA No. 24972, 81-2 BCA ¶ 15,307 at 2 ("Nothing in the history of [a predecessor to FAR 31.205-30] or in the literal language of the clause, as promulgated, warrants a distinction between direct and indirect patent costs.")

Concerning allocability, in this case there is no conflict between the FAR's provisions regarding indirect costs and those of the CAS. FAR 31.203(a), similarly to CAS 402-30(a)(5), provides that an indirect cost is one identified with two or more final cost objectives. Under FAR 31.203(b), indirect costs are to be accumulated by logical cost groupings. Each grouping should be determined so as to permit distribution of the grouping on the basis of the benefits accruing to the several cost objectives. (Finding 133) As Raytheon points out, RMS' patent legal costs at issue benefit both the government contracts under which they were incurred and Raytheon, because it owns the patents (finding 142).

Raytheon and RMS' consistent practice has been to charge outside legal costs indirectly (finding 136). This satisfies CAS 402. "CAS 402 gives the contractor considerable freedom in the classification of particular costs, so long as the contractor maintains consistency in making that determination. *See* CAS 402-20." *ATK Thiokol, Inc. v. United States*, 598 F.3d 1329, 1332 (Fed. Cir. 2010) (independent research and development (IR&D) costs were properly charged as indirect costs despite government's contention that, under FAR IR&D regulation, they should have been charged directly because they were required for contract performance).

We conclude that Raytheon and RMS' regular disclosed practice of charging outside legal costs as indirect costs meets CAS 402's consistency requirements and was proper under the circumstances of this appeal. All of the outside legal patent costs at issue are allowable and allocable as indirect costs.

## DECISION

ASBCA No. 59437 is sustained to the extent that it covers outside legal patent costs. The remainder of the disputes covered in ASBCA No. 59437 are addressed below.

## ASBCA Nos. 59437, 60057, 60059-60 -- AIRFARE COSTS (CORPORATE AND RMS)

## FINDINGS OF FACT CONCERNING AIRFARE COSTS (CORPORATE AND RMS)

### FAR 31.205-46, Travel Costs—DCAA Interpretation Conflicts With DCMA and Raytheon Interpretation

144. From April 9, 1986, until January 10, 2010, and at all times relevant to the contracts and costs at issue in these appeals, FAR 31.205-46, TRAVEL COSTS, governed

the allowability of airfare costs (*see* GPFF ¶ 275, APFF ¶ 150). FAR 31.205-46 provided in part[28]

> (a) Costs for transportation, lodging, meals, and incidental expenses.
>
> (1) Costs incurred by contractor personnel on official company business are allowable, subject to the limitations contained in this subsection.
>
> . . . .
>
> (4) Subparagraphs (a)(2) and (a)(3) of this subsection [pertaining to the Federal Travel Regulations (FTR) and Joint Travel Regulations (JTR)] do not incorporate the regulations cited in subdivisions (a)(2)(i), (ii), and (iii) of this subsection in their entirety. Only the maximum per diem rates, the definitions of lodging, meals, and incidental expenses, and the regulatory coverage dealing with special or unusual situations are incorporated herein.
>
> (b) Airfare costs in excess of the lowest customary standard, coach, or equivalent airfare offered during normal business hours are unallowable except when such accommodations require circuitous routing, require travel during unreasonable hours, excessively prolong travel, result in increased cost that would offset transportation savings, are not reasonably adequate for the physical or medical needs of the traveler, or are not reasonably available to meet mission requirements. However, in order for airfare costs in excess of the above standard airfare to be allowable, the applicable condition(s) set forth in this paragraph must be documented and justified.

(App. supp. R4, tab 158 at 2197-98)

---

[28] The parties agree that FAR 31.205-46 was amended, effective October 31, 2003, to renumber the paragraphs and make certain changes to other sections of the cost principle. As part of this amendment, the relevant text was moved from paragraph (d) to paragraph (b). No change was made to the quoted paragraph as part of the October 2003 amendment or at any other time prior to January 2010. (Gov't br. at 120, n.46; app. br. at 58, n.37) For ease, we refer to FAR 31.205-46(b) unless otherwise indicated.

145. Effective January 11, 201, FAR 31.205-46(b) was amended to state:

> (b) Airfare costs in excess of the lowest *priced* airfare *available to the contractor* during normal business hours are unallowable except when such accommodations require circuitous routing, require travel during unreasonable hours, excessively prolong travel, result in increased cost that would offset transportation savings, are not reasonably adequate for the physical or medical needs of the traveler, or are not reasonably available to meet mission requirements. However, in order for airfare costs in excess of the above airfare to be allowable, the applicable condition(s) set forth above must be documented and justified.

(R4, tab 459 at 11152) (emphasis added to reflect changes) As noted above, before amendment, the provision read: "(b) (Airfare costs in excess of the lowest *customary standard, coach, or equivalent airfare offered* during normal business hours are unallowable . . . ." (emphasis added to reflect language before changes).

146. FAR 31.205-46(b) implements 10 U.S.C. § 2324(e)(1)(J), which makes unallowable "Costs for travel by commercial aircraft which exceed the amount of the standard commercial fare" (Defense Procurement Improvement Act of 1985, title IX, National Defense Authorization Act Fiscal Year 1986, Pub. L. 99-145, § 911, 99 Stat. 583 (Nov. 8, 1985); AUPFF ¶ 151, supplemented by gov't at gov't reply br. at 34).

147. In 2001, a dispute arose between Raytheon and the government regarding the interpretation of the phrase "lowest customary standard, coach, or equivalent airfare offered during normal business hours." DCAA questioned RMS' use of standard coach fares offered to the general public to determine the allowability of premium airfare costs, and argued that it should instead use Raytheon's negotiated discount agreements with certain airlines. Local DCAA personnel at RMS elevated the issue to DCAA Headquarters. (Tr. 7/185, 10/56-57; AUPFF ¶ 152)

148. By email of December 11, 2001 to Terry Murphy, Raytheon's Assistant Controller for Government Accounting, Daniel Dowd, Acting Defense Corporate Executive (DCE)[29] detailed his understanding of Raytheon's excess airfare withdrawal methodology and DCAA's objection thereto as follows:

---

[29] DCMA has not disputed Raytheon's statement that "[a]t the time, the 'Defense Corporate Executive' was a function within DCMA serving – with respect to the five largest defense contractors – the same role as what is currently the CACO" (app. br. at 59, n.38).

> Raytheon has AMEX record the lowest customary standard coach fare on all quotes and invoices where higher class airfare is utilized …. The Company then treats as unallowable costs the difference between the actual higher class fare utilized and the standard coach rate.
>
> It is DCAA's opinion that the unallowable amount should be the actual higher class fare utilized less the negotiated reduced coach airfare.

(App. supp. R4, tab 8 at 51; AUPFF ¶ 153)

149. By April 10, 2002 email to Mr. Dowd, Glen Gulden of DCMA headquarters, said to be its representative to the DAR Council (APFF ¶ 154), stated:

> My review of the historical files found when the language "lowest customary standard, coach or equivalent airfare offered during normal business hours" was incorporated into the cost principle the meaning was: the lowest fare class regularly offered during normal business hours. The Committee report goes on to say that they do not recommend that the standard be the lowest fare available. The record does not address your specific situation (company discounts). The Committee wanted a generic definition.
>
> I discussed your issue with the cost, pricing and finance part of OSD [Office of the Secretary of Defense] and they felt we would be held to the words in the FAR which would support the company's position. After reviewing the files I would have to agree with the OSD position if we were faced with making a decision about going to court.

(App. supp. R4, tab 10) On August 20, 2002, Mr. Dowd forwarded Mr. Gulden's email to DCAA Resident Auditor Seay Anne Sheley, identifying Mr. Gulden as "our expert on FAR principle issues" (*id.*).

150. On November 20, 2002, DCAA Headquarters issued "Audit Guidance on the Application of FAR 31.205-46 (d), Airfare Costs in Excess of the Lowest Customary Standard" (DCAA's November 2002 memorandum) (app. supp. R4, tab 11 at 60). DCAA took the position:

> FAR 31.205-46(d) disallows cost of airfare in excess of the lowest customary standard, coach, or equivalent airfare offered during normal business hours available to the contractor. The lowest customary standard airfares available to Raytheon for

> certain city pairs are those negotiated with American Express Travel (AMEX). Any airfare costs in excess of the AMEX negotiated standard coach airfare should be questioned.

(*Id*.) The memorandum elaborated, among other things, that:

> Raytheon Corporate uses standard coach airfare that is available to the public (street fare) as their baseline for calculating excess unallowable airfare. DCAA uses the customary airfare that is available to Raytheon as the baseline for calculating excess unallowable airfare.
>
> . . . .
>
> The FAR clause for "customary standard" is specific to the contractor.

(*Id*.) The memorandum likened the airfare regulation to the discount provisions of FAR 31.205-26, MATERIAL COSTS (app. supp. R4, tab 11 at 61). DCAA sent a copy of the memorandum to Raytheon (*id*. at 58).

151. By January 27, 2003 email to Resident Auditor Sheley, DCE John McGrath responded to DCAA's November 20, 2002 memorandum as follows:

> DCMA Headquarters disagrees with the guidance in the attached DCAA memorandum. Based on their review of the available documents and conversations with OSD personnel, the agency believes that using a different standard to determine unallowable excess airfare costs than cited in FAR 31.205-46(d) (lowest customary standard, coach, or equivalent airfare offered during normal business hours) would not be sustainable if Raytheon disputed this cost question before the ASBCA or other court. There is nothing in the record to indicate defense contractors are to negotiate airfare rates with carriers and that the negotiated rates are the customary rates to be used for determining the unallowable amount. Accordingly, I can't support or sustain DCAA's audit position.
>
> I want to inform you also that I surveyed the other DCMA [DCEs] regarding this issue and all those responding concurred with the position taken by DCMA Headquarters.
>
> At my request, Raytheon Corporate Office provided information on Domestic Travel costs in CY 2001. It showed

> that 98.5 percent of flights taken were Coach Class, 1.4 percent of flights taken were First Class, and 0.1 percent of flights taken were Business Class. Further, the majority of those using First Class or Business Class were pre-approved for preferred seating. Therefore, the excess airfare costs would be allowable. The foregoing indicates that the total potential cost question using DCAA's suggested method would be relatively small.
>
> While I understand and appreciate the arguments raised by DCAA to support its position, the relatively immaterial travel amounts involved and the guidance from my Headquarters leads me to conclude that I can't support DCAA at this time. If, however, future audits determine that more Raytheon employees are flying other than standard coach and the amount of money has become material, I will reconsider my position.
>
> Based on the foregoing, I would have to agree with my Headquarters that we would be held to the words in the FAR 31.205-46(d) standard (lowest customary standard, coach, or equivalent airfare offered during normal business hours) which would support the company's position.

(App. supp. R4, tab 15 at 76 (January 2003 McGrath memorandum))

152. Mr. McGrath understood that the baseline Raytheon was using was a coach fare available to the general public and that the OSD and Mr. Gulden agreed with Raytheon's position (tr. 9/226-27). Mr. McGrath believed that Raytheon's position was the correct reading of the FAR (tr. 9/237).

153. Although the January 2003 McGrath memorandum mentioned domestic air travel, all of Raytheon's premium air fare travel, whether claimed or not, is an exceptional circumstance, amounting to 4-5 percent of its flights (tr. 2/35).

154. Mr. McGrath sent a copy of his memorandum to Raytheon's Assistant Controller for Government Accounting, Mr. Murphy (app. supp. R4, tab 15 at 77), who understood it to mean that "DCMA headquarters agreed with Raytheon's position, that the language of standard coach airfare in [the] FAR was what was to be used, and that they could not sustain [DCAA's] position of using negotiated rates" (tr. 10/61-62). It was not Mr. Murphy's understanding that DCMA headquarters had based its opinion on cost immateriality. Mr. McGrath never conveyed that to him. (Tr. 10/62-63)

155. After DCAA's November 2002 memorandum, the issue of "Excess Airfare Withdrawal Methodology" had been added as an "open item" discussion topic during

periodic "open items" meetings held among DCMA, DCAA, and Raytheon Corporate Government Accounting (*see* app. supp. R4, tab 12 at 65, tab 13 at 68, tab 14 at 72; tr. 10/58-60). After the January 2003 McGrath Memorandum, the excess airfare withdrawal item was removed from the agendas for the "open items" meetings, which meant to Mr. McGrath and Mr. Murphy that the issue had been resolved and was closed (*see* app. supp. R4, tab 16; tr. 9/239, 10/63-64).

156. The government admits that Mr. McGrath was acting within the scope of his authority as the CACO for Raytheon when he issued his January 2003 memorandum (app. supp. R4, tab 195 at 2911-12 (gov't resp. to interrog. No. 12); tr. 7/189).

157. In May 2007, as part of its audit of 2003 airfare costs, DCAA recommended that "the DCE consider requiring Raytheon to factor any negotiated airfare discounts into its policies and procedures relative to calculating unallowable amounts when premium airfares are purchased" (app. supp. R4, tab 93 at 1470-71; tr. 8/124). In response, DCMA Corporate contract specialist Roger Christianson, spoke to then-DCE Daniel Dowd (Mr. McGrath having retired). They determined that they had to follow the January 2003 McGrath memorandum and it was re-affirmed. The government then continued to apply what it described as a "walk-up coach fare" as the standard for allowability under FAR 31.205-46(b). (App. supp. R4, tab 97 at 1519; tr. 8/178)

158. For its audit of 2004 airfare costs, also undertaken in 2007, DCAA used a standard coach or equivalent coach fare as the baseline for allowability under FAR 31.205-46(b) (app. supp. R4, tab 102 at 1634, 1639; tr. 8/180-81).[30]

<u>Revised Language of FAR 31.205-46(b)</u>

159. On August 10, 2006, DCAA submitted a proposal to the DAR Council "to clarify" the travel cost principle (R4, tab 431). David Johnson, Regional Director for DCAA's Eastern Region, was the proposal's primary drafter (tr. 7/154, 158). On October 19, 2006, the Acquisition Finance Team (AFT) met to discuss the proposal. Mr. Johnson attended. His November 6, 2006 Memorandum for Record reported that "[t]he Team majority did not concur with DCAA's proposal and will recommend that the Case be closed with no further actions." (App. supp. R4, tab 56 at 903-04, 906). The memorandum elaborated in part:

> It was quite clear from the beginning that DCAA' s proposal was not well received by many of the representatives on the Team. The OSD representative, Chris Werner, essentially set the tone for the majority by taking the position that the existing language in the FAR is consistent with statutory language at 10 USC 2324(e)(1)[J] and 41 USC 256(e)(1)[J]),

[30] As noted elsewhere, the record does not clearly identify "coach" fare, which is described in various ways.

