No. 2021-2304

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

SECRETARY OF DEFENSE,

*Appellant*,

v.

RAYTHEON COMPANY, RAYTHEON MISSILE SYSTEMS,

*Appellees*.

Appeal from the Armed Services Board of Contract Appeals, ASBCA Nos. 59435, 59436, 59437, 59438, 60056, 60057, 60058, 60059, 60060, 60061, Administrative Judge Cheryl L. Scott, Administrative Judge Richard Shackleford, and Administrative Judge David D'Alessandris

# RESPONSE BRIEF OF APPELLEES RAYTHEON COMPANY AND RAYTHEON MISSILE SYSTEMS

Dhananjay S. Manthripragada
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7366
DManthripragada@gibsondunn.com

Erin N. Rankin
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2590
ERankin@crowell.com

John W.F. Chesley
*Principal Attorney*
Amir C. Tayrani
Lindsay M. Paulin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
JChesley@gibsondunn.com
ATayrani@gibsondunn.com
LPaulin@gibsondunn.com

*Counsel for Appellees Raytheon Company and Raytheon Missile Systems*

## CERTIFICATE OF INTEREST

Counsel for Appellees Raytheon Company and Raytheon Missile Systems certifies the following:

1. The full names of every entity represented by me are:

   Raytheon Company

   Raytheon Missile Systems

2. The parties named in the caption are the real parties in interest.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of Appellees are as follows:

   Raytheon Technologies Corporation

4. The names of all law firms and the partners or associates that appeared for Appellees in the originating agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

   Formerly of GIBSON, DUNN & CRUTCHER LLP: Karen L. Manos

5. There are no pending cases that may affect or be affected by this appeal.

6. There are no organizational victims or bankruptcy case debtors or trustees in this appeal.

Dated: March 28, 2022

*/s/ John W.F. Chesley*

John W.F. Chesley
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
JChesley@gibsondunn.com

# TABLE OF CONTENTS

**Page**


STATEMENT OF THE ISSUES ........ 1

STATEMENT OF THE CASE ........ 1

- I. Nature Of The Case ........ 1
- II. Statutory And Regulatory Background ........ 3
- III. Raytheon's Government Relations Costs – 2007 & 2008 ........ 6
  - A. The Government Relations Department Performed A Range Of Functions, Including Non-Lobbying Activities. ........ 6
  - B. Raytheon Identified And Excluded Unallowable Lobbying Costs From Its Claimed Government Relations Costs. ........ 8
    - 1. Raytheon's Lobbying Policy Was Comprehensive. ........ 9
    - 2. Government Relations Employees Fully Complied With The Lobbying Policy. ........ 9
    - 3. Raytheon Accurately Identified And Excluded Unallowable Lobbying Costs. ........ 11
  - C. DCAA Pursued A "Strategy" To Question All Government Relations Department Costs As Expressly Unallowable. ........ 12
- IV. Raytheon's Corporate Development Costs – 2007 & 2008 ........ 15
  - A. The Corporate Development Department Performed Many Functions, Including Economic And Market Planning Activities. ........ 15
  - B. Raytheon Developed And Implemented A "Bright Line" Policy For Recording Corporate Development Planning Activities. ........ 18
  - C. Raytheon Accurately Identified And Excluded Unallowable Organization Costs. ........ 20
  - D. DCAA Questioned 100% Of Raytheon's Corporate Development Department Costs For 2007 And 2008. ........ 20
- V. Proceedings Before The Board ........ 21

## TABLE OF CONTENTS
(continued)

**Page**

SUMMARY OF THE ARGUMENT ....................24

ARGUMENT ....................27

I. The Government Applies The Wrong Standard Of Review. ....................28

II. The Board Did Not Clearly Err In Finding That Raytheon Did Not Claim Any Lobbying Costs. ....................32

A. The Board Did Not Clearly Err In Finding That Raytheon Accurately Recorded Time Spent On Lobbying Activities. ....................33

1. There Is Substantial Evidence That Raytheon's Records Were Accurate. ....................34

2. The Government's Challenges To The Adequacy Of Raytheon's Records Fail. ....................38

B. The Board Did Not Clearly Err In Finding That Raytheon Properly Captured The Cost Associated With Lobbying Activities. ....................43

III. The Board Did Not Clearly Err In Finding That Raytheon Did Not Claim Any Unallowable Corporate Development Costs. ....................47

A. The Board Correctly Held That Raytheon's Bright Line Policy Reasonably Interprets And Implements FAR Requirements. ....................48

B. The Board Did Not Clearly Err In Finding That Raytheon Never Claimed Unallowable Organizational Costs. ....................52

CONCLUSION ....................56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bastien v. Shinseki*,
599 F.3d 1301 (Fed. Cir. 2010) ....................................................................31

*BearingPoint, Inc.*,
ASBCA No. 55354, 09-2 BCA ¶ 34,289 (Oct. 16, 2009) ...................................41

*Charles G. Williams Constr., Inc. v. White*,
326 F.3d 1376 (Fed. Cir. 2003) ..............................................................25, 37

*Crowley v. United States*,
398 F.3d 1329 (Fed. Cir. 2005) ....................................................................31

*Datascope Corp. v. SMEC, Inc.*,
879 F.2d 820 (Fed. Cir. 1989) ......................................................................56

*Deloach v. Shinseki*,
704 F.3d 1370 (Fed. Cir. 2013) ..............................................................27, 31

*Eaton Corp.*,
ASBCA No. 34355, 93-2 BCA ¶ 25,743 (May 6, 1993)..............................32, 33

*J.C. Equip. Corp. v. England*,
360 F.3d 1311 (Fed. Cir. 2004) ..............................................................31, 37

*Parsons Glob. Servs., Inc. ex rel. Odell Int'l, Inc. v. McHugh*,
677 F.3d 1166 (Fed. Cir. 2012) ....................................................................31

*Phoenix Data Sols. LLC*,
ASBCA No. 60207, 18-1 BCA ¶ 37,164 (Oct. 2, 2018) ....................................41

*Pro-Built Constr. Firm*,
ASBCA No. 59278, 17-1 BCA ¶ 36,774 (June 1, 2017)....................................41

*Raytheon Co.* ("*Raytheon I*"),
ASBCA No. 57743, 17-1 BCA ¶ 36724 (Apr. 17, 2017)..........15, 16, 18, 26, 38, 41, 47, 49, 50, 52, 53

*Raytheon Co. v. Sec'y of Def.* ("*Raytheon II*"),
940 F.3d 1310 (Fed. Cir. 2019) .......................................... 14, 32, 33, 35, 39, 40

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Raytheon Co. v. United States*,
747 F.3d 1341 (Fed. Cir. 2014) ....................29, 48, 52

*Rumsfeld v. Freedom N.Y., Inc.*,
329 F.3d 1320 (Fed. Cir. 2003) ....................29

*Sec'y of Def. v. Northrop Grumman Corp.*,
942 F.3d 1134 (Fed. Cir. 2019) ....................24, 28, 30, 44, 45

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) ....................33

*Thermalon Indus., Ltd. v. United States*,
51 Fed. Cl. 464 (2002) ....................41

*Wilson v. Dep't of Army*,
359 F. App'x 172 (Fed. Cir. 2010) ....................46

**Statutes**

10 U.S.C. § 2324(h) ....................4

29 U.S.C. § 201 ....................44

29 U.S.C. § 202 ....................44

29 U.S.C. § 203 ....................44

29 U.S.C. § 204 ....................44

29 U.S.C. § 205 ....................44

29 U.S.C. § 206 ....................44

41 U.S.C. § 7107(b)(2) ....................29

41 U.S.C. § 7107(b)(2)(C) ....................29

**Regulations**

48 C.F.R. § 30.202 ....................45

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

48 C.F.R. § 31.000 *et seq*. ....5
48 C.F.R. § 31.201-2(a) ....4
48 C.F.R. § 31.201-2(d) ....6, 41, 42
48 C.F.R. § 31.201-6(a) ....5, 37
48 C.F.R. § 31.201-6(e)(2)....46
48 C.F.R. § 31.203(b) ....3, 4
48 C.F.R. §§ 31.205-1–31.205-52 ....4
48 C.F.R. § 31.205-12....5, 26, 48, 51, 52
48 C.F.R. § 31.205-22....4
48 C.F.R. § 31.205-22(a) ....4, 34, 39
48 C.F.R. § 31.205-22(b) ....4, 39
48 C.F.R. § 31.205-22(d) ....5, 39
48 C.F.R. § 31.205-27(a) ....5, 26, 49, 50
48 C.F.R. § 31.205-38(b)(4) ....5, 26, 49, 51
48 C.F.R. § 52.216-7....3
48 C.F.R. § 52.216-7(d) ....4
48 C.F.R. § 52.216-7(d)(2) ....4
48 C.F.R. § 52.230-2(a)(1)....26
48 C.F.R. § 52.230-2(a)(2)....26
48 C.F.R. § 9903.202 ....45
48 C.F.R. § 9904.401-40(a) ....26, 45

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

48 C.F.R. § 9904.405-40(a) ....................................................6, 8, 42

48 C.F.R. § 9904.405-50(a) ....................................................42, 43

48 C.F.R. § 9904.405-50(b)(1) ....................................................42, 43

**Other Authorities**

49 Fed. Reg. 18,260 (Apr. 27, 1984) ....................................................40

John Cibinic, Jr. & Ralph C. Nash, Jr.,
Cost-Reimbursement Contracting (3d ed. 2004)..........................................47, 49

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Appellees Raytheon Company and Raytheon Missile Systems state that they are not aware of any other appeal in or from this action that previously was before this Court or any other appellate court under the same or similar title. Appellees' counsel is further unaware of any case pending in this Court that may directly affect or be affected by this Court's decision in this appeal.

The Court's decision in this appeal will likely control the outcome of several other cases that the Armed Services Board of Contract Appeals has stayed pending this appeal (ASBCA Nos. 60694, 60695, 60697, 60698, 61444, 61445, 61446, 61587, 61588, 61912, 61913, 62261, 62262, 62788, 62789, 62790, and 62791). Appellees' counsel is not aware of any other pending cases on which this Court's decision is likely to have an effect.

## STATEMENT OF THE ISSUES

1. Whether the Armed Services Board of Contract Appeals clearly erred in holding that the Government failed to prove that Raytheon Company charged the Government for unallowable lobbying costs.

2. Whether the Armed Services Board of Contract Appeals clearly erred in holding that the Government failed to prove that Raytheon Company charged the Government for unallowable organizational-planning costs.

