No. 2021-2304

# United States Court of Appeals for the Federal Circuit

SECRETARY OF DEFENSE,
*Appellant*
v.
RAYTHEON COMPANY, RAYTHEON MISSILE SYSTEMS,
*Appellees*

Appeal from the Armed Services Board of Contract Appeals in Nos. 59435, 59436, 59437, 59438, 60056, 60057, 60058, 60059, 60060, and 60061, Administrative Judge Cheryl L. Scott, Administrative Judge Richard Shackleford, and Administrative Judge David D'Alessandris

## CORRECTED BRIEF FOR AMICI CURIAE NATIONAL ASSOCIATION OF MANUFACTURERS AND AEROSPACE INDUSTRIES ASSOCIATION IN SUPPORT OF THE APPELLEES AND IN FAVOR OF AFFIRMANCE

Matthew Hall
DUNAWAY & CROSS, P.C.
1025 Connecticut Ave. NW, Suite 1000
Washington, D.C. 20036
T. 202.862.9700

***Counsel for Amicus Curiae Aerospace Industries Association***

Douglas W. Baruch
W. Barron A. Avery
Jennifer M. Wollenberg
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T. 202.739.3000

Sheila A. Armstrong
MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, TX 75201
T. 214.466.4000

Catherine L. Eschbach
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, Texas 77002
T. 713.890.5000

***Counsel for Amici Curiae National Association of Manufacturers and Aerospace Industries Association***

## CERTIFICATE OF INTEREST

**Case Numbers** 2021-2304

**Short Case Caption** *Secretary of Defense v. Raytheon Company*

**Filing Party/Entity** National Association of Manufacturers; Aerospace Industries Association

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Dated: April 4, 2022

*/s/ Douglas W. Baruch*
Douglas W. Baruch
*Counsel for Amici Curiae*
*National Association of Manufacturers*
*and Aerospace Industries Association*

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☑ None/Not Applicable |
| National Association of Manufacturers | Not Applicable | Not Applicable |
| Aerospace Industries Association | Not Applicable | Not Applicable |

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable

# TABLE OF CONTENTS

**Page**


Certificate of Interest ....................................................................................i

Table of Authorities .......................................................................................iv

Interests of Amici Curiae ..................................................................................1

Argument...........................................................................................................4

I. The Government's position that corporate policies and training are non-compliant unless they repeat, verbatim, FAR provisions would represent an unwarranted sea change in industry practices for government contractors. .................................................4

II. Government contractors need to be able explain to their personnel the FAR and how different cost principles interact with one another. .........................................................................7

A. For FAR compliance, government contractors should be free to explain technical legal concepts to non-legally trained personnel. ..........................................................9

B. FAR compliance necessarily requires looking beyond the FAR text. .........................................................................10

III. Failing to develop uniform policies and relying on individual, non-trained personnel to interpret the FAR could result in overbilling the Government and legal exposure for contractors........12

A. Company-developed bright-line rules foster FAR compliance and help prevent overbilling. ...............................13

B. Precluding contractors from developing policies and training that interpret the language of the FAR could increase the risk of non-compliance and contractor liability. ........................................................................15

Conclusion .......................................................................................................16

Certificate of Compliance ................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Armed Services Board of Contract Appeals Nos. 59435, 59436, 59437, 59438, 60056, 60057, 60058, 60059, 60060, 60061 ....................................... 11

## STATUTES

41 U.S.C. § 4303 ........................................................................................ 15

## RULES & REGULATIONS

48 C.F.R.

§ 1.101 ........................................................................................ 2

§ 1.102 ........................................................................................ 13

§ 31.000 ........................................................................................ 3

§ 31.201-2 ........................................................................................ 8

§ 31.204 ........................................................................................ 7, 8

§ 42.709-1 ........................................................................................ 15

§ 52.203-13 ........................................................................................ 6, 10

§ 52.222-50 ........................................................................................ 6

Fed. R. App. P. 29 ........................................................................................ 1

## OTHER AUTHORITIES

DCAA Contract Audit Manual ........................................................................ 5

Dinesh Dharmasada & Michael Rizzo, *Fiscal Year 2020 ASBCA Statistics Show Case Load Increases, Slower Resolutions and Fewer ADR Proceedings*, JDSUPRA (Nov. 2, 2020) ........................................................ 11

