2021-2304

IN THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

SECRETARY OF DEFENSE,

Appellant,

v.

RAYTHEON COMPANY, RAYTHEON MISSILE SYSTEMS,

Appellees.

Appeal from the Armed Services Board of Contract Appeals
in Nos. 59435, 59436, 59437, 59438, 60056, 60057, 60058, 60059, 60060, and 60061, Administrative Judge Cheryl L. Scott, Administrative Judge Richard Shackleford, and Administrative Judge David D'Alessandris

**REPLY BRIEF OF APPELLANT, THE SECRETARY OF DEFENSE**

MICHAEL D. GRANSTON
Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

DANIEL B. VOLK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 353-7955

Attorneys for Appellant

OF COUNSEL:

ALEXANDER M. HEALY
Senior Trial Attorney
Contract Disputes Resolution Center
Defense Contract Management Agency
Hanscom Air Force Base, MA 01731

May 2, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

REPLY BRIEF OF APPELLANT ........ 1

I. Raytheon's Clear-Error Standard Is Incorrect ........ 3

II. Inadequate Records: Records Of Unallowable Time Are Not Records Of Allowable Time ........ 5

A. Costs Without Adequate Documentation Are Never Allowable ........ 5

B. Raytheon's Records Do Not Comply With FAR 31.201-2(d), Which Requires Records Demonstrating Allowability, Not Unallowability ........ 7

C. Raytheon's Lobbying Records Do Not Satisfy FAR 31.205-22(d) ........ 12

D. Raytheon's Records Do Not Comply With CAS 405 ........ 15

III. When After-Hours Lobbying Is A Regular And Expected Part Of The Lobbyists' Job, Disregarding Those Hours Is Not Acceptable ........ 16

IV. Raytheon's A&D Policy Plainly Violates FAR 31.205-27 ........ 21

A. There Is No Lack Of Clarity In The Regulations ........ 22

B. There Is No Basis To Re-Write FAR 31.205-27 ........ 25

C. Even Under The Interpretation Espoused By Its Cited Treatise, Raytheon's Bright-Line Rules Still Violate The Regulation ........ 27

V. Consequences Of Raytheon's Policies ........ 30

CONCLUSION ........ 32

# TABLE OF AUTHORITIES

## CASES

*Dickinson v. Zurko*,
527 U.S. 150 (1999) ....................................................................4, 5

*E.L. Hamm & Assocs. v. England*,
379 F.3d 1334 (Fed. Cir. 2004) ....................................................................5

*Gen. Dynamics Corp. v. Panetta*,
714 F.3d 1375 (Fed. Cir. 2013) ....................................................................4

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) ....................................................................4

*Raytheon Co. v. Sec'y of Def.*,
940 F.3d 1310 (Fed. Cir. 2019) .......................................... 16, 18, 21, 23

*Raytheon Co.*,
ASBCA No. 57743, 17-1 B.C.A. ¶ 36,724 (Apr. 17, 2017) ........................ 25, 26

*Rumsfeld v. United Techs. Corp.*,
315 F.3d 1361 (Fed. Cir. 2003) ....................................................................25

*Sec'y of Def. v. Northrop Grumman Corp.*,
942 F.3d 1134 (Fed. Cir. 2019) ....................................................................4

*Sparton Corp. v. United States*,
77 Fed. Cl. 1 (2007) ....................................................................25

## STATUTES AND REGULATIONS

41 U.S.C. § 7107 ....................................................................3, 4

48 C.F.R. § 9904.405 .................................................................... 5, 15

FAR 31.201-2(d) .................................................................... passim

FAR 31.201-2(a)(5) ....................................................................6

FAR 31.201-2(a)(3) .....16

FAR 31.201-6(e)(2) .....20

FAR 31.204(d) .....27

FAR 31.205 ..... ii

FAR 31.205-22..... passim

FAR 31.205-27..... passim

FAR 31.205-12..... 22, 23, 24, 25

FAR 31.205-38..... 22, 24

OTHER

49 Fed. Reg. 18,278 (Apr. 27, 1984) . .....14

52 Fed. Reg. 19,800 (May 27, 1987)..... 14, 15

61 Fed. Reg. 31,656 (June 20, 1996) .....14

68 Fed. Reg. 56,686 (Oct. 1, 2003)..... 23, 24, 26

John Cibinic, Jr. *et al.*, Cost-Reimbursement Contracting 621 (4th ed. 2014) ......26

## REPLY BRIEF OF APPELLANT

In this appeal, we ask the Court to hold that certain corporate policies of appellees, Raytheon Company and Raytheon Missile Systems (collectively Raytheon), do not comply with the Federal Acquisition Regulation (FAR). Specifically, the Court should rule:

1. Lists of hours that employees spent working on an expressly unallowable activity do not constitute adequate records under FAR 31.201-2(d), among other provisions, to demonstrate that the employees' remaining, unaccounted-for time is allowable.

2. When lobbying outside of business hours is a regular and expected part of in-house lobbyists' duties, such after-hours lobbying work cannot be disregarded in determining how much of the lobbyists' salary is allowable or unallowable under FAR 31.205-22.

3. A corporate policy providing that "[u]nallowable acquisition costs commence with the submission of an indicative offer" and "[u]nallowable divestiture costs commence when the decision to 'go to market' with the offering materials is made," Appx3107, violates FAR 31.205-27.

Like the Armed Services Board of Contract Appeals (ASBCA or board), Raytheon characterizes this case as a matter of the Government having failed to meet its burden of proof. But the content of Raytheon's policies is not in dispute. Whether those policies comport with the FAR is not a matter of evidence.

