# United States Court of Appeals for the Federal Circuit

---

**SECRETARY OF DEFENSE,**
*Appellant*

**v.**

**RAYTHEON COMPANY, RAYTHEON MISSILE SYSTEMS,**
*Appellees*

---

2021-2304

---

Appeal from the Armed Services Board of Contract Appeals in Nos. 59435, 59436, 59437, 59438, 60056, 60057, 60058, 60059, 60060, 60061, Administrative Judge David D'Alessandris, Administrative Judge Cheryl L. Scott, Administrative Judge Richard Shackleford.

---

Decided: January 3, 2023

---

DANIEL B. VOLK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellant. Also represented by MICHAEL GRANSTON, PATRICIA M. MCCARTHY; ALEXANDER MARTIN HEALY, Contract Disputes Resolution Center, Defense Contract Management Agency, Hanscom Air Force Base, MA.

JOHN WILLIAM CHESLEY, Gibson, Dunn & Crutcher

LLP, Washington, DC, argued for appellees. Also represented by LINDSAY MIRIAM PAULIN, AMIR C. TAYRANI; DHANANJAY S. MANTHRIPRAGADA, Los Angeles, CA; NICOLE OWREN-WIEST, ERIN NICOLE RANKIN, Crowell & Moring LLP, Washington, DC.

DOUGLAS W. BARUCH, Morgan, Lewis & Bockius LLP, Washington, DC, for amici curiae Aerospace Industries Association, National Association of Manufacturers. Also represented by WILLIAM BARRON ARBUTHNOT AVERY, JENNIFER M. WOLLENBERG; SHEILA A. ARMSTRONG, Dallas, TX; CATHERINE LYNN ESCHBACH, Houston, TX. Amicus curiae Aerospace Industries Association also represented by MATTHEW F. HALL, Dunaway & Cross, PC, Washington, DC.

---

Before MOORE, *Chief Judge*, PROST and TARANTO, *Circuit Judges*.

PROST, *Circuit Judge*.

The Secretary of Defense ("Secretary") appeals an Armed Services Board of Contract Appeals ("Board") decision rejecting the government's claim that Raytheon Co. ("Raytheon") included unallowable costs in its final indirect-cost proposals for 2007 and 2008. We conclude that the Board erred in interpreting Raytheon's corporate practices and policies, which are inconsistent with the Federal Acquisition Regulation ("FAR"), Chapter I of Title 48 of the Code of Federal Regulations, and which led Raytheon to charge the government for unallowable costs. We therefore reverse.

## BACKGROUND

### I

In cost-reimbursement contracts with the United States, the government agency agrees to pay the

contractor's allowable costs. *See* 48 C.F.R. § 52.216-7. This case involves indirect costs, which are incurred as part of normal business operations rather than in performing a specific contract. *Id.* § 31.203(b). Each year, contractors submit indirect-cost rate proposals, which provide a schedule of all claimed expenses. *Id.* § 52.216-7(d)(2). A contractor may not pass on all of its costs to the government; some costs are unallowable by law, and the contractor must certify that its incurred-cost submissions do not include any unallowable costs. *See* 10 U.S.C. § 2324(e), (h) (2020).[1]

An allowable cost is a cost that complies with all of the following requirements: (1) reasonableness; (2) allocability; (3) "[s]tandards promulgated by the [Cost Accounting Standards ("CAS")] Board, if applicable; otherwise, generally accepted accounting principles and practices appropriate to the circumstances"; (4) "[t]erms of the contract"; and (5) "[a]ny limitations set forth in" subpart 31.2 of Title 48 of the Code of Federal Regulations. 48 C.F.R. § 31.201-2(a). An expressly unallowable cost is "a particular item or type of cost which, under the express provisions of an applicable law, regulation, or contract, is specifically named and stated to be unallowable." 48 C.F.R. § 31.001.