> which states "Costs for travel by commercial aircraft which exceed the amount of the **standard commercial fare**" are unallowable. The majority strongly believe that the current standard provides a reasonable baseline for allowable costs and any amounts less than this standard represent a savings to the Government, regardless as to whether those reduced fares are for first or business class accommodations. The majority also seemed to buy into the rationale that DCAA's recommendation would remove the contractors' incentive to negotiate reduced fares and might ultimately lead them to no longer pursue discounted fares, and eventually eliminate any cost savings that the Government is currently realizing.

(*Id*. at 904-05) (emphasis in original)

160. The AFT's draft majority report provided in part as follows:

> The [AFT] notes that FAR 31.205-46(b) implements the statutory limitation on allowable contractor airfare costs found at 10 U.S.C. 2324(e)(1)(J) and 41 U.S.C. 256(e)(1)(J). These provisions state that the "costs for travel by commercial aircraft which exceed the amount of the standard commercial fare" are not allowable on flexibly priced Government contracts. *Clearly, the statutory words "standard commercial fare" anticipate a ticket price that is available to the general public. Against this background, the [AFT] is convinced that the most reasonable interpretation of FAR 31.205-46(b) is that it also refers to the lowest standard or coach fare available to the general public. Nothing in the past Cost Principles Committee and Contract Administration Committee reports cited by DCAA alters this conclusion. Fundamentally, we believe that contractors should be able to rely on the most logical, plain English meaning of the cost principles.*
>
> . . . .
>
> It is also important to note that only the actual expenses incurred by a contractor are allowable on Government contracts. This means that the Government will actually save money in any case where a contractor has taken the initiative to negotiate airfares for its employees that are below the lowest standard or coach fare available to the general public. And even if the contractor has negotiated a higher level of seating at the lowest standard or coach fare available to the general public, the Government is not harmed. In all cases, we

> will only allow the actual airfare costs incurred by the contractor up to, but not exceeding, the lowest standard or coach fare available to the general public.
>
> . . . .
>
> DCAA's proposal would actually remove a contractor's incentive to negotiate airfares for its employees that are below the lowest standard or coach fare available to the general public, thereby eliminating any cost savings the Government may now enjoy as the direct result of such a contractor initiative.

(App. supp. R4, tab 55 at 901 (headings omitted)) (emphasis added) The draft majority report concluded that the current standard was sound public policy and that "the lowest standard or coach fare available to the general public represents a relatively objective, commercially based, 'bright line' test of cost reasonableness that adequately protects the taxpayers from reimbursing premium fares for higher levels of seating" (*id*. at 902).

161. Mr. Johnson prepared DCAA's draft minority report (tr. 7/193-94), which stated, among other things, that the majority's position allowed contractor employees to travel by first or business class at the taxpayer's expense, which DCAA "adamantly" opposed (R4, tab 433 at 12424). The report stated that the "current rule" was "ambiguous and inconsistently applied" and that it benefited larger contractors, which could negotiate airline discounts (*id*. at 12425). It was also inconsistent with other FAR cost principles that generally require contractors to pass discounts and rebates back to the government, such as FAR 31.205-26 (*id*. at 12425-26). The draft minority report stated that its interpretation of the travel cost principle "promotes a reasonable policy that would hold up to public scrutiny" and, even if the majority disagreed, "the current rule is ambiguous and needs to be clarified or restated to ensure consistent and equitable treatment among all contractors" (*id*. at 12427).

162. According to Mr. Johnson, "the majority of the focus of the other team members was … on the materiality of the issue we brought to the table" (tr. 7/169). Their view was that "this was just not a material issue" because the dollar amounts being questioned were not "significantly material (tr. 7/169-70). However, neither Mr. Johnson's Memorandum for Record, nor the draft majority report, nor Mr. Johnson's draft minority report, mentioned any materiality issue (app. supp. R4, tabs 55-56; R4, tab 433).

163. DCAA persisted and brought the travel cost principle issue to the Office of Defense Procurement and Acquisition Policy (DPAP). Mr. Johnson's November 16, 2006 Memorandum for Record of a November 13, 2006 meeting he and a colleague had with DPAP representatives states in part:

> While DPAP does not concur with our interpretation of the existing language, (nor do they wish to take a position regarding the proper interpretation of the current language), they have conceded that the language is ambiguous. Therefore, DPAP will recommend that the [AFT] draft a notice of proposed rule making to be issued in the Federal Register to obtain input with supporting rationale from the public on what the policy on airfare costs should be.
>
> . . . .
>
> During the meeting, Mr. Capitano made it clear that DPAP is not agreeing with our interpretation of the current FAR language, nor did he express DPAP's interpretation of the current language. He believes that the subject FAR case deals with whether and how the FAR language should be revised (prospectively), not what the current language means (retrospectively).

(App. supp. R4, tab 58 at 913)

164. On December 20, 2007, the DAR Council and the Civilian Agency Acquisition Council (the Councils) published a proposed rule to "amend the [FAR] to change the travel cost principle to ensure a consistent application of the limitation on allowable contractor airfare costs" (app. supp. R4, tab 104 at 1679).

165. In October 2008, after receiving public comment on both sides of the issue (app. supp. R4, tab 164 at 2415-18), the AFT recommended:

> (1) Changing the Travel Cost Principle to the "***lowest fare available to the contractor***." The rationale being that it is not prudent to allow the costs of the lowest fares available to the general public when contractors have obtained lower fares as a result of direct negotiation. (2) Omit the term "standard" from the description of the classes of allowable airfares, since that term doesn't describe the actual classes of airline service. (3) Omit the term "coach or equivalent", given that in today's environment, these fares may not be the lowest available to contractors. (4) Publishing these changes as a final rule to change the travel cost principle to ensure a consistent application of the limitation on allowable contractor airfare costs.

(App. supp. R4, tab 164 at 2297)

166. On December 10, 2009, the Councils published the final rule "to change the travel cost principle" (app. supp. R4, tab 163 at 2236). As noted above, the Councils changed the allowability restriction from "Airfare costs in excess of the lowest customary standard, coach, or equivalent airfare offered during normal business hours" to "Airfare costs in excess of the lowest priced airfare available to the contractor during normal business hours" (*id*. at 2238). The effective date was January 11, 2010 (*id*. at 2236), after award of the representative contracts and incurred costs at issue in these appeals.

167. Raytheon revised its Travel Policy, effective July 1, 2010, to reflect the change to the FAR (app. supp. R4, tab 168 at 2484; tr. 2/26-28).

168. On May 25, 2012, CACO Dowd issued a COFD challenging, among other things, Raytheon's use of a public coach airfare as the baseline for unallowable airfare costs in CY 2005 and assessing penalties.[31]

Raytheon's Application of Exceptions in FAR 31.205-46(b)

169. Meanwhile, in 2003, a second FAR 31.205-46(b) issue arose regarding Raytheon's implementation through its Travel Policy of the exceptions in the regulation that permitted costs in excess of standard, coach fare in certain circumstances. That is:

> [W]hen such accommodations require circuitous routing, require travel during unreasonable hours, excessively prolong travel, result in increased cost that would offset transportation savings, are not reasonably adequate for the physical or medical needs of the traveler, or are not reasonably available to meet mission requirements. However, in order for airfare costs in excess of the above standard airfare to be allowable, the applicable condition(s) set forth in this paragraph must be documented and justified.

170. Exhibit A, "Employee Guidelines for Company Travel Policy," ¶ 2.4.6 of the Raytheon Travel Policy in effect on April 28, 2003, stated:

> Employees traveling on trans-oceanic flights should use coach class when possible. However, upgrading from coach to business class is authorized on trans-oceanic flights when:

[31] The Board docketed Raytheon's appeal from this COFD as ASBCA No. 58212. The Board denied the parties' cross motions for partial summary judgment (while granting an unopposed summary judgment motion by appellant on one issue). *Raytheon Co.*, ASBCA No. 58212, 15-1 BCA ¶ 35,999 (*Raytheon 58212*). The Board then stayed the appeal pending the outcome of the subject appeals.

a. The total scheduled flight time from origin to destination is more than 10 hours;

b. The most direct routing is used (circuitous routing to achieve the 10 hour requirement is not permitted) and;

c. There is no overnight layover en-route.

(App. supp. R4, tab 17 at 81, 84)

171. The criteria for business class travel on oceanic flights were included in Raytheon's Travel Policy to meet FAR 31.205-46(b)'s requirements regarding allowability of airfare in excess of standard, coach fare, if the costs were claimed (tr. 1/42, 88, 2/32, 9/100). Mr. Panetta opined that Raytheon's Travel Policy "entrance criteria" for allowability, itineraries, and expense information in its WebTE satisfied the FAR's requirement for documentation and justification of airfare in excess of standard, coach (tr. 2/34 -35). WebTE is a highly customized expense reporting and reimbursement system developed by Raytheon. A credit card company provides data sets of travel expenses, such as airline tickets, that an employee assembles into an expense report, codes, and incorporates into the system. Itineraries sometimes go into the system. (Tr. 2/9, 9/118)

172. Raytheon considered Exhibit A to its Travel Policy to provide guidelines, not requirements. An employee's manager had the discretion to approve business class travel even if the policy criteria were not met. The employee would be reimbursed his or her actual expenses, but that travel would be charged to an unallowable account. This is true whether an employee is traveling in support of a government contract or a commercial contract. If for a government contract, the government would only be billed for standard coach fare. The key control is manager approval. (Tr. 1/81, 85, 94, 99, 2/31-32, 9/100-02, 160, 10/65-66)

173. By letter of September 25, 2003 to Mr. Murphy, DCE McGrath forwarded an August 22, 2003 DCAA audit report that questioned two potential non-compliances with FAR 31.205-46 (app. supp. R4, tab 18 at 87, 91). The report stated that none of the FAR exceptions indicated that "flight time alone can be the decisive factor for upgrading air travel accommodations from standard coach air fare. The FAR also does not make an exception for senior executives to travel first class" (*id*. at 91).[32]

174. In late 2003 to early 2004, DCMA and Raytheon corresponded concerning Raytheon's Travel Policy and its compliance with FAR 31.205-46. Much of the focus was upon Raytheon's use of more than 10-hours' flight time as a criterion for allowing airfare in excess of standard, coach. (App. supp. R4, tabs 20-21, 23) Raytheon noted, *inter alia*, that, prior to consolidation with the "new" Raytheon, its legacy companies

[32] It appears that only Raytheon's president is authorized to fly first class (tr. 1/57-58).

had long-standing policies and practices that allowed employees to upgrade to business class on transoceanic flights under certain conditions, including flight time of greater than 10 hours (“old” Raytheon), 8 hours (E-Systems), and 6 hours (Hughes) (R4, tab 23 at 138).

175. By letter to Mr. Murphy of January 27, 2004 (2004 McGrath letter), DCE McGrath compared Raytheon’s Travel Policy with the criteria that federal employees must meet when traveling on official business to TDY sites outside of the United States (app. supp. R4, tab 24). He highlighted ¶ C2204A(8) of the FTR as follows:

> The travel is between authorized origin and destination points (one of which is in the USA) and the scheduled flight time (including airport stopovers and plane changes) is in excess of 14 hours. A traveler is disqualified from using business class accommodations at Government expense if (a) a "stopover" en route is an overnight stay, (b) a rest stop en route [is] authorized, or (c) an overnight rest period occurs at the TDY location before beginning work. Business-class accommodations must only be used when exceptional circumstances warrant. Approval authorities must consider each request for business-class individually and carefully balance good stewardship of [scarce] resources with the immediacy of mission requirements.

(*Id*. at 140) Regarding the 10-hour criterion, DCE McGrath wrote in part:

> I understand that 10 hours of flight time or waiting at airports for connecting flights can be viewed as unreasonable by reasonable people. I also understand that flight time does not represent the true amount of time a traveler spends in travel status. There is time spent traveling from an employee’s residence to the airport and from the airport to the work site or returning to their residence. I also appreciate the fact that being able to rest better or sleep on a long flight before reporting to work improves efficiency and productivity. Further, that traveling overnight and not incurring additional hotel or meal expenses can benefit the Government. For these reasons, I will not disagree with a DCMA-Raytheon [CO’s] or Defense Corporate Analyst’s decision to view business-class airfare as allowable and reimbursable expenses if:
>
> 1. Travel primarily takes place during non-customary business hours i.e., flights take place in the late afternoon, evening or night/early morning and it is required. The reason(s) why the employee must travel

> during unreasonable hours must be clearly presented on the employee's expense account or other document that is subject to review/audit by the Government.
>
> 2. Raytheon employees report directly to their TDY or permanent duly station (PDS) after arrival at their destination airport, i.e., no rest periods en route or at the TDY /PDS site before reporting to work.
>
> 3. Flight time, not an employee's departure from their residence and travel time to a TDY site (and the reverse when returning home), must exceed 10 hours in duration. And, flight time is defined as the scheduled flight time between departure and arrival airports (including airport stopovers and plane changes).
>
> While this decision does not meet your request to use the Raytheon Travel Policy to justify and document that flight time of over 10 hours meets the FAR definition for requiring travel during unreasonable hours, it does allow the reimbursement of business-class airfare by the Government if this exception to the FAR is justified and documented. But, in no way should Raytheon view my decision as justification for an employee to travel on a trans-oceanic flight primarily during normal business hours that allows the employee sufficient time to consume a meal and get sufficient rest and/or sleep in a hotel or other such facility before reporting to work.

(*Id*. at 141) Mr. Panetta described the letter as a "very important document" which "[laid] out the accord between Raytheon and DCMA under which DCMA would not question the [business class airfare] cost as being unallowable" (tr. 1/136).

176. DCE/CACO McGrath had the authority to determine whether Raytheon was compliant with the FAR and the CAS (tr. 9/196). The government admits that he was acting within the scope of his responsibilities when he issued the 2004 McGrath letter (app. supp. R4, tab 195 at 2911-12 (response to interrogatory No. 12)).

177. Effective July 12, 2004, Raytheon revised its Travel Policy concerning business class travel on transoceanic flights based upon the 2004 McGrath letter (app. supp. R4, tab 27 at 230; tr.1/140, 2/37-38). The revised Exhibit A, Employee Guidelines for Company Travel Policy, ¶ 2.4.6, included the following four criteria:

> Employees traveling on trans-oceanic flights should use coach class when possible. However, upgrading from coach to business class is authorized on trans-oceanic flights when:

> a. The total scheduled flight time from origin to destination is more than 10 hours;
>
> b. The flight is overnight, and no flight is available during normal business hours that satisfies the traveler's business requirements;
>
> c. The most direct routing is used (circuitous routing to achieve the 10 hour requirement is not permitted) and;
>
> d. There is no significant rest period upon arrival at the destination, nor is there a rest stop enroute.