## STATEMENT OF THE CASE

### I. Nature Of The Case

This appeal arises from a comprehensive decision that the Armed Services Board of Contract Appeals ("Board") issued after receiving and considering extensive witness testimony and other evidence, as well as detailed briefing. The Board, sitting as the finder of fact, was charged with determining whether the Government met its burden of proving that Raytheon Company ("Raytheon") included unallowable lobbying and organizational-planning costs in its indirect cost rate proposals to the Government. The Board presided over a two-week evidentiary hearing that included the testimony of 30 witnesses and the introduction of more than 700 exhibits, then received and considered more than 560 pages of post-hearing briefing. Following all that, the Board issued a 115-page decision finding that the

Government failed to prove that Raytheon's indirect cost rate proposals, in fact, included any unallowable lobbying or organizational-planning costs.[1]

Substantial evidence readily supports the Board's findings. Based on extensive documentation and witness testimony that the Board deemed credible, the Board found that: (1) Raytheon's Government Relations Department was responsible for a wide range of functions, including lobbying, but *also* many allowable non-lobbying activities; (2) Raytheon's Corporate Development Department performed many functions, including planning and executing the organization or reorganization of the corporate structure, but *also* many allowable economic and market planning activities; and (3) Raytheon accurately recorded the time employees in those departments spent on lobbying and organizational planning, and excluded the associated unallowable costs from the indirect cost pools used to calculate Raytheon's indirect rates on Government contracts.

On appeal, the Government recasts its continuing disagreement with the Board's many *factual* findings—to which this Court accords great deference—as purported errors of *law* subject to plenary review. In declining to engage with the Board's factual findings, the Government effectively concedes that it cannot overcome the deference due to the finder of fact that presided over the hearing.

[1] The Government initially contended that certain other costs claimed by Raytheon and its division Raytheon Missile Systems were unallowable. Those costs were resolved by the Board and are not challenged by any party on appeal.

Further, the Government asserts legal interpretations that lack any support in this Court's jurisprudence or the Federal Acquisition Regulation ("FAR"). For instance, the Government takes the unprecedented position that a contractor's costs for entire departments are unallowable if those departments *sometimes* engage in activities that generate unallowable costs. The Government posits this, even where the contractor accurately records time spent on those activities, and the actual costs associated with those activities are never charged to the Government. The Government identifies no legal authority for such an extraordinary position, because there is none. Indeed, where the Government asserts a claim against a contractor for unallowable costs, the Government must prove that the contractor, in fact, sought reimbursement for such costs. It has not done so here.

## II. Statutory And Regulatory Background

Many of Raytheon's contracts with U.S. Government agencies, including the representative contracts relevant to this case, are cost-reimbursement type contracts under which the Government contractually agrees to pay Raytheon's allowable direct and indirect costs. *See* 48 C.F.R. § 52.216-7; Appx3–4. The costs at issue here are indirect costs, meaning that they were incurred to support normal business operations not directly associated with the performance of any specific contract. *See* 48 C.F.R. § 31.203(b). Indirect costs are typically allocated proportionately across a wide range of contracts and recovered through indirect rates. *Id.*; *see also id.*

§ 52.216-7(d). To determine indirect rates, contractors annually submit indirect cost rate proposals, providing a schedule of all claimed expenses. *Id.* § 52.216-7(d)(2).

Companies seeking reimbursement under a government contract must certify that "all indirect costs included in the[ir] proposal are allowable." 10 U.S.C. § 2324(h). To be allowable, a cost must be reasonable and allocable to the contract and comply with the Cost Accounting Standards ("CAS") (if applicable), the terms of the contract, and applicable FAR cost principles. *See* 48 C.F.R. § 31.201-2(a). FAR Part 31 governs the circumstances under which certain categories of costs are allowable or unallowable through numerous cost principles. *See id.* § 31.205-1 through § 31.205-52. There are several types of costs relevant to this appeal.

The first type consists of costs associated with lobbying and political activity. 48 C.F.R. § 31.205-22. Unallowable lobbying costs are those associated with "[a]ttempts to influence the outcomes of" elections, referenda, initiatives, or the introduction, enactment, or modification of legislation. *Id.* § 31.205-22(a). Conversely, lobbying costs associated with providing "technical [or] factual . . . information" related to the performance of a contract to members of Congress through, e.g., hearing testimony, statements, or letters are allowable if in response to a documented request.[2] *Id.* § 31.205-22(b). When contractors incur lobbying costs, they must "maintain adequate records to demonstrate" that those lobbying costs are

---

[2] Raytheon did not claim allowable lobbying costs under this provision. Appx37.

either "allowable or unallowable." *Id.* § 31.205-22(d). Importantly, however, nothing in the FAR makes unallowable, or extends this specific record-keeping requirement to, the costs associated with the performance of non-lobbying activities by persons who also perform lobbying activities. *See generally id.* § 31.000 *et seq*.

Another type of cost relevant to this appeal consists of "expenditures in connection with . . . planning or executing the organization or reorganization of a business, including mergers and acquisitions," which are unallowable. 48 C.F.R. § 31.205-27(a). Conversely, economic planning costs and market planning costs are allowable. *Id.* §§ 31.205-12, .205-38(b)(4). Economic planning is "general long-range management planning that is concerned with the future overall development of the contractor's business." *Id.* § 31.205-12. Market planning is "market research and analysis and general management planning concerned with development of the contractor's business." *Id.* § 31.205-38(b)(4). Nothing in the FAR makes unallowable the costs associated with the non-organizational-planning activities of persons who also perform organizational planning. *See generally id.* § 31.000 *et seq*.

Finally, a cost is unallowable if it is "directly associated" with an unallowable cost, meaning it "would not have been incurred" but for the unallowable cost. 48 C.F.R. § 31.201-6(a). The FAR generally requires that contractors maintain documentation "adequate" to substantiate the allowability of their claimed costs. *See*

*Id.* § 31.201-2(d). With respect to unallowable costs, CAS 405 requires contractors to "identif[y] and exclude[ ]" those costs from its claims. *Id.* § 9904.405-40(a).

## III. Raytheon's Government Relations Costs – 2007 & 2008

At all times relevant to this appeal, Raytheon maintained an office in Arlington, Virginia, housing its Government Relations Department. Appx14; Appx23628. That Department employed approximately 20–22 employees: 12–13 federal government relations specialists; two state and local government relations specialists; two Political Action Committee specialists; and several administrative specialists. Appx14.

### A. The Government Relations Department Performed A Range Of Functions, Including Non-Lobbying Activities.

While lobbying was "[o]ne of the duties" of Raytheon's Government Relations Department in 2007–08, the Department's primary function was "to represent Raytheon on Capitol Hill as well as the state legislatures and also [to] ensure that [its] internal customers, which are the Raytheon employees, kn[e]w of what's happening [in Congress] that could have some sort of an impact to them and the company."[3] Appx23630–23631; *see also* Appx26. The same was true for Raytheon's "Pentagon customer[s]": Government Relations employees would meet

[3] Notably, the Government's assertion that "the role of the [Government Relations] office is to attempt to influence legislation," Gov't Br. 8, is not consistent with the factual findings of the Board. *See*, *e.g.*, Appx26 ("Government Relations personnel engaged in some allowable non-lobbying activity.").

with internal Raytheon customers to "understand the status of executive branch business development efforts." Appx21892–21893. Government Relations employees consequently engaged in a substantial amount of allowable, non-lobbying activities, including performing their "key . . . function" of internal reporting. Appx23631. Specifically, Government Relations employees gathered Washington- and Pentagon-related information necessary to support Raytheon's business by attending hearings, monitoring other public-information sources, and analyzing and disseminating this information internally to the company's leadership. Appx26; Appx21892–21893; Appx23635. These information-gathering and reporting activities were not in preparation for and had nothing to do with "attempts to influence" elections, legislation, or the other activities made unallowable by FAR 31.205-22(a). Appx26; Appx21892–21893; Appx23635.

Government Relations employees also spent significant time analyzing already-enacted laws to inform Raytheon's decision-making. Appx26; Appx23635. Analyzing and reporting on new laws kept Raytheon current on customer needs and competitor activities, as well as any funding changes that might affect Raytheon's business. Appx21888–21889; Appx22913–22915. These also were not unallowable lobbying activities because "[o]nce legislation is enacted it . . . is no longer capable of being influenced." Appx23635 n.11.

Government Relations employees also performed other internal administrative functions, such as training and regulatory compliance activities, serving on company committees, attending staff meetings and human resources activities, and other administrative matters. Appx26; Appx23635. The costs associated with these activities are also allowable.

### B. Raytheon Identified And Excluded Unallowable Lobbying Costs From Its Claimed Government Relations Costs.

Raytheon devoted substantial resources to ensuring that it did not claim any costs associated with lobbying as defined by FAR 31.205-22. Specifically, to ensure that Raytheon's unallowable lobbying costs were "identified and excluded from" its indirect cost rate proposals consistent with CAS 405, 48 C.F.R. § 9904.405-40(a), multiple departments across Raytheon contributed to create a comprehensive system of internal controls, including written policies, guidelines, and compliance training. Appx15; Appx18–19. This began with Raytheon Policy 23-3045-110, Identifying and Reporting Lobbying Activity Costs ("Lobbying Policy"), developed and implemented by Government Accounting personnel with decades of compliance experience, who then trained Government Relations employees in conjunction with in-house and external counsel. Appx15; Appx18–19; Appx36; Appx23623. Government Relations employees then recorded all compensated time spent on lobbying activities pursuant to this Lobbying Policy. Appx15; Appx20. Finally, experienced accounting personnel identified and excluded (i.e., withdrew) the costs

associated with that time from Raytheon's indirect cost rate proposals. Appx19–22; Appx23623–23624. The Board found as a matter of fact that Government Relations employees were well-trained and consistently adhered to these compliance measures. Appx23–26; Appx36.

**1. Raytheon's Lobbying Policy Was Comprehensive.**

Raytheon's Lobbying Policy prescribed how Government Relations employees were required to log their time to comply with FAR 31.205-22. Appx15. All employees who spent more than 25% of their hours during the month on lobbying activities had to "maintain time logs, calendars, or similar records" documenting their time spent on lobbying activities. Appx17. Government Relations employees kept formal records of their time: in 2007, employees submitted paper time cards; beginning in 2008, Raytheon deployed digital timekeeping software (the "Lobbying Tool") to bolster compliance. Appx19–20.

The Lobbying Policy closely tracked FAR 31.205-22(a)'s definition of lobbying activities. Appx15; *see also*, *e.g.*, Appx23632. The Lobbying Policy also required any activities "directly associated" with lobbying to be documented as lobbying. Appx16.