Jerome S. Gabig, *DCAA Recommendations Of Disallowance Of Costs—Tips On Contesting The Disallowance*, BRIEFING PAPERS (March 2022) ............. 9, 11

John Cibinic, Ralph Nash & Stephen D. Knight, COST REIMBURSEMENT CONTRACTING, Ch. 8, Part V-Interpreting the Cost Rules (4th Edition 2014) ........................................................................................ 8

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

John Cibinic, Ralph Nash & Stephen D. Knight, COST REIMBURSEMENT Contracting, Ch. 12, Part I-Audit of Cost-Type Contracts (4th Edition 2014) .......... 13, 14

Martin P. Willard, *Allowability of Legal Costs*, BRIEFING PAPERS (April 2010) .......... 11

May 14, 2019 MRD (No. 19-PAC-002(R)) .......... 8

## INTERESTS OF AMICI CURIAE[1]

The National Association of Manufacturers ("NAM") is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states. NAM represents 14,000 member companies—from small businesses to global leaders—in every industrial sector, including government contractors. Manufacturing employs more than 12.5 million men and women, contributes $2.57 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for nearly two-thirds of all private-sector research and development in the nation. NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

The Aerospace Industries Association ("AIA") has been a voice for the American aerospace and defense industry since 1919, representing the interests of manufacturers and suppliers for commercial aircraft, manned and unmanned defense systems, engines, rockets, avionics, communications systems and satellites. The

[1] No counsel for a party authored this brief in whole or in part; no such counsel nor any party made a monetary contribution intended to fund the preparation or submission of the brief; and no person or entity, other than the amici curiae, their members, or their counsel made such a monetary contribution. Fed. R. App. P. 29(a)(4)(E). Pursuant to Rule 29(a) all parties to the appeal have consented to the timely filing of this amicus brief. Fed. R. App. P. 29(a)(2).

aerospace industry is critical to the health of the U.S. economy—and a seamless, fundamental part of daily life. AIA works as an advocate and convener, and is essential to shaping policy, shedding light on the industry's impact, and empowering its future. CEO-level officers from across more than 300 member companies, which include government contractors, guide these efforts, strengthening the industry's ability to effectively support America's national security and economy. Together, AIA advocates for effective federal investments, accelerated deployment of innovative technologies, policies that enhance our global competitiveness, and recruitment and retention efforts that support a capable and diverse 21st century workforce.

Government contractors, who are among NAM's and AIA's memberships, are among the most heavily regulated sectors of the economy. This case involves compliance with a specific form of government regulation—the Federal Acquisition Regulation ("FAR"). The FAR is part of the Federal Acquisition Regulations System, which was established for the codification and publication of uniform policies and procedures for acquisition by all executive agencies. 48 C.F.R. § 1.101. FAR Part 31, which includes the provisions at issue in this case, establishes cost principles and procedures for companies with federal government contracts. Specifically, Part 31 "contains cost principles and procedures for (a) the pricing of contracts, subcontracts, and modifications to contracts and subcontracts whenever

cost analysis is performed (*see* 15.404-1(c)) and (b) the determination, negotiation, or allowance of costs when required by a contract clause." 48 C.F.R. § 31.000. Pursuant to this subpart, the FAR directs government contractors on which costs are reimbursable from the federal government. Compliance with the FAR is an undertaking that typically requires government contractors to invest significant resources, talent, and efforts. Amici submit this brief to provide this Court with background and context on typical FAR compliance efforts, including developing targeted trainings and corporate policies, and the importance of being able to explain to contractor personnel responsible for ensuring compliance with the FAR's technical language and the interaction of different regulations.

## ARGUMENT

### I. The Government's position that corporate policies and training are non-compliant unless they repeat, verbatim, FAR provisions would represent an unwarranted sea change in industry practices for government contractors.

Among the issues in this case is Appellee Raytheon Company's inclusion of bright-line rules in corporate policies to help personnel navigate how various FAR provisions interact with one another and should be interpreted. The bright-line rule at issue in this case helped personnel determine when certain employee-related costs became unallowable under FAR Part 31. Gov't Br. at 48-49. The government argues that "the bright-line rules that must be followed are already in the FAR" and "the unambiguous language of the regulations leaves no room for confusion." Gov't Br. at 30, 48-49.