Raytheon acknowledges that "whether [its] timekeeping practices and bright line policy complied with the FAR[] are questions of law reviewed *de novo*." Appellee Br. 29-30. It attempts to minimize these legal questions by

characterizing them as "subsidiary to" factual issues. *Id.* at 31. The opposite is true. Indeed, many of the factual findings, or factual arguments, on which Raytheon relies are of no consequence to the Court's resolution of this appeal.

For example, Raytheon insists that its Government Relations and Corporate Development personnel performed some allowable activities. Its examples of purportedly allowable activities are largely unallowable, but there is no need for this Court to decide whether these employees ever performed an allowable activity.

On appeal, our first point is that the absence of records is dispositive, as a matter of law. Raytheon purposefully limited its recordkeeping to lists of hours that its employees spent working on activities that Raytheon itself considers to be expressly unallowable. If allowable activities were performed, they were not recorded. This practice prevented any meaningful review of the employees' own allowability determinations, but it also had another effect: it ensured that Raytheon would have no record of its Government Relations and Corporate Development employees performing any allowable activities, even if they did.

Records of unallowable activities are not records of allowable activities. If an employee performs an allowable activity but the contractor fails to maintain records sufficient to demonstrate that, the result is the same as if the activity itself was unallowable: the cost is not an allowable charge to the Government.
FAR 31.201-2(d).

As to the second question, regarding the permissibility of disregarding lobbying time outside of regular business hours, the board certainly stated a conclusion that there was no cost to Raytheon or the Government for that work. Appx36. However, that conclusion is not only unsupported by substantial evidence—which is the correct standard, rather than clear error, as Raytheon asserts—it is contradicted by the board's own findings of fact. The board found that the lobbyists understood the after-hours work to be a regular and expected part of their job. Appx23-25. Raytheon does not challenge those factual findings, which compel reversal, not affirmance.

Finally, notwithstanding Raytheon's arguments, the determination of whether Raytheon's bright-line acquisition and divestiture (A&D) policy complies with FAR 31.205-27 is a pure question of law.

## I. <u>Raytheon's Clear-Error Standard Is Incorrect</u>

Raytheon asserts that the board's decision should be reviewed for clear error. Appellee Br. 29-30. Clear error is not the correct standard of review for any issue—legal or factual—under 41 U.S.C. § 7107(b), which governs this Court's review of boards of contract appeals decisions. Under that statutory provision, questions of law are always reviewed *de novo*, and questions of fact are generally reviewed for substantial evidence. 41 U.S.C. § 7107(b) ("decision of the agency board on a question of law is not final or conclusive; but . . . the decision . . . on a

question of fact . . . may not be set aside unless the decision is (A) fraudulent, arbitrary, or capricious; (B) so grossly erroneous as to necessarily imply bad faith; or (C) not supported by substantial evidence."); *see, e.g.*, *Gen. Dynamics Corp. v. Panetta*, 714 F.3d 1375, 1378 (Fed. Cir. 2013).

Raytheon relies heavily on the clearly-erroneous standard throughout its brief, but it does not cite any case in which this Court has ever equated its factual review under 41 U.S.C. § 7107(b)(2) with a clear-error standard. The only case Raytheon cites for its assertion that "factual findings[s] [are] subject to clear-error review," Appellee Br. 30, is *Sec'y of Def. v. Northrop Grumman Corp.*, 942 F.3d 1134 (Fed. Cir. 2019). The Court's opinion in that case contains no reference to clear error or the clearly-erroneous standard. Rather, *Northrop Grumman* reinforces the applicability of the substantial evidence standard. 942 F.3d at 1140 ("Resolution of this appeal turns on whether substantial evidence supports . . . .").

The Supreme Court has made clear that substantial evidence and clear error are not equivalent standards. *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) (distinguishing the clearly-erroneous standard from the "somewhat less strict" substantial-evidence standard); *see also in re Gartside*, 203 F.3d 1305, 1311 (Fed. Cir. 2000).

Whereas the clearly-erroneous standard requires a "'definite and firm conviction' that an error has been committed," *Zurko*, 527 U.S. at 162,

"[s]ubstantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *E.L. Hamm & Assocs. v. England*, 379 F.3d 1334, 1338 (Fed. Cir. 2004). The difference may be "a subtle one," *Zurko*, 527 U.S. at 163, but the Court should apply the correct standard, which is not the clear-error standard that Raytheon repeats throughout its brief.

## II. Inadequate Records: Records Of Unallowable Time Are Not Records Of Allowable Time

For both its Government Relations and Corporate Development costs, Raytheon attempts to support the allowability of its claimed costs with records of how much time the employees reported working on the activities that Raytheon itself considers to be expressly unallowable—*i.e.*, lobbying and the A&D activities occurring after its bright-line policy thresholds. But records of unallowable time are not records of allowable time or activities. Raytheon's approach fails to satisfy the general recordkeeping requirement of FAR 31.201-2(d), the lobbying-specific recordkeeping provision of FAR 31.205-22(d), or the requirements of Cost Accounting Standard (CAS) 405, 48 C.F.R. § 9904.405.

### A. Costs Without Adequate Documentation Are Never Allowable

In our opening brief, we explained that, under FAR 31.201-2(d), costs are never allowable without adequate supporting documentation. Appellant Br. 36. Raytheon disagrees. Appellee Br. 40-41. Raytheon appears to reason that because the last sentence of FAR 31.201-2(d) states that the contracting officer "may

disallow" inadequately supported costs, unsupported costs could be either unallowable or allowable, depending on whether the Government disallows them. *Id.* Contrary to Raytheon's interpretation, cost allowability does not depend on what action the Government takes.