Subpart 31.2 outlines the allowability of specific costs and makes some expressly unallowable even if the cost otherwise meets the general allowability criteria of § 31.201-2(a). Relevant here, "lobbying and political activity costs"—which are costs associated with "[a]ttempts to influence the outcomes of" elections, referenda, initiatives, or the introduction, enactment, or modification of legislation—and "organization costs"—including costs associated with "planning or executing the organization or

---

[1] Section 2324 has since been repealed. *See* William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, Div. A, Title XVIII, sec. 1881(a), 134 Stat. 4293.

reorganization of the corporate structure of a business, including mergers and acquisitions"—are expressly unallowable. *See id.* §§ 31.205-22, 31.205-27. "A contractor is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles . . . ." *Id.* § 31.201-2(d). Contractors who submit indirect-cost rate proposals that include expressly unallowable costs are subject to penalties. 10 U.S.C. § 2324(b) (2020); 41 U.S.C. § 4303(b).

II

The challenged costs in this case relate to Raytheon's Government Relations and Corporate Development Departments.

Raytheon's Government Relations Department, which in 2007 and 2008 consisted of 20 to 22 employees, is housed in Arlington, Virginia. During the relevant time period, government-relations employees engaged in various activities including information gathering, internal discussions on lobbying strategies, attending meals with contractors and Congresspeople or Congressional staff, meeting with internal Raytheon customers, attending political fundraising events, administering Raytheon's Political Action Committee, interfacing between Raytheon and the legislative branch of the U.S. government, and responding to requests from Congressional staffers, among other similar activities. Raytheon's Policy 23-3045-110, "Identifying and Reporting Lobbying Activity Costs," instructed employees to record all compensated time spent on lobbying activities. Accounting personnel then identified and withdrew costs associated with that time from Raytheon's incurred-cost submissions. Raytheon's employees considered time worked outside of regular hours and on weekends to be part of their regular work duties, yet Raytheon's Lobbying Policy instructed them not to report "[t]ime spent on lobby

activity after the scheduled working day," which was between 8:00 a.m. and 5:00 p.m., Monday through Friday. Government-relations employees do not report time spent on allowable (*i.e.*, non-lobbying) activities.

Raytheon's Corporate Development Department, which in 2007 and 2008 consisted of roughly seven to eight employees, is housed in Waltham, Massachusetts. During the relevant period, Corporate Development worked with Raytheon's business units in strategic development and growth opportunities. When it identified gaps in a business's capabilities, Corporate Development would work with that business to fill the gap through, for example, internal investment, research and development, intellectual property licensing, partnerships, or acquisitions. Proposals for acquisitions or divestitures were made to the Acquisition Counsel, which made the final decision to submit a non-binding indicative offer or to go to market with offering materials. Per Corporate Development policy, "[u]nallowable acquisition costs commence with the submission of an indicative offer," and "[u]nallowable divestiture costs commence when the decision to 'go to market' with the offering materials is made." These bright-line rules establish when Raytheon's corporate-development employees begin recording their time: before the Acquisition Counsel makes its decision, Raytheon treats employee time as allowable and does not record it; after the decision, Raytheon switches the time to "unallowable," and employees begin to record their time.

In 2007 and 2008, Raytheon charged the government for roughly half of the salary costs of its Government Relations and Corporate Development Departments.

## III

The Defense Contract Audit Agency ("DCAA") audited both Raytheon's Government Relations Department and its Corporate Development Department, determined that Raytheon's 2007 and 2008 incurred-cost submissions for

those departments included unallowable costs, including expressly unallowable costs, and demanded reimbursement and payment of penalties. Raytheon appealed to the Board, which held a hearing in May 2017. On February 1, 2021, it ruled in Raytheon's favor, concluding, as relevant here, that Raytheon's claimed government-relations and corporate-development costs were allowable and appropriately charged to the government. *See Appeals of Raytheon Co.*, ASBCA No. 59435, 21-1 B.C.A. ¶ 37,796 (Feb. 1, 2021) (J.A. 1–115).

With respect to government-relations costs, the Board concluded that the government had not met its burden of proving that Raytheon's costs were unallowable lobbying costs. J.A. 35. The Board found that Raytheon's personnel were well trained in the FAR's lobbying reporting requirements and complied with Raytheon's policies. J.A. 36. It rejected the government's contention that the time Raytheon's employees spent lobbying outside regular working hours should be included because, even though "lobbying responsibilities were a regular part of the work duties," Raytheon's time-paid accounting policies meant that its employees were compensated for a 40-hour work week and, therefore, "[t]here was no cost to Raytheon or the government for work outside normal business hours." *Id.* The Board further rejected the idea that all unsupported costs were unallowable. J.A. 38.