(App. supp. R4, tab 27at 233)

178. In an internal July 30, 2004 DCAA email, copied to Mr. McGrath, Resident Auditor Sheley opined that:

> I think FAR is sufficiently vague and that Raytheon's policy does not contradict FAR and it seems in some ways to be even more restrictive (the "and" versus "or" on the exceptions as we've discussed earlier).

(App. supp. R4, tab 31 at 245-46)

179. By letter to Mr. Murphy dated August 18, 2004, DCE McGrath wrote that he had reviewed Raytheon's revised policy and found that it complied with FAR 31.205-46 (app. supp. R4, tab 29; tr. 10/78-79).

180. Raytheon relied upon DCE McGrath's approval because he was the cognizant federal agency official for determining Raytheon's compliance with the CAS, the acceptability of its business systems, and the allowability of costs. He provided guidance and oversight to the other COs assigned to cover Raytheon, through whom final indirect rates and billing rates were established. (Tr. 2/38-39, tr. 10/79)

181. In February 2007, Raytheon combined its policy for business travel, meetings, and entertainment expenses with its policy for company travel (app. supp. R4, tab 92 at 1403). The combined policy maintained the same four criteria for treating premium airfare in excess of standard, coach fare as allowable, but it added the following definition and note to the "no significant rest period" criterion:

> (4) There is no significant rest period upon arrival at the destination, nor is there a rest stop enroute. Significant

> rest period is defined as a hotel stay prior to reporting to work.
>
> Note: If the traveler arrives before noon on a week day, it is assumed that they are going to work that same day and there is no significant rest period. Conversely, if arrival is after noon, OR on a weekend, it will be assumed there was a rest period, and the difference between the premium class airfare and the coach comparison airfare provided by Raytheon's designated travel agency, will be processed as unallowable airfare. If that is not a valid assumption, comments should be included in the "Comments" section of the Expense Statement. The comments should explain the nature of the work that was performed before a significant rest period.

(*Id*. at 1409) The note was added to remove subjectivity in expense processing and to ensure consistency (tr. 9/105).

182. In an April 28, 2008 revision to its travel policy, among other things, Raytheon changed the fourth criterion in Exhibit A, ¶ 2.1.5.b. (4) to read "Upon arrival at their destination the traveler performed work prior to an overnight rest period" (app. supp. R4, tab 128 at 1938, 1944). The changes were due to Raytheon's implementation of an "airfare wizard" in its WebTE travel system to require an employee to answer directly if he or she met the criteria instead of Raytheon's Finance Shared Services (FSS) processors making an assumption from the traveler's itinerary based upon the time the employee arrived in-country (tr. 9/97, 112-13, 118). Travelers could still override the guidelines with approval from their manager (tr. 9/109-10, 113-14).

183. By letter to Mr. Panetta dated October 26, 2010, stated to be "effective immediately," then-CACO Dowd rescinded the 2004 McGrath letter, stating that it had created "significant confusion" among COs (app. supp. R4, tab 169 at 1). He elaborated that Raytheon's Travel Policy was not consistent with the FAR on the grounds that neither flight duration nor work performance upon arrival were FAR 31.205-46(b) exceptions; the policy could not justify airfare costs exceeding the lowest priced airfare available to the contractor; and it did not require employees to document and justify when airfare other than the lowest price available was used (*id*.).

184. By letter to Mr. Dowd of December 20, 2010, Mr. Panetta disagreed with his October 26, 2010 letter and asked that he rescind it. Mr. Panetta stated in part:

> The genesis of the McGrath memo was to address the ambiguity in the regulations with respect to allowability of costs where there was excessively prolonged travel and travel during unreasonable hours. The McGrath memo introduced a criterion which facilitated a mutually acceptable basis for

> determining allowability of these costs. In accepting this determination RTN and DCMA effectively settled long standing discussions on this grey area within the regulations. RTN believed this was working well in that costs were agreeably classified and thereby resulting in no disputes in this area adding to our collective efficiency.
>
> Your rescission of this memo, in the Company's view, may actually add confusion to our process where none existed in the past (rather than clearing up the confusion that you referenced). Portions of the Raytheon Company policy on travel are based on this memo, which in our view is more restrictive than the current FAR language. By agreeing to this determination back in 2004 the Company agreed to higher unallowable costs than is required by the FAR cost principle governing this element of cost.

(App. supp. R4, tab 171 at 2560) Mr. Panetta did not receive a response (tr. 2/40-41).

185. On September 22, 2011, Raytheon revised its travel policy and removed the requirement that, as a condition of flying business class, upon arrival at the traveler's destination he or she must perform work prior to an overnight rest period (R4, tab 466 at 2290-91) (work requirement removed from ¶ 2.1.5.(b)(4)).

186. On October 26, 2012, DCAA issued a draft Statement of Condition and Recommendation (SOCAR) alleging that Raytheon was noncompliant with DFARS 252.242-7006, Accounting System Administration, because its Travel Policy was noncompliant with FAR 31.205-46. On April 23, 2013, DCAA issued two Forms 1, Notice of Costs Suspended and/or Disapproved, contending that certain premium airfare costs charged directly to two RMS contracts were unallowable. Mr. Panetta responded by letter to DACO Jack Bradley dated May 15, 2013. (R4, tab 476; tr. 2/44-45; AUPPF ¶ 196) He stated that DCAA's position "extends well beyond the plain meaning" of the FAR (R4, tab 476 at 1) and gave Raytheon's reasons for disagreeing with DCAA.

187. On March 29, 2013, DCAA issued an audit report finding that RMS' estimating controls from 2009 through 2011 were deficient concerning its treatment of premium airfare. DCAA recommended that it revise its policies, procedures and standard practices relating to estimating international travel to reflect that only the lowest available fare be proposed in accordance with FAR 31.205-46(b). (R4, tab 474 at 51, 54)

188. By letter of October 2, 2013 to then-CACO Jeffry Holt, on the allowability of premium class airfare, Mr. Panetta focused upon the FAR 31.205-46(b) exception "not reasonably adequate for the physical or medical needs of the traveler." He stated that this was the company's primary basis for allowing premium class airfare. He correlated it with other exceptions and compared Raytheon's policy favorably with the FTR for

military personnel and the JTR for DoD civilians (now merged and called the "JTR"). He asserted that Raytheon's Travel Policy, its travel agent's documentation, and its WebTE expense system documented and justified how each trip met the requisite criteria. Mr. Panetta stressed that imposing a "significant deficiency" determination regarding Raytheon's estimating system regarding premium class airfare was unwarranted. He emphasized Raytheon's willingness to compromise. (R4, tab 487)

189. To resolve DCAA's threatened disapproval of its estimating system, Raytheon revised its Travel Policy, effective February 24, 2014 (R4, tab 493, *see also* tabs 490-492; tr. 1/44, 100-02, 2/54-56). The revised policy required a more stringent approval process, including director-level pre-approval for business class travel and approval of the expense report and reimbursement to the employee. The biggest change was to include a "meaningful work upon arrival" criterion. If the employee did not complete meaningful work, he or she would still be reimbursed for business travel but Raytheon would not charge the government for those costs. (R4, tab 493 at 152597 (Ex. A, ¶ 2.1.5.b.(2)); tr. 1/45, 104, 2/56-57). After the changes were made, DCMA approved the estimating system (tr. 1/105, 109).

190. After a five-year audit of Raytheon's accounting system, on January 29, 2015, DCAA issued an audit report questioning how Raytheon accounted for allowable and unallowable costs. DCAA found a significant deficiency in Raytheon's accounting system due to its treatment of premium class airfare. (R4, tab 500; *see also* R4, tab 499 (response to SOCAR); tr. 2/57-58)

191. During the relevant period, FSS processed the company's travel and expense (T&E) statements. The processors were responsible for ensuring that the costs complied with policy and were classified correctly as allowable or not based upon the FAR, and for withdrawing any unallowable costs. They were provided with written guidance and training materials, including hardcopy manuals, desktop procedures, and unallowable cost guidelines. (App. supp. R4, tabs 42, 44-45, 101; tr. 9/115-18, 124-26) AMEX was Raytheon's travel agent until it transitioned to BCD Travel beginning in July 2007 (tr. 9/360). The agents within those companies were dedicated solely to the Raytheon account and received substantial, on-going, training regarding its travel policies (tr. 9/368-71, 377; AUPFF ¶ 211).

192. FSS processors used "checkpoints" to review any T&E statement that included premium airfare. Raytheon's baseline for determining allowable costs was a standard coach fare. (*See* app. supp. R4, tab 44; tr. 9/98, 132) For example, "Checkpoint #1, Is Coach Fare Higher?" was to compare the premium airfare to a standard coach fare (app. supp. R4, tab 44 at 596). According to Jamie Humbarger, Raytheon's Travel Accounting Manager (tr. 9/95), if the standard coach fare were higher than the premium fare, there were no unallowable costs and no need to proceed (tr. 9/132). If the claimed airfare exceeded the standard coach fare, the processor moved on to the next checkpoint and reviewed each leg of the trip to ensure that it complied with Raytheon's Travel Policy. For round trips, only one way had to meet the criteria. It was Ms. Humbarger's

understanding that, during the relevant period, this was the most cost-effective way to purchase a ticket. (Tr. 9/135-36)

193. During 2007 and 2008, Raytheon was party to a series of agreements with various airlines pursuant to which certain flights qualified for negotiated discounts. The agreements applied corporate wide, including to RMS travelers. (App. supp. R4, tabs 37, 40-41, 47, 94-95, 99, 103, 114-16, 118, 125, 130, 136; tr. 9/359-61; APFF ¶ 212 (undisputed portion)) During the relevant period and as of the hearing, Jeanine Davis was manager of all of Raytheon's global travel. She negotiated all of the travel agreements and managed Raytheon's relationships with those suppliers (tr. 9/359). Each contract was "very different" and, within the contracts, the discount rates varied per market and per class of service or fare basis (tr. 9/382). Raytheon's discounted premium airfare was often less than a coach fare. The discounts could be significant, including, *inter alia*, 40%, or 37%. (Tr. 1/125; 10/33, 35-36; *see* GPFF ¶ 298)

194. Although both parties contend that FAR 31.205-46 was clear prior to the 2010 amendment, they dispute the meaning of "standard, coach fare." The government contends that the "Y" fare (economy, i.e. coach *see* tr. 9/391) is the "'highest priced coach fare' available on a given flight at the time of purchase," one that is interchangeable and refundable, citing, *inter alia*, testimony by Ms. Davis agreeing with the government's characterization (gov't rely at 42 regarding APFF ¶ 214; tr. 10/8). Ms. Humbarger described standard coach fare as the "fare available to the general public" and opined that it was not necessarily the highest coach fare charged, depending upon the circumstances and timing of booking (tr. 9/153-54). Ms. Humbarger and Ms. Davis disagreed with the government's description of the "standard coach fare" as the "walk-up fare" one would pay for a ticket on a flight departing the same day (tr. 9/133, 374-75). Rather, Ms. Humbarger described it as the "standard coach fare at the time of the ticketing or the time the reservation was made, whether it be two weeks in advance or two months in advance" (tr. 9/133).

195. Raytheon's third-party travel agency printed on the itineraries what Raytheon contends to be the standard coach fare at the time of booking. The record suggests that Raytheon used the "Y" fare or full-fare coach as the "standard, coach fare;" however, the record is not entirely clear on this point.[33] Occasionally, the fare designation was not included on the itinerary, such as when the employee did not use the preferred travel agent. Then, Raytheon's processors used Semi-Automatic Business Research Environment (SABRE), a licensed software used by travel agents to book air travel, to determine the standard, coach fare. SABRE did not provide historical data on airfare prices so the processors tried to replicate the booking as closely as possible. The SABRE analysis was performed shortly after the trip. (Tr. 9/132, 142-43; AUPFF ¶ 213)

[33] Airline booking codes differ between airlines and can change over time. We take judicial notice of the fact that there are typically refundable airfares available to the public at a lower price than the full-fare "Y" booking code. *See also* (App. supp. R4, tab 45 at 619, 624; tr. 9/127, 130, 388-89)

2008 Corporate Airfare Audit

196. On December 19, 2014, DCAA issued its Corporate Audit Report for 2008. Auditor Benjamin Blodgett conducted the 2008 Corporate travel, including airfare, portion of the audit. (App. supp. R4, tab 331 at 5094, 5255-69; tr. 2/168, 207) As is relevant to the ensuing COFD, DCAA questioned three categories of airfare costs: "Premium Airfare," "Excess Over Lowest Cost," and "Excess Over Airline Agreement" (app. supp. R4, tab 331 at 5256; R4, tab 517; tr. 2/207-08).

197. In the "Premium Airfare" category, DCAA questioned all airfare with a seat class greater than coach. It did not consider any FAR 31.205-46(b) exceptions. It did not agree with Raytheon's Travel Policy, or the checklist used by FSS processors to document that an employee went right to work upon arrival at the employee's destination, based upon an alleged lack of documentation. Also, DCAA disagreed with the assumption that an employee who qualified for premium airfare on an outgoing flight also qualified on the return. (App. supp. R4, tab 331 at 5256; tr. 2/169-71)

198. Rather than use the standard coach fare printed on a traveler's itinerary, DCAA derived its own audit-determined lowest, discounted coach airfare as the lowest airfare allegedly available to Raytheon (tr. 2/178-79, 214). On the ground that an average cost could not be determined for international flights, DCAA calculated a "current day price using a percentage ratio comparing premium airfare … to coach airfare" (app. supp. R4, tab 331 at 5262-63). DCAA applied the ratio to the premium airfare to calculate what it considered to be a reasonable amount for coach fare (*id*.). The ratio was calculated in 2014 to disallow costs incurred in 2008 (tr. 2/214). In calculating the ratio, DCAA did not try to match the time of year or number of days in advance that the actual ticket was purchased. Instead, it used a period of six weeks in advance of the date when it was performing its Internet search, regardless of the month in which the flight actually occurred. (Tr. 2/216-17) For domestic legs of international flights, DCAA used the lowest airfare in the Department of Transportation's Consumer Airfare Reports for 2008, which list certain average fares (app. supp. R4, tabs 232-33; tr. 2/212).

199. Raytheon cites to examples of DCAA's calculation of the ratio in a manner that did not account for the traveler's actual destinations. Auditor Blodgett agreed. (*See* R4, tab 552, items identified at APFF ¶ 221; tr. 2/218-47; app. br. 88-90) The government disagrees with Raytheon's characterization of DCAA Corporate's position and calculations (gov't reply br. at 44-45, responding to APFF ¶¶ 218-22, citing GPFF ¶¶ 301-03, 475-80).