**2. Government Relations Employees Fully Complied With The Lobbying Policy.**

Raytheon provided "an enormous amount of indoctrination training" to incoming members of the Government Relations team on "[c]ompliance related

matters" such as "what constitutes unallowable lobbying" and "how to report your unallowable lobbying time." Appx23633. Government Relations additionally held in-person and online training on lobbying compliance, led by in-house or external counsel, "at least once a year," which specifically addressed the definition of lobbying and Raytheon's recordkeeping policies. Appx18–19; Appx23633. Raytheon Government Accounting and corporate counsel also provided further guidance on FAR compliance. Appx18–19. The Board made a factual finding that Government Relations employees were "adequately trained in the FAR's lobbying reporting requirements." Appx36; *see also* Appx15–19.

Four members or alumni of the Government Relations Department—all of whom were in the Department during 2007–08—testified to their understanding of Raytheon's Lobbying Policy, the definition of "lobbying," and the distinction between unallowable and allowable costs. Appx23; Appx26; Appx23634. All testified to accurately and conscientiously applying those policies, with several additionally stating that they applied a "conservative bias" and would record an activity as lobbying if it was a close call. Appx23–26; Appx23634; Appx23636–23638. And all testified to using informal daily logs, Lotus notes calendars, Palm Calendar software, or archived emails to ensure they were accurately capturing and recording their lobbying activities each month. Appx23–26; Appx37; Appx23646–

23647. Importantly, the presiding Board judge, who personally observed their testimony, deemed all four witnesses to be "credible." Appx23–25.

#### 3. Raytheon Accurately Identified And Excluded Unallowable Lobbying Costs.

Consistent with CAS 405's requirement to identify and exclude unallowable costs, Government Relations employees recorded their time spent on lobbying activities, and then Raytheon withdrew the costs associated with that time from its indirect cost rate proposals. Appx17. Raytheon calculated its costs for salaried Government Relations employees "based upon a 40-hour work week"—i.e., using the hours paid, rather than the hours worked.[4] Appx20. This meant that Raytheon neither incurred nor claimed any incremental costs for work outside normal business hours. *Id.* (Board finding: "Raytheon maintains, and the government has not rebutted, that there was no cost to it or to the government for work outside normal business hours."). Because there was no cost to Raytheon for Government Relations employee time beyond the normal 40-hour work week, it instructed these employees not to record time spent on lobbying activities on weekends or on weekdays before 8:00 A.M. or after 5:00 P.M. *Id.*

To determine the amount of unallowable cost to be excluded from its indirect cost rate proposals, Raytheon calculated a withdrawal factor for each Government

---

[4] The Board found that Raytheon's "time-paid accounting" practice was "one common industry method" used by government contractors. Appx20.

Relations employee by dividing the total number of recorded unallowable hours (the numerator) by the total number of paid working hours in a year (the denominator), reduced as appropriate to account for mid-year employee arrivals or departures and further reduced on the conservative assumption that employees used all of their vacation time. Appx21; Appx23640. Thus, the withdrawal factor was a ratio that captured the proportion of salary costs associated with unallowable lobbying activities, relative to the total amount of salary costs incurred. Appx21. This calculation was subject to a series of quality controls, including collecting and reviewing all timesheets, confirming the accuracy of the list of employees for each year's withdrawal, further validation by Raytheon's Corporate Administration & Services Finance Manager, and supervisory oversight. Appx22; Appx23638.

Notably, several years earlier, the Defense Contract Audit Agency ("DCAA") audited the Government Relations Department's costs claimed for 2004, specifically considered Raytheon's time-paid method to calculate the withdrawal factor, and did not question any costs based on those practices. Appx23643.

### C. DCAA Pursued A "Strategy" To Question All Government Relations Department Costs As Expressly Unallowable.

DCAA audited the Government Relations Department for costs claimed in each of 2007 and 2008. Appx22–23; Appx27–31. The initial audit of 2007 Government Relations costs, which took place in 2008–09, proceeded much like prior-year audits, including the 2004 audit that did not question either Raytheon's

time-paid accounting or withdrawal factor calculation. *See* Appx23643–23644. DCAA interviewed Government Relations employees concerning their work activities and, in its draft report, questioned some (but not all) costs associated with four specific employees because these employees allegedly were not capturing time spent *preparing for* lobbying. Appx22–23; Appx22506–22507. As the DCAA auditor who prepared the draft report testified, however, every Government Relations employee she interviewed had classified "preparation for lobbying" time as lobbying, and nothing actually caused concern that these employees failed to record such time. Appx27–29; Appx22519. Notably, DCAA did not request, collect, or review the documentation supporting the recorded work activities—e.g., daily logs, desk calendars, Palm software calendars, and Lotus notes—at a time when those documents were available. Appx29–30; Appx23646–23647.

In 2010, a separate branch of DCAA interested in "sell[ing] its services internally to DCAA" was brought in to re-audit Raytheon's 2007 Government Relations costs, with a new "plan" and "strategy" to "question the entire lobbying cost center." Appx27–28; Appx12756; Appx22537–22538; *see also* Appx12867 (DCAA "deci[ded] to question 100% of [the] cost center"). Follow-up interviews of Government Relations employees by the new DCAA auditors confirmed that the employees accurately recorded time spent on lobbying activities. Appx28–29. The auditors likewise found no evidence that employees did not properly track their

lobbying preparation activities. *Id.* DCAA's final audit report nevertheless questioned 100% of the Government Relations Department's costs as purportedly inadequately documented to show the costs' allowability or unallowability. Appx27–28; Appx23648–23649. Specifically, DCAA contended that employees should have recorded as unallowable their time spent learning about Raytheon's products and services—which DCAA deemed "pre-lobbying activities"—and time related to general office administration—which DCAA deemed to be related to lobbying.[5] Appx21133–21134; Appx21140.

DCAA's audit of the Government Relations Department's 2008 costs followed materially the same "plan" as the re-audit of 2007 and, with minor exceptions, questioned virtually the entire cost center as expressly unallowable. Appx23653.

---

[5] The costs at issue here—for a wide range of non-lobbying activities—are distinct from the lobbying costs at issue in *Raytheon Co. v. Sec'y of Def.*, 940 F.3d 1310, 1314 (Fed. Cir. 2019) ("*Raytheon II*"). There, this Court held that salary costs associated with conceded lobbying activities are expressly unallowable because FAR 31.205-22 makes "cost associated with" certain specific lobbying activities unallowable. *See* 940 F.3d at 1313. The Court made clear, however, that "the entire salary of inhouse lobbyists" is not *per se* unallowable, "only the portion attributable to lobbying." *Id.* at 1314. This appeal, in contrast, concerns different activities—e.g., internal reporting, information gathering and analysis, and general office administration—that neither constitute lobbying costs as defined under FAR 31.205-22 nor are directly associated with lobbying (i.e., that are not performed but for the lobbying activities).

## IV. Raytheon's Corporate Development Costs – 2007 & 2008

At all times relevant to this appeal, Raytheon's Corporate Development Department was housed at Raytheon's Corporate Headquarters in Waltham, Massachusetts. Appx23654. Corporate Development had roughly seven to eight employees, including one to two administrators and six employees who worked primarily on strategic business planning, as well as activities related to divestitures, mergers, and acquisitions. *Id.* Corporate Development employees engaged in a wide array of strategic planning activities, some of which constituted economic and market planning (allowable cost activity) and some of which constituted planning or executing the organization of the corporate structure (unallowable cost activity). *See* Appx49; Appx23768.

### A. The Corporate Development Department Performed Many Functions, Including Economic And Market Planning Activities.

According to the factual findings of the Board, Corporate Development was "responsible for working with [Raytheon's] business units in strategic development and growth opportunities." Appx40 (quoting *Raytheon Co.*, ASBCA No. 57743, 17-1 BCA ¶ 36724, at 178,839 (Apr. 17, 2017) ("*Raytheon I*"), *aff'd on other grounds*, *Raytheon Co. v. Sec'y of Def.*, 940 F.3d 1310 (Fed. Cir. 2019) ("*Raytheon II*")). As the same presiding Board judge found in *Raytheon I*, "'[w]orking with Raytheon's businesses on M&A and divestitures was not Corporate Development's primary role but was part of its work to find strategic growth initiatives.'" Appx40–41 (quoting

*Raytheon I*, at 178,840). The Board found that the evidence in the instant case "was to the same effect." Appx41.

For example, Corporate Development regularly performed gap analyses in conjunction with Raytheon business units, which involved assessing Raytheon's current capabilities against future customer requirements and identifying solutions to bridge any gaps. Appx40–41; Appx23656. Where a "gap" was identified, Corporate Development had "a number of tools in [its] tool box" to fill that gap—e.g., "build" (independent research and development), "buy" (acquisition), "team" (teaming agreement), or "license" (intellectual property). Appx23656. The preferred "tools" were independent research and development, wherever feasible, followed by teaming partnerships or licensing agreements. Appx40–41; Appx23656. "Buy" (acquisition) was not a preferred "tool," and was typically considered only as a last resort. Appx23656. This analytical process was dynamic and "cycle[d] through" various options such that the outcome was rarely predictable from the outset. Appx40–41; Appx23656–23657.

If, during the course of its regular strategic reviews, Corporate Development identified an underperforming business or product line, Corporate Development would conduct further analysis with the primary goal of increasing capabilities to address the underperformance. Appx23657–23658. In these cases, Corporate Development treated eventual divestiture as a possible last resort. *Id.* Once again,

this process was not static, but could morph into various scenarios in which Raytheon might pursue alternative internal or partnership solutions. Appx23658.

Four current or former Corporate Development employees testified at the hearing. Appx43–44. Based on testimony the Board found credible, along with other record evidence, the Board made a factual finding that Corporate Development did not undertake any acquisition or divestiture "planning" until receiving direction from Raytheon's Acquisition Council, a group comprised of senior Raytheon leadership. Appx41–42; Appx23658. Although Corporate Development prepared proposals for the Acquisition Council, "Raytheon declared its intentions regarding potential acquisitions and divestitures through the Acquisition Council." Appx41; Appx23658. Specifically, the Acquisition Council assented to an acquisition proposal by approving the submission of a non-binding indicative offer, and it committed Raytheon to a divestiture proposal by approving that Raytheon go to market with offering materials. Appx41; Appx23658. Before the Acquisition Council approved an acquisition or divestiture, however, Corporate Development employees did not know whether there even would be a transaction to plan, as Raytheon could always change course based on updated information. Appx41–43; Appx23658. Accordingly, it was the Acquisition Council's decision that shifted Corporate Development's focus away from its more exploratory work and toward planning a specific organizational outcome. *See* Appx41.