If this were true as a general matter, each employee could be handed a copy of the FAR and be expected to correctly discern which of their job responsibilities generates an allowable cost and which is an unallowable cost and make the appropriate billing recordings without further guidance. But that is not reality; nor is it required by law. Instead, government contractors often expend considerable resources developing good faith policies that explain the requirements of the FAR and create clear and uniform billing practices, and then train personnel on FAR compliance issues. To ensure compliance, many government contractors engage outside advisors and devote significant in-house resources—lawyers, auditors,

consultants, and compliance officers—in connection with anything except the simplest of provisions.[2]

Contractors do not stand alone in this regard. Indeed, on the Government side, Defense Contract Audit Agency ("DCAA") auditors have an entire manual dedicated to explaining key FAR concepts on cost allowability. *See* DCAA Contract Audit Manual ("DCAM").[3] And DCAM Appendix A is devoted specifically to helping DCAA auditors determine whether certain costs are allowable or unallowable. If the FAR language truly were "unambiguous," none of these standard industry practices or government guidelines would be necessary. Thus, the Government's opposition to corporate policies that do not recite the FAR verbatim not only is at odds with industry practice and corporate compliance standards, but the Government's own practice.

Not only do contractors' real-world experiences implementing the FAR support the conclusion that the FAR's language cannot just be handed to any employees and understood as unambiguous—the FAR itself requires training programs. For example, under FAR 52.203-13, when a contract is expected to

---

[2] *See, e.g.*, https://www.acquisition.gov/Training (listing resources, learning institutes, and professional organizations for FAR training resources); https://www.dcaa.mil/Guidance/Selected-Area-of-Cost-Guidebook/ (the Defense Contract Audit Agency has a 75-chapter guidebook).

[3] https://www.dcaa.mil/Guidance/CAM-Contract-Audit-Manual/.

exceed $6 million, government contractors generally are required to create an "ongoing business ethics awareness and compliance program." 48 C.F.R. § 52.203-13(c)(1). Per the regulation, contractors must take "reasonable steps to communicate periodically and ***in a practical manner*** the Contractor's standards and procedures and other aspects of the Contractor's business ethics awareness and compliance program and internal control system." *Id.* § 52.203-13(c)(1)(i) (emphasis added). They are to do so by "by conducting effective training programs and otherwise disseminating information appropriate to an individual's respective roles and responsibilities." *Id.* In other words, the FAR itself recognizes that communication needs to be done in "a practical manner" and that training programs and the dissemination of information will need to be "appropriate[ly]" tailored. *See also* 48 C.F.R. § 52.222-50(h) (the FAR regulation on Combatting Human Trafficking, which requires contractors to develop procedures for compliance "consistent with the size and complexity" of the contractor's business).

Companies with significant government contracting activities typically have corporate policies and procedures, appropriately tailored training, and communications to give both content and effect to regulatory requirements, which expound upon and thus extend beyond the limited FAR text. The scope of these efforts will turn on factors such as the size of the company, the percentage of revenue attributable to government contracts, and compliance and audit history. The good

faith adoption of reasonable corporate policies and guidance aimed at implementing and complying with FAR provisions should be encouraged—not opposed and criticized—and in any event falls well within industry practice norms. A judicial determination that these practices are non-compliant—effecting a sea change for government contractor operations and compliance efforts—is unwarranted.

## II. Government contractors need to be able explain to their personnel the FAR and how different cost principles interact with one another.

How a company implements the FAR and explains the cost principles to its personnel will vary based on the nature of the company and the extent of its government contracting business. But although the exact trainings and policies adopted depend on each company's circumstances, certain common-sense necessities and concerns are typical among companies seeking to comply with the FAR and to explain its cost principles to their personnel.