The first sentence of FAR 31.201-2(d) alone renders an inadequately-supported cost unallowable. That sentence provides that the "contractor is responsible for . . . maintaining records, including supporting documentation, adequate to demonstrate that costs claimed . . . comply with applicable cost principles in this subpart [FAR 31.2, which includes FAR 31.205-22 and -27] . . . ." FAR 31.201-2(d); *see also* FAR 31.201-2(a)(5) (allowability requires compliance with all limitations in FAR Subpart 31.2). That first sentence establishes the requirement. The second sentence—providing that the Government's contracting officer may disallow inadequately supported costs—addresses the consequences. The act of disallowing an inadequately supported cost is not what makes the cost unallowable. Nor does the provision confirming that the Government may do so. Rather, what makes the cost unallowable is the contractor's failure to maintain adequate records.

The distinction is important. If the Government's act of disallowing an inadequately-supported cost were what renders the cost unallowable, contractors would be free to include inadequately supported costs in the incurred cost

submissions they present to the Government, evoking the "cat-and-mouse game" that Congress sought to end with penalties. *See* Appellant Br. 7. A cost without adequate supporting documentation is never an allowable cost. FAR 31.201-2(d).

### B. Raytheon's Records Do Not Comply With FAR 31.201-2(d), Which Requires Records Demonstrating Allowability, Not Unallowability

FAR 31.201-2(d) provides that the documentation supporting a claimed cost must be "adequate to demonstrate that costs claimed . . . comply with applicable cost principles." FAR 31.201-2(d). In Raytheon's words, FAR 31.201-2(d) requires documentation sufficient to "substantiate the allowability of . . . claimed costs." Appellee Br. 5. Raytheon thus concedes that the necessary records are ones that "substantiate the allowability," *id.*, of what is claimed, not merely records confirming the unallowability of what is not claimed.

Raytheon cannot point to any record—a company record, not litigation testimony—of a Government Relations or Corporate Development employee performing any allowable activity for any identifiable period of time in 2007 or 2008.[1] Meanwhile, there are extensive records of these employees performing

[1] Raytheon appears to argue that its employee calendars constitute the necessary supporting documentation. Appellee Br. 42, 54. These are the same calendars that Raytheon refused, or was unable, to provide to the Government and insisted "are not 'records' as would be defined in the FAR" and "are not in any way used to support our claimed costs." Appx45; Appx5133-5134.

expressly unallowable lobbying and A&D activities. *See* Appellant Br. 8-11, 16-17, 19-21, 23-28.

Raytheon asserts that we "take[] the unprecedented position that a contractor's costs for entire departments are unallowable if those departments *sometimes* engage in activities that generate unallowable costs." Appellee Br. 3. That is not a position we have taken.[2] If a department is engaged in allowable activities, it should have records demonstrating that. To be sure, this does not mean that every employee must maintain detailed activity logs. What records are adequate to substantiate allowability depends on the circumstances. If a department is primarily engaged in an allowable activity—and has records to demonstrate that—a policy of recording the unallowable activities as the exception would ordinarily be reasonable. In that situation, it is the general records showing that the department is accomplishing allowable activities that primarily support the costs, not inferences drawn from records of unallowable exceptions.

In this case, there are no records upon which one could conclude that Raytheon's Government Relations or Corporate Development department was engaged in any allowable activity. The only records are records of expressly unallowable activities.

---

[2] Similarly, the brief of Raytheon's *amici curiae* is filled with misstatements of our position. What is most notable about that brief is how it conspicuously avoids any contention that the specific Raytheon policies at issue in this case are remotely defensible.

In our principal brief, we explained that Government Relations is Raytheon's lobbying department. Appellant Br. 8. Raytheon disagrees to some degree, Appellee Br. 6, but it also objected to the board referring to its Federally-registered lobbyists as lobbyists. *See* Appx15 n.10. Regardless, although the Court need not determine the extent to which the department may have engaged in allowable activities, given the absence of records, the evidence that lobbying was Government Relations' primary purpose is overwhelming.

Government Relations was staffed mostly with lobbyists. Appx14; Appx3262-3264, Appx3569-3570. Its departmental goals all relate to lobbying. Appx3494. The "Goals and Accomplishments" documents prepared in connection with the employees' annual performance reviews do not reflect significant goals or accomplishments outside of the lobbying context. Appx3494-3566, Appx3781-3862.

Likewise, although not strictly necessary to the resolution of this appeal, Raytheon's characterization of A&D as just one of many activities that Corporate Development performed is decidedly contrary to the evidence. *See* Appx21924, Appx21935 ("Everything that we do is focusing around acquisition and acquisitions and divestitures . . . ."), Appx21936 (Q. "[W]as everything you did acquisition-related in 2008? A. Yes, yes."), Appx21937-21940.

A slide in Raytheon's "Participants Guide to Acquisitions, Divestitures and Equity Transactions," Appx4580, describes the role and responsibilities of Corporate Development:

> **Corporate Development**
>
> Corporate Development Role / Responsibilities – The Corporate Development Member leads and manages the transaction process. Corporate Development is responsible for identifying transaction opportunities; providing valuation expertise to the Business; leading the Executive Screening Committee; leading the transaction team; engaging and coordinating all activities of the investment banker, venture capitalist or other financing source, and outside advisors; and, negotiating transactions.

Appx4615 (excerpt); *see also* Appx4591-4592; Appx4608-4613; Appx4630.

The Corporate Development employees were hired to work on A&D. Appx4834-4839 (position descriptions). Their "Goals and Accomplishments" documents do not identify significant activities outside of the A&D context. Appx4844-4877. Corporate Development authored a detailed "M&A Process Guide," Appx5042-5046, and a "Divestiture Guide." Appx4580; *see also* Appx4774-4797. It did not author any materials relating to allowable activities. Appx20939-20941; Appx20970-20972.

Citing its own post-hearing brief as support,[3] Raytheon asserts that acquisitions were just one tool in Corporate Development's tool box, and a

---

[3] In its brief, Raytheon frequently supports its factual contentions with no

disfavored one at that. Appellee Br. 16. But the quotation about "a number of tools in the tool box," Appx21964, was in reference to the overall company's tool box, not Corporate Development specifically. *See* Appx21963 (witness using "we" to refer to the company).