The Board also concluded that the government had failed to show that the disputed corporate-development costs were unallowable. J.A. 50. The Board scrutinized Raytheon's bright-line rules and concluded that they were a permissible articulation of the line between allowable economic- or market-planning costs under 48 C.F.R. § 31.205-12 and unallowable organization costs under § 31.205-27. *Id.* Because Raytheon trained its employees on that policy, who then followed it, the Board concluded that the government had failed to show that Raytheon's incurred-cost submissions were inaccurate. J.A. 51–52.

The Secretary appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(10).

## DISCUSSION

We review the Board's legal determinations de novo and may set aside the Board's findings of fact if they are (a) fraudulent, arbitrary, or capricious; (b) so grossly erroneous as to necessarily imply bad faith; or (c) not supported by substantial evidence. 41 U.S.C. § 7107(b).

The Secretary's appeal challenges the Board's findings that Raytheon's cost-reporting policies comply with the FAR.[2] We address the government-relations and the corporate-development policies in turn.

### I

The Secretary contends that the government met its burden of showing that Raytheon overcharged the government because Raytheon's policy disregarding after-hours lobbying rendered the government-relations incurred-cost submissions meaningless. We agree.

The Board's conclusion that "there was no cost to [Raytheon] or to the government for work outside normal business hours," J.A. 20, is not supported by substantial evidence. Indeed, the Board's findings support the opposite conclusion. It observed that "Raytheon's lobbyists worked early mornings, late nights, and weekends from time to time on what all of the testifying witnesses considered to be a regular part of their work duties." J.A. 36. And it

---

[2] The Secretary also makes the more-general argument that all unsupported costs are unallowable but agrees that we need not reach that issue if we find, as we do, that Raytheon's policies are inconsistent with the FAR. Oral Arg. at 31:34–32:07, No. 21-2304, https://oralarguments.cafc.uscourts.gov/default.aspx?fl=21-2304_11012022.mp3.

stated, "logically, the expectation of regular night and weekend work would be factored into the salary paid to the lobbyists." J.A. 20 n.12. Together, these statements lead to the conclusion that Raytheon, by ignoring after-hours lobbying, must have charged the government for unallowable lobbying costs. Yet the Board ignored its own factual findings and logic and reached the opposite conclusion. It did so, seemingly, based on "Raytheon's testimony that the government was not charged for the night and weekend work," *id.*, and the finding, unsupported by any citation, that "[a]ccounting for labor costs as a function of time paid, rather than time worked, is one common industry method." J.A. 20.

Both Raytheon's testimony and the time-paid-accounting point are inconsistent with the Board's finding that "night and weekend work would be factored into the salary paid to the lobbyists." That finding alone reflects what a salary is: compensation for work performed on behalf of the company, regardless of when. *See, e.g.*, *Salary*, Black's Law Dictionary (11th ed. 2019) ("An agreed compensation for services"); *Abshire v. Cnty. of Kern*, 908 F.2d 483, 486 (9th Cir. 1990) ("A salaried employee is compensated not for the amount of time spent on the job, but rather for the general value of services performed."), *overruled on other grounds by Auer v. Robbins,* 519 U.S. 452, 463 (1997). Raytheon's time-paid accounting is a fiction that necessarily overcharges the government when it ignores time spent working on unallowable activities after regular business hours. Raytheon's lobbyists worked on unallowable activities after-hours, and their salaries necessarily compensated them for that time. Raytheon's policies ignoring after-hours time resulted in the government reimbursing Raytheon for unallowable costs.

The FAR confirms that after-hours work on unallowable activities should be accounted for. It instructs that "[t]ime spent by employees outside the normal working hours should not be considered except when it is evident

that an employee engages so frequently in company activities during periods outside normal working hours as to indicate that such activities are a part of the employee's regular duties." 48 C.F.R. § 31.201-6(e)(2). In other words, if an employee's after-hours work is extensive enough to be considered part of the employee's regular duties, as was the case here, *see* J.A. 36, that time "shall be treated as directly associated costs to the extent of the time spent on the proscribed activity." 48 C.F.R. § 31.201-6(e)(2). Though both parties point out that this provision is not directly applicable, it is nonetheless instructive: if after-hours activities should be considered for directly associated costs, for consistency's sake they should also be considered for expressly unallowable costs.[3]