200. Raytheon asserts that DCAA applied the 2010 version of FAR 31.205-46(b) to Raytheon's 2008 airfare costs. Auditor Blodgett agreed. (App. supp. R4, tab 331 at 5261; tr. 2/177-78; APFF ¶ 220). On the other hand, the government states, without specific citation or elaboration, that "all" of DCAA's conclusions and calculations regarding the 2008 Corporate airfare "are principally based upon the 2008 version of

FAR 31.205-46(b)" (gov't reply br. at 44). It is unclear whether the government is relying upon its own interpretation of the 2008 FAR provision.

201. Mr. Blodgett believed his method of determining quantum was reasonable:

> Because we were just trying to determine -- when we were doing the audit, we were just trying to determine a reasonable amount. We understand these are negotiations, so we were just trying to give the government some kind of platform to, kind of, base where they should start at.

(Tr. 2/250)

202. Referring to the audit, on June 22, 2015, CACO Forbush issued the Corporate Airfare COFD for 2008, asserting a government claim against Raytheon due to its inclusion of airfare costs in its final indirect cost proposal for CY 2008 that were allegedly unallowable under FAR 31.205-46 (app. supp. R4, tab 363 at 5946-48, 5951). The disallowed costs were in two categories: "Inadequate Premium to Coach Airfare Withdrawal" and "Premium Class Airfare" (*id*. at 5947). However, DCAA had not questioned the former category (*see* R4, tab 517). The costs that the CACO assigned to that category were actually the costs questioned by DCAA in its "Excess Over Lowest Cost" and "Excess Over Airline Agreement" categories. CACO Forbush had mistakenly assumed that DCAA had questioned only costs for premium airfare when virtually all of the questioned costs in those two categories were for coach class airfare. The government is no longer pursuing the costs questioned by DCAA in the "Excess Over Lowest Costs" and "Excess Over Airline Agreement" categories. (*See* tr. 2/210-11, 247; APFF ¶ 218 (undisputed portion))

203. As set forth above (finding 8), the Board docketed Raytheon's appeal from the Corporate Airfare COFD for 2008 as ASBCA No. 60057.

<u>2007 and 2008 RMS Airfare Audits</u>

204. DACO Bradley, who did not conduct the 2007 or 2008 RMS airfare audits, was the only witness presented by the government to explain them (AUPFF ¶ 224).

205. As with the 2008 Corporate audit, for both the 2007 and 2008 RMS audits, DCAA questioned all premium airfare that it sampled (app. supp. R4, tab 260 at 4050-54, tab 350 at 5783-89, 5799-805, 5849-54, 5857-61), and it determined that Raytheon's Travel Policy did not comply with FAR 31.205-46(b) (app. supp. R4, tab 350 at 5765). However, the auditors who performed the RMS audits used a different method to determine the allowable coach airfare baseline. Although, when the itineraries were available, DACO Bradley acknowledged that "usually the standard coach was on there" (tr. 4/56), for both years, the auditors declined to use the coach fare printed on the itinerary. They concluded that the actual airfare was not on the itinerary or WebTE or

elsewhere. For 2007, DCAA searched the Internet for flights departing two days after the date DCAA conducted its review, in 2014. For 2008, the auditors searched for flights one week thereafter. (App. supp. R4, tab 260 at 4052, tab 350 at 5785; tr. 3/168, 172)

206. DCAA's method of deriving 2007 and 2008 airfare costs did not account for various factors that could affect airfare price, for example, fluctuations due to season, trip duration, day and time of travel, or the fact that six or seven years had passed. In each case, DCAA selected the lowest priced coach fare that could be found through an Internet search. Because the testing occurred years after the flights, DCAA applied Global Insight inflation rates to decrement (or, rarely, increase) the selected airfares to a purported 2007/2008 amount. (*See* tr. 4/60, 171-72, 175-77, 181-82, 184-85)

207. DCAA reduced its derived baseline airfare by applying its computation of an average percentage discount purportedly available to RMS regardless of whether the particular flight qualified for a discount, and if so, how much (tr. 4/60-61, 67-69). DACO Bradley explained that:

> So Raytheon, on the itinerary, did identify the standard walk-up coach airfare, but again, we did not consider that coach airfare to be applicable. We think Raytheon, if they were going to determine the unallowable amount, should use the airfare that was available to Raytheon.
>
> So a standard walk-up coach airfare might be $5,000. But Raytheon might get a $2,000 airfare. Because they get big discounts from them. Plus, the walk-up fare is, again, you go up to the counter and buy the ticket, anybody can go buy it.

(Tr. 3/172-73)

208. Thus, as with the Corporate Audit for 2008, DCAA in effect applied the 2010 version of FAR 31.205-46(b), which was in accord with its interpretation of the predecessor version at issue, to RMS' 2007 and 2008 costs.

209. Both parties offered detailed examples of sample flights to show differences between airfares charged and DCAA's audit-determined fares, with the government aiming to show that Raytheon overcharged and Raytheon aiming to show that the audit-determined coach fares were significantly less than the actual coach fares and discounted coach fares that Raytheon actually paid (e.g., GPFF ¶¶ 475-480; APFF ¶ 231). In view of our disposition of this appeal, we need not make any findings concerning these competing contentions.

210. DACO Bradley's COFDs for FYs 2005 and 2006 did not disallow any premium airfare costs for RMS employee travel. He stated that those issues had been resolved at the corporate level. (Tr. 4/25-26, 150-53)

211. As noted above, on June 12, 2014, DACO Bradley issued his RMS COFD for 2007 (finding 10). He found $1,579,454 in claimed travel costs to be unallowable, citing the categories, as relevant, of "Foreign Airfare," "Statistical Sample," "Domestic Travel," "Per Diem," "Unsupported," and "Unallocable" (app. supp. R4, tab 277 at 4543-44). He found certain foreign airfare to be unallowable "since the employee flew business class instead of utilizing the lowest available airfare as required by FAR 31.205-46(b)" (*id*. at 4544.). On the other hand, DACO Bradley found some of the airfare questioned by DCAA to be allowable coach fares (tr. 4/225-26).

212. DACO Bradley stated that RMS had violated its own Travel Policy with regard to documentation requirements as well as the FAR. He quoted the 2007 version of FAR 31.205-46(b), but he nonetheless concluded that the business class travel was not justified because "Raytheon has not adequately documented an exception to the criteria contained in FAR 31.205-46(b) for allowance of airfare in excess of the lowest available airfare available to the contractor during normal business hours" (app. supp. R4, tab 277 at 4545). Thus, like DCAA, the DACO applied his interpretation of the 2007 FAR, which reflected the language of the 2010 version.

213. After the COFD, for the 2007 costs at issue, and various sample itineraries, RMS gave the government a 2007 "credit card lookup" report, a tool provided by the AMEX travel agency for looking up the details of a ticket, including class of service (app. supp. R4, tab 317; tr. 9/128-31). Although DCAA and DACO Bradley considered the report, they found it to be unreliable in validating the class of airfare that was flown and the DACO declined to use it (tr. 4/121-22, 133, 226-27). Raytheon contends that this means that coach flights shown in the report are still mistakenly part of the government's cost disallowance (APFF ¶ 234). The government counters that appellant's contention lacks documentary support and that the credit card look-up report information is not pertinent in any event because the DACO was only considering it as part of settlement negotiations (tr. 4/121; gov't reply br. at 48). There is insufficient evidence of record for the Board to make specific findings on the substance and applicability of the credit card look-up report(s).

214. Raytheon and RMS' appeal from the RMS COFD for 2007, with regard to travel costs, is part of ASBCA No. 59437.

215. On June 11, 2015, DACO Bradley issued a COFD disallowing RMS' 2008 indirect travel costs for premium airfare as noncompliant with FAR 31.205-46(b) and with FAR 31.201-2(d)'s documentation requirements. Raytheon's appeal from this COFD is docketed as ASBCA No. 60059 (finding 12).

216. Also on June 11, 2015 DACO Bradley issued two COFDs disallowing RMS' 2008 direct airfare costs that had been included in its billings under two contracts. He again referred to the company's alleged failure to comply with FAR 31.205-46(b), FAR 31.201-2(d), and its own Travel Policy. He again, in effect, applied the 2010 version

of FAR 31.205-46(b) by calling for use of the lowest airfare available to the contractor. (App. supp. R4, tabs 356-57) Raytheon's appeals from these COFDs are docketed as ASBCA Nos. 60060 and 60061, respectively (finding 13).

217. Except as noted above, DACO Bradley's 2007 and 2008 RMS COFDs largely incorporated DCAA's findings with respect to questioned airfare (app. supp. R4, tabs 277, 356-358). However, of the amounts disallowed by these COFDs, the government is no longer pursuing disallowed costs based upon projections from DCAA's purported use of "statistical sampling," or disallowed costs for "per diem," "unsupported," or "unallocable" (ex. G-7; AUPFF ¶ 223).

218. In reaching his decisions, DACO Bradley did not agree with or feel bound by DCE McGrath's August 18, 2004 determination that Raytheon's Travel Policy, which applied to the entire corporation, complied with FAR 31.205-46(b) (app. supp. R4, tab 29; tr. 4/19-20, 22-23).

219. Upon consideration of the above record concerning Raytheon's Travel Policy during the 2007-2008 time period, including the contemporaneous interpretations of FAR 31.205-46(b) by DCE/CACO McGrath, DCMA's Mr. Gulden, DCAA resident auditor Sheley, and DoD personnel, we find that the government has failed to prove its contention that the policy did not comply with the regulation.

## DISCUSSION OF AIRFARE COSTS

### I. The Parties' Contentions

#### A. The Government's Contentions

#### 1. Raytheon Has Not Satisfied FAR 31.205-46(b)'s Prerequisites for Allowing Costs of Premium Airfare

The following summarizes the government's principle contentions. First, the government characterizes the cost allowability questions at hand as:

> Whether Raytheon's Travel Policy justifies business-class airfare under FAR 31.205-46(b) --- and the determination of the appropriate "baseline" to apply under the FAR if it does not --- are both questions of regulatory interpretation. In this light, the Board must answer these questions based on the plain language of the regulation, as well as its purpose and regulatory history.

(Gov't br. at 170)

Specifically, the government contends that Raytheon allows its international travelers to upgrade to business class as a general rule, notwithstanding FAR 31.205-46(b)'s strict criteria. Therefore, it has failed to satisfy its obligation, addressed in *Data-Design Laboratories*, ASBCA No. 27535, 85-3 BCA ¶ 18,400, to demonstrate, on a case by case basis, that the FAR's exceptions apply. The government adds that, under an ASPR predecessor to the current FAR 31.205-46(b), Raytheon had to show that flying coach class "caused" one of the FAR's exceptions and the current FAR is similar. (Gov't br. at 170)

Citing legislative history, the government contends that the promulgators of FAR 31.205-46(b) intended that contractors be allowed premium class air travel under the circumstances described in the FTR/JTR. Because Raytheon's implementation of the "physical needs exception" in its Travel Policy is in effect a "rubber stamp" (gov't br. at 173) and compares unfavorably with the FTR/JTR, it must be categorically rejected. (Gov't br. at 173-175)

The government alleges that Raytheon's Travel Policy does not satisfy FAR 31.205-46(b)'s criteria; Raytheon does not meet its own standards; and Raytheon does not meet the "actual work" requirement set forth by CACO McGrath in 2004 (gov't br. at 177-81).

The government asserts that the Board should construe FAR 31.205-46(b), as in effect from 1986 until January 2010, "to limit the allowable airfare for unauthorized premium flights to the actual coach fare available to Raytheon, including any and all applicable discounts available to Raytheon through its airline agreements" (gov't br. at 189). The government contends that this reading "is compelled by, and is consistent with, the plain language of the regulation" (*id*.). However, the government again refers to regulatory history for support (*id*.).

The government alleges that its interpretation of FAR 31.205-46(b) is consistent with FAR 31.201-5, CREDITS (AUG 2007), which provides that:

> The applicable portion of any income, rebate, allowance, or other credit relating to any allowable cost and received by or accruing to the contractor shall be credited to the Government either as a cost reduction or by cash refund.

The government contends that, in the circumstances at hand, Raytheon is foregoing available discounts when it believes the government is covering the difference, a "perverse result" in direct contradiction of FAR 31.201-5 (gov't br. at 192).

The government asserts that, in contrast to its reasonable interpretation pursuant to the plain language of FAR 31.205-46(b), Raytheon's interpretation is unreasonable. It makes no economic sense and frustrates the regulation's purpose by allowing Raytheon to charge the government more for an "unauthorized" premium flight than the coach fare

Raytheon would have paid if its employee took the coach flight authorized by its Travel Policy and FAR 31.205-46(b)'s criteria. (Gov't br. at 193)

The government alleges that Raytheon cannot rely upon the views of CACO McGrath and DCMA DAR Council representative Gulden, which favored Raytheon's interpretation of FAR 31.205-46(b) (gov't br. at 193-94). The government contends that such "extrinsic evidence cannot trump the plain language of the cost principle" and is irrelevant to the Board's determination (gov't br. at 194). The government also claims that CACO McGrath's position was based upon misleading information from Raytheon that the costs at issue were immaterial in amount (*id.* at 194-95).

If the Board is not persuaded that FAR 31.205-46(b)'s language is plain, the government again contends that legislative history supports its interpretation; it asserts that Raytheon's interpretation is unreasonable and leads to absurd results; and the 2010 amendments to the FAR "were simple clarifications of existing requirements, not impermissible 'retroactive changes'" (gov't br. at 199).

2. Raytheon's Disallowed Airfare Costs Were Unreasonable

The government contends that Raytheon's alleged purchase of premium airfare in situations that FAR 31.205-46(b) did not contemplate, simply because it was cheaper than the highest-priced coach fare, was unreasonable. The government continues that "Raytheon believes that it has found a way to pass along all or a portion of these **indisputably unqualified** premium fares to the Government, by reading a loophole into FAR 31.205-46(b)." (Gov't br. at 182) (emphasis in original)

The government alleges that, when a premium airfare was less than the full, highest priced, "street" coach airfare, Raytheon did not bother to determine whether traveling premium class met the requirements of Raytheon's Travel Policy or of FAR 31.205-46(b) and it charged the government with the premium fare regardless of whether the actual coach fare available to it was substantially less than the highest-priced "Y" fare. Thus, the government was subsidizing Raytheon's premium travel. (Gov't br. at 183-186) The government argues:

> Raytheon's practice of submitting airfare costs to the Government in excess of those airfare costs that were actually available, and contractually obligated, to Raytheon (costs which Raytheon's own policies instructed Raytheon to incur) is unreasonable as a matter of law.