### B. Raytheon Developed And Implemented A "Bright Line" Policy For Recording Corporate Development Planning Activities.

The FAR does not clearly distinguish between unallowable organizational costs and allowable economic and market planning costs. *See Raytheon I*, at 178,851–52 (recognizing the distinction is "unclear" and without "a defined line"). Years before incurring the costs at issue here, Raytheon convened a cross-functional team of experienced Government Accounting, Corporate Development, and Legal personnel to create clear and practical guidelines for its Corporate Development employees so that unallowable organization costs would be excluded from the Company's indirect cost rate proposals. Appx23659–23660. The result was the "bright line" "Corporate Development policy": "[u]nallowable acquisition costs commence with the submission of an indicative offer," and "[u]nallowable divestiture costs commence when the decision to 'go to market' with the offering materials is made." Appx23660; *see also* Appx43. For both bright line rules, the triggering event was Raytheon's decision, through the Acquisition Council, to pursue an acquisition or divestiture.[6] Appx41. Raytheon settled upon these rules as "the best match to the cost principles of the FAR" and a practical implementation of a complex regulatory framework. Appx23659–23660; *see also* Appx43.

---

[6] When, after that "bright line" was crossed, Raytheon determined to abandon the acquisition or divestiture path in favor of another option (as did happen), Raytheon still withdrew those post-threshold costs from its indirect cost rate proposals as unallowable, unconsummated organizational activities. Appx43.

Raytheon rigorously trained its Corporate Development employees on how to apply its bright line policy. Appx23661. Corporate Government Accounting provided "indoctrination training" to incoming Corporate Development hires on the policy and also periodically provided additional training. *Id.* As a result, Corporate Development employees had a "very clear" understanding of the policy and experienced no confusion over its application. *Id.*

The Board found that Corporate Development employees faithfully implemented the bright line policy. Again, the presiding Board judge, who personally observed the hearing testimony, made a specific factual finding that all four testifying Corporate Development employees understood the policy, applied it consistently, and recorded all unallowable time accordingly. Appx41; *see also* Appx23662 (any deviation was in favor of "over logg[ing]" time as organization activities). The Board found no evidence that any Corporate Development employee failed to record time spent on activities on the "unallowable," organization side of Raytheon's "bright line" policy. And, like Raytheon's Government Relations employees, Corporate Development employees recorded their time spent on organization activities after consulting various contemporaneous records such as calendars, meeting notes, meeting invitations, email archives, call logs, project notebooks, and project files. Appx43–44; Appx23662–23663. The DCAA auditors

never requested these records during their audits of 2007 and 2008 costs, but nevertheless questioned 100% of the costs. Appx23646–23647; Appx23653.

### C. Raytheon Accurately Identified And Excluded Unallowable Organization Costs.

To properly identify and exclude unallowable organization costs from its indirect cost rate proposals, Raytheon used a similar time-paid method with regard to its unallowable Corporate Development costs as with its unallowable Government Relations costs.[7] *See* Appx43; Appx23664–23665. Specifically, experienced accounting personnel multiplied the hourly rates of each Corporate Development employee, as calculated based on the paid 40-hour workweek, by the number of organizational-planning hours that each employee reported, and then deducted that total from Raytheon's indirect cost rate proposals. Appx43; Appx23664–23665. The Board found no evidence that Raytheon incorrectly made these calculations or failed to make these deductions for any claimed Corporate Development costs.

### D. DCAA Questioned 100% Of Raytheon's Corporate Development Department Costs For 2007 And 2008.

In a "significant departure" from prior audits, DCAA's audit of the 2007 Corporate Development Department costs questioned all $903,817 in costs incurred by the Department as allegedly unallowable organization costs. Appx45. There is

---

[7] There was a slight difference in the "withdrawal factor" calculation, but this difference was audited by DCAA in 2006 and deemed immaterial. Appx23664.

only sparse evidence about this audit and DCAA's abandonment of its prior practice, as the Government declined to call as witnesses either of the two auditors who performed the audit, even though one of them was still a DCAA employee at the time of the hearing. Appx23666.

DCAA's 2008 audit was conducted by a different auditor, who "continue[d] to question 100% of" Corporate Development's costs on the asserted ground that their activities are "predominantly unallowable." Appx47. Disregarding the contemporaneous records, that auditor interviewed six Corporate Development employees in 2014, asking them "the percentage of their time spent on A&D [acquisition and divestiture] activities or non-A&D activities" during 2008. *Id.* The auditor, however, "did not define to the interviewees what he meant by 'A&D activities,'" nor did he "know whether they interpreted it to mean all A&D activities or just those that occurred after the 'bright lines' had been crossed." *Id.* Importantly, the auditor concluded that Raytheon's practices, policies, and procedures "were consistent," but recommended questioning all salary costs on the grounds that Raytheon's bright line rule was an impermissible interpretation of the FAR. Appx47–48; Appx23667.

## V. Proceedings Before The Board

The Defense Contract Management Agency corporate administrative contracting officer issued final decisions regarding Raytheon's 2007 and 2008

Government Relations and Corporate Development costs in 2014 and 2015, respectively. Appx3–5. Raytheon timely appealed to the Board, which held a two-week evidentiary hearing in 2017. Appx1; Appx23615. The Board presided over a voluminous record at the hearing, including over 700 exhibits and testimony from 30 witnesses. Appx23615; Appx24232. After the hearing, Raytheon and the Government submitted over 560 pages of post-hearing briefing. Appx2; Appx24234. The Board published its decision in February 2021, in relevant part sustaining Raytheon's appeals. Appx38; Appx52; Appx115. In reaching its decision, the Board made over 200 of its own findings of fact, 55 concerning the Government Relations costs and 30 on the Corporate Development costs. *See* Appx14; Appx32; Appx38; Appx47; Appx111.

With respect to Raytheon's Government Relations Department, the Board found that the Government failed to prove that Raytheon claimed any lobbying costs. Appx38. Based on extensive documentation and witness testimony that the Board found credible, the Board found that Government Relations employees accurately and contemporaneously documented time spent on lobbying activities, and that Raytheon properly used a FAR-compliant, time-paid accounting method to identify and exclude the unallowable costs for all recorded lobbying time spent by those employees. Appx36–38. Because Government Relations employees "are paid based upon a 40-hour work week," the Board found that "there was no cost to [Raytheon]

or to the government for work outside normal business hours." Appx20. For this latter finding, the Board credited Raytheon's extensive evidence, noting "[t]he government did not introduce testimony on this point." Appx20 & n.12.

With respect to Raytheon's Corporate Development Department, the Board likewise found that the Government failed to prove that Raytheon claimed any organizational-planning costs. Appx52. Again based on extensive documentation and witness testimony that the Board found credible, the Board found that Corporate Development employees accurately recorded time spent on planning or executing the organization of the corporate structure, in compliance with Raytheon's bright line policy. Appx43–44; Appx52. The "key issue," as the Board recognized, was whether Raytheon's bright line policy reflected a reasonable implementation of the FAR's distinction between allowable economic and market planning costs and unallowable organization costs. Appx50. The Board ruled that the Corporate Development Policy was reasonable, in part because a learned treatise and the Board itself had endorsed those same bright line distinctions. Appx50–51.

The Government subsequently moved for reconsideration, which the Board denied. Appx118. The Board concluded, "[i]t is . . . fully apparent that, after a two-week evidentiary hearing and extensive briefing, [the Government] is attempting to retry the appeals" by "repeat[ing] or elaborat[ing] upon proposed facts and arguments it raised in its post-hearing briefing." Appx118.

This appeal followed.

## SUMMARY OF THE ARGUMENT

Raytheon devotes enormous resources to compliance with the FAR and is committed to being an industry-leading partner of the Government in delivery and cost performance. The Board found that the Government failed to prove that Raytheon sought reimbursement for any unallowable costs. Because there was no error—much less clear error—in the Board's findings, the decision of the Board should be affirmed.

The central question in this case is whether Raytheon claimed any unallowable costs for its Government Relations and Corporate Development departments. That is a factual question informed by the Board's meticulous, in-person consideration of the witness testimony and exhibits and thus appropriately subject to deferential, clear-error review by this Court. *See Sec'y of Def. v. Northrop Grumman Corp.*, 942 F.3d 1134, 1141 (Fed. Cir. 2019). The Government incorrectly assumes, with no explanation, that *de novo* review applies and makes no attempt to satisfy the proper standard of review. Regardless, the Board neither erred nor clearly erred.

With respect to the **Government Relations Department**, the Board properly found that Raytheon employees accurately recorded their time spent on lobbying activities, and that Raytheon identified and excluded the unallowable costs

associated with those lobbying activities. Appx35–37. These findings were based on a strong factual record presented by Raytheon and not rebutted by the Government, including determinations of witness credibility that are "virtually unassailable" on appeal. *Charles G. Williams Constr., Inc. v. White*, 326 F.3d 1376, 1381 (Fed. Cir. 2003). Unable to mount any serious factual challenge, the Government instead seeks to manufacture a legal question regarding the sufficiency of Raytheon's recordkeeping for indirect *non-lobbying* costs. But this purported legal question itself rests upon the Government's misinterpretation of the FAR and the CAS and, correctly viewed, no such question of law exists.

The Board also properly found that Raytheon accurately withdrew costs associated with time spent on lobbying activities. Appx20; Appx36–37. The Government identifies no contrary evidence in its brief, having introduced no evidence at the hearing on this point. *See* Appx20 & n.12. Rather than engage with the record, the Government offers unsupported speculation that the withdrawal factor is understated because it does not reflect activities outside of the compensated, 40-hour work week. But the Board found as a matter of fact that "[t]here was no cost to Raytheon or the government for work outside normal business hours." Appx36. Raytheon's method of calculating its lobbying withdrawal factor based on the proportion of compensated time spent on lobbying is permissible under the FAR and CAS, and indeed it was required by the CAS because that was Raytheon's

disclosed cost accounting practice. *See* Appx20; Appx36–37; 48 C.F.R. § 9904.401-40(a); *id.* § 52.230-2(a)(1)–(2). The Government had the burden of proving that Raytheon claimed unallowable costs. Appx34–35. Without evidence that there was increased cost from employee time outside normal working hours, the Government's claim fails.

Likewise, with respect to the **Corporate Development Department**, the Board properly found that employees performed a broad range of functions, many of which pertained to economic or market planning (allowable costs), *see* 48 C.F.R. §§ 31.205-12, .205-38(b)(4), as opposed to "planning or executing the organization or reorganization of the corporate structure of a business" (unallowable costs), *id.* § 31.205-27(a). To navigate the FAR's complex regulatory framework, Raytheon adopted a bright line policy under which unallowable organizational costs begin when Raytheon decides to move forward with a specific acquisition or divestiture. The Board correctly held that this policy "represents a reasonable reading of" the applicable FAR cost principles, Appx51, which the Board and at least one learned treatise have previously endorsed, *see Raytheon I*, at 178,852.