As this Court understands from its docket, the FAR is a complicated regulation. Under the FAR there are allowable costs and unallowable costs. The FAR "does not cover every element of cost. Failure to include any item of cost does not imply that it is either allowable or unallowable. The determination of allowability shall be based on the principles and standards in [FAR Subpart 31.2] and the treatment of similar or related selected items[.]" 48 C.F.R. § 31.204. For a cost to be allowable, five requirements must be satisfied: (1) "[r]easonableness"; (2) "[a]llocability"; (3) "[s]tandards promulgated by the CAS Board, if applicable,

otherwise, generally accepted accounting principles and practices appropriate to the circumstances"; (4) "terms of the contract"; and (5) "[a]ny limitations set forth in [Subpart 31.2]." 48 C.F.R § 31.201-2(a). As a leading treatise on FAR cost principles explains, "[i]nterpretation of the various cost allowability provisions involves both the rules applicable to interpretation of regulations and those involved with interpretation of contracts." John Cibinic, Ralph Nash & Stephen D. Knight, COST REIMBURSEMENT CONTRACTING, Ch. 8, Part V-Interpreting the Cost Rules (4th Edition 2014).

Determining allowability is far from clear cut. The text of the FAR is not necessarily determinative of allowability. 48 C.F.R. § 31.204. And the terms of the specific contract must also be accounted for in the determination. 48 C.F.R § 31.201-2(a). As discussed, *supra* Part I, the Government issues a significant number of guidance documents to aid both government contractors and DCAA auditors in interpreting the FAR. And that guidance is not static. For example, in 2019, after recent court cases, the DCAA needed to issue a memorandum with guidance clarifying for its auditors the standards for determining that a cost is unallowable. *See* May 14, 2019 MRD (No. 19-PAC-002(R)).[4] Given all that must be accounted for under the FAR and the contract in determining the allowability of

---

[4] Available at https://www.dcaa.mil/Portals/88/Documents/Guidance/MRDs/MRD 19-PAC-001.pdf?ver=2019-10-10-140446-590.

costs, government contractors often successfully contest a DCAA auditor's disallowance determinations. *See* Jerome S. Gabig, *DCAA Recommendations Of Disallowance Of Costs—Tips On Contesting The Disallowance*, BRIEFING PAPERS, 22-4 (March 2022) (explaining why the DCAA's claim of a near 60% sustained rate is highly suspect).

Thus, the important task of explaining to personnel which costs are allowed and which are unallowable can be incredibly complex. Nor can the FAR's provisions necessarily be viewed in isolation. In determining whether costs are allowable and unallowable, a reasonable government contractor needs to look at how the different provisions of the FAR interact with one another and with the specific contract terms in the context of the contractor's business operations.

### A. For FAR compliance, government contractors should be free to explain technical legal concepts to non-legally trained personnel.

In light of the FAR's complex framework, government contractors need to have the flexibility to explain to their personnel the terms of individual FAR provisions and how they interact with one another as applied to the company's specific contracts. Although the sophistication of a company's government contract personnel will vary, as a general rule, most personnel generating and allocating costs for contracts are not attorneys. It is common sense that these individuals cannot simply be handed a copy of the FAR (or even specific provisions) and be expected to interpret its complex language and discern how the provisions interact with one

another. *See* 48 C.F.R. § 52.203-13(c)(1) (acknowledging trainings and information dissemination must be practical and appropriately targeted to role and responsibilities).

To aid in assisting a uniform interpretation of the FAR across personnel with varying levels of sophistication, adopting clear concepts—in language that is distilled down from the FAR's technical language and that embodies a reasonable interpretation of the FAR—can help a company ensure maximum compliance and that its personnel have a uniform understanding of the FAR cost principles at issue. To this end, targeted training and the adoption of policies with clear rules facilitates FAR compliance.

### B. FAR compliance necessarily requires looking beyond the FAR text.

A company evaluating its FAR compliance obligations must interpret a FAR cost principle in the context of the relevant regulations in their entirety. The plain language of one regulation does not necessarily explain how different cost principles interact. Therefore, many contractors invest heavily in various experts to advise on FAR compliance, training, and development of appropriate policies, procedures, and internal controls (such as bright line rules). These practices are necessary to ensure that relevant personnel have a shared understanding of which costs are allowable and may be charged to the company's government contracts. And likewise, which

are unallowable and must be excluded from those cost pools that are charged to the government.