Raytheon attempts to obscure the A&D focus of its Corporate Development dealmakers by painting them as leading strategy meetings and "gap analyses." *E.g.*, Appellee Br. 16. However, that was the responsibility of Corporate Strategy, a separate Raytheon department, Appx20936-20937, in conjunction with Raytheon's individual business units. Appx5055 (business units and Corporate Strategy responsible for gap analysis); Appx20556 ("the strategic GAP analysis is . . . undertaken by, principally the business unit, but it includes corporate strategy. And corporate development is, we have a voice, we're not the primary driver . . . .").

To the extent Corporate Development had a seat at the table for this strategic dialogue, it was there for its A&D perspective and role. Appx21964 ("Q. Okay, so that broad, strategic dialogue process you just described, would you encompass that within your definition of acquisition-related activity? A. Absolutely."); Appx21939-21940 ("Q. Are you agreeing that all of your activities have an eye

---

more than a citation to its own post-hearing brief, which begins at Appx23602 and ends at Appx23814. None of the appendix pages within that range are evidence.

towards the A&D end? (Pause.) A. I'm okay with that statement, yes."); Appx20889-20890; *see also* Appx5052-5058.

Raytheon also asserts that Corporate Development engaged in allowable management planning. Appellee Br. 15-16. Its own Corporate Development employees do not believe that. *E.g.*, Appx22335-22336 (Q. "[D]o you believe that your office, corporate development, performs any general long range management planning? A. No.").

Raytheon's records establish that Government Relations and Corporate Development were primarily, if not entirely, engaged in expressly unallowable activities. It has no records of their alleged allowable activities.[4] The employees' reports of time spent on expressly unallowable activities do not constitute records sufficient to support a determination that the remaining, unaccounted-for time was allowable.

### C. Raytheon's Lobbying Records Do Not Satisfy FAR 31.205-22(d)

In the lobbying context, FAR 31.205-22(d) provides that "[c]ontractors shall maintain adequate records to demonstrate that the certification of costs as being

[4] Raytheon argues that hearing testimony can take the place of records, but the cases it cites neither establish that proposition nor are they controlling. Appellee Br. 41-42. FAR 31.201-2(d) expressly requires "supporting documentation." *Id.* If that documentation does not exist, no amount of witness testimony can supply it. Moreover, Raytheon's witnesses provided generalized speculation as to what could have or would have occurred, not reliable accounts of what actually occurred. *E.g.*, Appx21889-21896.

*allowable or unallowable* (see [FAR] 42.703–2) pursuant to this subsection complies with the requirements of this subsection." FAR 31.205-22(d) (emphasis added). Thus, records under FAR 31.205-22(d) must capture in-house lobbyists' allowable *and* unallowable activities, and in sufficient detail to demonstrate that the activities have been classified correctly.

Raytheon attempts to side-step FAR 31.205-22, asserting that the lobbying cost principle is inapplicable to the Government Relations costs Raytheon claims because (1) Raytheon does not claim allowable lobbying costs under the exceptions enumerated in FAR 31.205-22(b), Appellee Br. 4-5 & n.2; and (2) the Government Relations costs that it does claim must be considered "non-lobbying" because they were not accounted-for as lobbying by the lobbyists. *Id.* at 39. The hearing testimony contradicts the first assertion. Appx21885-21886, Appx21920-21922. The second assertion, if accepted, would render FAR 31.205-22(d) largely meaningless.

Indeed, the history of FAR 31.205-22 demonstrates that Raytheon's attempt to avoid the lobbying recordkeeping requirement by characterizing its lobbyists' time as non-lobbying is contrary to the intent of the regulation. The 1984 version of the FAR 31.205-22 included both a paragraph similar to the current FAR 31.205-22(d) and a subsequent provision that had the effect of expounding on what types of records were expected:

> (e) Contractors shall maintain adequate records to demonstrate that the certification of costs as being allowable or unallowable pursuant to this subsection complies with the requirements of this subsection.
>
> (f) Time logs, calendars, or similar records documenting the portion of an employee's time that is treated as an indirect cost shall not be required for the purposes of complying with this subsection, and the absence of such records which are not kept pursuant to the discretion of the contractor will not serve as a basis for disallowing allowable costs by contesting estimates of unallowable lobbying time spent by employees during any calendar month unless; (1) the employee engages in lobbying, as defined in (a) and (b) above, more than 25% of the employee's compensated hours of employment during that calendar month; or (2) the organization has materially misstated allowable or unallowable costs within the preceding five year period.

49 Fed. Reg. 18,278, at 18,279 (Apr. 27, 1984). Thus, originally, "time logs, calendars, or similar records documenting the portion of an employee's time that is treated as an [allowable] indirect cost" were required, unless the employee spent less than 25 percent of his or her time engaged in lobbying and the organization had not misstated allowable or unallowable costs in the previous five years. *See id.*; *see also* 52 Fed. Reg. 19,800, at 19,802 (May 27, 1987) ("The '25 percent' rule is an extraordinary waiver of only the special recordkeeping requirements.").

In 1996, the under-25-percent exception provision (paragraph (f) in the above quotation) was deleted. 61 Fed. Reg. 31,656 ("The FAR rule deletes 31.205-22(f) because it conflicts with [other] recordkeeping requirements . . . .").

Thus, the drafters eliminated the exception, meaning that every employee engaging in lobbying should now be keeping "detailed activity records," 52 Fed. Reg. at 19,802, pursuant to FAR 31.205-22(d).