Raytheon's arguments to the contrary are unconvincing. It first suggests that not paying its salaried employees for time worked outside of normal business hours "simply reflects the reality that under the Fair Labor Standards Act [("FLSA")] . . . any exempt (i.e., salaried) employee is not entitled to pay for the time spent on business-related work beyond a 40-hour work week." Appellee's Br. 44. First, that argument is based on the premise—unprovable here—that all of Raytheon's government-relations employees worked full 40-hour work weeks during recordable time periods and that time worked outside regular business hours was only additional time. But employees could have worked less between 8:00 a.m. and 5:00 p.m., Monday

[3] Raytheon suggests that FAR 31.201-6(e)(2) only applies to salary expenses that generate unallowable costs; because the Board found that after-hours activities did not generate any costs, Raytheon contends, it does not apply. *See* Appellee's Br. 46. But that argument, again, relies on the fiction that Raytheon's employees were not compensated for after-hours lobbying, an idea fundamentally at odds with what a salary is.

through Friday, to offset time spent working earlier or later in the day or on weekends.[4] Second, Raytheon's argument is contrary to what the FLSA says. The exemption Raytheon refers to comes from 29 U.S.C. § 213, which simply provides that salaried employees are not subject to the minimum-wage or maximum-hours and overtime provisions of §§ 206 and 207, respectively. *See* 29 U.S.C. § 213(a)(1). That, again, reflects the reality that a salary, by definition, compensates an employee for everything the employee does on behalf of the company irrespective of the time spent on those services. *Cf. Brock v. Claridge Hotel & Casino*, 846 F.2d 180, 184 (3d Cir. 1988) (observing that "the salaried employee decides for himself how much a particular task is worth, measured in the number of hours he devotes to it," while for hourly employees "it is the employer who decides the worth of a particular task, when he determines the amount to pay the employee performing it"). It does not mean that salaried employees are not paid for time worked beyond 40 hours in a week.

Raytheon also argues that the CAS required it to disclose its cost-accounting practices to the government and to comply with those practices. Because, Raytheon says, that is exactly what it did here, it would be contrary to the CAS to find that Raytheon violated any other regulations. But as Raytheon admits, its CAS disclosure statements were not in evidence. Appellee's Br. 45. So substantial evidence does not support any contention that Raytheon disclosed its after-hours policy in advance, let alone that the government consented to the policy and agreed to reimburse costs pursuant to it.

---

[4] We can only speculate on these points because, as mentioned previously, Raytheon's employees do not record time that its policies deem allowable; Raytheon's timekeeping policies, therefore, make no distinction between allowable work time and time not worked at all.

Because Raytheon's incurred-cost submissions accounted only for unallowable costs incurred during regular hours and ignored after-hours lobbying, they do not accurately reflect the proportion of time that Raytheon's employees spent on unallowable lobbying activities. The only evidence, in the form of employee testimony, in the record of after-hours time was time spent on unallowable lobbying activities. There was no evidence of unaccounted for allowable time, meaning that—so far as can be divined from the record—the proportion of time Raytheon's lobbyists spent lobbying was necessarily higher than what Raytheon reported. We therefore conclude that the Board erred in finding that the government failed to meet its burden of showing that Raytheon charged it for unallowable costs. We reverse that finding and remand for the Board to determine the amount of unallowable lobbying costs improperly charged to the government. We recognize that the lack of timekeeping records makes that a difficult task. That unfortunate consequence, however, is attributable to Raytheon's policies. Raytheon, not the government, should bear the costs associated with Raytheon's policies.

## II

The Secretary next contends that Raytheon's bright-line corporate-development policies are inconsistent with the FAR and resulted in Raytheon charging the government for expressly unallowable costs. We agree.