(Gov't br. at 186)

B. Raytheon's Contentions

1. The Government has not Met its Burden to Prove that the Disputed Airfare Costs are Unallowable Under FAR 31.205-46(b)

Raytheon contends that, for many reasons, the government has not met its burden to prove that the disputed airfare costs are unallowable under FAR 31.205-46(b). The following are its principal arguments:

Raytheon alleges that "the [g]overnment fundamentally misconstrues the travel cost principle" (app. br. at 162). By its plain language, FAR 31.205-46(b) does not make premium class travel unallowable. Rather, it imposes an allowability limitation on "[a]irfare costs in excess of lowest customary standard, coach, or equivalent airfare offered during normal business hours" (*id.*). Indeed, FAR 31.205-46(a)(1) states that costs "incurred by contractor personnel on official company business are ***allowable***" subject to stated limitations (*id.*). One such limitation is in FAR 31.205-46(b) but, as long as airfare costs do not exceed the "lowest customary standard, coach, or equivalent airfare offered during normal business hours," they are not unallowable under FAR 31.205-46 and the exceptions are irrelevant (*id.*). Raytheon distinguishes the Board's *Data-Design Laboratories* decision relied upon by the government and the regulation and statute involved therein (*id*. at 163).

Raytheon asserts that the pre-2010 version of FAR 31.205-46(b), which refers to the "lowest customary standard, coach, or equivalent airfare offered during normal business hours," is unambiguous (app. br. at 164). It plainly means a coach fare available to the general public -- not the negotiated coach fare available only to Raytheon. This is consistent with the underlying statute, 10 U.S.C. § 2324(e)(1)(J), which refers to "standard commercial fare" (app. br. at 165). Therefore, the baseline for cost allowability was the standard coach fare available to the general public (*id*.).

Raytheon alleges that, because the pre-2010 regulation is clear, it is inappropriate to refer to its regulatory history (app. br. at 166). It adds that, in any case, the government improperly relies upon unpublished committee and subcommittee reports and irrelevant history (*id*.). Further, the government has misreported or misconstrued the legislative history, which actually favors Raytheon's interpretation of the regulation (*id*. at 166-67).

Raytheon further assert that the government's airfare claims are based upon an impermissible, retroactive application of the 2010 changes to FAR 31.205-46(b) to the 2007 and 2008 costs at issue and, contrary to the government's contention, the changes were substantive, not merely clarifications (app. br. at 168).

Next, Raytheon contends that its Travel Policy complies with FAR 31.205-46(b). It alleges that the policy's business class travel criteria satisfies the regulation's conditions (app. br. at 171). Raytheon alleges, *inter alia*, that the government is

incorrect that the regulation's "unreasonable hours" exception "applies only when coach-class accommodations ***cause*** the unreasonable hours and only business-class seats are available on flights during more reasonable hours" (app. br. at 173) (citation omitted) (emphasis in original). Further, the government misinterprets the regulation's "physical needs" exception and relies upon inapplicable FTR/JTR restrictions, contrary to FAR 31.205-46(a)(4) (finding 144), which limits the FTR/JTR's applicability (*id*.).

Raytheon alleges that its Travel Policy and WebTE supporting documentation satisfy FAR 31.205-46(b)'s requirement for documentation and justification of the applicable conditions for premium travel (app. br. at 176). The Travel Policy contains the requisite criteria and airfare in excess of standard coach requires approval from an employee's manager, which is documented in the WebTE travel expense system (*id*). That system includes the employee's expense statement, trip purpose, business class criteria compliance and the FSS processor's notes. Regardless, contrary to the government's contention, there is no requirement in FAR 31.205-46(b) for documentation and justification on a case by case basis. Raytheon distinguishes *Data-Design Laboratories* as involving a different regulation and stricter requirements for first class airfare. (App. br. at 177-78)

Raytheon contends that:

> [T]here is no requirement -- in FAR 31.205-46(b), Raytheon's Travel Policy, the 2004 McGrath Letter, or even the Government travel regulations – to perform work upon arrival as a condition for allowability for costs in excess of the standard coach fare. Most importantly, nowhere in FAR 31.205-46(b) is there any mention of work.

(App. br. at 178)

Raytheon asserts that, regardless of the foregoing, the government is bound by DCE McGrath's approval of Raytheon's interpretation of the allowability limitation in FAR 31.205-46(b) and of Raytheon's Travel Policy, citing, *inter alia*, *MPR Associates, Inc.*, ASBCA No. 54689, 05-2 BCA ¶ 33,115 (app. br. at 180).

2. <u>Raytheon's Airfare Costs Were Reasonable</u>

Raytheon contends that its airfare costs were reasonable as defined in FAR 31.201-3. Its interpretation and implementation of FAR 31.205-46(b) was reasonable and allowing business class travel on transoceanic flights that met Raytheon's Travel Policy criteria and/or the employee's manager had approved was consistent with standard industry practice. Raytheon implemented the Travel Policy the same way for both commercial and government contracts. The airfare costs did not exceed those that a prudent person would incur in the conduct of competitive business.

Moreover, so long as Raytheon's discounted premium fares were less than the standard coach fare, the government realized a cost savings. (App. br. at 182-86)

Under Raytheon's interpretation of the pre-2010 version of FAR 31.205-46(b), the "lowest customary standard, coach, or equivalent airfare offered during normal business hours," meant the standard coach fare available to the general public (app. br. at 182). Raytheon asserts that the reasonableness of its interpretation is evident by the fact that, except for DCAA, the government's own representatives so interpreted the regulation contemporaneously. Raytheon states that "[i]t was only **after** FAR 31.205-46 changed in 2010 -- to make unallowable (subject to the previous exceptions) airfare costs 'in excess of the **lowest priced airfare available to the contractor**' -- that DCMA determined that Raytheon's previously-approved practice was no longer compliant with FAR 31.205-46." (App. br. at 183-84)

Raytheon contends that its interpretation and implementation of the conditions for allowing airfare costs in excess of standard coach fare were also reasonable. In fact, it revised its Travel Policy criteria for transoceanic business class airfare to resolve a disagreement with DCAA, and DCE McGrath approved the revised policy and determined that it complied with FAR 31.205-46(b). (App. br. at 184)

3. <u>The Government has not Met its Burden to Prove the Amount of any Unallowable or Unreasonable Airfare Costs</u>

Raytheon asserts that, for the three audits at issue -- Raytheon Corporate (2008 costs) and RMS (2007 and 2008 costs) -- DCAA questioned all premium airfare costs reviewed, regardless of whether they exceeded the standard coach fare (app. br. at 186). This was erroneous because premium airfare costs that do not exceed the standard coach fare are allowable under FAR 31.205-46(a) and are not subject to the cost allowability limitation in FAR 31.205-46(b) (*id.*).

Moreover, according to Raytheon, it did not have discounts on every flight, but DCAA did not determine which, if any, discounts applied (app. br. at 186). Instead, for the RMS audits, DCAA applied an average discount and, for the Raytheon Corporate audit, it misapplied an assumed discount and ratio against an inappropriate, inapplicable coach fare (app. br. at 186-87).

Raytheon states that the government did not present any testimony by the DCAA auditors who performed the RMS audits and instead relied upon audit work papers that are not self-explanatory and DACO Bradley did not explain (app. br. at 187).

C. <u>The Parties' Replies</u>

The parties' replies reiterate or augment their prior contentions. To mention just a few of their points, the government delves into legislative history to support its arguments (gov't reply br. at 92-95). It contends that, in *Raytheon 58212*, the Board already found

FAR 31.205-46(b) to be ambiguous and that the government's interpretation was reasonable (gov't reply br. at 68). It also alleges that DCAA's quantum analysis was reasonable and sufficient for the Board to make a fair and reasonable approximation of damages (gov't reply br. at 46-47).

Raytheon replies that the plain language of both the governing statute and FAR 31.205-46(b) make it clear that the benchmark for unallowable costs is the standard coach fare available to the general public (app. reply br. at 30). While the regulation does not use the term "general public," "the words 'customary,' 'standard,' and 'offered' are all consistent with a public fare and inconsistent with a contractor-specific fare" (app. reply br. at 33). The Board is not to attempt to discern regulatory intent when the regulation is clear on its face (*id*.). Raytheon also asserts that, in *Raytheon 58212*, the Board did not find the regulation to be ambiguous (*id*. at 34). Rather, there were no determinations of ambiguity, of the reasonableness of each party's interpretation, or whether extrinsic evidence could be examined. Raytheon adds that, if the Board were to deem that legislative history is relevant, it supports Raytheon's interpretation. (*Id*. at 34-35)

Raytheon stresses that, under FAR 31.205-46(b), airfare costs are unallowable only to the extent that they exceed the "lowest customary standard, coach, or equivalent airfare offered during normal business hours," *i.e.*, the publicly available coach fare. "[B]ecause Raytheon never charged the Government more than the publicly available coach fare, it did not exceed the ceiling of subsection (b) and the costs are generally allowable pursuant to subsection (a)." (App. reply br. at 38)

Thus, the Board need not address the government's criticisms of Raytheon's Travel Policy because there are no excess costs to disallow (app. reply br. at 38). If the Policy were relevant, it complied with FAR 31.205-46(b) and the government is bound by its prior, contemporaneous, reasonable, authorized determination that it did so (*id*. at 40-41).

II. The Government Misreads the Pre-2010 Version of FAR 31.205-46(b)

The parties agree that the version of FAR 31.205-46(b) in effect from April 9, 1986 until January 10, 2010, and at all times relevant to the costs at issue, is the version that governs these appeals (*see* GPFF ¶ 275, APFF ¶ 150). Indeed, "[t]he regulations applicable to a contract are those in effect at the time the contract was executed." *Boeing Co*., ASBCA Nos. 57549, 57563, 13 BCA ¶ 35,427 at 173,786 (citation omitted); *see also* finding 15 (the Allowable Cost and Payment clause incorporated into the contracts at issue). The parties disagree about the proper interpretation of the regulation.

We are to "construe a regulation in the same manner as we construe a statute, by ascertaining its plain meaning." *Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339, 1346-47 (Fed. Cir. 2005) (citations omitted). We must look at a regulation's "plain language and consider the terms in accordance with their common meaning." *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227 (Fed. Cir. 1997) (citations omitted).

The disputed phrase in the pre-2010 version of FAR 31.205-46(b) is: "Airfare costs in excess of the lowest customary standard, coach, or equivalent airfare offered during normal business hours are unallowable [with exceptions]." Both parties first contend that the language is plain, despite their subsequent excursions into regulatory history. When a regulation's language is plain, "[i]t is well-settled that a tribunal is not to resort to the history of the drafting of a regulation . . . in construing an unambiguous regulation," except in rare circumstances, not present here. *SWR, Inc*., ASBCA No. 56708, 15-1 BCA ¶ 35,832 at 174,227, n.3.

Raytheon persuasively presents dictionary definitions of "customary," "standard," and "offered" in support of their common meaning and Raytheon's contention that they are all consistent with a public fare and inconsistent with a contractor-specific fare (app. br. at 164, app. reply br. at 30, 32-33). In connection with the governing statute, 10 U.S.C. § 2324(e)(1)(J), which makes "[c]osts for travel by commercial aircraft which exceed the amount of the *standard commercial fare*" unallowable (emphasis added), Raytheon cites to the FAR definition of "commercial item," which associates "commercial" with the "general public." *See* FAR 2.101. The government counters that, in accordance with the promulgators' intent, the regulation's plain language "must be read as applicable to the coach airfare actually available to a contractor" (gov't reply br. at 90). It relies upon the word "lowest" in the regulation as allegedly modifying not only "customary standard" but also the words "coach" and "equivalent" airfare (*id*. at 91).

Raytheon replies that "lowest" applies only to the words that immediately follow it -- "customary standard." Raytheon notes that even if "lowest" referred to "customary standard," "coach" and "equivalent" airfare, this does not resolve whether the terms apply to the lowest fare available to the general public or to each individual contractor. Raytheon points out that, if the promulgators had intended the interpretation of FAR 31.205-46(b) advanced by the government, they could have so drafted the regulation, as they did in the current version and with other subsections of pre-2010 FAR 31.205-46, which directly referred to contractor-specific costs (app. reply br. at 31 (citing FAR 31.205-46(a)(1) ("Costs incurred by contractor personnel . . . "), FAR 31.205-46(c)(2) ("The costs of travel by contractor-owned, -leased, or –chartered aircraft . . . "), and FAR 31.205-46(d) ("Costs of contractor-owned or leased automobiles . . .")).

In any case, as noted, we examine regulatory intent only if a regulation is ambiguous. We evaluate alleged ambiguity in a regulation similarly to our consideration of an alleged ambiguity in a contract provision. *See BAE Systems Information & Electronic Systems Integration, Inc*., ASBCA No. 44832, 03-1 BCA ¶ 32,193 at 159,116. As with a contract, for a regulation to be ambiguous, each party's interpretation must be reasonable. *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999). The government states that, in *Raytheon 58212*, the Board found that the government's interpretation of the pre-2010 version of FAR 31.205-46(b) was reasonable and the regulation was ambiguous. However, in *Raytheon 58212* there was no determination of reasonableness or of ambiguity. Rather, the Board concluded that it was presented with a

question of fact as to the reasonableness of each party's interpretation of FAR 31.205-46(b) and that there could be "no determination on a motion for partial summary judgment of ambiguity and no determination as to whether extrinsic evidence may be examined in resolving the meaning of the disputed language . . . ." *Raytheon 58212*, 15-1 BCA ¶ 35,999 at 175,864.

In fact, while Raytheon's interpretation of the pre-2010 version of FAR 31.205-46(b) as referring to a standard coach fare available to the general public is reasonable, the government's interpretation is not reasonable. As noted, the governing statute makes commercial aircraft travel costs that exceed the "standard commercial fare" unallowable. It does not refer to any negotiated airfare available to a particular contractor. Similarly, the pre-2010 implementing regulation, FAR 31.205-46(b), refers to the "lowest customary standard, coach, or equivalent airfare." The government's contention that "[t]his plain language must be read as applicable to the coach airfare actually available to a contractor" (gov't reply br. at 90) is simply incorrect no matter how much the government strains to read that language into the regulation. Moreover, contemporaneously, DCE McGrath and other DCMA officials agreed with Raytheon's reading of the regulation's plain language, despite DCAA's disagreement (findings 149, 151-52, 154, 157, 159-60).