The Government identifies no instance in which Raytheon claimed organizational-planning activities that occurred after the triggering event in its bright line policy. Instead, the Government tries to sweep "all A&D costs . . . at any stage" into the "unallowable" bucket. Gov't Br. 48. But that construction blurs the material

distinction between "planning" for specific, identified corporate transactions and other "planning" activities. The Government's overbroad view of "A&D costs" fails to acknowledge that, until there is a decision to pursue a specific acquisition or divestiture, Raytheon engages in a wide array of economic and market planning activities for which the associated costs are expressly allowable.

## ARGUMENT

The Government all but asks this Court to ignore that this appeal challenges detailed factual findings that followed an extensive evidentiary hearing. The Board, sitting as the finder of fact, was charged with determining whether the Government met its burden of proving that Raytheon claimed unallowable costs in its indirect cost rate proposals. After years of litigation culminating in a two-week evidentiary hearing, at which 30 witnesses testified and over 700 exhibits were introduced, followed by hundreds of pages of post-hearing briefing, the Board issued a 115-page decision with more than 230 findings of fact, 85 relating to the issues on appeal, and found that the Government failed to meet its burden of proof. This decision, based on credibility assessments and weighing of all the evidence, was a paradigmatic exercise of the Board's fact-finding function. *See Deloach v. Shinseki*, 704 F.3d 1370, 1380 (Fed. Cir. 2013).

Now, the Government comes to this Court for a do-over, asking the Court to reweigh *de novo* the extensive evidence before the Board. That is the wrong standard

of review. The Board's ultimate finding that no unallowable costs were actually submitted to the Government is reviewed for clear error. *Northrop Grumman*, 942 F.3d at 1141. But the Government does not even try to satisfy a clear-error standard. Instead, it ignores key factual findings by the Board and rehashes evidence that the Board already expressly considered and rejected without addressing why the Board rejected that evidence. Based on the robust factual record established by Raytheon and not contradicted by the Government at the hearing, the Board made no error—much less clear error—in finding that the Government failed to prove its case.

If adopted by this Court, the Government's position in this appeal would impose new, burdensome time-tracking and recordkeeping requirements, with no advance notice and without regulatory support. Specifically, the Government asks this Court to (1) require contractor employees to record all time spent on all activities to support the allowability of indirect costs, Gov't Br. 36–39, 46, 52–55; and (2) proscribe a practice for measuring the cost of a salaried employee's time—time-paid accounting—where neither the FAR nor the CAS prohibit it, Appx20; Appx36; *see* Gov't Br. 44–45. These positions are unsupported by any basis in law or fact.

The decision of the Board should be affirmed.

## I. The Government Applies The Wrong Standard Of Review.

Although the Government correctly notes that this Court reviews questions of law—including interpretation of the FAR—*de novo*, the Government omits that

legal interpretations by the Board, while not binding on this Court, employ an expertise that renders them worthy of this Court's "careful consideration and great respect." *Raytheon Co. v. United States*, 747 F.3d 1341, 1352 (Fed. Cir. 2014). The Government also curiously omits that the Board's factual findings are "final and conclusive" absent clear error. 41 U.S.C. § 7107(b)(2). Accordingly, factual findings may not be disturbed except where, as relevant, they are "not supported by substantial evidence." *Id.* § 7107(b)(2)(C). "[S]ubstantial evidence" requires only that the factual finding be grounded in "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion." *Rumsfeld v. Freedom N.Y., Inc.*, 329 F.3d 1320, 1327 (Fed. Cir. 2003) (citation omitted).

Against the void left by its failure to address these deferential standards of review, the Government incorrectly frames the Board's decisions on the Government Relations and Corporate Development costs as questions of law subject to *de novo* review. *See* Gov't Br. 31 ("Interpretation of the FAR, and application of its provisions to the facts of the case, are questions of law to which the Court owes the board no deference."). This Court should reject that framing. The key issue before this Court is whether the Board committed clear error in finding that the Government failed to satisfy its burden to prove that unallowable Government Relations and Corporate Development costs were claimed in 2007 and 2008. Subsidiary issues, such as whether Raytheon's timekeeping practices and bright line

policy complied with the FAR, are questions of law reviewed *de novo*. However, the Board's finding that the policies and practices at issue did not actually cause Raytheon to claim any unallowable costs, Appx20, Appx51–52, is a factual finding subject to clear-error review. *See Northrop Grumman*, 942 F.3d at 1141.

This Court has rejected prior attempts by the Government to "frame [its] challenge to the Board's decision as disputing the Board's legal interpretation and application of [FAR provisions on costs] to undisputed facts." *Northrop Grumman*, 942 F.3d at 1141. There, the Court explained that the relevant dispute was not whether a particular accounting method violated the FAR or whether certain "costs are unallowable," but rather that the Government "disputes the Board's *factual* findings that those unallowable costs were not charged to the government." *Id.*; *see also id.* at 1140 ("Resolution of this appeal turns on whether substantial evidence supports the Board's finding that . . . [certain unallowable] costs were never and will never be charged to the government."). So too here. Because the core issue is "the Board's finding that . . . [certain unallowable] costs were never . . . charged to the government," the Board's decision is reviewed for clear error. *Id.* at 1140.

The clear-error standard is appropriate for reviewing the Board's finding that the Government failed to carry its burden of proof. This is because, ultimately, that question turns solely on how the Board evaluated and weighed the evidence before it, including witness credibility. It is well established that "the evaluation and

weighing of evidence," including the credibility of witnesses, "are factual determinations committed to the discretion of the factfinder." *Deloach*, 704 F.3d at 1380 (citing *Bastien v. Shinseki*, 599 F.3d 1301, 1306 (Fed. Cir. 2010)); *J.C. Equip. Corp. v. England*, 360 F.3d 1311, 1315 (Fed. Cir. 2004) ("'The fact-finder has broad discretion in determining credibility because he saw the witnesses and heard the testimony.'") (citation omitted).

The two cases on which the Government relies for its assertion of a *de novo* standard are readily distinguishable. In *Parsons*, *de novo* review was appropriate because the relevant issue was a jurisdictional question of statutory interpretation. *See Parsons Glob. Servs., Inc. ex rel. Odell Int'l, Inc. v. McHugh*, 677 F.3d 1166, 1170 (Fed. Cir. 2012) ("[W]e review the Board's determination of jurisdiction under the CDA and its interpretation of the applicable FAR provisions de novo."). Here, any issues regarding interpretation of the FAR are subsidiary to and distinct from the ultimate issue of whether the Board properly found that the Government failed to satisfy its burden of proof. Similarly, while *Crowley* reviewed *de novo* whether the lower court's articulation of a factors test was consistent with past precedent, *see Crowley v. United States*, 398 F.3d 1329, 1333 (Fed. Cir. 2005), that legal issue is analogous here only to whether the Board erred in interpreting certain FAR provisions. *Crowley* has no bearing on the ultimate factual question of whether the Government proved that Raytheon claimed unallowable costs.

It should not escape this Court's notice that the Government makes no attempt to satisfy the clear-error standard of review. But even under a *de novo* standard of review, the Government's challenges still would fail. The Board not only avoided clear error; its decision was correct.

## II. The Board Did Not Clearly Err In Finding That Raytheon Did Not Claim Any Lobbying Costs.

The Government first challenges the Board's finding that the Government did not prove that Raytheon sought reimbursement for the cost of any time spent by its Government Relations employees on lobbying activities. This challenge is remarkable in that the Government failed to present any evidence below that Raytheon, in fact, claimed any unallowable costs for those employees. Before the Board, the Government instead tried to "shift[ ] the burden to Raytheon" to prove that the claimed costs were allowable. Appx23403 (Gov't Post-Hearing Br.). But as the Board correctly ruled, the Government cannot "shift[ ] the burden of proof" to Raytheon. Appx34–35; *see*, *e.g.*, *Eaton Corp.*, ASBCA No. 34355, 93-2 BCA ¶ 25,743, at 128,096 (May 6, 1993) (the Government bears the "burdens of proof and persuasion" on its own claims), *aff'd sub nom. Aspin v. Eaton Corp.*, 26 F.3d 140 (Fed. Cir. 1994); *see also Raytheon II*, 940 F.3d at 1311 ("The government bears the burden of proving that costs are expressly unallowable . . . ."). The Government does not dispute this ruling "in [its] opening brief" and thus has waived any burden-

shifting argument. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006); *see also* Gov't Br. 46.

As a result of the Government's decision not to offer evidence on the allowability of Raytheon's claimed costs, the Board faced a one-sided record of testimony and documentary evidence, and on that basis concluded that Raytheon employees accurately recorded time spent on lobbying activities, that Raytheon properly removed all costs associated with such time, and hence that the Government failed to prove that Raytheon submitted any unallowable costs. Appx36–38. This ruling was not clear error. Indeed, on this record, it is clearly correct.

### A. The Board Did Not Clearly Err In Finding That Raytheon Accurately Recorded Time Spent On Lobbying Activities.

After considering Raytheon's contemporaneous time records, as well as the firsthand testimony of four credible witnesses who were in the Government Relations Department during 2007–08, the Board found that Raytheon accurately documented all compensated time spent on lobbying activities. Appx36–37. Rather than pointing to contrary record evidence (it does not exist), the Government repeatedly asserts that Raytheon's records "do not establish" the allowability of its costs. Gov't Br. 38 (capitalization altered; emphasis omitted); *see also*, *e.g.*, Gov't Br. 35, 39–40, 46–47. But it is the Government that must demonstrate that Raytheon actually claimed unallowable costs. *See Raytheon II*, 940 F.3d at 1311; *Eaton*, at 128,096; *see also* Gov't Br. 53 (acknowledging "the Government bears the burden

of proof"). The Government's challenges to the Board's findings ignore its own burden, misconstrue regulatory provisions, and amount to disputes of factual findings on which the Board did not clearly err.

### 1. There Is Substantial Evidence That Raytheon's Records Were Accurate.

Substantial evidence supports the Board's finding that Raytheon's timesheets were accurate, including the timekeeping records themselves, as well as credible, corroborating testimony from four Government Relations employees. In fact, the Board's credibility determinations—which are virtually unassailable on appeal—infuse *all* of its factual findings regarding the accuracy of Raytheon's records. The Government identifies no contrary evidence.