In adopting these policies and trainings to help interpret the FAR, contractors are not working from a blank slate. There is a body of caselaw interpretating these cost principles generally and the issue of allowability specifically. *See, e.g.*, ASBCA Nos. 59435, 59436, 59437 59438, 60056, 60057 60058, 60059, 60060, 60061 (opinion on appeal); *DCAA Recommendations Of Disallowance Of Costs* (collecting cases where contractors successfully challenged the Government's assertion that costs are disallowable); *see also* Dinesh Dharmasada & Michael Rizzo, *Fiscal Year 2020 ASBCA Statistics Show Case Load Increases, Slower Resolutions and Fewer ADR Proceedings*, JDSUPRA (Nov. 2, 2020)[5] (noting in 2020 there were 497 appeals to the Armed Services Board of Contract Appeals). Part of creating trainings and constructing policies with clear rules requires looking to this body of caselaw and determining how those decisions impact the application of the FAR cost principles to a particular company. Especially in interpreting the FAR, courts often play a "gap-filling role," and a company cannot craft accurate policies and trainings without accounting for caselaw. *See* Martin P. Willard, *Allowability of Legal Costs*, BRIEFING PAPERS, 10-5 (April 2010) ("the U.S. Court of Appeals for the Federal

---

[5] Available at https://www.jdsupra.com/legalnews/fiscal-year-2020-asbca-statistics-show-81195/.

Circuit, other courts, and boards of contract appeals have sometimes played a 'gap-filling' role and considered questions of allowability" given that the FAR does not explicitly cover all circumstances). The regulations themselves and cases interpreting the FAR recognize that the plain language is not always indicative of whether costs are allowable or unallowable. Thus, contractors need the flexibility to adopt good faith policies and training that rely on more than just the verbatim text of the FAR.

Caselaw and interpretive principles therefore caution a government contractor from relying solely on the plain text of the FAR and assuming that a provision in isolation is in fact as clear cut as it may appear. That provision must be interpreted against the background caselaw and other provisions in the FAR. Naturally, this will and should translate into companies adopting policies and procedures that reflect all relevant FAR provisions and the body of interpretive caselaw and legal scholarship on the subject, not just the language of any one provision in isolation.

## III. Failing to develop uniform policies and relying on individual, non-trained personnel to interpret the FAR could result in overbilling the Government and legal exposure for contractors.

Given the complex exercise of determining which costs ultimately will be allowable and unallowable under the FAR, a company adopting clear-cut policies for its personnel can both aid the taxpayers and mitigate against the risk of penalties for non-compliance. The Government's position in this case, that policies and

trainings that do not mimic the exact language of the FAR are non-compliant, could result in more inadvertent overbilling to the Government and heighten the risk exposure for government contractors, both of which could adversely impact taxpayers.

### A. Company-developed bright-line rules foster FAR compliance and help prevent overbilling.

The purpose of the FAR cost principles is to make sure the Government does not overpay on its contracts. *See* 48 C.F.R. § 1.102 (stating the FAR's purpose is to "to deliver on a timely basis the best value product or service to the [Government], while maintaining the public's trust and fulfilling public policy objectives"). The adoption of uniform company policies, set forth in plain language for company personnel, serves the underlying purpose of the cost principles. If a company only puts the highly technical language of the FAR in front of personnel rather than distilling it down to clear policies and procedures, it is more likely to result in overcharges given the inherent difficulty in determining what is allowable and unallowable, and the fact that unallowable costs are not always explicitly set forth in the text of the FAR. *See supra* Part II.

The Government and contractors spend significant resources on audits of cost-reimbursement type contracts every year. John Cibinic, Ralph Nash & Stephen D. Knight, COST REIMBURSEMENT Contracting, Ch. 12, Part I-Audit of Cost-Type Contracts (4th Edition 2014). These audits focus on internal controls and a

contractor's policies and procedures. *Id.* at I.A.a. A contractor's expected policies are those that document decisions affecting costs and ensure the accuracy and reasonableness of costs charged to a contract. *Id.* In other words, a contractor's policies apply the cost principles to the company's unique circumstances. *Id.*

Any contention that only the text of the FAR is necessary for inclusion in a policy does not account for the differences among companies who do business with the government through cost-type contracts. Contractors properly establish policies that direct personnel regarding which costs can be charged under its cost-reimbursement contracts, and which must be excluded from its invoices. Bright-line policies explaining which costs may be charged to the government promote consistency and accuracy. If individuals who are preparing a contractor's invoices do not have a clear understanding of the relevant FAR provisions in terms comprehensible for non-legally trained personnel and are instead left to their own individual interpretative devices, the result is an increased likelihood of inadvertent mischarging under cost-reimbursement contracts. Left with nothing more than supposedly unambiguous provisions of the FAR, contractor personnel—in good faith—could reach vastly different conclusions. And government contractor personnel may hesitate to classify costs as unallowable if not set forth in the text or if they do not properly understand the interaction of the different FAR cost

principles. These results could remain in effect for years or longer, pending a DCAA audit.