Raytheon, by contrast, does not keep detailed activity records for any of the employees whom it pays to engage in lobbying. Under Raytheon's policy, employees spending less than 25 percent of their time on lobbying keep no records at all pursuant to FAR 31.205-22(d), and those spending more than 25 percent of their time on lobbying simply report the number of hours that they consider to be unallowable. *See* Appellee Br. 9.

Raytheon's approach does not comply with FAR 31.205-22(d). If a contractor wants to charge the Government for a portion of its in-house lobbyists' salaries, it must be able to support those charges with meaningful records sufficient to support its decision to categorize its costs as allowable or unallowable.

### D. <u>Raytheon's Records Do Not Comply With CAS 405</u>

Moreover, under CAS 405, "Accounting for Unallowable Costs," adequate records are those that "permit audit verification." 48 C.F.R. § 9904.405-50(b)(1)(iii); *id.* § 9904.405-50(b)(1); *accord* Appellee Br. 42 ("CAS 405 requires contractors to maintain records that are 'adequate for purposes of contract cost determination and [audit] verification'").[5]

---

[5] Although CAS 405 does not govern allowability of costs, 48 C.F.R.

Raytheon's lists of hours or days that its employees deemed unallowable do not permit audit verification. At the board hearing, a Raytheon lobbyist testified:

> Q. So if I wanted to go verify . . . the allowable activities you performed in 2007, . . . how would I do that?
>
> A. They're the ones that are not recorded on the sheets. You're recording the un-allowable activities, which was the purpose of the sheet.
>
> Q. Okay. And if I wanted to verify what you did and figure out whether those were allowable or not, how would I do that?
>
> A. You wouldn't.

Appx22957.

## III. When After-Hours Lobbying Is A Regular And Expected Part Of The Lobbyists' Job, Disregarding Those Hours Is Not Acceptable

As this Court has observed, FAR 31.205-22 does not prohibit contractors from recovering a portion of their in-house lobbyists' salaries, if it is not attributable to the lobbying activities enumerated in FAR 31.205-22(a). *Raytheon Co. v. Sec'y of Def.*, 940 F.3d 1310, 1314 (Fed. Cir. 2019). However, inherent in this allocation approach is an obligation to exclude all unallowable lobbying hours in determining what proportion of the salaries is allowable.

---

§ 9904.405-20(b), costs that do not comply with CAS, when applicable, are unallowable under FAR Part 31. FAR 31.201-2(a)(3). There is no dispute that the CAS apply to Raytheon. Appellee's Br. 45.

Raytheon characterizes our argument as an effort "to impose an unwritten rule—not found anywhere in the FAR or the CAS—that contractors must account for labor costs as a function of all time worked." Appellee Br. 43. We are not arguing about labor costs generally. Our appeal on this point is limited to the context of Raytheon's lobbyists.[6]

Nor is it an "unwritten rule" that we ask the Court to announce. The written rule on which we rely is FAR 31.205-22(a). That provision enumerates the unallowable lobbying activities, without any exceptions for time of day. The costs of the activities identified in FAR 31.205-22(a) are as unallowable on a Saturday night as they are on weekday morning. Raytheon's corporate policy of disregarding activities unallowable under FAR 31.205-22(a) based on the time of day when they are performed is not a reasonable implementation of FAR 31.205-22.

Contrary to Raytheon's argument, Appellee Br. 43-44, the board's factual findings do not support Raytheon's position. True, the board *concluded* that "[t]here was no cost to Raytheon or the government for work outside normal business hours." Appx36. However, substantial evidence does not support that conclusion. Indeed, no evidence—other than self-serving assertions by Raytheon

[6] To be sure, the same rationale would apply in other situations where expressly unallowable after-hours work is a regular and expected part of employees' job responsibilities.

employees and its counsel—supports that conclusion. The board acknowledged as much. It stated: "Raytheon maintains, and the government has not rebutted, that there was no cost to it or to the government for work outside normal business hours." Appx20; *see also id.* n.12 ("[L]ogically, the expectation of regular night and weekend work would be factored into the salary paid to the lobbyists. The government did not introduce testimony on this point, so we accept Raytheon's testimony that the government was not charged for the night and weekend work."). Thus, the board's conclusion that after-hours work was being performed at no cost to Raytheon was based on a belief that there was an absence of evidence to the contrary.

However, the board failed to recognize the consequence of its own findings of fact. The board made extensive findings, Appx23-25, that "Raytheon's lobbyists worked early mornings, late nights, and weekends from time to time on what all of the testifying witnesses considered to be a regular part of their work duties." Appx36.

These findings, which Raytheon does not challenge, cannot be squared with the conclusion that the lobbyists' salaries were not compensating them for their work outside of regular business hours. Testimony that the lobbyists' uniformly understood after-hours work to be a regular and expected part of their job responsibilities demonstrates that such work was part of their employment bargain

with Raytheon, not volunteer work. Thus, the board's findings of fact support reversal, not Raytheon's position.

Raytheon asserts that we "speculate[] (with no evidence)" that considering all hours of work would increase Raytheon's lobbying withdrawal percentage. Appellee Br. 43. Raytheon thus seeks to use its own failure to maintain adequate records as a shield for its unlawful policy. In any case, Raytheon's view of the evidence is not in accord with the record. There is extensive evidence that Raytheon's lobbyists regularly engaged in after-hours lobbying work. Appx3630-3633; Appx21206-21211; Appx21857-21858; Appx22898-22900; Appx22936-22946. By contrast, there is no evidence that Raytheon's lobbyists ever engaged in any allowable activity outside of business hours—or at any specifically identifiable time.