The FAR expressly disallows costs associated with "planning . . . mergers and acquisitions." 48 C.F.R. § 31.205-27(a)(1). By only reporting time after the submission of an indicative offer or the decision to go to market with offering materials—the bright-line rules—Raytheon's corporate policies are plainly inconsistent with the regulation. As a matter of both logic and common sense, a decision on submitting an offer or to go to market cannot be made unless at least some planning for that offer or the offering materials has occurred. The clearest illustration

of that point is: acquire (or divest of) *what*? Even identifying the subject of the decision involves preliminarily planning the acquisition or divestiture and is, per the regulation, unallowable. And, naturally, more preliminary planning must be involved before the Acquisition Counsel can capably decide what to do. So the language of the policies alone reflects the fact that Raytheon fails to account for expressly unallowable costs in its indirect-cost rate proposals. Confirming that understanding, ample evidence before the Board established that at least some of Raytheon's "allowable" pre-decision salary costs related to planning mergers, acquisitions, or divestitures. *See, e.g.*, J.A. 4953 (slide illustrating divestiture process which shows tasks like "identify opportunity," "preliminary valuation," "team selection and launch," all happening before go-to-market decision); J.A. 20547 (employee testifying that he performed "acquisition planning" before offer submission); J.A. 20883–84 (employee testifying to research and analysis before offer submission). The Board therefore erred as a matter of law in concluding that Raytheon's policies are consistent with the FAR. The government met its burden of showing that Raytheon charged it for expressly unallowable costs.

Raytheon tries to justify its policies by suggesting that the distinction between unallowable organizational-planning costs and allowable economic- or market-planning costs is "unclear" and not "a defined line." *See* Appellee's Br. 47. The solution, Raytheon contends, is that the FAR creates a distinction between *general* planning and planning for a *specific* acquisition or divestiture. *Id.* at 49. It then argues that its bright-line policies reflect that distinction. There are at least two problems with Raytheon's position. First, if Raytheon's point about the lack of a defined line is intended to suggest that there might be overlap between these categories of costs, that's wrong: FAR 31.205-12 says that "[e]conomic planning costs do not include organization or reorganization costs covered by 31.205-27."

Even if it can sometimes be difficult to determine whether a specific activity generates allowable economic-planning costs or unallowable corporate-reorganization costs, that doesn't justify Raytheon's decision to establish policies drawing bright lines that start the clock on unallowable time at points obviously later than the FAR permits.

Second, even if we accept that FAR § 31.205-27(a)(1) only disallows planning for a specifically identified acquisition or divestiture—a proposition that the generality of the regulation does not support—evidence before the Board shows that, before involving the Acquisition Counsel, Raytheon employees identified specific acquisition targets and worked towards possible acquisitions, which are activities that plainly involve "planning . . . mergers." *See, e.g.*, J.A. 4849 (employee Goals & Accomplishments document for 2007 identifying specific acquisition targets and explaining work performed relating to each). But because Raytheon never submitted indicative offers to the identified targets, all of those salary costs were deemed allowable under Raytheon's corporate policies. J.A. 22349 (employee testifying that all time spent pursuing acquisition targets was included in charges to the government). So the evidence belies Raytheon's justifications and confirms the common-sense view that Raytheon's policies are facially inconsistent with the FAR.

Amici suggest that siding with the Secretary on this issue is tantamount to finding that corporate policies and trainings purporting to explain the FAR to employees are impermissible. *See, e.g.*, Brief for *Amicus Curiae* National Association of Manufacturers and Aerospace Industries Association, 12–13. But that is not what we understand the Secretary's position to be, and that is not what we have concluded. We are not saying that *all* policies that attempt to draw lines interpreting FAR provisions are improper; we have simply concluded that *these* policies drawing *those* lines are inconsistent with the FAR. We see nothing wrong, as a general matter, with policies that interpret and

explain the FAR; each policy should be evaluated on its own merits, as Raytheon's have been here.

Because the Board erred as a matter of law in concluding that Raytheon's corporate-development policies were consistent with the FAR, its factual determination that the government was not charged for unallowable costs because Raytheon's employees complied with those policies is also legally incorrect. We therefore reverse the Board's conclusion and remand for the Board to determine the amount of unallowable costs improperly charged to the government. We again recognize that Raytheon's policies make this a difficult task, but we reiterate our view that Raytheon should shoulder the burden its policies created.

## CONCLUSION

We have considered Raytheon's remaining arguments and find them unpersuasive. For the reasons set forth above, we conclude that the Board erred in finding both that Raytheon's policies comply with the FAR and that the government failed to show by a preponderance of the evidence that Raytheon overcharged it. We therefore reverse the Board's judgment and remand for a determination of costs Raytheon must repay and, if necessary and appropriate, an assessment of penalties.

## REVERSED AND REMANDED

### COSTS

No costs.