Contrary to the government's stance, its revision of the regulation in 2010 was not a mere clarification, it was a change. If that change were made to apply to the 2007 and 2008 costs in question, it would be an impermissible retroactive change. "Retroactivity is not favored in the law." *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988). "The presumption against statutory retroactivity is founded upon elementary considerations of fairness dictating that individuals should have an opportunity to know what the law is and to conform their conduct accordingly. It is deeply rooted in this Court's jurisprudence . . ." *Landgraf v. USI Film Products*, 511 U.S. 244, 245 (1994).

In sum, 10 U.S.C. § 2324(e)(1)(J), makes airfare costs unallowable if they exceed "the standard commercial fare." The statute does not mention contractor-specific airfare. The pre-2010 FAR 31.205-46(b) implementing regulation does not mention contractor-specific airfare, and there are no words in the regulation that support the government's interpretation, unlike with Raytheon's interpretation. Thus, DCAA's use of Raytheon's discounted airfares as baselines to measure allegedly unallowable costs, rather than standard commercial coach fares, was incorrect.

## III. The Government has not Proved that Raytheon's Travel Policy Did Not Comply with FAR 31.205-46(b); the Policy was Reasonable

Under FAR 31.201-2 (a)(1), to be allowable, a cost must be reasonable. The government alleges that Raytheon's Travel Policy during the relevant time periods did not comply with FAR 31.205-46(b)'s exceptions for allowing premium travel and Raytheon's premium airfare costs were unreasonable. Here, when there are no costs above FAR 31.205-46(b)'s allowable threshold, there is no need to evaluate the regulation's

exceptions. In any case, the government has not met its burden to show that Raytheon's Travel Policy did not comply with the regulation (*see*, e.g., findings 172, 219; app. reply br. at 40).

The government cites to *Data-Design Labs*, 85-3 BCA ¶ 18,400, for the proposition that Raytheon had to document the circumstances justifying premium air travel on a case by case basis (gov't br. at 170-72; gov't reply br. at 96-97). As Raytheon points out, *Data-Design* involved a different statute, different regulation, first class airfare, and is otherwise distinguishable. Regardless, even if Raytheon were required to document and justify business class upgrades for tickets that did not exceed the standard coach fare (which we do not find), it did so (*see*, e.g., findings 171, 182, 188, 191-92; app. br. at 171-78). In particular, Raytheon's Travel Policy documented and justified premium airfare under FAR 31.205-46(b)'s exceptions for "travel during unreasonable hours" and "not reasonably adequate for the physical or medical needs of the traveler." Raytheon also reasonably applied a criterion of "no significant rest period" upon arrival. The regulation itself did not state that a traveler must perform work upon arrival. (*See* findings 144, 172-75, 184; app. reply br. at 40, n.26)

Contemporaneously, DCE McGrath endorsed Raytheon's interpretation of FAR 31.205-46(b) and determined that its Travel Policy complied with the regulation. He acted within the scope of his authority in so doing. (Findings 149, 151-52, 156) This binds DCMA and underscores the reasonableness of Raytheon's interpretation and implementation of the cost principle. *MPR Associates, Inc.*, ASBCA No. 54689, 05-2 BCA ¶ 33,115 at 164,112.

## IV. Because Raytheon Did Not Charge the Government More Than FAR 31.205-46(b)'s Cost Allowability Cap, There Are No Unallowable Excess Costs

Under FAR 31.205-46 "[c]osts incurred by contractor personnel on official company business are allowable," subject to certain limitations, including those in FAR 31.205-46(b) regarding premium airfare. However, we agree with Raytheon that, by its plain language, the pre-2010 version of FAR 31.205-46(b) does not make premium class travel unallowable *per se*. Rather, it imposes an allowability limitation upon airfare costs that exceed the "lowest customary standard, coach, or equivalent airfare offered during normal business hours," which Raytheon reasonably interprets as a baseline of standard coach fare available to the general public. Therefore, as long as airfare costs do not exceed that limitation, they are not unallowable under FAR 31.205-46. (App. br. at 162) Raytheon represents, without rebuttal, that it "never charged the [g]overnment more than the publicly available coach fare" (app. reply br. at 38) and "there are no costs above the subsection (b) threshold" (*id*. and *see* finding 172).

The Board's quantum decision regarding another cost regulation, FAR 31.205-6(o) (Postretirement benefits other than pensions (PRB)) is apt. There, the Board concluded that "the government suffered no damages" and that the cost disallowance in question was

improper. *Northrop Grumman Corp*., ASBCA No. 60190, 17-1 BCA ¶ 36,800 at 179,365, *reaffirmed*, 18-1 BCA ¶ 36,947, *aff'd, Secretary of Defense v. Northrop Grumman*, 942 F.3d 1134 (Fed. Cir. 2019). The Board stated: "We consider that FAR 31.205-6(o), properly construed, establishes a cost allowability 'ceiling,' and focuses on whether the contractor *overcharged* the government for PRB costs in its relevant cost-related submissions." *Northrop Grumman Corp*., 17-1 BCA ¶ 36,800 at 179,371 (emphasis in original). The Board concluded that "[t]here is no *excess* to disallow." *Id*. at 179,372 (emphasis in original). In reaffirming its decision, the Board explained that "[t]he gravamen of this dispute has always been whether the government was damaged, i.e., in the words, of FAR 31.201-2(c) whether the contractor claimed (or the government paid) any disallowable 'excess' PRB costs as a consequence of appellant's noncompliance. The ultimate overriding fact is that the government did not pay any 'excess.' It cannot overcome that basic fact …" *Northrop Grumman Corp*.,18-1 BCA ¶ 36,947 at 180,043-44.

The same is true in the appeal before us. Raytheon did not claim any airfare costs in excess of the standard coach fare available to the general public[34] and there is no evidence that it charged the government for any costs that it did not incur. We cannot determine on this record whether Raytheon incurred costs in excess of FAR 31.205-46(b)'s "**lowest** customary standard, coach, or equivalent airfare offered during normal business hours" (emphasis added), which neither party illuminates. In any case, the government has not met its burden to prove that it suffered any damages.

Accordingly, the Board need not address Raytheon's challenges to DCAA's calculations of allegedly unallowable premium airfare and Raytheon's assertion that the government did not meet its burden to prove quantum.

## DECISION

ASBCA No. 59437, to the extent that it pertains to airfare, and ASBCA Nos. 60057, 60059, 60060, and 60061 are sustained.

---

[34] The record before us contains non-contemporaneous Raytheon-specific fares estimated by DCAA, and a "standard fare" reported by Raytheon's travel agent, that is apparently the full-fare "Y" booking code. On this record, we accept the "standard fare" as the "lowest customary standard, coach" fare. However, we explicitly limit our holding to the record before us, and do not interpret the FAR as providing that the "Y" fare is the "lowest standard, coach fare."

ASBCA NO. 59437 – RMS' 2007 RECRUITING TRAVEL COSTS

FINDINGS OF FACT CONCERNING RMS' 2007 RECRUITING TRAVEL COSTS

220. FAR 31.205-34, RECRUITMENT COSTS (MAY 1999), quoted more fully below, provides in paragraph (a), subject to inapplicable exceptions, that certain costs are allowable, including "[t]ravel costs of applicants for interviews." FAR 31.205-34(a)(5).

221. The 2007 RMS Audit Report originally questioned $199,715 of RMS' claimed recruiting costs. As set forth below, RMS agreed to withdraw $103,312 of the questioned costs, which pertained to spouses or guests, leaving $96,402 at issue. (Tr. 2/298, 3/74, 197-201; *see* gov't. br. at 113) During incurred cost negotiations, RMS provided additional supporting information concerning certain of its recruiting costs, which DCAA accepted, leaving about $51,000 ultimately at issue (R4, tabs 602-06; tr. 2/299-300; 3/198-99, 205-08).

222. DACO Bradley's June 12, 2014 2007 RMS COFD disallowed $50,434 in airfare costs claimed for interviewees traveling to RMS' Tucson, Arizona headquarters as unallowable under FAR 31.201-2 for lack of supporting documentation, and $1,002 as excessive and unreasonable on the ground that the costs pertained to duplicate tickets. The DACO stated that the information RMS supplied did not show that interviews were actually completed or establish that the costs were for interviewees and not for their guests. (App. supp. R4, tab 277 at 4543, 4546-47)[35] As noted, RMS' appeal from this COFD was docketed as ASBCA No. 59437.

223. The hiring events at issue typically brought in hundreds of applicants for interviews, which occurred at RMS or local hotels. RMS paid for the applicants' travel costs, including flights and hotels. As DACO Bradley acknowledged, RMS provided documentation to show that the costs were incurred and paid. (Tr. 4/203) For the first part of 2007, RMS also paid the travel costs for certain interviewees to bring a guest. RMS reimbursed these costs as part of its recruiting efforts for certain positions because accepting a job at RMS often meant relocating the applicant's family. RMS ultimately voluntarily withdrew the travel costs for guests from its 2007 incurred cost proposal. (App. supp. R4, tab 256 at 3967, tab 260 at 4040; tr. 3/55-56, 74, 198; AUPFF ¶ 259)

224. RMS provided documentation to support its 2007 recruiting travel costs, including: interview and hiring event schedules; applicant travel expense statements; screen shots from its Human Resources (HR) system, "RAYCATS," showing that the individuals applied for positions at RMS and submitted resumes; other RAYCATS tracking records; HR expense reimbursement records; relocation documents; medical clearance documents; background application documents; American Express statements

[35] Although the decision also cited FAR 31.205-33, PROFESSIONAL AND CONSULTANT SERVICE COSTS (AUG 2003), it did not address that regulation.

itemizing the applicants' air fare charges; and hotel invoices itemizing the applicants' hotel charges. (App. supp. R4, tab 83 at 1169-1215, tab 84, tab 256 at 3967, tab 260 at 4040; tr. 3/56-59, 62, 79)

225. DCAA nevertheless concluded, with a few exceptions, that there was insufficient support to establish that the individuals whose costs were in question actually participated in an interview and that "interview panels" were completed, making the costs unreasonable in DCAA's view (app. supp. R4, tab 260 at 4041; tr. 4/204, 208). For example, DCAA questioned, and the COFD disallowed, airfare costs for four interviewees (app. supp. R4, tab 375 at 6322-24). They flew to Tucson around June 19, 2007 for a hiring event held by RMS at the Westin La Paloma hotel. The supporting documentation submitted to DCAA showed that they had submitted their resumes and stayed at the hotel. (App. supp. R4, tab 84 at 1241, 1243-44, 1246, 1279, 1281, 1295, 1297; tr. 3/ 59-61, 63-66) The government wanted an initialed "Travel Interview Reimbursement Form," submitted by some of the interviewees (*see*, e.g., R4, tabs 603-604 at 109620; app. supp. R4, tab 84 at 1240, 1286; tr. 3/57). Otherwise, the government did not accept that the individual was brought in by RMS for an interview. However, submission of this form was an exception to the regular practice. (*See* tr. 3/76-77)

226. Of the $1,002 in recruiting travel costs questioned as excessive in the 2007 RMS COFD (finding 222), DCAA later accepted $673 pertaining to one interviewee, leaving only $329 in airfare costs for one interviewee in question. DCAA was concerned that the individual was an interviewee and a spouse and sought reimbursement in both capacities. (Tr. 3/203-04) In its response to DCAA's draft audit report, RMS noted that one individual had expensed two trips, one trip as a spouse and a second trip as an interviewee (app. supp. R4, tab 260 at 4040).

227. As noted, RMS ultimately agreed to withdraw costs for spouses and guests. If the challenged $329 refers to the referenced interviewee as a spouse, and it was not withdrawn, the amount is not material, and the parties are to agree to an adjustment in the government's favor as they deem to be the most practical.

## DISCUSSION OF RMS' 2007 RECRUITING TRAVEL COSTS

### I. The Parties' Contentions

#### A. The Government's Contentions

DCMA alleges that claimed travel costs related to RMS' recruiting are unallowable because "(1) RMS failed to provide adequate support showing potential employees actually were interviewees for a position – as opposed to spouses or guests ($51,107), and (2) several 'duplicate' airline tickets were identified for the same prospective employee ($329)" (gov't br. at 112-13).

B. Raytheon's Contentions

Raytheon contends that the questioned costs are expressly allowable under FAR 31.205-34(a)(5), which states that recruiting costs are allowable and does not specify any particular type of documentation in support of claimed costs. Raytheon asserts that it provided ample documentation and that there is no basis in the FAR for the government's requiring documentation signed by the interviewee to prove that an interview occurred. The government is merely speculating that the interviews never took place or that the costs were for guests, regardless of the fact that RMS voluntarily withdrew guest costs. In any case, RMS incurred the guest costs as part of its efforts to encourage applicants to relocate their families to Tucson and FAR 31.205-34 does not make such costs unallowable. (App. br. at 196-98)

C. The Government Failed to Satisfy its Burden of Proof

We conclude that the government has not met its burden to prove that the recruiting costs challenged in the 2007 RMS COFD are unallowable. Any spouse-related costs for the one referenced interviewee are immaterial and can be reimbursed to the government, as the parties see fit, in accordance with RMS' voluntary agreement to withdraw such costs (finding 227).

DECISION

With the exception of any spouse-related costs mentioned above, ASBCA No. 59437, to the extent that it pertains to RMS' recruiting travel costs, is sustained.

ASBCA NOS. 59435, 59436, 60056 - BONUS, INCENTIVE COMPENSATION, AND RESTRICTED STOCK COSTS

FINDINGS OF FACT REGARDING RAYTHEON'S BONUS, INCENTIVE COMPENSATION, AND RESTRICTED STOCK COSTS

228. CACO Forbush's Corporate COFD for 2007 included a claim that bonus, incentive compensation, and restricted stock costs for employees alleged to have engaged in expressly unallowable activities, such as lobbying and corporate development, were themselves expressly unallowable. The CACO found that $681,044 in restricted stock costs were unallowable under FAR 31.205-22, LOBBYING AND POLITICAL ACTIVITY COSTS (*see* finding 16); FAR 31.205-27, ORGANIZATION COSTS (see finding 27); and FAR 31.205-47, COSTS RELATED TO LEGAL AND OTHER PROCEEDINGS. For the most part, the COFD identified the legal proceedings, which did not appear to include anything relevant to any of the appeals at issue in this decision as a whole. (App. supp. R4, tab 279 at 4556, 4563, 4566-67) Indeed, none of the appeals have been described as involving any legal or other proceedings covered by FAR 31.205-47. Neither party discussed that regulation or its alleged relevance. Accordingly, we do not

consider it here or below. As noted, the Board docketed Raytheon's appeal from this COFD as ASBCA No. 59435.