To begin with, the Government distorts the record by repeatedly calling the Government Relations Department a "lobbying" department whose sole purpose was "to attempt to influence legislation." *See*, *e.g.*, Gov't Br. 2, 5, 8, 11, 35, 38, 43. The Board made a factual finding that Government Relations employees performed a wide range of activities *other than* lobbying. Appx26. For example, they worked to keep Raytheon well apprised of the Government's needs by attending legislative hearings, monitoring other public sources of information, and introducing Raytheon's business leaders to congressional members at courtesy constituent meetings. *Id.*; *see also* Appx23635. According to the FAR, those are all non-lobbying activities. *See* 48 C.F.R. § 31.205-22(a). Government Relations

employees also performed other non-lobbying activities, such as analyzing newly enacted laws to inform senior leadership of their possible impact on Raytheon, as well as training, administrative, and other related functions that played a significant role in the office's internal function. Appx26; *see also* Appx23635. The Government ignores the Board's factual findings of non-lobbying activities by the Government Relations Department. This Court cannot.

The Government's disregard of the Board's factual findings regarding non-lobbying activities, and its assumption that *all* costs for employees who perform *any* lobbying activities constitute unallowable lobbying costs, further cannot be reconciled with *Raytheon II*. Despite the Government's reliance on that case, *see* Gov't Br. 34–35, this Court squarely recognized in *Raytheon II* that "the entire salary of inhouse lobbyists" is not unallowable—"only the portion attributable to lobbying" is unallowable. 940 F.3d at 1314; *cf.* Gov't Br. 6 (misstating that "salaries of in-house lobbyists are expressly unallowable"). Because the activities at issue in *Raytheon II* were concededly lobbying activities, this Court held that "salary costs for [those] lobbying activities are expressly unallowable under FAR § 31.205-22." 940 F.3d at 1314. This case, in contrast, involves costs associated with the non-lobbying activities of the same Department. The *Raytheon II* holding regarding expressly unallowable costs associated with undisputed lobbying activities does not apply to any of the activities, and therefore any of the costs, at issue here.

As the Board further found, Government Relations employees' timesheets and Lobbying Tool entries accurately and comprehensively recorded compensated time spent on lobbying activities, and those records were "corroborated by the credible hearing testimony of current and former members of Government Relations." Appx35–36. The Board found that the four testifying Government Relations employees all possessed an accurate, nuanced, and statutorily-informed understanding of the distinction between lobbying and non-lobbying activities. Appx24–26. And it found the employees credible in testifying that they consistently and accurately recorded their lobbying hours with the help of contemporaneous media such as daily logs, desk calendars, Palm software calendars, and emails. Appx23–26; Appx37; *see also* Appx52 n.25 ("We do not disclaim the value of diaries, calendars, log books, Lotus Notes, etc. as time keeping records.").

The Board considered the possibility of countervailing evidence that the timesheets or Lobbying Tool entries were incomplete or unreliable, but found none. Specifically, the Board considered the testimony of a DCAA auditor who worked on the 2007 Government Relations audit and found her credible when she testified that she had no reason to think that Government Relations employees did not record lobbying costs. Appx28–29. The Board also considered whether non-testifying employees were ignorant of their reporting obligations or failed to discharge them competently, but found no such evidence. *See* Appx23–26.

All of the above factual findings turn on credibility determinations grounded in the Board's own firsthand view of the witnesses as they testified. As a result, those credibility determinations are "virtually unassailable" on appeal. *Charles G. Williams*, 326 F.3d at 1381; *J.C. Equip.*, 360 F.3d at 1315 ("The Board's [d]eterminations of witness credibility are virtually unreviewable.") (alteration in original; citation omitted).

The Government identifies no evidence to undermine the Board's credibility determinations, nor any evidence contradicting the Board's finding that Government Relations employees accurately recorded time spent on lobbying activities. *See* Gov't Br. 38–39. Rather, the Government speculates that the employees' non-lobbying activities might be "directly associated" with lobbying and hence generate unallowable costs. *See* Gov't Br. 35 (quoting 48 C.F.R. § 31.201-6(a)).

The Government failed to introduce *any* evidence, however, that the costs for employees' non-lobbying activities "would not have been incurred" but for unallowable lobbying costs—as is required to establish direct association. 48 C.F.R. § 31.201-6(a). Indeed, based on credible, unrefuted testimony, the Board found as a matter of fact that these non-lobbying activities had "nothing to do with trying to influence legislation." Appx26. Regardless of any lobbying activities, Raytheon would have gathered information, or analyzed and reported on new laws, so that it could be informed on customer needs, competitor activities, and funding changes

that might affect its operations. *See id.*; Appx21888–21889; Appx22914–22915; Appx23213–23214. Moreover, to the extent an activity constituted "preparing to influence" legislation or elections, or even had a "mixed purpose," employees consistently erred on the side of caution and counted it as lobbying. Appx24; Appx26. The Board specifically found that Government Relations employees applied a conservative bias so that close cases would be recorded as lobbying. Appx26; Appx23634.

The Government has no evidence to counter these factual findings, and simply asserting *ipse dixit* that all non-lobbying activities must be associated with lobbying is insufficient. *See* Gov't Br. 35–36. On this record, the Board's factual finding that Raytheon Government Relations employees accurately allocated their time as between non-lobbying and lobbying activities was not error, much less clear error.

#### 2. The Government's Challenges To The Adequacy Of Raytheon's Records Fail.

Unable to identify any evidence that Raytheon's records were inaccurate, the Government argues those records are "inadequate under the regulations" because Raytheon did not "keep records of any allowable activities." Gov't Br. 38–39. It is relevant in this respect that in the years immediately preceding this litigation, the Government found that Raytheon's recordkeeping system met its highest rating. *See Raytheon I*, at 178,829 ("In its 27 April 2006 audit report, DCAA [said] Raytheon's accounting system and related internal controls were 'adequate for accumulating,

reporting and billing costs on Government contracts,' which was DCAA's highest rating."). But even more important is that the Government is asking this Court to impose a *new* requirement to prove the negative: that contractors must "maintain adequate records to demonstrate that [they are] not charging the Government for . . . unallowable activities." Gov't Br. 31. Not only does this seek to circumvent the applicable burden of proof, the Government's argument conflates and misconstrues the obligations of contractors set forth in the FAR and the CAS, specifically in (i) FAR 31.205-22(d); (ii) FAR 31.201-2(d); and (iii) CAS 405-50.

*First*, FAR 31.205-22(d) does not apply to the *non-lobbying* costs that are at issue in this appeal. FAR 31.205-22(d) requires that contractors document "allowable or unallowable" costs for lobbying or political activities claimed as indirect costs "pursuant to this subsection." 48 C.F.R. § 31.205-22(d). FAR 31.205-22(a) defines political and lobbying activities for which the associated costs are unallowable; FAR 31.205-22(b) then describes "activities [that] are excepted from the coverage of (a) of this section"—but in both instances the costs in question are associated with lobbying or political activities. *See* 48 C.F.R. § 31.205-22(a)–(b). These provisions are irrelevant to this case because the Board found that Raytheon did not claim any costs associated with allowable lobbying activities. Appx37.

As this Court already has recognized, nothing in FAR 31.205-22 speaks to the recordkeeping requirements for non-lobbying activities. *See Raytheon II*, 940 F.3d

at 1314 (noting the provision relates to "records documenting . . . an employee's time . . . [*when*] *the employee engages in lobbying*") (alterations in original; citation omitted; emphasis added). Accordingly, FAR 31.205-22(d) does not dictate how Raytheon was supposed to document the activities at issue here—e.g., information-gathering and analysis, internal reporting, or general office administration—which were all found by the Board to constitute *non-lobbying* activities.[8] *See* Appx20; Appx26; Appx37–38.

*Second*, the Government claims that FAR 31.201-2(d)'s general record-keeping provision instructing contractors to maintain adequate records to support claimed costs means that a cost without documentation is "never an allowable cost" and that "adequate supporting documentation is always required." Gov't Br. 29, 36. FAR 31.201-2(d), however, does not stand for this proposition. Rather, it provides:

> A contractor is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles in this subpart

[8] Even if FAR 31.205-22(d) were applicable, and it is not, the Government's interpretation still would fail. Although the Government stresses the history of FAR 31.205-22(d), *see* Gov't Br. 37, it does not acknowledge that this provision was "intentionally" adopted to make the recordkeeping requirements "less onerous," and thus "d[id] not call for separate establishment of the lobbying and non-lobbying activities of an entity." 49 Fed. Reg. 18,260, 18,265–66 (Apr. 27, 1984). That is why, as this Court has recognized, this provision contemplated that contractors would keep records of time spent "'[when] the employee engages in lobbying.'" *Raytheon II*, 940 F.3d at 1314 (citation omitted). That is what Raytheon did here.

> and agency supplements. The contracting officer may disallow all or part of a claimed cost that is inadequately supported.

48 C.F.R. § 31.201-2(d). The Government fails to recognize the contracting officer's express discretion under this provision to allow costs that are deemed "inadequately supported." *Id.*

The Government further fails to acknowledge that it is well established that employee testimony is also sufficient to support the allowability of costs. *See*, *e.g.*, *Thermalon Indus., Ltd. v. United States*, 51 Fed. Cl. 464, 478 (2002) (employee calendar pages indicating only the name of the contracting agency and the number of hours, along with testimony that the "records were created contemporaneously" sufficient to find allowable labor costs under FAR); *Phoenix Data Sols. LLC*, ASBCA No. 60207, 18-1 BCA ¶ 37,164 at 180,921 (Oct. 2, 2018) (costs allowable absent documentation of disallowed costs in record where contractor "presented unrebutted hearing testimony from individuals with personal knowledge of [the contractor's] travel expenses sufficient to establish the allowability of the costs"); *Raytheon I*, 17-1 BCA ¶ 36724 (emails coupled with testimony "sufficient to determine the nature and scope of the actual work performed by the consultant" for allowable consultant costs under FAR); *Pro-Built Constr. Firm*, ASBCA No. 59278, 17-1 BCA ¶ 36,774, at 179,194 (June 1, 2017) ("monthly [employment contracts] without . . . detailed time sheets" sufficient to find allowable labor costs under FAR); *BearingPoint, Inc.*, ASBCA No. 55354, 09-2 BCA ¶ 34,289, at 169,393 (Oct. 16,

2009) ("contemporaneous documentation" corroborated by "testimonial evidence" sufficient to find allocable costs under FAR in the absence of timecards).