The Government's (and taxpayers') interests thus are served by contractors adopting bright line rules and clear policies, in good faith, for its personnel that are reasonable interpretations of the FAR as a whole.

### B. Precluding contractors from developing policies and training that interpret the language of the FAR could increase the risk of non-compliance and contractor liability.

A regime that renders a company non-compliant with the FAR if it implements policies and rules that expound upon and interpret—rather than mimic precisely—the FAR's text ultimately harms taxpayers as well. Effective corporate compliance and risk mitigation includes being able to conduct training and adopt policies providing "color" on the FAR provisions and how they interact. If government contractors cannot help their personnel understand how to comply with the FAR and do so uniformly, that ultimately will increase risks for companies with government contracts, which in turn could increase costs to the Government.

Failing to comply with the FAR and billing the Government for unallowable costs can in some instances carry the risk of monetary penalties. *See* 41 U.S.C. § 4303 & 48 C.F.R. § 42.709-1. Thus, an employee who does not properly understand the FAR poses an increased risk to a company subject to FAR compliance. Contractors are incentivized to properly train personnel in giving

substance and effect to the FAR and adopting a reasonable interpretation in setting policies. But if a company also is worried that it will be deemed non-compliant if it strays from the language of the FAR in explaining how to implement the cost principles to its personnel, it will have to account for the increased risk in determining whether to submit a bid and for what amount.

Other potential risks companies face if they are unable to set bright lines in their policies that help their personnel understand the FAR include a heightened risk of cost allowance disputes with the Government. These risks likewise would need to be accounted for in proposals. Requiring companies to limit their compliance efforts to the exact language of the FAR—without further guidance or explanation to implementing personnel—serves no useful purpose and likely would result in less compliance, not more, in addition to increasing overall contracting costs as companies factor the increased risk of lawsuits into their proposals.

## CONCLUSION

Companies that contract with the Government need the freedom to adopt policies and rules for personnel that explain and implement the FAR cost principles without being tethered to the FAR's exact language. Adopting clear policies and rules, which embody a reasonable interpretation of how the various FAR regulations as a whole and the body of interpretive caselaw interact, aligns with the interests of taxpayers and government contractors, as well as with the FAR's purposes and

compliance requirements. The Government's assertion that a company adopting language that does not exactly mimic the FAR regulation at issue is non-compliant would, if adopted, have far-reaching consequences for how contractors craft and implement FAR policies and training. And ultimately these consequences could adversely impact the taxpayers.

Dated: April 4, 2022

Respectfully submitted,

*<u>/s/ Douglas W. Baruch</u>*

Douglas W. Baruch
W. Barron A. Avery
Jennifer M. Wollenberg
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T. 202.739.3000
F. 202.739.3001
douglas.baruch@morganlewis.com
barron.avery@morganlewis.com
jennifer.wollenberg@morganlewis.com

Sheila A. Armstrong
MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, TX 75201
T. 214.466.4000
F. 214.466.4001
sheila.armstrong@morganlewis.com

Catherine L. Eschbach
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, Texas 77002
T. 713.890.5000
F. 713.890.5001

catherine.eschbach@morganlewis.com

***Counsel for Amici Curiae National Association of Manufacturers and Aerospace Industries Association***

Matthew Hall
DUNAWAY & CROSS, P.C.
1025 Connecticut Ave. NW, Suite 1000
Washington, D.C. 20036
T. 202.862.9700
mhall@dunawaycross.com

***Counsel for Amicus Curiae Aerospace Industries Association***

# CERTIFICATE OF COMPLIANCE

**Case Number:** 2021-2304

**Short Case Caption:** *Secretary of Defense v. Raytheon Company*

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 3,537 words.

☐ the filing has been prepared using a monospaced typeface and includes __________ lines of text.

☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Dated: April 4, 2022

*/s/ Douglas W. Baruch*
Douglas W. Baruch
*Counsel for Amicus Curiae National Association of Manufacturers and Aerospace Industries Association*