Raytheon asserts that "the Board found as a factual matter, based on uncontroverted testimony, that time-paid accounting was proper based on Raytheon's disclosed cost accounting practice." Appellee Br. 45 (citing Appx20). As an initial matter, the propriety of Raytheon's accounting vis-à-vis the regulations is not a factual question. Even if it were, substantial evidence does not support a contention that Raytheon's CAS disclosure statements disclosed the practice of limiting its lobbying withdrawal to lobbying work performed during regular business hours. Indeed, Raytheon does not even represent that the

procedure at issue was itself disclosed. Rather, it asserts only that its hours-paid accounting "is consistent with its disclosed cost accounting practice." Appellee Br. 45. The exact practice allegedly disclosed, and the words used to effect the disclosure, remain a mystery.

Regardless, the supposed disclosure, like the rest of Raytheon's arguments on this point, depends on the Court accepting the delusion that time paid was different than time worked for these salaried lobbyists. If the Court rejects that delusion, it is irrelevant what Raytheon may have disclosed in its CAS disclosure statements. If the practice is not a permissible implementation of FAR 31.205-22, it cannot become permissible through disclosure.

Finally, Raytheon's discussion of FAR 31.201-6(e)(2), Appellee Br. 46-47, does not offer any meaningful response to the point we made in our brief. Appellant Br. 44-45. As we explained, by stating that it is impermissible to disregard after-hours work "when it is evident that an employee engages so frequently in company activities during periods outside normal working hours as to indicate that such activities are a part of the employee's regular duties," FAR 31.201-6(e)(2) establishes that pretending that such work has no cost is unreasonable even in the context of merely directly associated costs. Reading FAR Part 31 as a whole, if disregarding such hours is impermissible with respect to

directly associated costs, it is surely unacceptable with respect to expressly unallowable lobbying salary costs, for which there is no immateriality exception.

## IV. Raytheon's A&D Policy Plainly Violates FAR 31.205-27

According to Raytheon, our "contention that FAR 31.205-27(a) 'unambiguously makes all A&D costs—at any stage—expressly unallowable' . . . has no support in the FAR." Appellee Br. 50. However, that is exactly what FAR 31.205-27(a) states: "expenditures in connection with . . . planning or executing the organization or reorganization of the corporate structure of a business, including mergers and acquisitions, . . . are unallowable." FAR 31.205-27(a).

Even more succinctly: "expenditures in connection with . . . mergers and acquisitions . . . are unallowable." *Id.* No exception is allowed for early-stage work. Thus, a corporate policy decreeing that "[u]nallowable acquisition costs commence with the submission of an indicative offer" and "[u]nallowable divestiture costs commence when the decision to 'go to market' with the offering materials is made," Appx3107, is plainly inconsistent FAR 31.205-27(a).

Raytheon suggests that it would be "irresponsible" for it to simply tell its employees that time spent working on acquisitions or divestitures is unallowable, as its employees cannot be expected to comprehend that guidance. Appellee

Br. 55. Besides, "what is a purported 'A&D cost[?]'" Raytheon wonders. Appellee Br. 50.

Contrary to Raytheon's position, there is no lack of clarity in the regulations. The possibility of disagreements regarding *application* of the rules is inherent in having rules; it does not mean that the rules are unclear or may be unilaterally re-written by the companies obligated to comply with them.

### A. **There Is No Lack Of Clarity In The Regulations**

The Court should reject Raytheon's contention that the "the distinction between unallowable costs for organizational planning and allowable costs for economic or market planning is 'unclear' and not 'a defined line.'" Appellee Br. 47. Neither economic planning under FAR 31.205-12 nor market planning under FAR 31.205-38(b)(4) include activities aimed at altering the contractor's organizational structure, which is the touchstone of FAR 31.205-27(a).

FAR 31.205-12, "Economic planning costs," provides:

> Economic planning costs are the costs of general long-range management planning that is concerned with the future overall development of the contractor's business and that may take into account the eventual possibility of economic dislocations or fundamental alterations in those markets in which the contractor currently does business. Economic planning costs are allowable.

FAR 31.205-12. The rule goes on to expressly state that "[e]conomic planning costs do not include organization or reorganization costs covered by 31.205-27."

*Id.* Thus, Raytheon's assertion that the line between economic planning costs and organizational costs is "unclear" and "not 'a defined line,'" Appelle's Br. 47, is at odds with the plain language of FAR 31.205-12.

A permutation of Raytheon's position was expressly rejected by the drafters of the regulation in 2003, in comments accompanying the issuance of the current version of FAR 31.205-12. 68 Fed. Reg. 56,686, at 56,687 (Oct. 1, 2003). The drafters initially proposed deleting the phrase "and that may take into account the eventual possibility of economic dislocation or fundamental alterations in those markets in which the contractor currently does business" as superfluous. *See id.* A commenter asserted that "the [drafters] may be unintentionally narrowing the allowability of economic planning costs. Specifically, . . . 'costs associated with the generalized planning of possible divestitures may no longer be considered economic planning costs by auditors and ACOs but be considered unallowable organization costs instead.'" *Id.*

The drafters responded by firmly rejecting the suggestion that "planning of possible divestitures" constitutes allowable economic planning. *See id.* Although the drafters ultimately decided not to delete the phrase at issue because no change in scope was intended, they made very clear that they rejected the commenter's position, stating:

> It was not the Council's intent to change the scope of this cost principle . . . . However, *the Councils also want to*

> *go on record as not agreeing with the assertion that planning costs related to divestiture efforts are economic planning costs covered by this cost principle.* Efforts by a contractor to analyze future market conditions and assess the impact of those conditions on its current organization are economic planning costs. *Any efforts by a contractor to analyze, initiate, or change its current organization to meet future market conditions are organization or reorganization costs covered under FAR 31.205-27, Organization costs.*

*Id.* (emphasis added).

Nor is there any lack of clarity in the distinction between unallowable A&D costs and allowable market planning costs under FAR 31.205-38(b)(4). FAR 31.205-38 addresses selling costs. "'Selling' is a generic term encompassing all efforts to market the contractor's products or services . . . ." FAR 31.205-38(a). Allowable "[m]arket planning involves market research and analysis and general management planning concerned with development of the contractor's business." FAR 31.205-38(b)(4).