229. CACO Forbush's CAS 405 COFD for 2007 claimed, among other things, that bonus and restricted stock costs for employees alleged to have engaged in expressly unallowable activities were expressly unallowable. He found $570,035 in bonus costs to be expressly unallowable under FAR 31.205-22, FAR 31.205-27, and FAR 31.205-47, and $683,891 in restricted stock costs to be expressly unallowable under those regulations and under FAR 31.205-1, ADVERTISING COSTS. (App. supp. R4, tab 281 at 4573, 4575, 4580-81)[36] As noted, the Board docketed Raytheon's appeal from this COFD as ASBCA No. 59436.

230. CACO Forbush's Corporate COFD for 2008 concluded that $125,280 in incentive compensation costs paid to Raytheon's "Strategic Business Development" employees were expressly unallowable under FAR 31.205-27. He stated that: "[t]hese costs include the applicable employee bonus and incentive compensation for their time spent performing unallowable [A&D] activities. As you know, these determinations relate to matters currently being litigated as part of ASBCA Nos. 57576 et al." (App. supp. R4, tab 364 at 5961). As noted, the Board docketed Raytheon's appeal from this COFD as ASBCA No. 60056. The CACO's 2008 CAS 405 COFD, issued the same day as his Corporate COFD for 2008, did not mention bonus, restricted stock or incentive compensation costs (app. supp. R4, tab 365).

231. The parties resolved some of the matters in dispute. They agree that, for 2007, bonus, restricted stock, incentive compensation costs in the amount of $1,242,895 remain at issue and, for 2008, incentive compensation costs in the amount of $125,280 remain in dispute. (Tr. 7/249, 251-52; *see* finding 14; gov't br. at 115; app. br. at 161 (total of $1,368,175 in dispute)).

## DISCUSSION OF RAYTHEON'S BONUS, INCENTIVE COMPENSATION, AND RESTRICTED STOCK COSTS

### I. The Parties' Contentions

#### A. The Government's Contentions

The government contends that the Board's decision in *Raytheon Co*., ASBCA No. 57576 *et al*., 15-1 BCA ¶ 36,043 (CAS 405 decision), is controlling (gov't br. at 116). There the Board held that bonus, incentive compensation, and restricted stock awards paid to Raytheon employees performing unallowable activities under FAR 31.205-47 were

[36] The COFD appears to be inconsistent concerning the bonus and restricted stock amounts stated to be expressly unallowable (*see* above compared to chart at app. supp. R4, tab 281 at 4575), but this is immaterial in view of their settlement of some of the issues (finding 231) and of our decision, below.

expressly unallowable and that the same categories of payments to employees performing unallowable activities under FAR 31.205-22 and FAR 31.205-27 were unallowable. 15-1 BCA ¶ 36,042 at 176,052.

B. Appellant's Contentions

Raytheon contends that that the government has failed to meet its burden to prove that Raytheon owes it $1,368,175 in allegedly unallowable bonus, incentive compensation, and restricted stock awards. It asserts that the evidence of record is paltry and insufficient to prove the government's claim. (App. br. at 161-62)

The Board's Resolution

The circumstances of these appeals differ significantly from those of the CAS 405 decision. Unlike in that decision, we have not found any claimed costs to be unallowable under FAR 31.205-22, FAR 31.205-27, or FAR 31.205-47. Thus, the employees in question were not performing unallowable activities and any bonus, incentive compensation or restricted stock payments associated with their allowable activities are not expressly unallowable or unallowable.

## DECISION

We sustain ASBCA Nos. 59435, 59436, and 60056, to the extent they cover bonus, incentive compensation and restricted stock awards.

## ASBCA NO. 60056—"SOUVENIR" OR "REMINDER ITEMS" COSTS

## FINDINGS OF FACT REGARDING "SOUVENIR" OR "REMINDER ITEMS" COSTS

232. The following statute and regulations are pertinent:

Title 10 U.S.C. § 2324 (e)(1) provides that certain specific costs are "not allowable," including, under subsection (H), "Costs of advertising designed to promote the contractor or its products," and, under subsection (I), "Costs of promotional items and memorabilia, including models, gifts, and souvenirs."

FAR 31.205-1, PUBLIC RELATIONS AND ADVERTISING COSTS (AUG 2003), provides in part[37]:

> (a) "Public relations" means all functions and activities dedicated to-

[37] This FAR provision has changed but we include the one in effect during the period at issue.

(1) *Maintaining, protecting, and enhancing the image of a concern* or its products; or

(2) *Maintaining or promoting reciprocal understanding and favorable relations with the public at large, or any segment of the public.* The term public relations includes activities associated with areas such as advertising, customer relations, etc.

(b) Advertising means the use of media to promote the sale of products or services and to accomplish the activities referred to in paragraph (d) . . . . . *Advertising media include but are not limited to conventions, exhibits, free goods, samples* . . . .

. . . .

(d) The *only allowable advertising costs are those that are* --

. . . .

(2) Costs of activities to promote sales of products normally sold to the U.S. Government, including trade shows . . . are allowable . . . . However, such costs do not include the costs of memorabilia (e.g. models, gifts and souvenirs)…

(3) *Allowable in accordance with 31.205-34*.

(e) Allowable public relations costs include the following:

. . . . [list of various activities]

(f) *Unallowable public relations and advertising costs include* the following:

. . . . [list of various activities]

(5) *Costs of promotional material*, motion pictures, videotapes, brochures, *handouts*, magazines, and other media that are *designed to call favorable attention to the contractor and its activities.*

(6) Costs of *souvenirs*, models, *imprinted clothing*, buttons, *and other mementos* provided to customers or the public.

(Emphasis added)

FAR 31.205-34, RECRUITMENT COSTS (MAY 1999), provides in part:

(a) Subject to paragraph (b) of this subsection, the following costs are allowable:

(1) Costs of help-wanted advertising.

(2) Costs of operating an employment office needed to secure and maintain an adequate labor force.

(3) Costs of operating an aptitude and educational testing program.

(4) Travel costs of employees engaged in recruiting personnel.

(5) Travel costs of applicants for interviews.

(6) Costs for employment agencies, not in excess of standard commercial rates.

(b) *Help-wanted advertising costs are unallowable if the advertising-*

(1) *Does not describe specific positions or classes of positions*; or

(2) Includes material that is not relevant for recruitment purposes, such as extensive illustrations or descriptions of the company's products or capabilities.

(Emphasis added)

233. Under the category "Recruitment Reminder Items" (RRI) CACO Forbush's 2008 Corporate COFD disallowed $17,780 in costs on the ground that they "related to items given away by Raytheon as souvenirs" and "constitute[d] unallowable promotional costs under FAR 31.205-1" (app. supp. R4, tab 364 at 5961).

234. The costs at issue are 15% of Raytheon's RRI costs incurred for 2008. The costs apparently include purchase costs and the costs of handling and displaying the items. (*See*, e.g., R4, tab 646) Raytheon voluntarily withdrew 85% of the costs consistent with negotiated resolutions reached with DCMA in prior years, including for 2007, even though, in Raytheon's view, the costs were allowable (*see, e.g*., app. supp. R4, tab 32 at 251; tr. 8/35).

235. No resolution was reached for 2008. DCAA considered the 2008 costs in question to be expressly unallowable but, although he thought so too, CACO Forbush did not so claim in view of a June 17, 2013 letter to Raytheon from predecessor CACO Holt, entitled "Contracting Officer Determination on Allowability -- Public Relations and Advertising Costs-(FAR 31.205-1)," which stated that DCMA would consider such costs to be expressly unallowable beginning with Raytheon's CY 2009. (R4, tab 646; app. supp. R4, tab 331 at 5201-02; app. supp. R4, tab 364 at 5961; tr. 7/256-57, 360-62, 8/35-37)

236. The RRIs are items such as mouse pads, pens, pencils, coffee mugs, and possibly T-shirts, that bear Raytheon's logo, with at least some, if not all, showing its website, which, if accessed, would enable checking for available jobs (app. supp. R4, tab 331 at 5201; tr. 2/71-72, 8/33-34). Raytheon hands the items out at collegiate job fairs to "kids that come up to the booth as a way to get them aware of the Raytheon name" (tr. 8/33). At these and other events, Raytheon tries to solicit young engineering students to replenish the company's acquisition workforce. The items are not handed out to the general public outside of the job fairs. (App. supp. R4, tab 331 at 5201; tr. 2/71-72, 75, 8/34) However, there is no evidence that the physical items themselves describe specific positions or classes of positions or that they are unique to students or recruits. Mr. Michael Downing, Raytheon's Senior Manager of Government Accounting at the Corporate office, agreed that the RRIs could be characterized as souvenirs, reminder items, giveaways and mementos (tr. 8/6, 44).

237. As noted, the Board docketed Raytheon's appeal from the 2008 Corporate COFD as ASBCA No. 60056.

## DISCUSSION OF "SOUVENIR" OR "REMINDER ITEMS" COSTS

### I. The Parties' Contentions

#### A. The Government's Contentions

The government alleges that Raytheon's voluntary withdrawal of 85% of its RRI costs was a "tacit acknowledgment that these costs are unallowable" (gov't br. at 117). It also alleges that the CACO "determined that the remaining 15% of souvenir costs charged to the Government by Raytheon were expressly unallowable pursuant to FAR 31.205-1 (Public Relations & Advertising Costs)" (*id*.).

The government contends that the costs at issue are for souvenirs or mementos that "fit squarely into the unallowable costs specified in FAR 31.205-1" (gov't br. at 118). It alleges that "[t]he souvenirs are provided to the public or a segment of the public (the attendees of various college fairs and other symposiums), and the purpose of those souvenirs is dedicated to maintaining favorable relations within the definition of public relations" (*id*.). Thus, the cost principle makes both the souvenirs and the related handling activities expressly unallowable (*id.*).

The government asserts that Raytheon's mementos, souvenirs and giveaways are not allowable recruitment costs under FAR 31.205-34, which makes specific costs allowable but not costs of souvenirs for college students, which it does not address. In contrast, FAR 31.205-1 expressly makes souvenirs or mementos for the public or segment of the public and the activities to distribute them unallowable. The government states that "it is also obvious that [the RRI] are literally '**designed to call favorable attention'** to Raytheon in order to attract people to its website." (Gov't br. at 119)[38] The government also relies upon 10 U.S.C. § 2324(e)(1)(H) and (I), quoted in part above (finding 232).

The government concludes that "the Board should find that Raytheon's souvenir reminder items are expressly unallowable" (gov't br. at 120).

B. Appellant's Contentions

Raytheon asserts that the government has not met its burden to prove that the RRI costs at issue are unallowable (app. br. at 198). Raytheon contends that the costs are recruitment costs, which FAR 31.205-34 makes allowable, and that the regulation does not limit the types of allowable costs to those it enumerates (*id.*). Raytheon also alleges that the costs are "fairly 'costs of help-wanted advertising' made allowable by subsection (a)(1)" of FAR 31.205-34 (app. reply br. at 51). On the other hand, Raytheon alleges that the RRIs are neither for public relations nor advertising as defined in FAR 31.205-1 (app. br. at 198; app. reply br. at 50). Rather, their purpose is to encourage candidates to apply for positions at Raytheon and to remind them of Raytheon's recruiting website (app. br. at 198). Further, according to Raytheon, "RRIs are not meant to enhance the image of Raytheon to the public or a segment of the public, and they do not promote the sale of Raytheon's products" (app. br. at 198-99).

Finally, Raytheon notes that CACO Forbush did not find the costs in question to be expressly unallowable or impose penalties (app. br. at 199, n.72). Raytheon asserts that,

[38] The government also alleges that a prior, unappealed COFD involving FAR 31.205-1(f)(5) and (6) pursuant to which RMS paid a penalty (R4, tab 645 at 112352) (business card holders and travel mugs deemed to be expressly unallowable gifts to job applicants) is binding upon RMS and authoritative regarding Raytheon (gov't br. at 119-20). There are no proposed fact findings and no developed record regarding this contention. Under the circumstances, we reject it.

under the circumstances, the Board does not have jurisdiction to do so and the government is seeking an impermissible advisory opinion when it asks the Board to find the costs to be expressly unallowable (*id.*).

II. RRI Costs are Unallowable

First, the government's argument that, due to its prior practice of withdrawing 85% of its RRI costs, Raytheon has tacitly acknowledged that its RRI costs are unallowable, is plainly wrong, as this litigation exemplifies. As we have found, in the past, DCMA and Raytheon resolved their RRI cost dispute with the stated cost allocation, but Raytheon continued to believe that its RRI costs were allowable (finding 234). However, we conclude that the most reasonable reading of the regulations pertinent to this dispute is that the costs of the items in question are unallowable.

FAR 31.205-1(a), upon which the government relies, defines "public relations" as:

> all functions and activities dedicated to –
>
> (1) Maintaining, protecting, and enhancing the image of a concern or its products; or
>
> (2) Maintaining or promoting reciprocal understanding and favorable relations with the public at large, or any segment of the public. The term public relations includes activities associated with areas such as advertising, customer relations, etc.

Subsection (d) of FAR 31.205-1 lists the "only allowable" advertising costs. Items such as the RRI items in question are not named. In fact, by way of analogy, the regulation specifies in subsection (d)(2), regarding costs of activities to promote product sales, that "such costs do not include the costs of memorabilia (e.g. models, gifts, and souvenirs) . . . ." However, subsection (d)(3) includes among allowable costs those that are allowable under FAR 31.205-34, addressed below.

Subsection (e) of FAR 31.205-1 lists allowable public relations costs. Items such as the RRI items in question are not covered. Subsection (f) lists "[u]nallowable public relations and advertising costs," including in subsection (5), "[c]osts of promotional material . . . [and] handouts . . . designed to call favorable attention to the contractor and its activities." The items at issue are certainly promotional material designed to call favorable attention to Raytheon. The unallowable costs also include, per subsection (6), "[c]osts of souvenirs, models, imprinted clothing, buttons, and other mementos provided to customers or the public." (Finding 232) We consider that attendees at collegiate job fairs or similar events could reasonably be described as members of the public or, at least, a segment thereof.

Raytheon relies upon FAR 31.205-34, which makes allowable listed recruitment costs. The RRI items in question are not listed. While Raytheon contends that they could fairly be included in subsection (a)(1)'s allowable "[c]osts of help-wanted advertising," subsection (b)(1) states that help-wanted advertising costs are unallowable if the advertising "[d]oes not describe specific positions or classes of positions." While some, if not all, of the disputed items are marked with Raytheon's recruiting website, which would show available jobs if accessed, there is no evidence that the physical items themselves describe specific positions or classes of positions (finding 236). To the extent that the RRI items display the web address for a recruiting webpage containing information regarding job listings, the RRIs conceivably would comply with the spirit of the FAR; however, they do not comply with the FAR as written. We apply the FAR as written. FAR 31.205-34(b)(2) additionally provides that help-wanted advertising costs are unallowable if they "[i]nclude[] material that is not relevant for recruitment purposes, such as extensive illustrations or descriptions of the company's products or capabilities." Thus, the FAR strictly limits allowable help-wanted advertising to advertising describing specific positions or classes of positions without irrelevant material. The RRIs do fit within this narrow definition.