Raytheon's contemporaneous documentation of timesheets, Lobbying Tool entries, daily logs, desk calendars, Palm software calendars, and Lotus notes, backed by credible witness testimony, are clearly adequate to support the allowability of the claimed costs.[9] Indeed, it is the powerful corroboration effect of records and testimony that clearly informed the Board's factual findings, to which the Government has no response. *See* Appx35–36. Finally, by documenting its lobbying activities, Raytheon's records were adequate to demonstrate that its claimed costs—the remainder after unallowable costs are documented and removed—"compl[ied] with applicable cost principles." 48 C.F.R. § 31.201-2(d). The only question here was how much to withdraw for lobbying activities.

*Third*, CAS 405 ("Accounting for Unallowable Costs") requires contractors to "identif[y] and exclude[] from any billing, claim or proposal" only unallowable costs. 48 C.F.R. § 9904.405-40(a). Although CAS 405 requires contractors to maintain records that are "adequate for purposes of contract cost determination and [audit] verification," *id.* § 9904.405-50(a), (b)(1), it is for the purpose of "establish[ing] and maintain[ing] visibility of identified unallowable costs

[9] The Board found as a matter of fact that the absence of even more documentation of allowable non-lobbying activities was a direct consequence of DCAA's own audit methodology. Appx20; Appx36.

(including directly associated costs), their accounting status in terms of their allocability to contract cost objectives, and the cost accounting treatment which has been accorded such costs." *Id.* § 9904.405-50(a); *see also id.* § 9904.405-50(b)(1). That is precisely what Raytheon did. Despite the Government's complaints that Raytheon "default[s] to allowable," Gov't Br. 11 (capitalization omitted), Raytheon's timekeeping policies and withdrawal calculations properly "identified and excluded" unallowable costs from its indirect cost rate proposals. The Board found as a matter of fact that the Government failed to prove otherwise. Appx38.

### B. The Board Did Not Clearly Err In Finding That Raytheon Properly Captured The Cost Associated With Lobbying Activities.

After misconstruing the applicable documentation requirements, the Government seeks to impose an unwritten rule—not found anywhere in the FAR or the CAS—that contractors must account for labor costs as a function of all time worked (i.e., including time beyond 40 hours, often referred to as "total time accounting") as opposed to a function of time paid (i.e., a 40-hour work week, referred to herein as "time-paid accounting"). *See* Gov't Br. 39–46. This too fails.

The Government theorizes that Raytheon "could just as easily" have required its employees to track all of their time worked on all activities, to result in a different withdrawal factor calculation—one that the Government speculates (with no evidence) would be in its favor. *See* Gov't Br. 46. But this is a red herring, because the Board found as a matter of fact that "[t]here was no cost to Raytheon or the

government for work outside normal business hours." Appx36. In other words, Raytheon did not pay its exempt, salaried Government Relations employees for time worked outside of normal business hours (for allowable or unallowable activities). Appx20. This does not mean that "these salaried employees do large amounts of work for free," Gov't Br. 41, but simply reflects the reality that under the Fair Labor Standards Act, 29 U.S.C. §§ 201–206, an exempt (i.e., salaried) employee is not entitled to pay for the time spent on business-related work beyond a 40-hour work week. Because time outside of normal business hours did not increase the employees' salary, it likewise did not increase the *cost* to Raytheon (or the Government). Appx36.

In effect, the Government seeks payment for costs that Raytheon never incurred or claimed from the Government. The Government recently advanced much the same argument to this Court, and this Court rejected it. In *Northrop Grumman*, the Government took issue with the contractor's measurement of its post-retirement benefit ("PRB") costs, and disallowed $253 million as unallowable costs under the applicable FAR cost principle (FAR 31.205-6(o), Postretirement benefits other than pensions). 942 F.3d at 1137. This Court held that substantial evidence supported the Board's finding that the disallowed PRB costs "were never and will never be charged to the government." *Id.* at 1140. And because the contractor "never actually submitted any unallowable costs for reimbursement . . . the

government had no basis to disallow that amount from" the contractor's claims. *Id.* at 1141. That holding forecloses the Government's argument in this case.

Not only are there no additional costs to disallow as a factual matter, there also is no legal authority in the FAR or the CAS to support the Government's argument.

*First*, the CAS require covered contractors, like Raytheon, to disclose their cost accounting practices to the Government, and to comply with those disclosed practices. *See generally* 48 C.F.R. § 9903.202; *id.* § 30.202. Under CAS 401, Raytheon was required to account for the cost of hours paid rather than hours worked because that is consistent with its disclosed cost accounting practice and how it calculated estimated costs for purposes of bidding on contracts. *See* Appx20; Appx36; 48 C.F.R. § 9904.401-40(a) ("A contractor's practices used in estimating costs in pricing a proposal shall be consistent with his cost accounting practices used in accumulating and reporting costs."). The Government complains that Raytheon's specific CAS disclosure statements were not "offered into evidence" below. Gov't Br. 43 n.26. But the Board found as a factual matter, based on uncontroverted testimony, that time-paid accounting was proper based on Raytheon's disclosed cost accounting practice. *See* Appx20 (citing Appx20023); *see also* Appx36. The Government could have introduced its own evidence to attempt to refute this testimony, but chose not to. Where Raytheon introduced testimonial evidence and

the Government introduced none, the Government cannot now cite the absence of documentary evidence as a basis to overturn the Board's well-supported factual findings. *See Wilson v. Dep't of Army*, 359 F. App'x 172, 174 (Fed. Cir. 2010) (affirming judgment below where there was no record evidence to contradict the credible testimony supporting it).

*Second*, the Government's reliance on FAR 31.201-6(e)(2) fares no better, because that provision does not apply. FAR 31.201-6(e)(2) states in relevant part:

> Salary expenses of employees who participate in *activities that* generate unallowable costs shall be treated as directly associated costs *to the extent of the time spent on the proscribed activity*, provided the costs are material in accordance with paragraph (e)(1) above (except when such salary expenses are, themselves, unallowable). The time spent in proscribed activities should be compared to total time spent on company activities to determine if the costs are material.

48 C.F.R. § 31.201-6(e)(2) (emphases added). FAR 31.201-6(e)(2) applies only to salary expenses for employees that generate unallowable "costs," and only "to the extent of the time spent" on such activities that generate unallowable costs. *Id.* Yet the Board found as a matter of fact that "[t]here was no cost to Raytheon or the government for work outside normal business hours." Appx36. Because no unallowable "cost" was generated—either because the activities at issue were non-lobbying activities that generated allowable costs, or because the lobbying activities outside normal business hours did not generate costs at all—there can be no directly associated cost subject to FAR 31.201-6(e)(2). Indeed, the Government

acknowledges that there is "no direct application of FAR 31.201-6(e)(2)" here. Gov't Br. 45. The Court should reject the Government's argument.

The Board did not err, let alone clearly err, in finding that Raytheon properly withdrew the cost associated with lobbying activities.

## III. The Board Did Not Clearly Err In Finding That Raytheon Did Not Claim Any Unallowable Corporate Development Costs.

The Board did not clearly err in finding that the Government failed to prove that Raytheon claimed any unallowable Corporate Development costs. Appx51–52. As the Board and other experts in government contracts law have long recognized, the distinction between unallowable costs for organizational planning and allowable costs for economic or market planning is "unclear" and not "a defined line." *Raytheon I*, at 178,852 (citing John Cibinic, Jr. & Ralph C. Nash, Jr., Cost-Reimbursement Contracting at 943 (3d ed. 2004)). In this context, the Board found Raytheon's bright line policy for distinguishing between allowable and unallowable costs to be a "reasonable reading of the [relevant] FAR provisions." Appx51.

Corporate Development performed a wide array of functions—some of which included economic and market planning activities, which are allowable, while others constituted organizational planning activities, which are unallowable. Appx40–41. In light of their varied activities, Raytheon provided clear, practical guidance to Corporate Development employees in the form of a "bright line" policy on how to account for their work by the stages of their activities. Appx41; Appx51. The Board

upheld Raytheon's "bright line" policy as a reasonable interpretation of the FAR, because it tracks the FAR's distinction between allowable costs for economic and market planning and unallowable costs for organizational planning. Appx50–51. The Board then found that, because Raytheon complied with its own policy, the Government failed to prove that Raytheon claimed any unallowable Corporate Development costs. Appx51–52. This finding was not clear error because it was supported by substantial evidence, including the credible, uncontroverted testimony of Raytheon's Corporate Development employees.

### A. The Board Correctly Held That Raytheon's Bright Line Policy Reasonably Interprets And Implements FAR Requirements.

The Board ruled that "Raytheon's 'bright-line' policy represents a reasonable reading of the FAR provisions governing organization, economic planning, market planning and selling costs." Appx51. Although this Court reviews the Board's interpretation of FAR provisions *de novo*, the Court gives "careful consideration and great respect" to such interpretations and should affirm the Board's ruling here. *Raytheon*, 747 F.3d at 1352.

Three FAR cost principles are pertinent here. FAR 31.205-12 specifies that economic planning costs associated with "general long-range management planning that is concerned with the future overall development of the contractor's business" "are allowable." 48 C.F.R. § 31.205-12. FAR 31.205-38(b)(4) similarly designates as allowable, costs associated with "market research and analysis and general

management planning concerned with the development of the contractor's business." *Id.* § 31.205-38(b)(4). In contrast, FAR 31.205-27(a) specifies that costs associated with "planning or executing the organization or reorganization of the corporate structure of a business, including mergers and acquisitions," are unallowable. *Id.* § 31.205-27(a).

As a learned treatise explains, the interplay between these three cost principles creates a distinction between costs for *general* planning (allowable) and costs for planning for a *specific* acquisition or divestiture (unallowable). *See* Cibinic & Nash, *supra*, at 943 ("the costs of surveying various business opportunities, making demographic and economic studies, and evaluating potential markets or firms for mergers or acquisitions would be allowable," whereas "*once a target has been identified*, the costs of planning or executing organizational changes would be unallowable") (emphasis added). The Board agreed with this distinction in *Raytheon I*, explaining that "costs in connection with actually planning the organization or reorganization of a business, *such as by a specific merger or acquisition*, are unallowable whereas generalized long-range management planning costs are allowable." *Raytheon I*, at 178,851 (emphasis added).[10]

---

[10] The Government did not appeal this ruling in *Raytheon I* even though the parties had extensively litigated the issue before the Board, and the Board had ruled against the Government on whether certain costs at issue were allowable costs for economic and market planning. *See Raytheon I*, at 178,851–52.