Thus, as with economic planning under FAR 31.205-12, market planning under FAR 31.205-38(b)(4) concerns the contractor's current business organization. There is no basis to treat "efforts by a contractor to analyze, initiate, or change its current organization," 68 Fed. Reg. at 56,687, as market planning.

**B. <u>There Is No Basis To Re-Write FAR 31.205-27</u>**

Raytheon relies on a prior decision of the ASBCA, along with a treatise[7] cited by the board in that case. Appellee Br. 47. Neither is binding on this Court, of course. And neither offers any persuasive basis to effectively re-write the language of the FAR.

In *Raytheon Co.*, ASBCA No. 57743, 17-1 B.C.A. ¶ 36,724 (Apr. 17, 2017). the board observed that the economic planning provision, FAR 31.205-12, "excludes organization and reorganization costs covered by FAR 31.205-27." *Id.* The board also recognized that FAR 31.205-27 "does not clearly limit its coverage to costs of targeting a specific merger or acquisition. Although it mentions 'the' organization or reorganization of a business, in the singular, it also refers to costs in connection with mergers and acquisitions broadly, in the plural, not to 'a' merger and acquisition." *Id.*

Despite these observations, the board then asserted that the distinction between FAR 31.205-12 and FAR 31.205-27 is unclear. *Id.* The board also

[7] Raytheon's reliance on "experts in government contacts law," Appellee's Br. 47, does not carry any persuasive value. The interpretation of regulations is firmly the province of judges, not self-proclaimed expert commentators. *See Rumsfeld v. United Techs. Corp.*, 315 F.3d 1361, 1369 (Fed. Cir. 2003) ("The views of the self-proclaimed CAS experts . . . as to the proper interpretation of those regulations is simply irrelevant to our interpretive task . . . ."); *see also Sparton Corp. v. United States*, 77 Fed. Cl. 1, 9 (2007) (excluding expert testimony regarding legal questions from one of the authors of the treatise Raytheon cites).

quoted, approvingly, the treatise on which Raytheon continues to rely.[8] *Id.* That treatise asserts, without any support, that "evaluating potential markets or firms for mergers or acquisitions would be allowable. Conversely, once a target has been identified, the costs of planning or executing organizational changes would be unallowable." *See id.*

The treatise's once-a-target-is-identified distinction, while far less objectionable than Raytheon's own rule, is still not what the regulation says. There is no support in the regulations for the treatise's assertion that "evaluating potential markets or firms for mergers or acquisitions would be allowable." *Id.* (quoting treatise). If Raytheon hires an employee solely to "evaluate[] potential . . . firms for mergers or acquisitions," *id.*, none of the cost of that employee's salary is an allowable charge to the Government. FAR 31.205-27(a) ("expenditures in connection with . . . mergers and acquisitions . . . are unallowable"); *see also* 68 Fed. Reg. at 56,687 ("Any efforts by a contractor to analyze, initiate, or change its current organization to meet future market conditions are organization or reorganization costs covered under FAR 31.205-27, Organization costs."). If Raytheon hires an employee solely to prepare best-practices guides for mergers

---

[8] Neither Raytheon nor the board mentions passages of the treatise that are at odds with Raytheon's position, such as: "Thus, a contractor attempting to recover economic planning costs must demonstrate that the cost is not associated with a merger or acquisition. The burden of proof, it would seem, is squarely on the contractor's shoulders." John Cibinic, Jr. *et al.*, Cost-Reimbursement Contracting 621 (4th ed. 2014) (EBSCO electronic version).

and acquisitions, without ever considering any specific target, the cost of that work is equally unallowable under the plain language of FAR 31.205-27(a).

However well-intentioned, adoption of the once-a-target-is-identified distinction has the effect of re-writing a rule that does not need re-writing. The rules are in the FAR. They are not unclear. With any set of rules, there will inevitably be disagreements about which rule applies to specific items.[9] Disagreements of application do not mean that the rules are unclear, or that this Court should participate in re-writing them.

### C. Even Under The Interpretation Espoused By Its Cited Treatise, Raytheon's Bright-Line Rules Still Violate The Regulation

Raytheon asserts that its cited treatise and a previous board decision endorse the "same bright line distinctions" it has attempted to draw. Appellee Br. 23. That is not accurate. Raytheon's policy draws the line far later than the point at which a specific target is identified. Corporate Development did not show up to meetings with the "C-Suite" executives of Raytheon's Acquisition Council for brainstorming sessions. *See* Appx5065-5069. They were presenting thoroughly-researched and analyzed proposals for specific acquisitions or divestitures. *E.g.*, Appx4849 ("In 2007, 23 opportunities . . . were brought forward to [Raytheon's] Acquisition

[9] FAR Subpart 31.2 includes provisions governing its application. *See, e.g.*, FAR 31.204(d) (When a cost, to which more than one subsection in 31.205 is relevant, cannot be apportioned, the determination of allowability shall be based on the guidance contained in the subsection that most specifically deals with, or best captures the essential nature of, the cost at issue.")

Council") Appx20918 ("there is a lot of work up front before an [indicative offer] is submitted"); Appx20905-20910 (describing process leading up to indicative offer).

The following graphic from Corporate Development's "M&A Process Guide," Appx5042, depicts Raytheon's "[k]ey decision points" "during [a] transaction review," Appx5048:




Appx5049.[10] By the time Corporate Development seeks approval to submit an indicative offer to an acquisition target—the middle diamond in the graphic—Corporate Development has put in considerable work evaluating the acquisition target, all of which occurs before there is any possibility of crossing Raytheon's bright-line acquisition threshold.[11] Appx20547 (Q. "[D]o you believe you

[10] Raytheon's Acquisition Council later became its Acquisition Review Team (ART). Appx21957. A "teaser" is a pitch document from an investment banker providing general information about a proposed acquisition candidate, without revealing confidential information. Appx20911-20912 (A teaser "gives you enough to know about the company to make a decision on whether or not you want to enter into a non-disclosure agreement. . . . And then from there after you've executed one . . . , they have what they call Confidential Information Memorandums or offering materials.").