We conclude that, on balance and in practicality, the physical items in question are most properly classified as "souvenirs," which are things "kept as a reminder." Merriam Webster Dictionary, merriam-webster.com, (last visited January 29, 2021). Souvenir costs are not allowable. Indeed, the governing statute provides that "[c]osts of promotional items and memorabilia, including models, gifts, and souvenirs" are not allowable. Title 10 U.S.C. § 2324 (e)(1)(I); (finding 232). The disputed items also fit the categories of unallowable promotional items, memorabilia and mementos.[39] Raytheon's Senior Manager of Government Accounting at the Corporate office agreed that the RRIs could be characterized as souvenirs, reminder items, giveaways and mementos (finding 236).

Accordingly, we deny Raytheon's appeal. However, contrary to the government's assertion that we should conclude that the RRI costs were expressly unallowable, we decline to do so when the CACO and his COFD on appeal did not do so (finding 235). Moreover, this is not an obvious case of unallowability and of a contractor's flaunting the regulations. The parties had operated for years under a negotiated resolution under which Raytheon was allowed to include 15% of its RRI costs in its incurred cost proposals (finding 234). Further, under CACO Holt's June 17, 2013 "Contracting Officer Determination on Allowability-- Public Relations and Advertising Costs-(FAR 31.205-1)," DCMA was not going to consider such costs to be expressly unallowable until 2009 (finding 235), which is after the 2008 year in question.

<u>DECISION</u>

We deny ASBCA No. 60056 to the extent that it covers RRIs.

---

[39] We need not address whether the items are gifts.

SUMMARY OF DECISIONS

We sustain ASBCA Nos. 59435, 59436, 59438, 60056, 60057, 60058, 60059, 60060, and 60061. Except for the immaterial amount of spousal travel costs stated, we sustain ASBCA No. 59437. We sustain ASBCA No. 60056 in part, to the extent stated, and deny it to the extent that it covers RRIs.

Dated: February 1, 2021

CHERYL L. SCOTT
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

DAVID D'ALESSANDRIS
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 59435, 59436, 59437, 59438, 60056, 60057, 60058, 60059, 60060, 60061, Appeals of Raytheon Company and Raytheon Missile Systems, rendered in conformance with the Board's Charter.

Dated: February 3, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

# Addendum B

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| Raytheon Company and Raytheon Missile Systems | ) | ASBCA Nos. 59435, 59436, 59437 59438, 60056, 60057 60058, 60059, 60060 60061 |
| | ) | |
| Under Contract Nos. W15P7T-07-C-P207 W31P4Q-07-C-0159 | ) | |

APPEARANCES FOR THE APPELLANT: Karen L. Manos, Esq.
John W. F. Chesley, Esq.
Gibson, Dunn & Crutcher LLP
Washington, DC

APPEARANCES FOR THE GOVERNMENT: Arthur M. Taylor, Esq.
DCMA Chief Trial Attorney
Alexander M. Healy, Esq.
Trial Attorney
Defense Contract Management Agency
Hanscom AFB, MA

OPINION BY ADMINISTRATIVE JUDGE SCOTT
ON GOVERNMENT'S MOTION FOR RECONSIDERATION

The Defense Contract Management Agency (DCMA) moves the Board to reconsider its February 1, 2021 post-hearing decision in *Raytheon Company and Raytheon Missile Systems*, ASBCA Nos. 59435, 59436, 59437, 59438, 60056, 60057, 60058, 60059, 60060, and 60061, and asks the Board to refer its motion to the Board's Senior Deciding Group. Appellants Raytheon Company and Raytheon Missile Systems (Raytheon) oppose the motion and the request.

## DISCUSSION

### Senior Deciding Group Request

Under the Board's Rules, the Chairman may refer an appeal to the Senior Deciding Group if the appeal is of unusual difficulty, of significant precedential importance, or if the appeal has occasioned serious dispute within the normal division decision process. ASBCA Rules, Preface, Part II (c), 48 C.F.R. Chapter 2, App'x A, Part 2, Preface, Part II(c). The Chairman has determined that the decision in question

does not meet any of these criteria and he declines to refer DCMA's motion for reconsideration to the Senior Deciding Group.

Motion for Reconsideration

The Board applies the following standards in deciding a motion for reconsideration:

> [W]e look to whether the movant has presented newly discovered evidence, mistakes in findings of fact, or errors of law. *Kellogg Brown & Root Services, Inc.*, ASBCA Nos. 57530, 58161, 16-1 BCA ¶ 36,554 at 178,039. A reconsideration motion is not an opportunity to reargue issues previously raised and decided, or to advance arguments that should have been presented in an earlier proceeding. *Precision Standard, Inc.*, ASBCA No. 59116, 15-1 BCA ¶ 36,155 at 176,445; *Avant Assessment, LLC*, ASBCA No. 58867, 15-1 BCA ¶ 36,137 at 176,384. A party moving for reconsideration "must show a compelling reason" why the Board should alter its decision. *Precision Standard*, 15-1 BCA ¶ 36,155 at 176,445.

*Supreme Foodservice, GmbH*, ASBCA No. 57884 *et al.*, 17-1 BCA ¶ 36,740 at 179,092.

A motion for reconsideration is not for bolstering contentions that the Board has already rejected or for expressing disagreements with the trier of fact over the weight to be accorded evidence and the inferences to be drawn from the evidence. *Potomac Electric Corp.*, ASBCA No. 61371, 20-1 BCA ¶ 37,663 at 182,862. Our appellate court advises that "long-established and salutary precepts" governing motions for reconsideration include the principles that:

> [W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again . . . . Motions for reconsideration do not afford litigants the opportunity to take "a second bite at the apple" or to advance arguments that properly should have been presented in an earlier proceeding.

*Dixon v. Shinseki*, 741 F.3d 1367, 1378 (Fed. Cir. 2014) (citations omitted).

We have reviewed DCMA's extensive motion, Raytheon's opposition, and DCMA's reply. Contrary to DCMA's contention, we have not ignored its proffered

evidence or its arguments. As we stated in our decision at issue, we have considered all of the parties' arguments, whether or not we have addressed them.

It is fully apparent that DCMA does not like, and disagrees with, much of the Board's decision. It is also fully apparent that, after a two-week evidentiary hearing and extensive briefing, DCMA is attempting to retry the appeals. With a few exceptions, DCMA repeats or elaborates upon proposed facts and arguments it raised in its post-hearing briefing. The exceptions, including quantum calculations on the issue of unallowable invention disclosure costs, are matters that could have been raised during the hearing and in post-hearing briefing.

DCMA has not offered any newly-discovered evidence or persuaded the Board that we made any mistakes in our fact findings or any errors of law.

DECISION

DCMA's Request for Referral to the Senior Deciding Group and its Motion for Reconsideration are denied.

Dated: May 11, 2021

CHERYL L. SCOTT
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

DAVID D'ALESSANDRIS
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 59435, 59436, 59437, 59438, 60056, 60057, 60058, 60059, 60060, 60061, Appeals of Raytheon Company and Raytheon Missile Systems, rendered in conformance with the Board's Charter.

Dated: May 12, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

# Addendum C

Code of Federal Regulations
Title 48. Federal Acquisition Regulations System
Chapter 1. Federal Acquisition Regulation
Subchapter E. General Contracting Requirements
Part 31. Contract Cost Principles and Procedures (Refs & Annos)
Subpart 31.2. Contracts with Commercial Organizations
31.205 Selected Costs.

48 C.F.R. 31.205–22

31.205–22 Lobbying and political activity costs.

Currentness

(a) Costs associated with the following activities are unallowable:

(1) Attempts to influence the outcomes of any Federal, State, or local election, referendum, initiative, or similar procedure, through in kind or cash contributions, endorsements, publicity, or similar activities;

(2) Establishing, administering, contributing to, or paying the expenses of a political party, campaign, political action committee, or other organization established for the purpose of influencing the outcomes of elections;

(3) Any attempt to influence (i) the introduction of Federal, state, or local legislation, or (ii) the enactment or modification of any pending Federal, state, or local legislation through communication with any member or employee of the Congress or state legislature (including efforts to influence state or local officials to engage in similar lobbying activity), or with any government official or employee in connection with a decision to sign or veto enrolled legislation;

(4) Any attempt to influence (i) the introduction of Federal, state, or local legislation, or (ii) the enactment or modification of any pending Federal, state, or local legislation by preparing, distributing or using publicity or propaganda, or by urging members of the general public or any segment thereof to contribute to or participate in any mass demonstration, march, rally, fund raising drive, lobbying campaign or letter writing or telephone campaign;

(5) Legislative liaison activities, including attendance at legislative sessions or committee hearings, gathering information regarding legislation, and analyzing the effect of legislation, when such activities are carried on in support of or in knowing preparation for an effort to engage in unallowable activities; or

(6) Costs incurred in attempting to improperly influence (see 3.401), either directly or indirectly, an employee or officer of the Executive branch of the Federal Government to give consideration to or act regarding a regulatory or contract matter.

(b) The following activities are excepted from the coverage of (a) above:

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

(1) Providing a technical and factual presentation of information on a topic directly related to the performance of a contract through hearing testimony, statements or letters to the Congress or a state legislature, or subdivision, member, or cognizant staff member thereof, in response to a documented request (including a Congressional Record notice requesting testimony or statements for the record at a regularly scheduled hearing) made by the recipient member, legislative body or subdivision, or a cognizant staff member thereof; provided such information is readily obtainable and can be readily put in deliverable form; and further provided that costs under this section for transportation, lodging or meals are unallowable unless incurred for the purpose of offering testimony at a regularly scheduled Congressional hearing pursuant to a written request for such presentation made by the Chairman or Ranking Minority Member of the Committee or Subcommittee conducting such hearing.

(2) Any lobbying made unallowable by paragraph (a)(3) of this subsection to influence state or local legislation in order to directly reduce contract cost, or to avoid material impairment of the contractor's authority to perform the contract.

(3) Any activity specifically authorized by statute to be undertaken with funds from the contract.

(c) When a contractor seeks reimbursement for indirect costs, total lobbying costs shall be separately identified in the indirect cost rate proposal, and thereafter treated as other unallowable activity costs.

(d) Contractors shall maintain adequate records to demonstrate that the certification of costs as being allowable or unallowable (see 42.703–2) pursuant to this subsection complies with the requirements of this subsection.

(e) Existing procedures should be utilized to resolve in advance any significant questions or disagreements concerning the interpretation or application of this subsection.

**Credits**

[49 FR 18278, April 27, 1984; 51 FR 12301, April 9, 1986; 52 FR 19804, May 27, 1987; 60 FR 42660, Aug. 16, 1995; 61 FR 31657, June 20, 1996; 61 FR 67425, Dec. 20, 1996; 62 FR 237, Jan. 2, 1997; 62 FR 44829, Aug. 22, 1997]

SOURCE: 48 FR 42301, Sept. 19, 1983; 52 FR 35669, Sept. 22, 1987; 54 FR 5054, Jan. 31, 1989; 68 FR 28079, 28091, May 22, 2003; 68 FR 43865, 43872, July 24, 2003; 68 FR 56688, Oct. 1, 2003; 68 FR 69247, 69254, Dec. 11, 2003; 69 FR 17766, April 5, 2004; 69 FR 34242, 34243, June 18, 2004; 70 FR 11763, March 9, 2005; 70 FR 33675, June 8, 2005; 78 FR 6191, Jan. 29, 2013, unless otherwise noted.

AUTHORITY: 40 U.S.C. 121(c); 10 U.S.C. chapter 137; and 51 U.S.C. 20113.

Notes of Decisions (1)

Current through December 17, 2021; 86 FR 71792.

End of Document © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Addendum D

Code of Federal Regulations
Title 48. Federal Acquisition Regulations System
Chapter 1. Federal Acquisition Regulation
Subchapter E. General Contracting Requirements
Part 31. Contract Cost Principles and Procedures (Refs & Annos)
Subpart 31.2. Contracts with Commercial Organizations
31.205 Selected Costs.

48 C.F.R. 31.205–27

31.205–27 Organization costs.

Currentness

(a) Except as provided in paragraph (b) of this section, expenditures in connection with (1) planning or executing the organization or reorganization of the corporate structure of a business, including mergers and acquisitions, (2) resisting or planning to resist the reorganization of the corporate structure of a business or a change in the controlling interest in the ownership of a business, and (3) raising capital (net worth plus long-term liabilities), are unallowable. Such expenditures include but are not limited to incorporation fees and costs of attorneys, accountants, brokers, promoters and organizers, management consultants and investment counselors, whether or not employees of the contractor. Unallowable reorganization costs include the cost of any change in the contractor's financial structure, excluding administrative costs of short-term borrowings for working capital, resulting in alterations in the rights and interests of security holders, whether or not additional capital is raised.

(b) The cost of activities primarily intended to provide compensation will not be considered organizational costs subject to this subsection, but will be governed by 31.205–6. These activities include acquiring stock for (1) executive bonuses, (2) employee savings plans, and (3) employee stock ownership plans.

**Credits**
[53 FR 10830, April 1, 1988]

SOURCE: 48 FR 42301, Sept. 19, 1983; 52 FR 35669, Sept. 22, 1987; 54 FR 5054, Jan. 31, 1989; 68 FR 28079, 28091, May 22, 2003; 68 FR 43865, 43872, July 24, 2003; 68 FR 56688, Oct. 1, 2003; 68 FR 69247, 69254, Dec. 11, 2003; 69 FR 17766, April 5, 2004; 69 FR 34242, 34243, June 18, 2004; 70 FR 11763, March 9, 2005; 70 FR 33675, June 8, 2005; 78 FR 6191, Jan. 29, 2013, unless otherwise noted.

AUTHORITY: 40 U.S.C. 121(c); 10 U.S.C. chapter 137; and 51 U.S.C. 20113.

Current through December 17, 2021; 86 FR 71792.

End of Document © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2021-2304

**Short Case Caption:** Secretary of Defense v. Raytheon Company

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- ☑ the filing has been prepared using a proportionally-spaced typeface and includes 12,614 words.
- ☐ the filing has been prepared using a monospaced typeface and includes __________ lines of text.
- ☐ the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 01/25/2022

Signature: /s/ Daniel B. Volk

Name: Daniel B. Volk

Save for Filing