As confirmed by the Board's factual findings in this case, Raytheon's bright line policy reflects this same distinction. *See* Appx41. Corporate Development employees incurred allowable costs for "demographic and economic studies," *Raytheon I*, at 178,851—not only on the "acquisition" side, when they guided businesses through the strategic dialogue process, conducted gap analysis, and evaluated which "tools" could potentially be used to fill the gap, but also on the "divestiture" side, when they evaluated businesses to determine how to improve performance. Costs became unallowable, however, once Raytheon's Acquisition Council made a formal decision to pursue a specific acquisition or divestiture target. *See* Appx41; Appx51.

The Government's contention that FAR 31.205-27(a) "unambiguously makes all A&D costs—at any stage—expressly unallowable," Gov't Br. 48, has no support in the FAR. It also begs the question of what is a purported "A&D cost."

*First*, the Government's interpretation impermissibly blurs the line between "planning" and other preliminary activities. The FAR does not make "all A&D costs" unallowable; it only makes costs for "planning and executing" acquisitions or divestitures unallowable. 48 C.F.R. § 31.205-27(a). By its terms, FAR 31.205-27(a) does not encompass merely investigating or researching possible acquisitions or divestitures, among other types of planning specifically made allowable under FAR 31.205-12 and FAR 31.205-38(b)(4). Until there actually is an acquisition or

divestiture to "plan" for, any preliminary investigation by the company is not yet "planning" for anything, much less "planning" for the "reorganization of [its] corporate structure." *Id.*

*Second*, the Government's interpretation conflates materially distinct forms of "planning." Not all "planning" generates unallowable costs. "Economic planning" and "market planning" generate allowable costs. *See* 48 C.F.R. §§ 31.205-12, .205-38(b)(4). The key question for allowability purposes, therefore, is: "Planning for what?" The Government assumes that, even when an acquisition or divestiture is one of a multitude of options considered in addressing a strategic growth initiative, any initiative that ultimately took a completely different path—e.g., pursuing a teaming arrangement, licensing agreement, or internal R&D—must nonetheless be deemed a "fruitless acquisition pursuit[ ]." Gov't Br. 51. That is an absurd approach that would be unworkable in practice, as contractors would be forced to determine if *any* employee *ever* considered an acquisition or divestiture as an option—even if immediately rejected as a poor option—so as to identify and exclude the costs of everything that came after any such consideration as a "fruitless acquisition pursuit."

*Third*, the Government's reliance on FAR 31.205-12 does not move the ball forward. *See* Gov't Br. 49. Raytheon agrees that unallowable organizational planning costs under FAR 31.205-27(a) are excepted from the definition of allowable economic planning costs in FAR 31.205-12. *See* 48 C.F.R. § 31.205-12

("Economic planning costs do not include organization or reorganization costs covered by 31.205-27."). But that does not answer the relevant question here of *what* costs constitute "organization or reorganization costs covered by 31.205-27." *Id.* Certainly, nothing in FAR 31.205-12 precludes Raytheon's bright line rule, as the Board has now twice found. Appx51 (citing *Raytheon I*, at 178,852). "[I]n light of the Board's considerable experience in the field of government contracts," this Court should show "great respect" to the Board's interpretation and affirm that ruling. *Raytheon*, 747 F.3d at 1352.

**B. The Board Did Not Clearly Err In Finding That Raytheon Never Claimed Unallowable Organizational Costs.**

The Board made findings of fact, based on documentary evidence and credible witness testimony, that Corporate Development scrupulously complied with Raytheon's bright line policy. *See* Appx43–44. Substantial evidence readily supports that conclusion. The Board credited the testimony of four witnesses, all of whom worked in the Corporate Development Department during 2007–08. The Board found that they understood the bright line policy, accurately recorded time spent on organizational-planning activities, and did so in compliance with that policy. Appx43–44; Appx51–52. In fact, the Government did not "challenge[ ] the reasonableness or allocability of [any] corporate development costs in question." Appx50. The only issue, therefore, is whether the Board clearly erred in finding that the Government did not establish that Raytheon claimed any unallowable

organizational planning costs. The Government asserts two errors, but neither holds up under scrutiny.

*First*, the Government contends that Raytheon should not have claimed costs associated with Corporate Development's "work long before reaching Raytheon's bright-line thresholds." Gov't Br. 50. Because Raytheon's bright line policy was a reasonable interpretation of the FAR, *supra* 48–52, any costs related to work before its threshold were allowable. Regardless, the Board's factual findings—which the Government does not challenge—foreclose the Government's argument.

The Board found that Corporate Development performed numerous functions beyond acquisition or divestiture planning. *See* Appx40–41. Many of Corporate Development's activities—e.g., surveying the market, undertaking demographic or economic studies, or participating in annual strategic dialogue with Raytheon's Corporate strategy department—thus did not pertain to "planning" for acquisitions or divestitures at all. *See* Appx40–41. The Government ignores this factual finding.

Moreover, based on credible witness testimony, the Board expressly found that "'[w]orking with Raytheon's businesses on M&A and divestitures was not Corporate Development's primary role but was part of its work to find strategic growth initiatives.'" Appx40–41 (quoting *Raytheon I*, at 178,840 and affirming that this finding still applied in 2007–08). That is because—as the Board found—all such work was still under consideration until the Acquisition Council decided

whether Raytheon actually would pursue an acquisition or divestiture. Appx41. The Government repeatedly uses the word "target" to describe companies Raytheon was merely researching at this preliminary stage. *See*, *e.g.*, Gov't Br. 26–27, 51–52. But that description ignores the Board's finding that, until the Acquisition Council "declared its intentions regarding potential acquisitions and divestitures," Corporate Development could not know which company, if any, to target for any actual planning. Appx41 ("Corporate Development did not know which route Raytheon was going to follow until after the Acquisition Council made its decision.").

Accordingly, even under its misreading of the FAR, the Government has not proven that Raytheon claimed unallowable "organizational planning" costs.[11]

*Second*, the Government argues that, irrespective of whether Raytheon's bright line policy complied with the FAR, it "has no adequate records on which it could claim that any of its Corporate Development costs are allowable." Gov't Br. 55; *see also id.* at 52–55. But the Board made a specific factual finding that Raytheon's Corporate Development withdrawal was adequately "supported by documentation [including diaries, calendars, log books, Lotus Notes, etc.] and

[11] In a footnote, the Government alleges that, in 2008, no paid hours were withdrawn from Raytheon's cost submission for certain Corporate Development employees who left during the course of the year. Gov't Br. 22 n.20. That provides no basis for disturbing the Board's factual finding that Raytheon did not seek reimbursement for any unallowable costs. Appx20. The Government has identified no evidence to establish that these employees worked on matters generating any material unallowable costs, before the Board or this Court.

credible witness testimony." Appx52 & n.25. Because the Government provides no basis to overturn this factual finding, and merely seeks to impose on Raytheon obligations to document allowable costs beyond what the FAR requires, the Court should reject this challenge. *See supra* 38–43.

*Third*, in the absence of sound legal footing to attack the allowability of Raytheon's claimed costs based on recordkeeping, the Government instead invents blanket rules that would render unallowable the *entirety* of Raytheon's Corporate Development costs, regardless of records and documentation, because the Government disagrees with Raytheon's policy designed to implement the FAR's requirements to identify and exclude unallowable costs. Gov't Br. 52, 54. The Government's position that Raytheon's bright line policy is "unacceptable" appears to be premised on the policy's purported "failure to conform" to (i.e., to parrot) the applicable regulations. Gov't Br. 30 ("[T]he bright-line rules that must be followed are already in the FAR."); *see also* Gov't Br. 48–49, 52, 54. But it would be irresponsible for Raytheon to simply place the FAR in front of its employees—especially non-government contracts specialists—and tell them to follow it. As the Board recognized, the very effectiveness of Raytheon's bright line rule is to explain and implement the FAR's requirements. Appx43–44. The Government's position also begs the question how employees should reconcile the three provisions relating to planning costs in the absence of reasonable policy guidance on how to do so.

*Fourth*, the Government wrongly asserts (without citation to the record) that it "proved that Raytheon charged the Government for unallowable A&D costs" for "time that Mr. Bailey spent" preparing presentations on possible "acquisition candidates." Gov't Br. 55. Not only is an appellant's assertion, devoid of record evidence, insufficient to overturn the Board's factual findings, *see Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 827 (Fed. Cir. 1989), none of the complained-of activities by Mr. Bailey generated unallowable costs. Approaching two businesses about possible acquisitions and being told they are not interested, and presenting a third to the Acquisition Council only to be rejected, merely underscore the fluid and multidimensional nature of Corporate Development's work. *See* Appx4849 (cited at Gov't Br. 51); *see also* Appx40–41. The Government presents no justification for rejecting the Board's thoroughly supported and well-reasoned factual findings.

The Court should affirm the Board's finding that the Government failed to prove that Raytheon claimed any unallowable organizational-planning costs.

## CONCLUSION

Raytheon devotes substantial resources to satisfying its obligations under the FAR and leading the industry in compliance with the cost principles. Its senior leadership engages in multi-departmental efforts to draft and promulgate FAR compliance policies and guidelines, on which its employees receive extensive training and to which those employees consistently adhere. For the years in

question, if there was any doubt about the allowability of a Government Relations or Corporate Development cost, employees applied a conservative bias and categorized those costs as unallowable. Raytheon spared no time, expense, or expertise ensuring that it claimed only allowable costs—indeed, Raytheon withdrew substantial unallowable costs. This Court has only to review the Board's thorough decision finding that the Government failed to establish that Raytheon claimed any unallowable Government Relations or Corporate Development costs.

Based on this record, the Board did not err, much less clearly err. For these and the foregoing reasons, this Court should affirm the decision of the Board.

March 28, 2022

Respectfully submitted,

/s/ *John W.F. Chesley*

John W.F. Chesley
*Principal Attorney*
Amir C. Tayrani
Lindsay M. Paulin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
JChesley@gibsondunn.com
ATayrani@gibsondunn.com
LPaulin@gibsondunn.com

Dhananjay S. Manthripragada
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7366
DManthripragada@gibsondunn.com

Erin N. Rankin
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2590
ERankin@crowell.com

*Counsel for Raytheon Company and Raytheon Missile Systems*

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2022, I served a copy of the foregoing brief on all counsel of record via the CM/ECF system.

March 28, 2022

/s/ *John W.F. Chesley*

John W.F. Chesley
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
JChesley@gibsondunn.com

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because it contains 12,752 words, excluding the parts of the brief exempted by Federal Circuit Rule 32(b)(2).

2. This brief complies with the typeface and type style requirements of Rules 32(a)(5) and (6) of the Federal Rules of Appellate Procedure because it has been prepared in a monospaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

March 28, 2022

/s/ *John W.F. Chesley*

John W.F. Chesley
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
JChesley@gibsondunn.com