[11] Notably, a previous iteration of Raytheon's A&D policy, Appx4576,

performed any acquisition planning before you submitted [an indicative offer]? A. Yes, I do.”). For example, Corporate Development cannot propose an amount for the indicative offer without first performing valuation analyses of the target company. Appx4785; *see* Appx20913-20914.

Similarly, for divestitures, for Corporate Development to request approval to “go to market” with its offering materials, it had to first complete a range of activities, such as performing valuation analyses of the business unit proposed for divestiture. *E.g.*, Appx4873 (Accomplishment: “Developed overview of Elcan as a divestiture target, including preliminary valuation and identification of potential buyers.”); *see also* Appx20919-20926.

Corporate Development’s own documents flatly contradict Raytheon’s contention that the department “could not know which company, if any, to target for any actual planning” until the Acquisition Council “declared its intentions.” Appellee Br. 54. For example, on Corporate Development’s list of deliverables for divesting a business, Appx4727-4757, the “Go/No Go Approval” is task number 205. Appx4756. Every one of the preceding 204 tasks is focused on a potential divestiture of a specifically-identified business unit. Appx4727-4756; *see also* Appx4616, Appx4637-4644, Appx4697-4726.

---

stated that “unallowable” acquisition costs commence “no later than the time at which a confidentiality agreement is executed.” Appx4577.

Raytheon concludes its brief with an attempt to defend the indefensible. In our principal brief, we described how Corporate Development Director Paul Bailey classified his work regarding 21 of the 23 acquisition targets he presented to Raytheon's Acquisition Council in 2007 as allowable time to be charged to the Government. Appellant Br. 26-28, 50-52. In its brief, Raytheon doubles-down, insisting that "none of the complained-of activities by Mr. Bailey generated unallowable costs." Appellee Br. 56. Mr. Bailey's efforts to acquire businesses are the epitome of expressly unallowable acquisition activities. The need for Raytheon's policies to change could hardly be clearer.

## V. <u>Consequences Of Raytheon's Policies</u>

Even if Government Relations and Corporate Development performed some allowable activities, the choices Raytheon made with respect to recordkeeping leave it without any record of anyone in either department performing an allowable activity. In contrast, there are extensive records that those departments existed for the purpose of accomplishing expressly unallowable activities. Consequently, Raytheon had no basis to charge the Government for any portion of those salaries, all of which were expressly unallowable under FAR 31.205-22 or -27.[12]

[12] Although the Court may leave issues of quantum, *see* Appx6, for the board to resolve, along with penalties, the amounts that should have been disallowed are: expressly unallowable lobbying salary costs of $1,870,428 in 2007 and $981,822 in 2008 (plus $83,659 that the Government's administrative decision found unallowable, but not expressly unallowable, *see* Appx23597); and expressly

Moreover, Raytheon's failure to conform the policies it used to determine the proportion of its Government Relations and Corporate Development salary costs to charge to the Government to the FAR renders those calculations meaningless. None of the costs of the lobbying activities identified in FAR 31.205-22(a) may be charged to Government. When after-hours lobbying is a regular and expected part of in-house lobbyists' duties, a computation of how much time they reported spending on unallowable lobbying during regular business hours is not determinative of the total costs of their lobbying activities.

Raytheon's bright line policy resulted in a similarly useless computation. The proportion of Corporate Development's time spent after Raytheon's thresholds is a meaningless subset of their A&D activities, which are expressly unallowable under FAR 31.205-27(a). Neither of Raytheon's withdrawal calculations gave it a basis to charge the Government for any portion of its Government Relations or Corporate Development salary costs.

Ordinarily, when there is a dispute regarding calculation methodology, the contractor may prepare an alternative calculation in case its methodology is rejected. In this case, however, Raytheon has deprived itself of any possibility of recalculating its claimed costs. Raytheon's decision to intentionally limit its

---

unallowable A&D salary costs of $862,010 in 2007 and $831,797 in 2008. *See* Appellant Br. 12, 28; Appx898 ("Summary of Conclusions" explaining two adjustments representing the difference between the $862,010 in 2007 A&D costs to be disallowed and the $903,817 identified at Appellant Br. 28).

recordkeeping to what it deemed unallowable—erroneously—leaves it without any ability to present an alternative calculation that complies with the FAR (supposing it were true that these departments performed some allowable activities). These problems are entirely of Raytheon's own making.

## CONCLUSION

We respectfully request that the Court reverse the board's decision as to the allowability of Raytheon's Government Relations and Corporate Development costs, and remand for a determination of penalties.

Respectfully submitted,

MICHAEL D. GRANSTON
Deputy Assistant Attorney General

/s/ Patricia M. McCarthy
PATRICIA M. MCCARTHY
Director

/s/ Daniel B. Volk
DANIEL B. VOLK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 353-7955

Attorneys for Appellant

OF COUNSEL:

ALEXANDER M. HEALY
Senior Trial Attorney
Contract Disputes Resolution Center
Defense Contract Management Agency
Hanscom Air Force Base, MA 01731

May 2, 2022

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2021-2304

**Short Case Caption:** Secretary of Defense v. Raytheon Company

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 6,998 words.

- [ ] the filing has been prepared using a monospaced typeface and includes ________ lines of text.

- [ ] the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 05/02/2022

Signature: /s/ Daniel B. Volk

Name: Daniel B. Volk

Save for Filing